**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

—————————————————————————

| | | |
|---|---|---|
| | ) | |
| In re: | ) | |
| | ) | Chapter 11 |
| EAGLE BULK SHIPPING INC., | ) | |
| | ) | Case No. 14-_____ (__) |
| Debtor. | ) | |
| | ) | |

—————————————————————————

**DECLARATION OF ADIR KATZAV,**
**CHIEF FINANCIAL OFFICER OF EAGLE BULK SHIPPING INC.,**
**PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2**
**AND IN SUPPORT OF FIRST DAY FILINGS**

I, Adir Katzav, declare and state as follows:

1.      I am the Chief Financial Officer of Eagle Bulk Shipping Inc. (the "Debtor"), a corporation incorporated in the Republic of the Marshall Islands (the "Marshall Islands") and the debtor and debtor in possession in the above-captioned chapter 11 case (the "Chapter 11 Case").  I have been the Debtor's Chief Financial Officer since July 2012, prior to which I served as the Debtor's Director of Financial Reporting, a position I held since joining the Debtor in 2008.  Before that time, I served in various positions at PricewaterhouseCoopers in both the United States and overseas, including Senior Audit Manager, during which time I provided business advisory and auditing services to public and private companies across multiple industries.  During my 20-year career, I have developed deep experience in corporate finance, accounting, and capital markets regulatory structures.  I hold a bachelor's degree in Statistics and Operations Research and Accounting.

2.      I am familiar with the Debtor's day-to-day operations, business, and financial affairs, and I submit this declaration (the "Declaration") pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Bankruptcy Rules"),

concurrently with the Debtor's voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code") filed on the date hereof (the "Petition Date"), and in support of the relief requested in the motions and applications the Debtor filed, or will file, contemporaneously therewith (collectively, the "First Day Filings").  I am familiar with the contents of each of the First Day Filings.

3.       On the Petition Date, the Debtor also filed the *Debtor's Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code*, dated as of August 6, 2014 (as it may be amended, supplemented, restated, or modified from time to time, the "Plan"),[1] as well as a disclosure statement for the Plan (as it may be amended, supplemented, restated, or modified from time to time, the "Disclosure Statement").  The Debtor commenced solicitation of the Plan prior to commencing the Chapter 11 Case and, to date, holders of more than two-thirds of the Prepetition Credit Facility Claims have voted in favor of the Plan, constituting in excess of 85% of the principal amount of such claims outstanding.  Under the Plan, no class of claims or interests other than the Prepetition Credit Facility Claims is entitled to vote to accept or reject to the Plan.

4.       Except as otherwise indicated herein, the facts and statements set forth in this Declaration are based on my personal knowledge, my discussions with other members of the Eagle's senior management, my discussions with the Debtor's advisors, my review of relevant documents, or my opinion based upon experience, knowledge, and information concerning the Debtor's operations and financial affairs.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtor.

---

[1]       Capitalized terms used but not defined herein have the meanings ascribed to them in the Plan or the First Day Filings, as applicable.

**I.**

**Introduction**

5.      Headquartered in New York, New York, the Debtor is a leading provider of ocean-borne transportation services for a broad range of major and minor "dry bulk" cargoes, including iron ore, coal, grain, cement, and fertilizer, along worldwide shipping routes.  Together with its 63 wholly-owned direct and indirect non-debtor subsidiaries (collectively, the "Non-Debtor Subsidiaries," and, collectively with the Debtor, "Eagle"), the Debtor operates a fleet of 45 modern vessels in the Handymax sector (collectively, the "Vessels"), comprised principally of Supramax-class vessels[2] equipped with enhanced capabilities to load and unload dry bulk cargo in ports that do not otherwise have the requisite infrastructure in place.  Since its initial public offering in June 2005, the Debtor's common stock has been publicly traded and listed on the NASDAQ Global Select Market under the ticker symbol "EGLE."

6.      As discussed in greater detail below, Eagle has several key strengths that provide it with a competitive advantage in the dry bulk shipping industry, including (i) a modern and comparatively young fleet of Vessels, (ii) a technical management and operational approach that focuses on maximizing efficiency, (iii) a global footprint that allows it to constantly and actively monitor the shipping market and its customer needs, (iv) a diverse customer base, and (v) a highly capable and experienced management team.

7.      These strengths notwithstanding, the dry bulk shipping market is highly cyclical, and industry participants, including Eagle, are subject to high volatility in charter hire rates, a key driver in profitability.  Amidst deteriorating charter hire rates that were negatively impacting the dry bulk market, Eagle experienced declining revenues in 2012 and 2013 and faced

---

[2]      "Handymax" and "Supramax" refer to specific classes of bulk carriers as determined by size.  Supramax vessels are a sub-category of vessels within the Handymax sector.  Specifically, Supramax carriers can

increasing difficulty in meeting certain financial covenants under its Prepetition Credit Facility. Although Eagle had negotiated a series of amendments and waivers to obtain relief from these covenants during that time, charter hire rates remained depressed during 2013, resulting in significant losses to Eagle.

8.      In December 2013, faced with a highly leveraged capital structure with over $1.2 billion of secured debt and potential looming defaults under its Prepetition Credit Facility (which constitutes Eagle's only material indebtedness), Eagle retained restructuring counsel and a financial advisor and investment banker to provide advice on potential restructuring alternatives. During January and February 2014, Eagle considered various alternatives, including refinancing its obligations under the Prepetition Credit Facility. Despite these efforts, however, Eagle was unable to raise new debt or equity absent a more comprehensive restructuring of its balance sheet. Accordingly, at the end of February 2014, Eagle determined that the only viable path forward involved a standalone restructuring with the lenders under its Prepetition Credit Facility.

9.      Eagle thereafter engaged in extensive negotiations with an *ad hoc* group of holders of loans under the Prepetition Credit Facility (the "*Ad Hoc* Group") in an effort to achieve a consensual restructuring of its balance sheet – albeit amidst one of the most challenging operating environments facing the dry bulk shipping industry in years. Following a series of hard fought, good faith, and arm's length negotiations spanning several months (and numerous forbearance agreements), in August 2014, Eagle ultimately reached agreement with the *Ad Hoc* Group on the terms of a consensual restructuring to be implemented through the Plan.

---

transport approximately 50,000-60,000 deadweight tons ("DWT") and Handymax carriers can transport approximately 40,000-50,000 DWT.

10.    On August 6, 2014, Eagle and holders of in excess of 85% the outstanding principal amounts owing under the Prepetition Credit Facility and constituting more than two-thirds of the lenders under the Prepetition Credit Facility (collectively, the "Consenting Lenders") entered into a restructuring support agreement (the "RSA") setting forth the terms of their agreement.[3]  The Plan, annexed as Exhibit B to the RSA, provides, among other things, that (i) the Prepetition Credit Facility Lenders will receive 99.5% of the new common stock in the Reorganized Debtor (subject to dilution) through the conversion of a substantial majority of the approximately $1.2 billion in outstanding debt under the Prepetition Credit Facility, and certain cash distributions in satisfaction of the balance of such claims, (ii) all holders of general unsecured claims will be left unimpaired pursuant to section 1124 of the Bankruptcy Code, (iii) existing equity holders will receive 0.5% of the new common stock in the Reorganized Debtor and warrants to acquire an additional 7.5% of the new common stock (subject to dilution), constituting distributions to which the Prepetition Credit Facility Lenders would otherwise be entitled, and (iv) the Debtor will enter into an exit financing facility secured by the collateral securing the Prepetition Credit Facility, the proceeds of which will be used to fund cash distributions under the Plan and provide working capital for Eagle's business upon emergence from chapter 11.

11.    Contemporaneous with the execution of the RSA on August 6, 2014, the Debtor commenced solicitation of the Plan, acting through its proposed voting agent, Kurtzman Carson Consultants LLC ("KCC"), who caused copies of the Disclosure Statement, Plan, and Ballot to be distributed to each holder of a claim entitled to vote on the Plan.  The Debtor has established August 12, 2014, at 5:00 p.m. (Eastern Time) as the deadline for the receipt of votes

---

[3]    A copy of the RSA is annexed hereto as Appendix I.  The Plan and the Disclosure Statement, forms of which were annexed as Exhibits to the RSA, were filed by the Debtor contemporaneously herewith.

to accept or reject the Plan from the holders of claims in Class 3 (Prepetition Credit Facility Claims) – the only impaired class of Claims or Equity Interests under the Plan entitled to vote. As a result of this prepetition solicitation, votes accepting the Plan have been cast in excess of the statutory thresholds for class acceptance specified in section 1126(c) of the Bankruptcy Code by holders of claims in Class 3.

12.    The Plan thus has the support of an overwhelming majority of the Debtor's secured lenders, without which the Debtor would not be able to (i) complete the debt-to-equity conversion contemplated by the Plan, which will substantially deleverage its balance sheet, or (ii) provide new common stock and warrants to existing equity holders, as contemplated by the Plan.  Indeed, a recent appraisal of the Debtor's assets and the valuation analysis set forth in the Disclosure Statement demonstrate that the total amount of the Debtor's liabilities exceeds the market value of its assets by several hundreds of millions of dollars.

13.    The Debtor believes that the transactions contemplated by the Plan will deleverage its balance sheet, improve its liquidity going forward, and position Eagle for flexibility and future growth in the dry bulk shipping industry.  Moreover, in light of the settlement embodied in the RSA and Plan, the Debtor expects to proceed expeditiously through this Chapter 11 Case with minimal disruption to its business operations.[4]

14.    To further familiarize the Court and parties in interest with the Debtor's business, operations, and capital structure, as well as the relief sought in the First Day Filings, this Declaration is organized as follows:  Part II provides an overview of Eagle's business, including a description of its organizational structure, business, operations, and management team; Part III provides an overview of the Debtor's capital structure; Part IV provides a summary

---

[4]    Simultaneously herewith, the Debtor has filed a motion requesting, among other things, that the Court schedule a hearing to consider confirmation of the Plan on September 10, 2014.

of events leading up to commencement of the Chapter 11 Case, including the Debtor's prepetition restructuring initiatives, the terms of the RSA and Plan, and the solicitation of the Plan; Part V describes the relief sought in the First Day Filings; and Part VI describes the schedules of information required by Local Bankruptcy Rule 1007-2 annexed to this Declaration.

**II.**
**<u>Overview of Eagle's Business</u>**

**A.**     **Eagle's Organizational Structure**

15.     As of the Petition Date, Eagle is comprised of Eagle Bulk Shipping Inc. and its 63 Non-Debtor Subsidiaries organized under the laws of the United States, Singapore, Liberia, and the Marshall Islands.  Each of Eagle's 45 Vessels is flagged in the Marshall Islands and owned by a separate wholly-owned Non-Debtor Subsidiary organized as a limited liability company under the Marshall Islands (collectively, the "<u>Vessel-Owning Subsidiaries</u>").  A chart identifying each of the Vessels, its Vessel-Owning Subsidiary owner, deadweight tonnage, year of build, class, and flag is annexed as <u>Exhibit A</u> hereto.  A corporate organization chart, identifying the Debtor and each of its Non-Debtor Subsidiaries, is annexed as <u>Exhibit B</u> hereto.

16.     Eagle's corporate headquarters are located in New York, New York.  The principal function of the New York headquarters is to (i) administer financial and accounting aspects of Eagle's businesses, and (ii) provide commercial operation and technical management services.  Eagle also maintains a corporate office in Singapore, from which it provides commercial operations, technical management, and accounting services.

17.     Operation of Eagle's fleet has two central components: **commercial operations**, which involves chartering and operating the Vessels; and **technical operations**, which involves maintaining, crewing, and providing insurance to the Vessels. Eagle carries out the commercial and strategic management of its fleet through two of its wholly-owned Non-

7

Debtor Subsidiaries: (i) Eagle Shipping International (USA) LLC ("ESI"), a Marshall Islands limited liability company, which maintains its principal executive office in New York; and (ii) Eagle Bulk Pte. Ltd, a Singapore company with its executive office located in Singapore. The day-to-day technical management of Eagle's fleet is provided either in-house, through Eagle Ship Management LLC ("ESM"), or by V Ships Management Ltd. ("V Ships"), an unaffiliated third-party manager, which is one of the world's largest providers of independent ship management and related services.

## B.    Eagle's Business and Operations

18.    Eagle participates in the dry bulk shipping industry, and its results are largely dependent on the charter hire rates it is able to realize by hiring out the Vessels to customers via a chartering system. A "**time charter**" involves the chartering of a vessel from its owner for a period of time pursuant to a contract under which the vessel owner places its ship (including its crew and equipment) at the service of the charterer. Under a typical time charter, the charterer periodically pays the vessel owner a daily charter hire rate that is either fixed or determined by reference to an index, and also bears all voyage expenses, including the cost of fuel, port and canal charges. Once a vessel has been time chartered-out, trading of the vessel and the commercial risks shift to the customer. Subject to certain restrictions imposed in the applicable charter contract, the charterer determines the type and quantity of cargo to be carried and the ports of loading and discharging.

19.    By contrast, under a "**voyage charter**," the owner of a vessel provides the vessel for the transport of goods between specific ports in return for the payment of an agreed-upon freight per ton of cargo, or, alternatively, a specified total amount. All operating costs of a

voyage charter are borne by the owner of the vessel.  A single voyage charter is often referred to as a "spot market" charter, and generally lasts from two to ten weeks.

20.     In general, Eagle's chartering strategy is to balance its charters between mid-term time charters, short-term time charters,[5] voyage charters, and "pool arrangements"[6] in order to maximize its financial performance throughout shipping cycles.  Eagle also regularly monitors the dry bulk shipping market and, based on market conditions, will consider taking advantage of long-term charters at higher rates when appropriate.

(i)     _Eagle's Modern, High Quality Fleet_

21.     As of the Petition Date, Eagle owned and operated a modern fleet of **45 Vessels**, consisting of 43 Supramax Vessels and 2 Handymax Vessels, with a combined carrying capacity of 2,451,259 DWT.  Eagle's fleet of Supramax Vessels is one of the largest Supramax fleets in the world.  In addition, as of July 31, 2014, the average age of Eagle's fleet is approximately 7.2 years, compared to the global Supramax fleet's average age of approximately 9.0 years.

22.     Eagle believes that the Handymax sector, and particularly, the Supramax sub-category of vessels, present several advantages relative to larger vessel classes, including increased operating flexibility, ability to access more ports, ability to carry a more diverse range of cargoes, and a broader customer base.  Eagle believes that the cargo handling flexibility and carrying capacity of its Supramax Vessels make them particularly attractive to charterers.  Specifically, the Supramax Vessels have on-board cranes that provide cargo loading and

---

[5]     In general, "short-term" charters consist of charters with a length between two weeks to 3 months.  Charters between 3 months to a year in length are referred to as "mid-term" charters.  Charters over a year in length are referred to as "long-term" charters.

[6]     Under its pool arrangements, Eagle's Vessels, along with the vessels of other third-party members in the pool, operate under a time charter agreement with a pool "manager."  In general, the members of the pool

unloading flexibility without the need to rely on port facilities, while offering cargo carrying capacities approaching that of larger "Panamax" dry bulk vessels, which generally must rely on such port facilities to load and offload their cargoes.

23.     In addition, as circumstances warrant, Eagle periodically may identify and sell its existing Vessels to various purchasers.  Eagle's commercial management team is able to use its long-standing relationships in the dry bulk industry to access an extensive network of ship brokers in connection with such potential sale transactions.

(ii)     *Eagle's Cost-Conscious Operational Structure*

24.     Eagle's fleet consists of a number of "sister" and similar ships which allow it to maintain low cost, highly-efficient operations.  The sister ships generally are built in the same shipyard on the same or virtually identical design specifications.  Acquiring and operating sister and similar ships provides Eagle with certain operational and scheduling flexibility, efficiencies in employee training, and lower inventory.  These efficiencies, in turn, allow Eagle to better control its operating costs.

25.     In addition, Eagle has distinguished itself from some of its competitors by developing an in-house technical management division, which allows Eagle to manage certain of its Vessels internally as opposed to outsourcing for those services.  Eagle also continually and actively monitors and controls its Vessel operating expenses while maintaining the high quality of its fleet through regular inspection and maintenance programs.

(iii)     *Eagle's Global Footprint*

26.     Eagle's dual-office, worldwide structure provides a global footprint that allows it to monitor the global shipping market continuously.  In addition, because of the

---

share in the revenue generated by the entire group of vessels in the pool, and the pool may operate either in (i) the time charter market, (ii) the spot market or (iii) the voyage charter market.

seamless integration between the New York and Singapore offices, Eagle can, in real time, (i) react and respond to its customers' needs, (ii) interface with its suppliers and service providers, and (iii) assess and respond to any issues that may arise in the course of operation of Eagle's various Vessels, regardless of where those Vessels may be located.

(iv)    *Eagle's Balanced Charter Program*

27.    As noted above, Eagle's strategy is to balance its revenues between mid-term time charters, short-term time charters, voyage charters, and pool arrangements to maximize its financial performance throughout shipping cycles.    In general, Eagle's charter program allows it to take advantage of the stable cash flows and high utilization rates that are associated with medium-term time charters, while at the same time providing the company with revenue upside potential, when the market improves, from short-term time charters or voyage charters.    In addition, Eagle believes that the pool arrangements provide cost-effective commercial management activities for a group of similar class vessels.    The pool arrangements also provide the benefits of a large-scale operation and chartering efficiencies that might not be available to smaller fleets.

(v)    *Eagle's Diverse Customer Base*

28.    Eagle's Vessels are generally chartered to major trading houses (including commodities traders), publicly traded companies, reputable vessel owners and operators, major producers, and government-owned entities (rather than to more speculative or undercapitalized entities).    As part of the chartering process, Eagle evaluates the counterparty risk and reliability of potential customers based on its management team's decades of experience in the shipping industry, combined with additional input from independent credit risk research.

29.     With these systems in place, Eagle has developed a customer base that is well-diversified in terms of the range of businesses and industries in which the customers operate.  Eagle believes that its customer base, in conjunction with the operational flexibility provided by its carefully balanced charter program, allows it to adapt its business operations as market conditions and customer demands dictate.

## C.     Management Team

30.     Eagle's senior management team consists of highly experienced and dedicated individuals who have extensive knowledge of its business and the dry bulk shipping industry generally, and who are committed to Eagle's business and its long term strategies. Together, these attributes will help ensure that Eagle continues its operations on an uninterrupted basis.  In addition to myself, Eagle's senior management team consists of:

a.     **Mr. Sophocles Zoullas**.  Mr. S. Zoullas, Eagle's founder, has served as the Debtor's Chief Executive Officer and Chairman of the Board of Directors since 2005. Mr. S. Zoullas has been involved in the dry bulk shipping industry for 25 years with experience in strategic, commercial, and operational aspects of the business.  Mr. S. Zoullas's strategic and commercial experience includes ship purchase negotiations and financing, chartering, and insurance.   Mr. S. Zoullas's operational experience includes oversight of ship repair, maintenance and cost control.  From 1989 to 2005, Mr. Zoullas served as an executive officer and a director of Norland Shipping & Trading Corporation, a shipping agency in the dry bulk shipping industry.  Mr. S. Zoullas holds a bachelor's degree from Harvard College and an MBA from IMD (IMEDE) in Lausanne, Switzerland.  Mr. S. Zoullas is currently Chairman of the USA Advisory Committee of Lloyd's Register and a member of the American Bureau of Shipping. Mr. S. Zoullas serves as Director Emeritus of the North American Marine Environment

Protection Association (NAMEPA).  Mr. S. Zoullas is also a committee member of the London P&I Club Committee.

b.   **Alexis P. Zoullas**.  Mr. A. Zoullas serves as the President of Non-Debtor Subsidiary ESI, which he joined in August 2008.  ESI is a wholly owned subsidiary of the Debtor, which provides commercial and strategic management to Eagle's fleet.  He has served as a Director of the Debtor since April 2007.  Mr. A. Zoullas provides valuable maritime experience in the areas of technical, operations, legal, insurance, and commercial experience. Mr. A. Zoullas has significant international experience and a critical global perspective, which is of immense value in the development of Eagle's strategy.  Presently, Mr. A. Zoullas serves as Chairman of the Class NK North American Advisory Committee.  In addition, Mr. A. Zoullas is also a member of the following committees: the Norwegian Hull Club, American Bureau of Shipping (of which he is also a member), and the USA Advisory Committee of Lloyd's Register.  Before joining Eagle, Mr. A. Zoullas had served as Vice-President at Norland Shipping & Trading Corporation since 2005, where he began his maritime career in 1993. From 2000 to 2004, Mr. A. Zoullas worked as Chief Strategic Officer of Kaufman Astoria Studios and was a founding partner of Filter Partners LLC, an entertainment licensing company.  He holds a bachelor's degree from Harvard College and a J.D. from Fordham University.

### III.
### Overview of Eagle's Capital Structure

(i)   *Prepetition Credit Facility*

31.   The Debtor is a party to that certain Fourth Amended and Restated Credit Agreement, dated as of June 20, 2012 (as amended, supplemented, amended and restated, or otherwise modified from time to time, the "Prepetition Credit Agreement") between the Debtor, as borrower, the Non-Debtor Subsidiaries, as guarantors, the lenders party thereto (collectively,

the "Prepetition Lenders"), and Wilmington Trust (London) Limited, as successor agent and security trustee (in such capacity, the "Prepetition Credit Facility Agent").

32.     The Prepetition Credit Agreement amended the Debtor's Third Amended and Restated Credit Agreement dated as of October 19, 2007 (as amended by an Amendatory Agreement dated as of July 3, 2008, a Second Amendatory Agreement dated as of December 17, 2008, a Third Amendatory Agreement dated as of August 4, 2009, a Fourth Amendatory Agreement dated as of August 4, 2010, a Sixth Amendatory and Commercial Framework Implementation Agreement dated as of September 26, 2011, and a Supplement to Sixth Amendatory and Commercial Framework Implementation Agreement dated as of December 31, 2011, the "Original Credit Facility").[7]

33.     The obligations under the Prepetition Credit Facility are secured by (i) a first "preferred mortgage" within the meaning of Chapter 3 of the Marshall Islands Maritime Act, 1990, as amended, on each of the 45 Vessels owned by the Vessel-Owning Subsidiaries, (ii) substantially all of the personal property of the Debtor and each Non-Debtor Subsidiary, and (iii) a pledge by the Debtor and ESI of their respective equity interests in the Non-Debtor Subsidiaries.

34.     As of the Petition Date, an aggregate amount of not less than $1,188,847,632 was outstanding under the Prepetition Credit Facility, comprised of (i) $1,129,478,742 in outstanding principal amount of term loans and (ii) $59,368,890 of PIK

---

[7]     On August 4, 2010, a Fifth Amendatory Agreement in relation to the Original Credit Facility was entered into, but the amendments to the terms of the Original Credit Facility contemplated therein did not come into effect.

loans, plus accrued but unpaid interest, plus the costs and expenses payable under the Finance Documents (as defined in the Prepetition Credit Agreement).[8]

   (ii) *Prepetition Equity*

   35. <u>Common Stock</u>.  As of the Petition Date, the Debtor, a publicly-held company, had authorized 100,000,000 shares of its common stock, of which approximately 18,315,213 shares were issued and outstanding.[9]  Each holder of the Debtor's common stock is entitled to one vote for each share on all matters submitted for a vote of the Debtor's stockholders.[10]

   36. <u>Lender Warrants</u>.  In connection with the Prepetition Credit Agreement, the Debtor entered into that certain Warrant Agreement, dated June 20, 2012 (the "<u>Warrant Agreement</u>"), pursuant to which the Debtor issued to the Prepetition Lenders warrants convertible on a cashless basis into shares of the Debtor's common stock, par value $0.01, equal to an aggregate of 19.99% of the Debtor's outstanding common stock on June 20, 2012, at an exercise price of $0.01 per share of common stock (the "<u>Lender Warrants</u>").  One-third of the Lender Warrants were exercisable immediately on the issue date, the next third were exercisable when the price of the Debtor's common stock reached $10.00 per share (subject to certain customary adjustments in the event of stock splits, reverse stock splits and certain distributions to all holders of common stock) or certain other events occurred (the "<u>Trigger Price B Warrants</u>"), and the last third of the Lender Warrants were exercisable when the price of the Debtor's common stock reached $12.00 per share (subject to the aforementioned adjustments) or certain

---

[8] As of the Petition Date, Eagle had not drawn on, and thus no amount was outstanding in respect of, the revolving loans under the Prepetition Credit Agreement.

[9] This amount is subject to increase based on the exercise of outstanding warrants to acquire approximately 852,000 additional shares.

[10] The Debtor also has authorized shares 25,000,000 shares of preferred stock, but as of the Petition Date, none of the prepetition preferred stock has been issued or is outstanding.

other events occurred (the "Trigger Price C Warrants"). Unexercised Lender Warrants will expire on June 20, 2022.

37.     As discussed in further detail below, on July 2, 2014, the Debtor and certain of the Prepetition Lenders entered into the Warrant Agreement Amendment (as defined below), which, among other things, eliminated the conditions restricting the immediate exercise of the Trigger Price B Warrants and the Trigger Price C Warrants held by Prepetition Lenders, thus making such warrants immediately exercisable.

## IV.
## Events Leading to Filing of Chapter 11 Case

38.     As discussed above, Eagle participates in the dry bulk shipping industry, which is a cyclical market with high volatility in charter hire rates and profitability. Eagle's results from its operations depend primarily on the charter hire rates they are able to realize. Fluctuations in charter rates result from changes in the supply of, and demand for, vessel capacity and changes in the supply of and demand for the major commodities carried by water internationally. Set forth below is a summary of certain events that contributed to the formulation of the restructuring proposal embodied in the Plan and the commencement of the Chapter 11 Case.

**A.     International Dry Bulk Shipping Market**

39.     The dry bulk shipping industry is cyclical, with high volatility in charter hire rates and profitability. Charter rates for dry bulk vessels have declined significantly since 2008. The Baltic Dry Index (the "BDI"), a daily index that tracks 20 key shipping routes published by the Baltic Exchange, which has long been viewed as the main benchmark to monitor the movements of the dry bulk vessel charter market and the performance of the entire dry bulk shipping market, declined 94% in 2008 from a peak of 11,793 in May 2008, to a low of

663 in December 2008, and has remained volatile since then.  The BDI recorded a record low of

647 in 2012, and reached highs and lows of 2,337 and 698, respectively, in 2013.  During 2014,

the BDI reached its year-to-date high of 2,113 in the first quarter, and a low of 723 on July 22,

2014.

**B.      Industry Instability and Prepetition Credit Facility Amendments**

             40.      In 2012, faced with reduced dry bulk charter hire rates, Eagle determined

and disclosed in its Annual Report on Form 10-K for the year ended December 31, 2011, dated

as of March 15, 2012, that it would not be able to meet certain covenant requirements under its

Original Credit Facility commencing in January 2013.   To that end, in June 2012, Eagle

negotiated numerous amendments and waivers with its lenders to obtain relief under the Original

Credit Facility.   As reflected in the Prepetition Credit Agreement, these amendments, among

other things, (i) permanently waived any purported defaults or events of default that were the

subject of a temporary waiver in connection with the Original Credit Facility, (ii) converted the

$1,129,478,741 outstanding under a revolving credit facility into a term loan, (iii) extended the

maturity date to December 31, 2015, and upon satisfaction of certain conditions, provided the

Debtor the option to further extend the maturity date by an additional 18 months to June 30, 2017

(the "Termination Date"), (iv) provided for a new liquidity facility in the aggregate amount of

$20,000,000, which permits the purchase or sale of vessels within certain parameters and permits

management of third party vessels, and (v) provided that all capitalized interest would be

evidenced in the form of PIK loans, which would mature on the Termination Date.  Additionally,

the Prepetition Credit Agreement replaced the previously-existing financial covenants under the

Original Credit Agreement, and substituted them with new covenants, which require the Debtor

to, among other things, (a) maintain a maximum leverage ratio of the term loan indebtedness on

a trailing four quarter basis, (b) maintain a minimum interest coverage ratio of EBITDA to cash interest expenses on a trailing four quarter basis, (c) maintain free cash with the Prepetition Credit Facility Agent, and (d) maintain a maximum collateral coverage ratio.

## C.      2013's Events Set Stage for 2014 Financial Restructuring

41.     As discussed above, the Prepetition Credit Agreement contains financial covenants that were implemented in 2013 and became increasingly tighter with each progressive quarter.  Such covenants are primarily driven off a trailing twelve month EBITDA calculation, which, in turn, is primarily based on charter hire rates.  In order to remain in compliance with the covenants, charter hire rates, the primary driver of Eagle's EBITDA, must increase over time.

42.     The charter hire rates, which were driven down during the recession, remained relatively low in 2013.  To that end, in its Annual Report on Form 10-K for the year ended December 31, 2012 dated as of April 1, 2013, Eagle disclosed that (i) if charter hire rates did not improve for the remainder of 2013 and in the first quarter of 2014, Eagle would not be in compliance with the maximum leverage ratio and the minimum interest coverage ratio covenants under the Prepetition Credit Agreement at, or after, March 31, 2014, and (ii) if charter rates deteriorated significantly, or if Eagle was unable to achieve certain cost cutting measures, Eagle may not be in compliance with the maximum leverage ratio or the minimum interest coverage ratio covenants in 2013.

43.     Moreover, Eagle's operations were further undermined by the financial hardship of one of its key charterers, Korea Line Corporation ("KLC").  By way of background, on January 25, 2011, KLC filed for protective receivership in Seoul, South Korea.  Thereafter, Eagle took back the employment of all affected chartered vessels and re-chartered them out on the spot and short-term time charter markets, pursuant to terms approved by the Korean court.  In

connection with the receivership, 538,751 common shares of KLC stock were issued to Eagle in the second quarter of 2013.

44.    The KLC stock is designated as available for sale and is reported at fair value, with unrealized gains and losses recorded in shareholders' equity as a component of accumulated other comprehensive income.  During the third and fourth quarters of 2013, the value of the KLC stock declined.  The resulting change in the fair value of the KLC investment was considered as other than temporary, and therefore Eagle recorded an impairment loss of $7.3 million and $8.2 million on Eagle's shares of KLC in the third and fourth quarters of 2013, respectively.  To that end, in its Quarterly Report on Form 10-Q for the period ended June 30, 2013 dated as of August 12, 2013, Eagle disclosed that, if Eagle realized losses on its KLC available for sale investment, Eagle may not be in compliance with the maximum leverage ratio covenant in 2013.  In addition, in its Quarterly Report on Form 10-Q for the period ended September 30, 2013 dated as of November 14, 2013, Eagle disclosed that, if Eagle realized additional losses on its KLC investment, Eagle would not be in compliance with the maximum leverage ratio covenant in the fourth quarter of 2013.

45.    Despite relatively low charter hire rates in 2013, Eagle met all of its covenants in 2013, other than the maximum leverage ratio at December 31, 2013.  That ratio was exceeded primarily due to the recognized loss of $8.2 million on Eagle's shares of KLC during the fourth quarter.  Eagle also believed that it would fail to meet both the maximum leverage ratio covenant and the minimum interest coverage ratio covenant at their respective compliance measurement dates beginning on March 31, 2014 and continuing throughout each measurement date in 2014.

**D.     Prepetition Restructuring Initiatives**

46.     In light of looming potential defaults under the Prepetition Credit Agreement, in December 2013, Eagle retained Milbank, Tweed, Hadley & M^cCloy LLP as its restructuring counsel and Moelis & Company LLC as its financial advisor and investment banker to provide advice on a potential restructuring.  Shortly thereafter, the *Ad Hoc* Group was formed and retained Paul, Weiss, Rifkind, Wharton & Garrison LLP as its counsel and Houlihan Lokey Capital, Inc. as its financial advisor.

47.     <u>Potential Refinancing</u>.  In January and February 2014, Eagle considered and explored various alternatives to the currently proposed restructuring, including refinancing the obligations under the Prepetition Credit Agreement.  To that end, Eagle and its advisors identified and approached 19 prominent potential investors to gauge interest in investment and/or refinancing opportunities.  While most of the prospective investors approached indicated that they were not interested in proceeding, four of the prospective investors expressed preliminary interest and executed non-disclosure agreements in order to receive detailed, non-public information about Eagle via a private data room.  Only one of these prospective investors submitted a preliminary, non-binding indication of interest, which attributed zero value to Eagle's equity capital and, further, was subject to financing and due diligence conditions.  This investor ultimately notified the Debtor that it was no longer interested in pursuing a transaction.

48.     <u>Standalone Discussions</u>.  Accordingly, Eagle acknowledged that the only viable path forward involved a standalone restructuring with the lenders under the Prepetition Credit Agreement.  Consequently, on February 27, 2014, Eagle delivered to the *Ad Hoc* Group's advisors an initial term sheet for a proposed restructuring of the obligations outstanding under the Prepetition Credit Agreement.

49.     To facilitate negotiations over the terms of the potential restructuring, on March 19, 2014, Eagle and certain members of the *Ad Hoc* Group, constituting the "Requisite Lenders" under the Prepetition Credit Agreement, entered into that certain Waiver and Forbearance Agreement (as amended, restated, supplemented, or otherwise modified from time to time, the "Waiver and Forbearance Agreement").  Pursuant to the Waiver and Forbearance Agreement, the lenders agreed, subject to Eagle's compliance with the terms, conditions, and milestones set forth in the Waiver and Forbearance Agreement, to defer exercising any remedies with respect to certain potential Events of Default under the Prepetition Credit Agreement, including due to Eagle's potential failure to (i) supply the agent with a consolidated balance sheet and related consolidated statements of income, equity, and cash flows within 90 days of the end of each financial year that does not include a "going concern" qualification or any qualification or exception as to the scope of the audit performed by PricewaterhouseCoopers or another independent certified public accountant, (ii) meet the maximum leverage ratio covenant as of December 31, 2013 and each quarter thereafter, and (iii) meet the minimum interest coverage ratio covenant as of March 31, 2014 and each quarter thereafter.  The Waiver and Forbearance Agreement required, among other things, Eagle and the lenders to agree on the terms of a restructuring of the obligations outstanding under the Prepetition Credit Agreement, and execute a binding restructuring support agreement or similar agreement documenting such agreed-upon terms, on or before April 15, 2014 ("RSA Milestone").

50.     Shortly after the execution of the Waiver and Forbearance Agreement, the members of the *Ad Hoc* Group entered into non-disclosure agreements with Eagle to facilitate negotiating a consensual restructuring.  In connection with the negotiations, Eagle entered into several amendments to the Waiver and Forbearance Agreement, each of which further extended

21

the RSA Milestone, subject to Eagle's continued compliance with the various terms and conditions of the Waiver and Forbearance Agreement, as amended.    On June 5, 2014, Eagle entered into Amendment No. 5 to the Waiver and Forbearance Agreement with certain members of the *Ad Hoc* Group ("Amendment No. 5").    As consideration for the lenders' agreement to enter into Amendment No. 5 and extend the RSA Milestone to June 27, 2014, Eagle agreed to pay each lender that executed Amendment No. 5 a one-time forbearance fee of 50 basis points on the principal amount of the loans under the Prepetition Credit Agreement held by such lender (the "Forbearance Fee"), the payment of which was deferred pursuant to the terms of Amendment No. 5.    Furthermore, Amendment No. 5 provided that, upon the request of the Debtor or the majority holders of the Lender Warrants, the Debtor and certain Prepetition Lenders, as existing holders of the Lender Warrants, would enter into the Warrant Agreement Amendment (as defined below).    In exchange, each of the Prepetition Lenders party to Amendment No. 5 would be deemed to have forfeited its pro rata portion of the Forbearance Fee upon the consummation of the Warrant Agreement Amendment.

51.    Thereafter, the dry bulk market continued to worsen.    Given its cash position, the Debtor determined that it would be prudent not to make a scheduled interest payment of approximately $10.7 million (the "Interest Payment") under the Prepetition Credit Agreement, which was due on June 30, 2014.    Accordingly, and in furtherance of the restructuring discussions, on June 27, 2014, Eagle and certain members of the *Ad Hoc* Group entered into Amendment No. 6 to the Waiver and Forbearance Agreement ("Amendment No. 6"), whereby the lenders agreed, among other things, to (i) forbear from exercising, and from instructing or directing the Prepetition Credit Facility Agent to exercise, any rights or remedies with respect to the Interest Payment until the termination of the forbearance period afforded by

the Waiver and Forbearance Agreement, and (ii) extend the RSA Milestone to July 15, 2014. Pursuant to Amendment No. 6, Eagle agreed that, in the event it failed to make the Interest Payment, default interest would accrue on such amount in accordance with Section 8.3(a) of the Prepetition Credit Agreement.  Amendment No. 6 also provided that any restructuring support agreement subsequently entered into by Eagle and certain Prepetition Lenders would provide for continuation of the forbearance set forth in Amendment No. 6 until the occurrence of a termination event or event of default thereunder.

52.     On July 2, 2014, as contemplated by Amendment No. 5, the Debtor and certain of the lenders under the Prepetition Credit Agreement entered into Amendment No. 1 to Warrant Agreement (the "Warrant Agreement Amendment").    The Warrant Agreement Amendment eliminated the conditions restricting the exercise of the Trigger Price B Warrants and the Trigger Price C Warrants held by the Prepetition Lenders (collectively, the "Amended Lender Warrants"), including the minimum share price conditions, such that all Amended Lender Warrants were immediately exercisable.  The Warrant Agreement Amendment also included a prohibition on the trade or transfer by any such lender of its Amended Lender Warrants, or shares of common stock received upon exercise thereof, except in connection with a transfer of such lender's loans under the Prepetition Credit Agreement, for so long as the Waiver and Forbearance Agreement is in effect.  Contemporaneously with the execution of the Warrant Agreement Amendment, each Prepetition Lender party to the Waiver and Forbearance Agreement forfeited its *pro rata* portion of the Forbearance Fee.

53.     In order to finalize a consensual restructuring framework, on July 15, 2014, Eagle and certain members of the *Ad Hoc* Group entered into a final amendment to the Waiver and Forbearance Agreement that would expire on August 5, 2014 unless the parties

agreed on terms of a restructuring of the obligations outstanding under the Prepetition Credit Agreement and executed a binding restructuring support agreement or similar agreement documenting such agreed-upon terms.

**E.     Restructuring Support Agreement and Plan**

54.     On August 6, 2014, following months of intensive, good faith, and arm's length negotiations, Eagle and certain Prepetition Lenders (collectively, the "Consenting Lenders") collectively holding in excess of 85% of the outstanding loans under the Prepetition Credit Facility and constituting more than two-thirds of the Prepetition Lenders under the Prepetition Credit Facility, entered into the RSA.

55.     The RSA binds the Consenting Lenders to support the restructuring to be consummated through the Plan, which would substantially reduce the Debtor's debt burden and solidify Eagle's long-term growth and operating performance.   Specifically, the Consenting Lenders agreed to support the Plan annexed to the RSA and filed with the Court on the Petition Date.  As discussed above, the Plan provides, among other things, (i) that the Prepetition Credit Facility Lenders will receive 99.5% of the New Eagle Common Stock (subject to dilution) and the Prepetition Credit Facility Cash Distribution, (ii) that all General Unsecured Claims would be left unimpaired under section 1124 of the Bankruptcy Code, (iii) that Equity Interests will be cancelled as of the Effective Date and holders of such Equity Interests shall receive the Shareholder Equity Distribution, representing 0.5% of the New Eagle Common Stock and the New Eagle Equity Warrants, representing 7.5% of the New Eagle Common Stock (each, subject to dilution), (iv) for the establishment of a Management Incentive Program that provides senior management and certain employees with 2.0% of the shares of New Eagle Common Stock (on a fully diluted basis) and two tiers of stock options, which will generally vest over four (4) years,

and (v) for entry into the Exit Financing Facility, the proceeds of which will be used to pay (a) the obligations under the Debtor's contemplated debtor-in-possession financing facility, the Prepetition Credit Facility Cash Distribution, the Outstanding Trade Obligations, and the Restructuring Expenses, and (b) following the payment, or reserving for the payment, of each the foregoing, any amount necessary to fully fund a working capital reserve of $72.5 million.

56.     Notably, in addition to other customary termination rights, Eagle, the Debtor's board of directors, and/or Eagle's officers may terminate the RSA in order to comply with their fiduciary obligations – otherwise known as a "fiduciary out."  Importantly, although the Debtor cannot solicit alternative proposals, it may respond to any proposed or offer for an Alternative Transaction (as defined in the RSA) to the extent that the board of directors determines in good faith, and consistent with its fiduciary duties, that such a response is necessary, without breaching or terminating the RSA, provided that Eagle must promptly provide copies of all such documentation and materials received by Eagle concerning such an Alternative Transaction to the advisors to the Consenting Lenders.  If the RSA is terminated (other than pursuant to a breach by a Consenting Lender or consummation of the Plan), the Consenting Lenders would receive a termination fee equal to 3.0% of the total outstanding principal amount of loans held by the Consenting Lenders under the Prepetition Credit Facility (the "RSA Fee"), which, at the Debtor's option, may be paid in cash or in additional "PIK Loans" under the Prepetition Credit Agreement, provided that if the RSA is terminated by virtue of the Debtor's entry into and consummation of an Alternative Transaction, then the Consenting Lenders would receive the RSA Fee in cash upon the substantial consummation of such Alternative Transaction.

57.     After participating in good faith negotiations, the parties to the RSA agreed to embody these terms in definitive documentation, including the Plan, the Disclosure

Statement, and the Plan solicitation procedures.  Subject to the terms and conditions of the RSA, the Consenting Lenders are obligated to support the Plan and other elements of the Chapter 11 Case.

**F.      Prepetition Solicitation of the Plan**

58.      As discussed above, the Debtor commenced solicitation of the Plan prior to the Petition Date, although the Debtor will continue to accept votes to accept or reject the Plan until the voting deadline of August 12, 2014 at 5:00 p.m. (Eastern Time) (the "Voting Deadline").  As of the Petition Date, votes in excess of 85% in dollar amount of the Prepetition Lenders' claims and more than two-thirds in number of claims have been cast in favor of the Plan.  The Prepetition Lenders, as members of Class 3 (Prepetition Credit Facility Claims), are the only parties entitled to vote on the Plan.

59.      Given the overwhelming consensus among Prepetition Lenders evidenced by the RSA and the votes accepting the Plan received by the Debtor prior to the commencement of the Chapter 11 Case, the Debtor is optimistic that it will emerge from chapter 11 expeditiously, and with an optimized balance sheet that will allow the Reorganized Debtor to succeed in a competitive industry.  This outcome would be in the best interests of the Debtor and its stakeholders.

## V.
## First Day Filings

60.      Recognizing that any interruption of Eagle's business, even for a short period, could negatively impact customer and vendor relationships and Eagle's revenue and profits, which would be detrimental to the value of the Debtor's estate, the Debtor has filed the First Day Filings concurrently with the filing of its chapter 11 petition.

61.     The First Day Filings are necessary to (a) continue the Debtor's operations in chapter 11 with as little disruption and loss of productivity as possible, (b) maintain the confidence and support of Eagle's customers, employees, vendors, suppliers, service providers, and certain other key constituencies, and (c) establish procedures for the smooth and efficient administration of the Chapter 11 Case.  I have been advised that the First Day Filings request relief that is typical of relief requested in similar cases, and are intended to streamline the administration of this Chapter 11 Case and allow it to proceed promptly to confirmation of the Debtor's Plan.

62.     In addition, as further set forth below, I believe that the relief sought in each of these filings is necessary to allow the Debtor to operate effectively and minimize the potential adverse impact to its business and operations during the pendency of the Chapter 11 Case, and thereby preserve and maximize the value of the Debtor's estate and the Debtor's prospects for a successful reorganization.  Absent the relief sought in the First Day Filings, I believe that the Debtor's estate would suffer immediate and irreparable harm.

### *Operational Motions*

(i)    **Cash Management Motion:** *Debtor's Motion For Entry Of Interim and Final Orders (I) Authorizing Debtor to Continue in Ordinary Course (A) Using Existing Cash Management System, Bank Accounts, and Business Forms and (B)Performing Intercompany Transactions; (II) Authorizing and Directing Debtor's Banks to Honor All Related Payment Requests; (III) Waiving Investment Guidelines Of Section 345(b) Of Bankruptcy Code; (IV) Scheduling a Hearing To Consider Entry of a Final Order; and (V) Granting Related Relief*

63.     Eagle utilizes an integrated, centralized Cash Management System designed to collect, track, aggregate, disburse, and invest funds used in its operations, including the disbursement of funds from the Debtor to its Non-Debtor Subsidiaries.  As part of the Cash Management System, Eagle maintains a number of Bank Accounts at various Cash Management Banks, including a concentration account (the "Parent Account") with the Royal Bank of

Scotland plc ("RBS"), which is maintained directly by the Debtor.  The Parent Account is maintained directly by the Debtor, and generally is funded via transfers from Bank Accounts maintained by the Non-Debtor Subsidiaries of (i) charter revenues received by the Debtor's individual Vessel-Owning Subsidiaries and (ii) revenues received from Non-Debtor Subsidiary Eagle Management Consultants LLC on account of technical management services provided by to third parties.  In addition, the Debtor recently opened a new account with HSBC Bank USA, N.A. (the "DIP Account") for the purpose of receiving the proceeds of, and repaying, the Debtor's contemplated debtor in possession financing.

64.     To administer the Cash Management system, Eagle routinely engages in Intercompany Transactions between its Bank Accounts via wire transfers and other electronic funds transfers.  The Debtor typically does not transact directly with Eagle's vendors, suppliers, and other trade creditors, nor does the Debtor directly employ any personnel directly.  Rather, Eagle's operating expenses are, generally, contractual obligations of the various Non-Debtor Subsidiaries.  For example, when Eagle needs to pay operating expenses (including, but not limited to, obligations to trade creditors, maritime insurance providers, bunker suppliers, general and administrative ("G&A") expenses, corporate payroll, and crew pay), the Debtor typically transfers funds from its Parent Account to an operating account owned by Non-Debtor Subsidiary ESI (the "ESI Operating Account").  ESI then pays such operating expenses either (i) directly from the ESI Operating Account, or (ii) by transferring the necessary funds to other Non-Debtor Subsidiaries' accounts for ultimate payment.  Furthermore, the Debtor does not directly pay any of its own operating expenses, and instead directs ESI to pay such expenses by transferring the necessary funds from the Parent Account to the ESI Operating Account.  In

addition, as part of its Investment Practices, Eagle invests excess funds in the Parent Account in an RBS facility that consists principally of investments in the London money markets.

65.     To facilitate a smooth transition into the Chapter 11 Case and allow Eagle to continue to meet its operational needs, pursuant to the Cash Management Motion, the Debtor is requesting authority to continue using its existing Cash Management System, Bank Accounts, and Business Forms and to continue engaging in Intercompany Transactions in accordance with Eagle's historical practices during the pendency of the Chapter 11 Case.  In addition, through the Cash Management Motion, the Debtor seeks authority to make transfers to, or on behalf of, the Non-Debtor Subsidiaries in order to satisfy operating expenses, in accordance with Eagle's historical practices described above; provided, however, that during the period between the Petition Date and September 12, 2014 the Debtor's aggregate transfers to, or on behalf of the Non-Debtor Subsidiaries would be subject to a cap of $23,100,000 (the "Aggregate Non-Debtor Subsidiary Cap").

66.     I believe that the relief requested in the Cash Management Motion is necessary and appropriate in order to avoid any interruptions to the operation of Eagle's business.  More specifically, given Eagle's complex corporate and financial structure, I believe that requiring the Debtor to open and maintain separate accounts after the Petition Date, alter its Investment Practices, or discontinue the Intercompany Transactions would be exceedingly burdensome to the Debtor and its management because it would decentralize Eagle's existing cash management system and require management to establish an entirely new cash management system for the Debtor.  The delays that would result from opening the new accounts, revising cash management procedures, and instructing customers to redirect payments would disrupt Eagle's business operations at this critical time and potentially require the Debtor to amend its

charter agreements, which would have little or no benefit to the Debtor's estate, and potentially erode the value of Eagle's business to the detriment of all stakeholders.  For similar reasons, including to avoid creating any unnecessary confusion in the marketplace that would result from the use of new Business Forms, I believe that the Debtor should be authorized to continue using its existing Business Forms.

67.     I also believe the Debtor should be authorized to continue performing Intercompany Transactions in the ordinary course of Eagle's business, which are integral to ensure Eagle's ability to operate its world-wide businesses and preserve and maintain the Debtor's going-concern value for the benefit of all parties in interest.  Because Eagle's businesses are operationally and functionally interconnected, it maintains the centralized Cash Management System described above, which necessarily requires numerous intercompany transactions.  Even if it were possible for the Debtor to obtain the services it currently receives from certain of its Non-Debtor Subsidiaries pursuant to intercompany transactions on a per-company basis, I believe that, aside from incurring excessive financial burdens in identifying appropriate providers of these services and entering into individual agreements for providing these services, the Debtor would be required to divert its attention from its restructuring efforts and the desired smooth transition into operating as a debtor in possession.  In contrast, I believe the continuation of the Intercompany Transactions helps preserve the "business as usual" atmosphere, and avoids the unnecessary distractions that would inevitably be associated with any substantial disruption in the its existing cash management system.

(ii)    **DIP Motion:**    *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Obtain Postpetition Financing and to Use Cash Collateral; (II) Granting Liens and Providing Superpriority Administrative Expense Status; (III) Granting Adequate Protection, (IV) Modifying Automatic Stay; (V) Scheduling a Final Hearing to Consider Entry of a Final Order; and (VI) Granting Related Relief*

68.    Following arms' length negotiations with the Debtor, the Consenting Lenders agreed to provide the Debtor with a senior secured superpriority debtor in possession term loan facility in an aggregate principal amount of up to $50 million (the "DIP Facility"), which will contain terms and conditions as are customary for a debtor in possession financing facility, provided that $25 million of the DIP Facility will be made available to the Debtor as a delayed draw occurring after the entry of an order approving the DIP Facility on a final basis if Eagle's cash balance levels fall below $15 million.  The Debtor will be the borrower under the DIP Facility, which will be guaranteed by each of the Non-Debtor Subsidiaries.  Subject to approval by the Court, the proceeds of the DIP Facility will be used for general corporate purposes during the pendency of the Chapter 11 Case, in accordance with the terms of the DIP Orders (as defined below), a debtor in possession credit and guaranty agreement, and subject to a budget.  As the DIP Facility has been negotiated in the context of the current proposed restructuring, a failure to meet certain milestones under the RSA could, among other things, trigger an event of default and the payment of default interest as specified under the terms of the DIP Facility.

69.    Pursuant to the DIP Motion, the Debtor is seeking entry of two orders (together, the "DIP Orders") approving, on an interim and final basis, respectively, (i) the Debtor's entry into the DIP Facility and (ii) the Debtor's use of the cash collateral of the Prepetition Credit Facility Lenders during the pendency of the Chapter 11 Case.  In addition, pursuant to the DIP Motion, the Debtor is seeking approval of certain superpriority liens and

claims to be granted to the agent for the DIP Facility (the "DIP Agent") pursuant to the DIP

Orders, as well as certain adequate protection liens and claims for the benefit of the Prepetition

Credit Facility Lenders, whose prepetition liens will be "primed" by those granted to the DIP

Agent in connection with the DIP Facility.  By the DIP Motion, the Debtor also seeks the

scheduling of a hearing to consider approval of the DIP Facility on a final basis.

70.    I believe the relief requested in the DIP Motion is necessary and

appropriate because the Debtor needs the funds to be provided pursuant to the DIP Facility to

preserve the value of its estate.  Absent access to the DIP Facility and the use of cash collateral,

the Debtor will be unable to operate its business and administer the Chapter 11 Case, which I

believe would threaten the Debtor's going concern value.  In addition, the DIP Facility will

provide the Debtor with immediate access to $25 million in postpetition financing, which the

Debtor and its advisors have independently determined is sufficient and necessary to allow the

Debtor to maintain its operations and its relationships with key constituents notwithstanding the

commencement of the Chapter 11 Case.  Furthermore, the DIP Facility contemplates that the

Debtor will be able to use cash collateral, which will maintain the Debtor's ability to access

liquidity in the same accounts as prior to the Petition Date, without the disruption or delay that

would result if the Debtor was required to set aside that cash and re-fund its accounts with new

postpetition borrowings.  Accordingly, I believe the proceeds of the DIP Facility and the access

to cash collateral are sufficient to support the Debtor's operations and restructuring activities

through the anticipated pendency of the Chapter 11 Case.

(iii) **Wages and Benefits Motion:** *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing Debtor to (A) Pay Prepetition Wages, Other Compensation, and Reimbursable Expenses, (B) Continue Employee Benefit Programs, and (C) Pay Director Fees and Expenses; (II) Directing Financial Institutions To Honor and Process All Checks and Electronic Payment Requests Related to Such Obligations; (III) Scheduling a Hearing to Consider Entry of a Final Order; and (IV) Granting Related Relief*

71. Eagle's ability to manage its international shipping business requires the continued focus and commitment of its employees, crew members, and independent contractors. These individuals rely on their compensation and benefits to pay their daily living expenses, absent which they would be exposed to significant financial difficulties. Although none of these individuals is employed by the Debtor, the Debtor will need the sole focus of Eagle's employees, crew members, and independent contractors during the Chapter 11 Case, and cannot afford for these individuals to be distracted by unnecessary concern over the payment of their wages and other benefits in the ordinary course of operations.

72. Accordingly, and as further set forth in the Wages and Benefits Motion, the Debtor is seeking authority to (i) pay (either directly or through its Non-Debtor Subsidiaries, as applicable) amounts related to certain Workforce Obligations, including, as applicable, prepetition wages, salaries, and other compensation owing to Eagle's employees, crew members, and independent contractors in the ordinary course of business, (ii) continue to honor all Employee Benefits programs and policies, consistent with the ordinary course of business and past practices, (iii) pay outstanding Director Obligations in the ordinary course of business, and (iv) alter, modify, or discontinue employee benefit programs as the Debtor deems necessary, provided that (a) during the period between the Petition Date and September 12, 2014, the Debtor's aggregate transfers to, or on behalf of, the Non-Debtor Subsidiaries on account of any of the foregoing obligations shall be subject to the Aggregate Non-Debtor Subsidiary Cap and

(b) during the period between entry of an interim order granting such relief and entry of a final order, any payment of prepetition Workforce Obligations or Director Obligations that are the direct obligations of the Debtor shall not exceed $100,000.

73.     I believe the relief requested in the Wages and Benefits Motion is necessary and appropriate in order to avoid any unnecessary disruptions to Eagle's operations and any resulting deterioration in the value of the Debtor's estate.   Eagle's employees, contractors, and crew members perform a variety of critical functions necessary to maintain Eagle's operations, including, among other things, administering operations on, and related to, the Vessels, accounting, administrative support, accounts payable, billing operations, compliance (legal and regulatory), corporate development, customer care, external affairs, financial planning and analysis, human resources, information technology, legal, marketing, payroll, procurement, sales, and treasury.   The employees' experience enables them to effectively and successfully manage Eagle's business operations and relationships with vendors and customers.   The crew members provide valuable maritime operational services to the Vessels.   The contractors provide valuable support services, including, but not limited to, technical, electrical, and machinery supervisory services.   In the absence of these dedicated employees, crew members, and contractors, I believe that Eagle's business operations and the likelihood of the Debtor's successful reorganization would be at risk.

74.     Similarly, just as Eagle depends on the employees, crew, and contractors for its day-to-day operations, the employees, crew members, and contractors depend on Eagle. Indeed, the employees, crew, and contractors rely on payments received from Eagle for their compensation, benefits, and expense reimbursements (as applicable) to continue to pay their daily living expenses.   In the event of a failure to pay the current wages and benefits of its

employees, contractors, and crew members, I believe Eagle would potentially face severe threats to the successful operation of its businesses, including employee attrition and turnover, loss of goodwill, and loss of morale.

75.     In addition, I believe that, in the event of any attrition, employees, contractors, and crew members may prove difficult to replace, including those whose services are essential to the operation of the Vessels.  In particular, it would be extremely difficult for the Debtor to find and attract qualified talent and most likely would require higher salaries, guaranteed bonuses, and overall higher cost compensation packages than are currently provided to Eagle's employees, crew members, and contractors.

(iv)     **Trade Motion:**  *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing Payment of Certain Trade Claims in The Ordinary Course of Business; (II) Authorizing the Debtor to Continue to Perform Under Pooling Agreements; (III) Authorizing Payment of Prepetition Amounts Owed to Customers Under Charter Agreements; (IV) Authorizing the Payment of Section 503(b)(9) Administrative Expenses; (V) Directing Financial Institutions to Honor All Related Checks and Electronic  Payment Requests; (VI) Scheduling a Hearing to Consider Entry of a Final Order; and (VII) Granting Related Relief*

76.     In the ordinary course of its business, Eagle relies on a variety of vendors, suppliers, and service providers (many of which are not located in the United States).  Although the Debtor expects to pay all of its obligations to general unsecured creditors in full pursuant to the Plan, some of Eagle's vendors and service providers may nonetheless seek to terminate their relationship with the Eagle or alter payment terms, to the detriment of Eagle as a whole, in the event that Eagle fails to timely honor outstanding obligations as they become due.

77.     To avoid the potentially detrimental effects of any such party's efforts to terminate its relationship with Eagle and to ensure uninterrupted operations and a seamless transition through the Chapter 11 Case, pursuant to the Trade Motion, the Debtor is seeking authority to pay certain Trade Creditor Claims, directly or indirectly through its Non-Debtor

Subsidiaries, in the ordinary course of business, which include amounts owed to Eagle's vendors and service providers, whether arising prior or subsequent to the Petition Date, provided, however, that during the period between the Petition Date and September 12, 2014, the Debtor's aggregate transfers to, or on behalf of, the Non-Debtor Subsidiaries on account of any of the foregoing obligations would be subject to the Aggregate Non-Debtor Subsidiary Cap.

78.     I believe that the relief requested in the Trade Motion is necessary and appropriate because it will help minimize any disruption in Eagle's business operations during the period between the Petition Date and contemplated confirmation of the Plan, and preserve the value of the Debtor's estate.  I believe that payment in full of Eagle's trade obligations in the ordinary course is appropriate and necessary due to the substantially foreign (non-U.S.) nature of Eagle's business and the constantly moving location of their material assets – the Vessels – at any time throughout the world.  There is a significant risk that failing to make payments on account of prepetition claims to certain of these foreign trade creditors could provoke them to seek the arrest of the Vessels, otherwise enforce a maritime lien before a foreign court on account of any prepetition claims, or take actions that would hinder and delay the continued safe operation of the Vessels in foreign ports.

79.     I also believe that many of Eagle's trade creditors have limited (or no) contacts with the United States.  As such, I believe there is a significant risk that certain foreign trade creditors will not respect the automatic stay or the orders of a court in the United States.  Such acts would cause a severe disruption to Eagle's ability to operate its businesses, which depend on the ability of the Vessels to travel without hindrance or delay through international waters and transact in hundreds of foreign ports of call.  Furthermore, payment of the Trade

Creditor Claims will reduce confusion in the marketplace regarding which creditor or customer obligations Eagle is or is not authorized to pay.

80.     Accordingly, in order to avoid the potential erosion of value that could ensue following the arrest of an Eagle vessel and/or customers refusing to accept the Vessels for hire, I believe it is imperative that it be authorized to pay Eagle's trade creditors in the ordinary course, and otherwise continue with Eagle's customer arrangements in the ordinary course of business and in accordance with Eagle's past practices, whether or not the obligations to such creditors arise before or after the Petition Date.

(v)     **Taxes Motion:** *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing, But Not Directing, Debtor to Pay Taxes and Fees; (II) Authorizing and Directing Financial Institutions to Honor All Related Checks and Electronic Payment Requests; (III) Scheduling a Final Hearing to Consider Entry of a Final Order; and (IV) Granting Related Relief*

81.     Although the Debtor expects to pay all taxes and regulatory obligations in full pursuant to the Plan, in order to minimize the potential disruption to Eagle's business during the Chapter 11 Case, pursuant to the Taxes Motion, the Debtor is seeking authority to pay, directly or indirectly through the Non-Debtor Subsidiaries, Eagle's fees and other similar charges and assessments, as well as certain taxes, whether arising prior or subsequent to the Petition Date, to the appropriate taxing, licensing, and other governmental authorities.

82.     I believe that the relief requested in the Taxes Motion is necessary and appropriate because Eagle's failure to pay its fees and taxes could materially and adversely impact its business operations and threaten the Debtor's reorganization in several ways.  More specifically, absent such relief, taxing authorities could initiate audits of the Debtor and certain of its Non-Debtor Subsidiaries, which would unnecessarily divert the Debtor's focus and attention from the tasks required by the reorganization process at a critical time for its business.

In addition, one or more taxing authorities may attempt to suspend Eagle's operations, file liens (including, potentially, maritime liens against the Vessels), arrest the Vessels, or pursue other remedies that not only would be administratively burdensome to the Debtor's estate, but could have disastrous consequences on Eagle's business operations. Moreover, Eagle's failure to pay required fees to regulatory authorities and other relevant third parties could cause it to incur late fees, penalties, and other charges in addition to such fees, thereby further depleting estate resources.

(vi)    **Insurance Motion:** *Debtor's Motion For Entry of Interim and Final Orders (I) Authorizing, But Not Directing, Debtor To (A) Maintain Existing Insurance Programs and Pay All Insurance Obligations Arising Thereunder and (B) Renew, Revise, Extend, Supplement, Change, Or Enter Into New Insurance Programs; (II) Authorizing and Directing Financial Institutions to Honor All Related Checks and Electronic Payment Requests; (III) Scheduling a Final Hearing To Consider Entry of a Final Order; and (IV) Granting Related Relief*

83.    In connection with the operation of its business, Eagle maintains comprehensive insurance programs that include a variety of policies through several different insurance carriers. By the Insurance Motion, the Debtor is seeking authority to pay, directly or indirectly through the Non-Debtor Subsidiaries, any obligations on account of insurance programs, including premiums, deductibles, taxes, commissions and fees, whether arising prior or subsequent to the Petition Date, provided, however, that during the period between the Petition Date and September 12, 2014, the Debtor's aggregate transfers to, or on behalf of, the Non-Debtor Subsidiaries on account of any of the foregoing obligations would be subject to the Aggregate Non-Debtor Subsidiary Cap.

84.    I believe that the relief requested in the Insurance Motion is necessary and appropriate because continuation of Eagle's insurance programs and payment of Eagle's insurance obligations is imperative to Eagle's continued operation and preserving the value of

the Debtor's estate.  The Debtor needs to minimize the risks associated with operating its businesses, particularly those unique to the maintenance and operation of the Vessels.  I believe that even a brief delay or suspension in Eagle's ability to pay the insurance obligations could create significant risk that Eagle would void or otherwise lose its insurance coverage, including those policies that protect its critical assets, the vessels.  Furthermore, Eagle is required to maintain certain insurance programs by various regulations, laws, agreements, and contracts that govern Eagle's maritime and commercial activity.  I also believe that payment of Eagle's insurance obligations in the ordinary course is necessary in order to maintain Eagle's relationships with its existing insurance carriers.

(vii)    **Utilities Motion:** *Debtor's Motion For Entry of an Order (I) Determining That Utilities Have Been Provided with Adequate Assurance of Payment; (II) Approving Proposed Adequate Assurance Procedures; (III) Prohibiting Utilities From Altering, Refusing, Or Discontinuing Utility Services; (IV) Determining that Debtor is Not Required to Provide Any Additional Assurance; and (V) Granting Related Relief*

85.    Eagle incurs utility expenses for electricity, telephone, and other essential services in the ordinary course of its business at its global headquarters located in New York, New York.  These utility services generally are procured on behalf of Eagle by, and are the direct obligations of, and paid by, Non-Debtor Subsidiary ESI.  I am not aware of (i) any utility service providers with which the Debtor directly transacts or which provide utility service directly to the Debtor or (ii) any utility costs relating to the prepetition period that are the direct obligations of the Debtor.  Nevertheless, out of an abundance of caution, pursuant to the Utilities Motion, the Debtor is seeking approval of adequate assurance procedures as set forth in the Utilities Motion.

86.    I believe the relief requested in the Utilities Motion is necessary and appropriate because it will ensure that there is process to address any utility provider that may make a demand to the Debtor for adequate assurance or otherwise threatens to alter, refuse, or

discontinue utility service. I am informed and believe that the proposed adequate assurance

procedures are consistent with procedures that are typically approved in large and complex

chapter 11 cases.

### *Plan-Related and Case Administration Motions*

    (i)    **Combined Hearing Motion:** *Motion For Entry Of (I) An Order (A) Scheduling a Combined Hearing on Adequacy of Disclosure Statement and Confirmation of Plan, (B) Approving Form of Combined Notice of Combined Hearing, Commencement of Chapter 11 Case, and Establishment of Limited Bar Dates, (C) Establishing Limited Bar Dates, (D) Conditionally Waiving Requirement to File Statement and Schedules, and (E) Granting Related Relief and (II) An Order (W) Approving Solicitation Procedures, (X) Approving Adequacy Of Disclosure Statement, (Y) Confirming Plan, and (Z) Granting Related Relief*

87.    The Debtor's Combined Hearing Motion seeks, among other things, entry

of an order (the "Scheduling Order"):

    (a)    Scheduling a combined hearing (the "Combined Hearing") to consider approval of the Solicitation Procedures, adequacy of the Disclosure Statement, and confirmation of the Plan and establishing procedures for objections thereto;

    (b)    Approving the form and manner of notice of the Combined Hearing, the Limited Bar Dates, and commencement of the Chapter 11 Case;

    (c)    Establishing the Limited Bar Dates for holders of 510(b) Claims; and

    (d)    Conditionally waiving the requirement for the Debtor to file its Schedules and Statement.

88.    In addition, the Debtor requests that, following due notice and the

subsequent Combined Hearing on the Solicitation Procedures, Disclosure Statement, and

confirmation of the Plan, the Court enter the Confirmation Order, which will grant the following

substantive relief:

    (a)    Approving the Solicitation Procedures and related procedures necessary for consummation of the Plan,

(b)   Approving the Disclosure Statement as containing adequate information in accordance with the Bankruptcy Code, and

(c)   Confirming the Plan.

89.   Based on discussions with the Debtor's advisors, I believe that the Combined Hearing is appropriate in this Chapter 11 Case.   First, it will promote judicial economy by avoiding unnecessary hearings.   Second, scheduling the Combined Hearing will allow the Chapter 11 Case to proceed expeditiously and thereby will maximize the benefits of the Debtor's restructuring to its stakeholders by (i) minimizing any adverse effects the Chapter 11 Case may have on Eagle's businesses and going-concern value, (ii) allowing for prompt distributions to be made to various parties in interest, and (iii) minimizing administrative expenses for the Debtor's estate.

90.   I also believe the Debtor's request to conditionally waive the requirement to file the schedules and statement of financial affairs is warranted.   Preparation of these schedules and statements would require it to expend considerable time and resources, which expenses may ultimately be unnecessary if the Plan is confirmed on the presently intended timetable.   Furthermore, given the substantial burdens already imposed on Eagle's management team by commencement of this Chapter 11 Case, and the time and attention it will require to devote to the restructuring process, the Debtor may have significant difficulty completing its schedules and statement of financial affairs by the current deadline.

(ii)   **Automatic Stay Motion:** *Debtor's Motion for Entry of an Order (I)  Enforcing and Restating the Automatic Stay and Ipso Facto Provisions; and (II) Approving Notice to Customers, Suppliers and Other Stakeholders of the Debtor's Non-Debtor Subsidiaries; and (IV) Granting Related Relief*

91.   Due to the international nature of Eagle's businesses, it has many foreign creditors and counterparties in various jurisdictions that are not likely to be familiar with the Bankruptcy Code, particularly with the protections it affords to the Debtor, such as the automatic

41

stay.    Accordingly, pursuant to the Automatic Stay Motion, the Debtor is seeking entry of an order enforcing and restating the automatic stay and ipso facto provisions of the Bankruptcy Code.  I believe this relief is necessary and appropriate to discourage actions by foreign parties against the Debtor's assets.

92.    In addition, the Automatic Stay Motion seeks approval of a form of notice to Eagle's customers, suppliers, and other stakeholders communicating that (i) the Non-Debtor Subsidiaries are not debtors in this Chapter 11 Case, and (ii) any third party's business conducted with a Non-Debtor Subsidiary will not be impacted by the commencement of this Chapter 11 Case.  I believe such notice is necessary and appropriate to alleviate any confusion that may arise concerning the impact of the Chapter 11 Case on the Non-Debtor Subsidiaries.

(iii)    **Other Procedural Motions.**

93.    The Debtor also has filed, or will file, several other procedural motions as part of the First Day Filings (the "Other Procedural Motions"), including:

a.    A motion seeking a waiver of the requirements (i) to prepare and file a list of the Debtor's creditors and instead maintain an electronic creditor list with KCC and (ii) a waiver of the requirement to prepare and file a list of the Debtor's existing equity holders;

b.    A motion seeking to implement certain case management procedures, including, but not limited to, setting certain notice and filing procedures, scheduling omnibus hearing dates, and establishing uniform hearing and objection procedures; and

c.    An application to retain KCC as the Debtor's claims and noticing agent.

94.    I believe the relief requested in the various Other Procedural Motions is necessary and appropriate because it will help minimize administrative burdens typically associated with large and complex chapter 11 cases, reduce costs, and allow the Debtor and its management to focus their time and efforts on the restructuring process, confirmation of the Plan, and a prompt emergence from bankruptcy.

# VI.
## Information Required by Local Bankruptcy Rule 1007-2

95.     Local Bankruptcy Rule 1007-2 requires the filing of certain information with the Court related to the Debtor, which, to the extent available and not contained in this Declaration, is set forth in Exhibit B hereto and the various Schedules thereto described below.

96.     Pursuant to Local Bankruptcy Rule 1007-2 (a)(3), Schedule 1 lists the names and addresses of the members of, and attorneys for (if known), any *ad hoc* committees of creditors formed prepetition.

97.     Pursuant to Local Bankruptcy Rule 1007-2(a)(4), Schedule 2 lists the following information with respect to each of the holders of the Debtor's 20 largest unsecured claims on a consolidated basis, excluding claims of insiders:  the creditor's name, address (including the number, street, apartment or suite number and zip code, if not included in the post office address) and telephone number; the name(s) of persons(s) familiar with the Debtor's accounts; the amount of the claim; and an indication of whether the claim is contingent, unliquidated, disputed or partially secured.

98.     Pursuant to Local Bankruptcy Rule 1007-2(a)(5), Schedule 3 provides the following information with respect to each of the holders of the five (5) largest material secured claims against the Debtor:  the creditor's name, address (including the number, street, apartment or suite number and zip code, if not included in the post office address) and telephone number; the amount of the claim; a brief description of the collateral securing the claim; an estimate of the value of the collateral and whether the claim or lien is disputed.

99.     Pursuant to Local Bankruptcy Rule 1007-2(a)(6), Schedule 4 provides a summary of the Debtor's assets and liabilities.

100.    Pursuant to Local Bankruptcy Rule 1007-2(a)(7), <u>Schedule 5</u> a summary of the Debtor's stock.

101.    Pursuant to Local Bankruptcy Rule 1007-2(a)(8), <u>Schedule 6</u> provides a list of the Debtor's property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditor, or agent for any such entity, giving the name, address and telephone number of such entity and the location of the court in which any proceeding relating thereto is pending.

102.    Pursuant to Local Bankruptcy Rule 1007-2(a)(9), <u>Schedule 7</u> provides a list of the premises owned, leased or held under other arrangement from which the Debtor operates its businesses.

103.    Pursuant to Local Bankruptcy Rule 1007-2(a)(10), <u>Schedule 8</u> provides the location of the Debtor's substantial assets, the location of its books and records and the nature, location and value of any assets held by the Debtor outside the territorial limits of the United States.

104.    Pursuant to Local Bankruptcy Rule 1007-2(a)(11), <u>Schedule 9</u> provides a list of the nature and present status of each action or proceeding, pending or threatened, against the Debtor or its property where a judgment against the Debtor or a seizure of its property may be imminent.

105.    Pursuant to Local Bankruptcy Rule 1007-2(a)(12), <u>Schedule 10</u> provides the names of the individuals who comprise the Debtor's existing senior management, their tenure with the Debtor and a brief summary of their relevant responsibilities and experience.

106.    Pursuant to Local Bankruptcy Rule 1007-2(b)(1)-(2)(A), <u>Schedule 11</u> provides information relating to payroll obligations (not including officers, directors,

stockholders and partners) and the estimated amount to be paid to officers, stockholders, directors and financial partners and business consultants retained by the Debtor, for the 30-day period following the filing of the Debtor's chapter 11 petition.

107.    Pursuant to Local Bankruptcy Rule 1007-2(b)(3), <u>Schedule 12</u> provides, for the 30-day period following the filing of the chapter 11 petition, a list of estimated cash receipts and disbursements, net cash gain or loss, obligations and receivables expected to accrue but remain unpaid, other than professional fees, and any other information relevant to an understanding of the foregoing.

[*The remainder of this page is intentionally left blank.*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.  Executed in New York, New York on this 6th day of August, 2014.

By:      /s/ Adir Katzav

Name:    Adir Katzav

Title:   Chief Financial Officer
         Eagle Bulk Shipping Inc.
         477 Madison Avenue
         New York, NY 10022

**Exhibit A**

**Vessels**

| Vessel Name | Deadweight Tonnage | Class | Year Built | Flag (Registration) | Vessel Owning Subsidiary |
|---|---|---|---|---|---|
| Avocet | 53,462 | Supramax | 2010 | Marshall Islands | Avocet Shipping LLC |
| Bittern | 57,809 | Supramax | 2009 | Marshall Islands | Bittern Shipping LLC |
| Canary | 57,809 | Supramax | 2009 | Marshall Islands | Canary Shipping LLC |
| Cardinal | 55,362 | Supramax | 2004 | Marshall Islands | Cardinal Shipping LLC |
| Condor | 50,296 | Supramax | 2001 | Marshall Islands | Condor Shipping LLC |
| Crane | 57,809 | Supramax | 2010 | Marshall Islands | Crane Shipping LLC |
| Crested Eagle | 55,989 | Supramax | 2009 | Marshall Islands | Crested Eagle Shipping LLC |
| Crowned Eagle | 55,940 | Supramax | 2008 | Marshall Islands | Crowned Eagle Shipping LLC |
| Egret Bulker | 57,809 | Supramax | 2010 | Marshall Islands | Egret Shipping LLC |
| Falcon | 50,296 | Supramax | 2001 | Marshall Islands | Falcon Shipping LLC |
| Gannet Bulker | 57,809 | Supramax | 2010 | Marshall Islands | Gannet Shipping LLC |
| Golden Eagle | 55,989 | Supramax | 2010 | Marshall Islands | Golden Eagle Shipping LLC |
| Goldeneye | 52,421 | Supramax | 2002 | Marshall Islands | Goldeneye Shipping LLC |
| Grebe Bulker | 57,809 | Supramax | 2010 | Marshall Islands | Grebe Shipping LLC |
| Harrier | 50,296 | Supramax | 2001 | Marshall Islands | Harrier Shipping LLC |
| Hawk I | 50,296 | Supramax | 2001 | Marshall Islands | Hawk Shipping LLC |
| Ibis Bulker | 57,775 | Supramax | 2010 | Marshall Islands | Ibis Shipping LLC |
| Imperial Eagle | 55,989 | Supramax | 2010 | Marshall Islands | Imperial Eagle Shipping LLC |
| Jaeger | 52,248 | Supramax | 2004 | Marshall Islands | Jaeger Shipping LLC |
| Jay | 57,802 | Supramax | 2010 | Marshall Islands | Jay Shipping LLC |
| Kestrel I | 50,326 | Supramax | 2004 | Marshall Islands | Kestrel Shipping LLC |
| Kingfisher | 57,776 | Supramax | 2010 | Marshall Islands | Kingfisher Shipping LLC |

| Vessel Name | Deadweight Tonnage | Class | Year Built | Flag (Registration) | Vessel Owning Subsidiary |
|---|---|---|---|---|---|
| Kite | 47,195 | Handymax | 1997 | Marshall Islands | Kite Shipping LLC |
| Kittiwake | 53,146 | Supramax | 2002 | Marshall Islands | Kittiwake Shipping LLC |
| Martin | 57,809 | Supramax | 2010 | Marshall Islands | Martin Shipping LLC |
| Merlin | 50,296 | Supramax | 2001 | Marshall Islands | Merlin Shipping LLC |
| Nighthawk | 57,809 | Supramax | 2011 | Marshall Islands | Nighthawk Shipping LLC |
| Oriole | 57,809 | Supramax | 2011 | Marshall Islands | Oriole Shipping LLC |
| Osprey I | 50,206 | Supramax | 2002 | Marshall Islands | Osprey Shipping LLC |
| Owl | 57,809 | Supramax | 2011 | Marshall Islands | Owl Shipping LLC |
| Peregine | 50,913 | Supramax | 2001 | Marshall Islands | Peregine Shipping LLC |
| Petrel Bulker | 57,809 | Supramax | 2011 | Marshall Islands | Petrel Shipping LLC |
| Puffin Bulker | 57,809 | Supramax | 2011 | Marshall Islands | Puffin Shipping LLC |
| Redwing | 53,411 | Supramax | 2007 | Marshall Islands | Redwing Shipping LLC |
| Roadrunner Bulker | 57,809 | Supramax | 2011 | Marshall Islands | Roadrunner Shipping LLC |
| Sandpiper Bulker | 57,809 | Supramax | 2011 | Marshall Islands | Sandpiper Shipping LLC |
| Shrike | 53,343 | Supramax | 2003 | Marshall Islands | Shrike Shipping LLC |
| Skua | 53,350 | Supramax | 2003 | Marshall Islands | Skua Shipping LLC |
| Sparrow | 48,225 | Handymax | 2000 | Marshall Islands | Sparrow Shipping LLC |
| Stellar Eagle | 55,989 | Supramax | 2009 | Marshall Islands | Stellar Eagle Shipping LLC |
| Tern | 50,200 | Supramax | 2003 | Marshall Islands | Tern Shipping LLC |
| Thrasher | 53,360 | Supramax | 2010 | Marshall Islands | Thrasher Shipping LLC |
| Thrush | 53,297 | Supramax | 2011 | Marshall Islands | Thrush Shipping LLC |
| Woodstar | 53,390 | Supramax | 2008 | Marshall Islands | Woodstar Shipping LLC |
| Wren | 53,349 | Supramax | 2008 | Marshall Islands | Wren Shipping LLC |

**<u>Exhibit B</u>**

**Information Required by Local Bankruptcy Rule 1007-2**



## Schedule 1

## LIST OF COMMITTEE(S) FORMED PRIOR TO THE PETITION DATE

Pursuant to Local Bankruptcy Rule 1007-2(a)(3), the following financial institutions formed the following *ad hoc* committee(s) prior to the Petition Date.

| Type of Committee | Name of Committee Members[1] | Date of Formation | Counsel to Committee |
|---|---|---|---|
| *Ad Hoc* Group of Secured Lenders | Bank of America, N.A.<br>Merrill Lynch Credit Products, LLC.<br>BlueBay Asset Management LLP<br>Brigade Capital Management, LLC<br>Canyon Capital Advisors LLC<br>Goldman Sachs Lending Partners LLC<br>Midtown Acquisitions L.P.<br>Oaktree Capital Management, L.P.<br>Onex Credit Partners, LLC<br>Panning Capital Management LP | Approximately January 1, 2014 | Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, NY 10017<br><br>Attn: Andrew N. Rosenberg, Esq. |

---

[1]     Certain committee members joined the *Ad Hoc* Group subsequent to its initial formation.

## Schedule 2

## LIST OF CREDITORS HOLDING 20 LARGEST UNSECURED CLAIMS

On August 6, 2014, Eagle Bulk Shipping Inc., as debtor and debtor in possession in the above-captioned chapter 11 cases (the "Debtor"), filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532.

The following list of the Debtor's creditors holding the twenty (20) largest unsecured claims against the Debtor has been prepared in accordance with Rule 1007(d) of the Federal Rules of Bankruptcy Procedure and Rule 1007-2(a)(4) of the Local Bankruptcy Rules for the Southern District of New York.  This list does not include (i) persons who come within the definition of "insider" set forth in section 101(31) of title 11 of the United States Code or (ii) secured creditors, unless the value of the collateral is such that the unsecured deficiency places the creditor among the holders of the twenty largest unsecured claims.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtor.  The Debtor reserves all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount or status of any such claim or debt.  In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

| Name of creditor and complete mailing address, including zip code | Name, telephone number and complete mailing address including zip code, of employee, agent or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed, or subject to setoff | Amount of Claim (if secured also state value of security) |
|---|---|---|---|---|
| Wilmington Trust (London) Limited, as successor agent and security trustee Third Floor, 1 King's Arms Yard London, EC2R 7AF United Kingdom Attn: Paul Barton | Wilmington Trust (London) Limited, as successor agent and security trustee Third Floor, 1 King's Arms Yard London, EC2R 7AF United Kingdom Attn: Paul Barton | Unsecured Deficiency Claim under Prepetition Credit Agreement | | Undetermined |
| International Chartering Services, Inc. C/O Keane & Marlowe LLP 197 Route 18, Suite 3000 East Brunswick, NJ 08816 United States | International Chartering Services, Inc. C/O Keane & Marlowe LLP 197 Route 18, Suite 3000 East Brunswick, NJ 08816 United States Attn: Christopher P. Keane, Jr Phone: (732) 951-8300 | Litigation | Contingent, Unliquidated, Disputed | Undetermined |

| Name of creditor and complete mailing address, including zip code | Name, telephone number and complete mailing address including zip code, of employee, agent or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed, or subject to setoff | Amount of Claim (if secured also state value of security) |
|---|---|---|---|---|
| Peraco Chartering (USA) LLC C/O Keane & Marlowe LLP 197 Route 18, Suite 3000 East Brunswick, NJ  08816 United States | Peraco Chartering (USA) LLC C/O Keane & Marlowe LLP 197 Route 18, Suite 3000 East Brunswick, NJ  08816 United States Attn: Christopher P. Keane, Jr.  Phone :(732) 951-8300 | Litigation | Contingent, Unliquidated, Disputed | Undetermined |

## Schedule 3

## HOLDERS OF DEBTOR'S 5 LARGEST MATERIAL SECURED CLAIMS

   Pursuant to Local Bankruptcy Rule 1007-2(a)(5), the following lists the Debtor's five (5) largest material secured claims.  The five largest secured creditors are the lenders under the Prepetition Credit Agreement, for which Wilmington Trust (London) Limited serves as the successor agent and security trustee.

   The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtor.  The Debtor reserves all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount or status of any such claim or debt.  The descriptions of the collateral securing the underlying obligations are intended only as brief summaries.  In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.  The schedule estimates outstanding material claim amounts (including principal and interest) of not less than $1,188,847,632.09.

|  | Creditor | Contact:  Mailing Address & Telephone Number & Fax Number | Amount of Claim | Type of Collateral |
|---|---|---|---|---|
| 1. | Wilmington Trust (London) Limited | Third Floor, 1 King's Arms Yard, London EC2R 7AF Attention: Paul Barton Office:  +44 (0) 207 397 3648 Fax:  +44 (0) 207 397 3601 Email: Pbarton@wilmingtontrust.com | $1,188,847,632.09[2] | Amounts outstanding under the Prepetition Credit Facility are secured by a first-priority security interest in substantially all of the assets of the Debtor and its subsidiaries. |

---

[2]   Excludes accrued but unpaid principal and other fees, costs and charges.

**Schedule 4**

**SUMMARY OF DEBTOR'S ASSETS AND LIABILITIES**

    Pursuant to Local Bankruptcy Rule 1007-2(a)(6), the following financial data (unaudited) is the latest available information and reflects the Debtor's financial condition, as of March 31, 2014.  The following financial data shall not constitute an admission of liability by the Debtor.  The Debtor reserves all rights to assert that any debt or claim included herein is a disputed claim or debt or challenge the priority, nature, amount or status of any claim or debt.

<u>Total Assets</u>:  No greater than approximately $850-950 million.[3]

<u>Total Liabilities</u>:  Approximately $1.2 billion.

---

[3]  This range is based on the valuation analysis undertaken by the Debtor's financial advisor in connection with the Disclosure Statement, in which additional information can be found.

**Schedule 5**

**SCHEDULE OF PUBLICLY HELD SECURITIES**

| Eagle Bulk Shipping Inc. | | | | |
|---|---|---|---|---|
| Issuance | Issue Amount | Maturity | Secured/ Unsecured | Number of Shares Outstanding as of Petition Date |
| Common Stock | N/A | N/A | N/A | 18,315,213[4] |

---

[4]    This amount is subject to increase based on the exercise of outstanding warrants to acquire approximately 852,000 additional shares.  As the Debtor's common stock is publicly traded, the approximate number of holders of such common stock is subject to constant fluctuation, and as such, no estimate is provided.

## Schedule 6

### DEBTOR'S PROPERTY NOT IN THE DEBTOR'S POSSESSION

Pursuant to Local Bankruptcy Rule 1007-2(a)(8), the following schedule lists property of the Debtor in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents or secured creditor, or any agent for any such entity.  The Debtor is working to confirm that no other such party is in possession of any of the Debtor's property and reserves the right to supplement this schedule if additional property is identified.   The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtor. The Debtor reserves all rights to challenge the priority, nature, amount or status of any claim or debt.

**To the best of the Debtor's knowledge, it does not have any property that is in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents or secured creditor, or any agent for any such entity other than the following:**

Wilmington Trust (London) Limited, in its capacity as security trustee under the Prepetition Credit Facility, holds certain certificated equity interests in the Non-Debtor Subsidiaries as collateral to secure the Debtor's obligations under the Prepetition Credit Facility.

**Schedule 7**

**DEBTOR'S PROPERTY**

Pursuant to Local Bankruptcy Rule 1007-2(a)(9), the following lists the property or premises owned, leased or held under other arrangement from which the Debtor operates its businesses as of the Petition Date.

Owned Real Property

None.

Leased Property

None.

## Schedule 8

## LOCATION OF DEBTOR'S ASSETS, BOOKS AND RECORDS

Pursuant to Local Bankruptcy Rule 1007-2(a)(10), the following lists the locations of the Debtor's substantial assets, the location of its books and records, and the nature, location and value of any assets held by the Debtor outside the territorial limits of the United States.

The principal books and records for Eagle Bulk Shipping Inc. are primarily located at 477 Madison Avenue, Suite 1405, New York, NY 10022.

Any books and records for the Debtor located outside the United States are primarily located at 51 Cuppage Road #07-02/03, Singapore, 229469.

### Debtor's Substantial Assets

The Debtor's substantial assets consist of its equity interests in the Debtor's direct subsidiaries and certain funds on deposit with the Debtor's concentration account maintained with Royal Bank of Scotland plc.

### Nature, Location, and Value of Assets Held Outside the United States

The Debtor has certain funds on deposit in its concentration account maintained with Royal Bank of Scotland plc in London, United Kingdom. As of August 1, 2014, the approximate balance in the concentration account was $1,058,352.

Certain of the Debtor's equity interests in its non-debtor subsidiaries are certificated and held by Wilmington Trust (London) Limited, in its capacity as security trustee under the Prepetition Credit Facility, as collateral to secure the Debtor's obligations under the Prepetition Credit Facility. The Debtor is informed and believes that such certificated equity interests are held by Wilmington at its London, United Kingdom offices.

## Schedule 9

## LITIGATION

Pursuant to Local Bankruptcy Rule 1007-2(a)(11), the following is a list of the nature and present status of each action or proceeding, pending or threatened, against the Debtor or its properties where a judgment against the Debtor or a seizure of its property may be imminent.

| Parties to Lawsuit | Location of Litigation | Nature of Lawsuit | Date Legal Proceeding Commenced | Current Status of Litigation |
|---|---|---|---|---|
| Plaintiff(s): Eagle Bulk Shipping Inc. Defendant(s): Anglo Eastern Ship Management | South Africa | Arbitration regarding arrest of one of the Debtor's ships | February, 2014 | Parties are currently engaged in arbitration for wrongful arrest of a ship and with respect to disputes arising from applicable ship management agreements. |

## Schedule 10

## SENIOR MANAGEMENT

Pursuant to Local Bankruptcy Rule 1008-2(a)(12), the following provides the names of the individuals who comprise the Debtor's existing senior management and a brief summary of their relevant responsibilities and experience.

| Name | Title | Approximate Start Date | Responsibilities and Prior Experience |
|---|---|---|---|
| Sophocles N. Zoullas | Chief Executive Officer | March 24, 2005 | Mr. S. Zoullas, Eagle's founder, has served as the Debtor's Chief Executive Officer and Chairman of the Board of Directors since 2005. Mr. S. Zoullas has been involved in the dry bulk shipping industry for 25 years with experience in strategic, commercial and operational aspects of the business.  Mr. S. Zoullas's strategic and commercial experience includes ship purchase negotiations and financing, chartering and insurance. Mr. S. Zoullas's operational experience includes oversight of ship repair, maintenance and cost control. From 1989 to 2005, Mr. Zoullas served as an executive officer and a director of Norland Shipping & Trading Corporation, a shipping agency in the dry bulk shipping industry.<br><br>Mr. S. Zoullas holds a bachelor's degree from Harvard College and an MBA from IMD (IMEDE) in Lausanne, Switzerland. Mr. S. Zoullas is currently Chairman of the USA Advisory Committee of Lloyd's Register and a member of the American Bureau of Shipping. Mr. S. Zoullas serves as Director Emeritus of the North American Marine Environment Protection Association (NAMEPA).  Mr. S. Zoullas is also a committee member of the London P&I Club Committee. |
| Adir S. Katzav | Chief Financial Officer | August 4, 2008 | Mr. Katzav has been Chief Financial Officer of Eagle Bulk Shipping Inc. since July 11, 2012 and has been with since 2008. He previously worked at PricewaterhouseCoopers in both the United States and overseas, where he was a Senior Audit Manager, among other positions. Mr. Katzav holds a Bachelor degree in Statistics and Operations Research and Accounting. |

## Schedule 11

## PAYROLL

Pursuant to Local Bankruptcy Rules 1007-2(b)(1)-(2)(A) and (C), the following provides the estimated amount of weekly payroll to the Debtor's employees (not including officers, directors and stockholders) and the estimated amount to be paid to officers, stockholders, directors and financial and business consultants retained by Debtor, for the 30-day period following the Petition Date.

| | |
|---|---|
| **Weekly Payroll / Payments to Employees (not including Officers, Directors, Stockholders)** | The Debtor does not directly employ any personnel; accordingly, the weekly payroll estimate for the 30-day period following the Petition Date is $0.00. |
| **Payments to Officers, Directors and Stockholders** | Officers:  The Debtor's officers, Sophocles Zoullas and Adir Katzav are paid by the Debtor's Non-Debtor Subsidiary, Eagle Shipping International, and accordingly the Debtor estimates that any direct payments to Officers in the 30-day period will be $0.00.[5]<br><br>Directors:  $0.00[6]<br><br>Stockholders:  $0.00 |
| **Payments to Financial and Business Consultants** | Moelis & Company LLC: $175,000<br><br>Alvarez & Marsal LLC:  undetermined |

---

[5]     Consistent with its ordinary course intercompany transactions, and as reflected in the "first day" relief requested by the Debtor, the Debtor intends to continue paying Eagle's officers by transferring funds from the Debtor to its applicable non-debtor subsidiaries for the purposes of funding Eagle's ordinary course payroll obligations.

[6]     The Debtor's directors are paid up front fees on a quarterly basis, and the next quarterly payment will not come due until more than 30 days after the Petition Date.

**Schedule 12**

**CASH RECEIPTS AND DISBURSEMENTS, NET CASH GAIN OR LOSS,
UNPAID OBLIGATIONS AND RECEIVABLES**

        Pursuant to Local Bankruptcy Rule 1007-2(b)(3), the following provides the estimated aggregated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid (other than professional fees) for the 30-day period following the Petition Date.

| | |
|---|---|
| **Cash Receipts** | $7,900,000 |
| **Cash Disbursements (excluding professional fees)** | $19,100,000 |
| **Net Cash Loss** | $11,200,000 |
| **Unpaid Obligations (excluding professional fees)** | $0 |
| **Unpaid Receivables (excluding professional fees)** | $0 |

**<u>Appendix I</u>**

**Restructuring Support Agreement**

**THIS RESTRUCTURING SUPPORT AGREEMENT IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS.**

**THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF VOTES WITH RESPECT TO A PLAN OF REORGANIZATION.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.**

<hr>

### EAGLE BULK SHIPPING INC.

### RESTRUCTURING SUPPORT AGREEMENT

### August 6, 2014

<hr>

This Restructuring Support Agreement (together with the exhibits annexed hereto, and as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof, this "**Agreement**"), dated as of August 6, 2014, is entered into by and among:  (i) Eagle Bulk Shipping Inc., a Marshall Islands corporation ("**EBS**"), and each of its direct and indirect subsidiaries (each an "**Eagle Entity**" and, collectively, the "**Eagle Entities**" or the "**Company**") and (ii) the lenders under the Credit Agreement (as defined herein) that are (or may become in accordance with Section 11 hereof) signatories hereto (in their capacity as lenders under the Credit Agreement, holders of Warrants (as defined below), and/or holders of common stock or other equity interests in EBS, the "**Consenting Lenders**").  Each of the Eagle Entities, the Consenting Lenders, and each other person that becomes a party to this Agreement in accordance with its terms shall be referred to herein individually as a "**Party**" and collectively as the "**Parties**."

### RECITALS

WHEREAS, the Company and certain lenders under that certain Fourth Amended and Restated Credit Agreement, dated as of June 20, 2012 (as amended to date and as may be further amended, restated, supplemented, or otherwise modified from time to time in accordance with its terms, the "**Credit Agreement**"), entered into that certain Waiver and Forbearance Agreement, dated as of March 19, 2014 (as amended, restated, supplemented or otherwise modified from time to time, the "**Waiver and Forbearance Agreement**");

WHEREAS, the Waiver and Forbearance Agreement terminates, subject to the terms and conditions set forth therein, on August 5, 2014 if the Company and the Majority Lenders (as defined in the Credit Agreement) have not, on or before such date, (i) agreed on the terms of a restructuring of the obligations outstanding under the Credit Agreement and (ii) executed a binding restructuring support agreement or similar agreement documenting such agreed-upon terms, including milestones for the commencement, implementation, and closing of the restructuring;

WHEREAS, certain lenders under the Credit Agreement are holders of (i) warrants to

purchase common stock of EBS (the "<u>Warrants</u>") issued under that certain Warrant Agreement, dated as of June 20, 2012, between EBS and the other parties thereto (as amended to date and as may be further amended, restated, supplemented, or otherwise modified from time to time in accordance with its terms, the "<u>Warrant Agreement</u>") and/or (ii) common stock in EBS.

WHEREAS, the Parties have engaged in good faith, arm's-length negotiations regarding a restructuring transaction (the "**<u>Restructuring</u>**") pursuant to the terms and conditions set forth in this Agreement (the general terms of which are reflected in the term sheet annexed hereto as **<u>Exhibit A</u>** (together with all exhibits thereto, the "**<u>Term Sheet</u>**") for illustrative purposes only), including the proposed prepackaged chapter 11 plan of reorganization for EBS annexed hereto as **<u>Exhibit B</u>** (the "**<u>Plan</u>**"), and the related disclosure statement annexed hereto as **<u>Exhibit C</u>** (the "**<u>Disclosure Statement</u>**"), each of which may be amended, restated, supplemented, or otherwise modified from time to time pursuant to the mutual consent of EBS and the Majority Consenting Lenders (as defined below) and which is incorporated by reference pursuant to <u>Section 2</u> hereof;[1]

WHEREAS, it is contemplated that the Restructuring will be implemented through a voluntary case commenced by EBS and, if necessary, one or more of the Eagle Entities (the "**<u>Chapter 11 Case(s)</u>**") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (as amended, the "**<u>Bankruptcy Code</u>**") in the United States Bankruptcy Court for the Southern District of New York (the "**<u>Bankruptcy Court</u>**"), pursuant to the Plan;

WHEREAS, certain of the Consenting Lenders have agreed to provide financing and otherwise extend credit to the Company and consent to the use of cash collateral during the pendency of the Chapter 11 Case(s) pursuant to and subject to the terms and conditions of the Financing Orders and the DIP Credit Agreement (each as defined below);

NOW, THEREFORE, in consideration of the promises and mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the Parties, intending to be legally bound, hereby agrees as follows:

<u>**AGREEMENT**</u>

1.    <u>Effective Date</u>.    This Agreement shall become effective, and the obligations contained herein shall become binding upon the Parties (the "**<u>Effective Date</u>**"), upon the execution and delivery of counterpart signature pages to this Agreement by and among (a) the Company and (b) the Consenting Lenders constituting collectively more than 50% of the current Lenders under the Credit Agreement and holding claims equal to at least 66 2/3% in amount of the total outstanding Loans under the Credit Agreement (the "**<u>Required Lenders</u>**").

2.    <u>Exhibits and Schedules</u>.    Each of the Exhibits and Schedules annexed hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include the Exhibits and Schedules. Subject to the following sentence, in the event of any inconsistencies between the terms of this Agreement and the Plan, (i) prior to the entry of the Confirmation Order (as defined below), this Agreement shall govern, and (ii) on and after the entry of the Confirmation Order, the Plan shall govern. The use of cash collateral and

---

[1]    Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Plan or Credit Agreement, as applicable.

debtor-in-possession financing prior to the Consummation Date shall be governed by the terms of, as applicable, (a) the interim order authorizing the use of cash collateral and debtor-in-possession financing, in the form annexed hereto as **Exhibit D** or such other form as is reasonably acceptable to the Company and the Majority Consenting Lenders (the "**Interim Financing Order**"), (b) the final order authorizing the use of cash collateral and debtor-in-possession financing in such form as is reasonably acceptable to the Company and the Majority Consenting Lenders (the "**Final Financing Order**" and together with the Interim Financing Order, the "**Financing Orders**"), and (c) the debtor-in-possession credit agreement (the "**DIP Credit Agreement**") to be entered into in accordance with the Financing Orders.  For the avoidance of doubt, the Term Sheet annexed hereto as **Exhibit A** is provided solely for illustrative purposes and shall have no binding effect on any of the Parties except as expressly provided herein.

3.    Definitive Documentation.    The definitive documents and agreements (the "**Definitive Documentation**") governing the Restructuring shall include: (a) the Plan (and all schedules, exhibits and supplements thereto) and the Confirmation Order; (b) the Disclosure Statement (and all exhibits thereto) with respect to the Plan; (c) the solicitation materials with respect to the Plan (collectively, the "**Solicitation Materials**"); (d) the documents identified on **Exhibit E** hereto (collectively, the "**Consummation Documents**"); (e) the DIP Credit Agreement, (f) the Financing Orders; and (g) the new credit agreement (the "**Exit Financing**"). Other than the Plan (excluding the schedules, exhibits and supplements thereto that have not been negotiated and completed as of the date of this Agreement), the Disclosure Statement, and the Interim Financing Order, the Definitive Documentation identified in the foregoing sentence (i) remains subject to negotiation and completion and (ii) shall upon completion (x) contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement and (y) be in form and substance reasonably acceptable to the Company and the Majority Consenting Lenders.

4.    Milestones.    The Company shall implement the Restructuring on the following timeline (in each case, a "**Milestone**"):

(a)    on or before August 6, 2014, EBS shall commence a solicitation of the Lenders seeking the approval and acceptance of the Plan;

(b)    on or before August 6, 2014, EBS shall receive the approval and acceptance of the Plan by  Lenders collectively constituting the Required Lenders as of such date (the "Lender Class Acceptance");

(c)    upon the occurrence of the Lender Class Acceptance, EBS shall commence the Chapter 11 Case on or before August 6, 2014;

(d)    no later than the date of the commencement of the Chapter 11 Case (the "**Petition Date**"), EBS shall file with the Bankruptcy Court the Plan, the Disclosure Statement, a motion seeking approval of the DIP Facility (as defined below), and a motion seeking a joint hearing to consider the adequacy of the Disclosure Statement, approval of the Company's prepetition solicitation of the Lenders, and confirmation of the Plan (the "**Joint Disclosure Statement and Plan Confirmation Hearing**");

(e)      no later than 5 business days after the Petition Date, the Bankruptcy Court shall enter a final order scheduling the Joint Disclosure Statement and Plan Confirmation Hearing;

(f)      no later than 5 business days after the Petition Date, the Bankruptcy Court shall enter the Interim Financing Order in the form annexed hereto or in such other form as is reasonably acceptable to the Company and the Majority Consenting Lenders, authorizing the Company to enter into a post-petition credit facility (the "**DIP Facility**") and use cash collateral, and scheduling a final hearing with respect to such matters;

(g)      no later than 37 days after the Petition Date, the Bankruptcy Court shall enter the Final Financing Order in a form reasonably acceptable to the Company and the Majority Consenting Lenders;

(h)      no later than 37 days after the Petition Date, the Bankruptcy Court shall commence the Joint Disclosure Statement and Plan  Confirmation Hearing;

(i)      no later than 45 days after the Petition Date, the Bankruptcy Court shall enter an order (1) approving the adequacy of the Disclosure Statement and the Company's prepetition solicitation of the Lenders and (2) confirming the Plan (the "**Confirmation Order**"); and

(j)      no later than 60 days after the Petition Date, the effective date of the Plan (the "**Consummation Date**") shall occur.

Notwithstanding the above, a specific Milestone may be extended or waived with the express prior written consent of both the Company and the Majority Consenting Lenders; provided, however, that in the event that the Company or the Majority Consenting Lenders determine, in their exercise of their reasonable discretion and after consultation with the professionals for the other parties, that commencing a Chapter 11 Case for one or more Eagle Entities (other than EBS) is necessary or advisable to facilitate the consummation of the Restructuring, then any of the foregoing Milestone dates that falls on or after the date of such decision shall automatically be deferred by 20 business days.

5.      Commitment of Consenting Lenders.  Subject to compliance in all material respects by the other Parties with the terms of this Agreement, from the Effective Date and until the occurrence of a Termination Date, each Consenting Lender shall (severally and not jointly):

(a)      support and take all actions necessary or reasonably requested by the Company to facilitate consummation of the Restructuring, including without limitation, to (i) timely vote all of its claims (as defined in section 101(5) of the Bankruptcy Code) against, and interests in, the Company, now or hereafter owned by such Consenting Lender or for which it now or hereafter serves as the nominee, investment manager, or advisor for holders thereof, to accept the Plan in accordance with the applicable

procedures set forth in the Disclosure Statement and the solicitation materials with respect to the Plan, provided, further, that any Consenting Lender, simultaneously with its execution of this Agreement, shall deliver and release to the Company's solicitation agent such Consenting Lender's executed ballot accepting the Plan, and (ii) to the extent such election is available, not elect on its ballot to preserve claims, if any, that each Consenting Lender may own or control that may be affected by any releases contemplated by the Plan;

(b)     not withdraw, amend, or revoke (or cause to be withdrawn, amended, or revoked) its vote with respect to the Plan;

(c)     (i) support the confirmation of the Plan and approval of the Disclosure Statement and the solicitation procedures and (ii) not (1) object to, delay, interfere, impede, or take any other action to delay, interfere or impede, directly or indirectly, with the Restructuring, confirmation of the Plan, or approval of the Disclosure Statement or the solicitation procedures (including, but not limited to, joining in or supporting any efforts to object to or oppose any of the foregoing), or (2) propose, file, support, or vote for, directly or indirectly, any restructuring, workout, or chapter 11 plan for the Company other than the Restructuring and the Plan;

(d)     not commence any proceeding to oppose or alter any of the terms of the Plan or any other document filed by EBS or the Company in connection with the confirmation of the Plan (as long as such documents are materially consistent with the terms and conditions of this Agreement);

(e)     support (and not object to) the "first day" motions and other motions consistent with this Agreement filed by EBS or the Company in furtherance of the Restructuring, including, but not limited to, any motion seeking approval of the DIP Facility on the terms set forth in the Financing Orders;

(f)     not, nor encourage any other person or entity to, take any action, including, without limitation, initiating or joining in any legal proceeding, which is  inconsistent with this Agreement, or delay, impede, appeal, or take any other negative action, directly or indirectly, that could reasonably be expected to interfere with the approval, acceptance, confirmation, consummation, or implementation of the Restructuring or the Plan, as applicable;

(g)     use commercially reasonable efforts to execute any document and give any notice, order, instruction, or direction necessary or reasonably requested by the Company to support, facilitate, implement, consummate, or otherwise give effect to the Restructuring;

(h)     use good faith efforts to negotiate, execute and implement the Definitive Documentation on terms not materially inconsistent with the Term Sheet,

including the exhibits thereto;

(i)     support (and not object to) the Company's efforts to obtain the Exit Financing Facility, and not object to, or support the efforts of any other Person to oppose or object to, the Exit Financing Facility;

(j)     support (and not object to), and enter into any amendments to the Finance Documents and/or provide direction and instructions to the Agent and the Security Trustee (each as defined in the Credit Agreement) as may be reasonably requested by the Company to effectuate, the priming, subordination and/or release of (i) all claims against the Company (including, for the avoidance of doubt, EBS' subsidiaries) under the Finance Documents and (ii) the liens, security interests, mortgages and other encumbrances granted by the Company (including, for the avoidance of doubt, EBS' subsidiaries) securing the obligations under the Finance Documents, in each case as contemplated pursuant to, and in order to facilitate the implementation and/or consummation of, (1) the DIP Facility and the Financing Orders, (2) the Plan, and (3) the Exit Financing Facility (as defined in the Plan);

(k)     support the Company's efforts to remain listed on the NASDAQ Global Select Market ("NASDAQ") and, if the Company loses its NASDAQ listing for any reason prior to the consummation of the Restructuring, support the Company's good faith efforts to become relisted on NASDAQ;

(l)     not exercise any right or remedy or take any action (or initiate, join in, or encourage in any way an instruction or direction to any other party, including, but not limited to, the Agent or the Security Trustee, to take any action) in respect of any potential, actual, or alleged occurrence of any "Default" or "Event of Default" under the Credit Agreement that exists or otherwise has been acknowledged as of the date hereof and is described on **Schedule 1** hereto or that would be triggered as a result of the commencement or pendency of the Chapter 11 Case(s); and

(m)     not instruct (or join in any direction requesting that) the Agent and/or Security Trustee under the Credit Agreement or the related loan documents to take any action, or refrain from taking any action, that would be inconsistent with this Agreement or the Restructuring.

Notwithstanding the foregoing, nothing in this Agreement and neither a vote to accept the Plan by any Consenting Lender nor the acceptance of the Plan by any Consenting Lender shall (w) be construed to prohibit any Consenting Lender from contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement, (x) be construed to prohibit any Consenting Lender from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement and are not for the purpose of hindering, delaying, or preventing the consummation of the Restructuring, (y) impair or waive the rights of any

Consenting Lender to assert or raise any objection permitted under this Agreement in connection with any hearing on confirmation of the Plan or in the Bankruptcy Court, or (z) impair or waive the rights of any Consenting Lender under any applicable credit agreement, indenture, or other loan document except as contemplated by this Agreement; nor shall anything in this Agreement or a vote to accept the Plan cast by any Consenting Lender limit any rights a Consenting Lender has in its capacity as a post-petition lender under (and subject to) the DIP Credit Agreement and the Financing Orders, including to take or direct any action relating to maintenance, protection, or preservation of any collateral securing the DIP Facility.

6.      <u>Commitment of the Company</u>.  Subject to compliance in all material respects by the Consenting Lenders with the terms of this Agreement, from the Effective Date and until the occurrence of a Termination Date (as defined below):

(a)      Subject to paragraph (b) immediately below, the Company (i) agrees to (A) support and complete the Restructuring and all transactions set forth in the Plan and this Agreement, (B) complete the Restructuring and all transactions set forth or described in the Plan in accordance with the Milestones set forth in <u>Section 3</u> of this Agreement, (C) negotiate in good faith all Definitive Documentation that is subject to negotiation as of the Effective Date, (D) take any and all necessary actions in furtherance of the Restructuring, this Agreement, and the Plan, (E) make commercially reasonable efforts to obtain any and all required regulatory and/or third-party approvals for the Restructuring, and (F) use good faith efforts to negotiate, execute and implement the Definitive Documentation on terms not materially inconsistent with the Term Sheet, including the exhibits thereto, and (ii) shall not undertake any actions materially inconsistent with the adoption and implementation of the Plan and confirmation thereof.

(b)      Notwithstanding anything to the contrary herein, (i) the Company's obligations hereunder (including, without limitation, the obligations of the Company's board of directors and officers) are subject at all time to the fulfillment of their respective fiduciary duties, (ii) nothing in this Agreement shall require the Company, the board of directors, or officers of any Eagle Entity to take any action, or to refrain from taking any action, that is required to comply with such director's, officer's, or manager's fiduciary obligations under applicable law, and (iii) to the extent that such fiduciary obligations require the Company, the board of directors, or officers to terminate the Company's obligations under this Agreement, the Company, the board of directors, and/or the officers may do so without incurring any liability to any Party under this Agreement except as otherwise set forth herein.

7.      <u>Consenting Lenders' Termination Events</u>.  A Consenting Lender shall have the right, but not the obligation, to terminate its own obligations under this Agreement, upon five (5) days' prior written notice to all Parties setting forth the basis for termination following the occurrence of any of the following events (each, a "**Lender Termination Event**"), unless such event has been waived, in writing, by such Consenting Lender or the Majority Consenting

Lenders (as defined herein):

(a)     the failure to meet any Milestone, unless such failure is the result of any act, omission, or delay on the part of any Consenting Lender or such Milestone is waived in accordance herewith;

(b)     the occurrence of a material breach of this Agreement by the Company that has not been cured (if susceptible to cure) within five (5) days after the receipt by the Company of written notice of such breach;

(c)     the occurrence of (i) any Event of Default under (and as defined in) the Credit Agreement (other than any Acknowledged Default or any Event of Default triggered as a result of the commencement or pendency of the Chapter 11 Cases) or the DIP Credit Agreement or (ii) a violation of the Company's obligations under Financing Orders, in each case, which Event of Default or violation has not been cured (if susceptible to cure) in accordance with the terms set forth therein;

(d)     entry of an order by the Bankruptcy Court converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code;

(e)     entry of an order by the Bankruptcy Court appointing a trustee, receiver, or examiner with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code in the Chapter 11 Case;

(f)     entry of an order by the Bankruptcy Court terminating any Eagle Entity's exclusive right to file a plan of reorganization pursuant to section 1121 of the Bankruptcy Code;

(g)     any Eagle Entity amends or modifies, or files a pleading seeking authority to amend or modify, the Definitive Documentation, unless such amendment or modification is (i) consistent with this Agreement or (ii) reasonably acceptable to the Majority Consenting Lenders;

(h)     entry of an order by the Bankruptcy Court amending or modifying the Definitive Documentation, unless such amendment or modification is (i) consistent with this Agreement or (ii) reasonably acceptable to the Majority Consenting Lenders;

(i)     either (i) the board of directors of any Eagle Entity and the officers of such Eagle Entity determine to pursue any Alternative Transaction (as defined below), including any plan of reorganization (other than the Plan) or (ii) any Eagle Entity files, propounds, or otherwise publicly supports or announces that any Eagle Entity will support any Alternative Transaction, including any plan of reorganization other than the Plan, or files any motion or application seeking authority to sell any material assets, without the prior written consent of the Majority Consenting Lenders;

(j)     the issuance by any governmental authority, including the Bankruptcy Court, any regulatory authority, or any other court of competent jurisdiction, of any ruling or order enjoining the substantial consummation of the Restructuring; provided, however, that the Company shall have five (5) days after issuance of such ruling or order to obtain relief that would allow consummation of the Restructuring in a manner that (i) does not prevent or diminish in a material way compliance with the terms of the Plan and this Agreement or (ii) is reasonably acceptable to the Majority Consenting Lenders;

(k)     the Bankruptcy Court enters any order authorizing the use of cash collateral or post-petition financing that is not substantially in the form of the Interim Financing Order or otherwise consented to by the Majority Consenting Lenders;

(l)     either (i) any Eagle Entity files a motion, application or adversary proceeding (or supports such a filing) (1) challenging the validity, enforceability, perfection or priority of, or seeking avoidance or subordination of, the loans under the Credit Agreement or the DIP Credit Agreement or the liens securing such obligations, (2) asserting any other cause of action against and/or with respect or relating to such obligations or the liens securing such obligations, or (3) challenging the validity of the Warrants, the Warrant Agreement (as amended) or any claims asserted by a holder of such Warrants (to the extent such holder is also a Consenting Lender) in respect of such Warrants; or (ii) the Bankruptcy Court (or any court with jurisdiction over the Chapter 11 Cases) enters an order providing relief against the interests of the Consenting Lenders (in their capacity as holders of loans under the Credit Agreement or the DIP Credit Agreement or as holders of Warrants) with respect to any of the foregoing causes of action or proceedings;

(m)     a breach by any Eagle Entity of any representation, warranty, or covenant of such Eagle Entity set forth in Section 16(b) of this Agreement that could reasonably be expected to have a material adverse impact on the Restructuring or the consummation of the Restructuring that (if susceptible to cure) remains uncured for a period of five (5) days after the receipt by the Company of written notice of such breach;

(n)     a breach by any Eagle Entity of any of its obligations under this Agreement that could reasonably be expected to have a material adverse impact on the Restructuring or the consummation of the Restructuring that (if susceptible to cure) remains uncured for a period of five (5) days after the receipt by the Company of written notice of such breach;

(o)     the Exit Financing amount or terms differ in a meaningful way from the terms of that certain financing proposal received by the Company on July 29, 2014 reflecting a $225,000,000 term loan component and a $50,000,000 revolving credit facility component; or

(p)     the Consummation Date shall not have occurred by November 30, 2014.

As used herein, the term "**Majority Consenting Lenders**" shall mean at least four (4) Consenting Lenders who are not affiliates of each other and who hold, in the aggregate, at least 66 2/3% of the principal amount of total outstanding Loans under the Credit Agreement held by all Consenting Lenders.  Notwithstanding the foregoing, Sections 7(o) and (p) hereof may not be amended, waived or otherwise modified without the consent of such affected Consenting Lender.

8.      Company's Termination Events.  The Company may, in its sole discretion, terminate this Agreement as to all Parties upon five (5) days' prior written notice to the Consenting Lenders setting forth the basis for termination, delivered in accordance with this Agreement, following the occurrence of any of the following events (each a "**Company Termination Event**" and, together with the Lender Termination Events, the "**Termination Events**"):

(a)     a breach by a Consenting Lender of any of the representations, warranties, or covenants of such Consenting Lender set forth in Section 15 of this Agreement that that could reasonably be expected to have a material adverse impact on the Restructuring or the consummation of the Restructuring that (if susceptible to cure) remains uncured for a period of five (5) days after the receipt by the Consenting Lenders of written notice of such breach;

(b)     a breach by any Consenting Lender of any of its obligations under this Agreement that could reasonably be expected to have a material adverse impact on the Restructuring or the consummation of the Restructuring that (if susceptible to cure) remains uncured for a period of five (5) days after the receipt by the Consenting Lenders of written notice of such breach;

(c)     the Company's board of directors determines, (i) consistent with Section 6(b) above that continued pursuit or support of the Restructuring (including, without limitation, the Plan or the solicitation of the Plan) would be inconsistent with the exercise of its fiduciary duties or (ii) to pursue an Alternative Transaction consistent with Section 17 below;

(d)     the Consenting Lenders at any time constitute less than the Required Lenders;

(e)     the issuance by any governmental authority, including the Bankruptcy Court or any other regulatory authority or court of competent jurisdiction, of any injunction, judgment, decree, charge, ruling, or order preventing the consummation of a material portion of the Restructuring; or

(f)     the Consummation Date shall not have occurred by November 30, 2014.

10

9.    <u>Mutual Termination; Automatic Termination</u>.    This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual agreement by and among the Company and the Majority Consenting Lenders.  This Agreement and the obligations of all Parties hereunder shall terminate automatically on the Consummation Date.

10.    <u>Effect of Termination</u>.

(a)    The earliest date on which a Party's termination of this Agreement is effective in accordance with <u>Section 7</u>, <u>Section 8</u>, or <u>Section 9</u> of this Agreement shall be referred to as a "**Termination Date**."  Termination shall not relieve any Party from liability for its breach or non-performance of its obligations hereunder prior to the Termination Date.  Upon any Party's termination of this Agreement in accordance with its terms prior to the date on which the Confirmation Order is entered by the Bankruptcy Court, such Party shall have the immediate right, without further order of the Bankruptcy Court, and without the consent of the Company, to withdraw or change any vote previously tendered by such Party, irrespective of whether any voting deadline or similar deadline or bar date has passed, provided that such Party is not then in material breach of its obligations under this Agreement; provided further that, for the avoidance of doubt, the foregoing shall not be construed to prohibit any Party from contesting whether such terminating Party's termination of this Agreement is in accordance with the terms of this Agreement. Any Consenting Lender withdrawing or changing its vote(s) pursuant to this <u>Section 10(a)</u> shall promptly provide written notice of such withdrawal or change to each other Party and, if such withdrawal or change occurs on or after the Petition Date, file notice of such withdrawal or change with the Bankruptcy Court.

(b)    All Parties' obligations under this Agreement shall be terminated effective immediately, and all Parties hereto shall be released from their respective commitments, undertakings, and agreements upon the occurrence of termination of this Agreement (i) by the Required Lenders pursuant to <u>Section 7</u> or (ii) as provided in <u>Section 8 or 9</u>.  Notwithstanding the foregoing, each of the following shall survive termination of the Agreement by any Party, and all rights and remedies with respect to such claims shall not be prejudiced in any way: (i) any claim for breach of this Agreement that occurs prior to the Termination Date, (ii) the Company's obligations in <u>Sections 13 and 14</u> of this Agreement (subject to the terms and conditions of such Sections), (iii) <u>Section 10(a)</u> and (iv) this <u>Section 10(b)</u>.

(c)    Except with respect to Section 8(c) of this Agreement, no occurrence shall constitute a Termination Event if such occurrence is the result of the action or omission of the Party seeking to terminate this Agreement.

11.    <u>Cooperation and Support</u>. The Company shall provide draft copies of all "first day" motions and "second day" motions that any Eagle Entity intends to file with the Bankruptcy Court to counsel for the Consenting Lenders at least four (4) calendar days (or as soon thereafter as is reasonably practicable under the circumstances) prior to the date when such Eagle Entity intends to file such document, and shall consult in good faith with such counsel regarding the form and substance of any such proposed filing with the Bankruptcy Court.  The Company will use reasonable efforts to provide draft copies of all other material pleadings any Eagle Entity intends to file with the Bankruptcy Court to counsel to the Consenting Lenders at least three (3) calendar days prior to filing such pleading to the extent practicable and shall consult in good faith with such counsel regarding the form and substance of any such proposed pleading.  For the

11

avoidance of doubt, the Parties agree to negotiate in good faith the Definitive Documentation that is subject to negotiation and completion, consistent with the last sentence of Section 3 hereof.

12.   <u>Transfers of Claims and Interests.</u>

(a)   Each Consenting Lender shall not (i) sell, transfer, assign, hypothecate, pledge, grant a participation interest in, or otherwise dispose of, directly or indirectly, its right, title, or interest in respect of any of such Consenting Lender's interests in the Credit Agreement, or any other claim against, or interests in, the Company, as applicable, in whole or in part, or (ii) grant any proxies, deposit any of such Consenting Lender's interests in the Credit Agreement, or any other claim against or interests in the Company, as applicable, into a voting trust, or enter into a voting agreement with respect to any such claims or interests (the actions described in clauses (i) and (ii) are collectively referred to herein as a "**<u>Transfer</u>**" and the Consenting Lender making such Transfer is referred to herein as the "**<u>Transferor</u>**"), unless such Transfer is to another Consenting Lender or any other entity that (x) first agrees, in writing, to be bound by the terms of this Agreement by executing and delivering to the Company, at least five (5) business days prior to effectiveness of the relevant Transfer, a Transferee Joinder substantially in the form annexed hereto as **<u>Exhibit F</u>** (the "**<u>Transferee Joinder</u>**") and (y) is reasonably capable, after due inquiry and investigation by the Transferor, of fulfilling its obligations under this Agreement.  With respect to the Credit Agreement and any other claims against, or interests in, the Company held by the relevant transferee upon consummation of a Transfer, such transferee shall be deemed to make all of the representations and warranties of a Consenting Lender set forth in this Agreement, and shall be deemed to be a Party and a Consenting Lender for all purposes under the Agreement.  Upon compliance with the foregoing, the Transferor shall be deemed to relinquish its rights under this Agreement solely to the extent of such transferred rights and obligations but shall otherwise remain party to this Agreement as a Consenting Lender with respect to any interest in the Credit Agreement or other claim not so transferred.  Any Transfer made in violation of this <u>Section 11</u> shall be deemed null and void and of no force or effect, regardless of any prior notice provided to the Company and/or the Consenting Lenders, and shall not create any obligation or liability of the Company to the purported transferee (it being understood that the putative transferor shall continue to be bound by the terms and conditions set forth in this Agreement).

(b)   Notwithstanding <u>Section 12(a)</u>, (i) a Consenting Lender may transfer (by purchase, sale, assignment, participation or otherwise) its right, title, and/or interest in respect of any of such Consenting Lender's interests in the Credit Agreement to an entity that is acting in its capacity as a Qualified Marketmaker without the requirement that the Qualified Marketmaker be or become a Consenting Lender, provided that such transfer shall only be valid if such Qualified Marketmaker transfers (by purchase, sale, assignment, participation or otherwise) such right, title and/or interest within five (5) business days of its receipt thereof to a transferee that is, or concurrent with such transfer becomes, a Consenting Lender, and (ii) to the extent that a party to this Agreement is acting in its capacity as a Qualified Marketmaker, it may transfer (by purchase, sale, assignment, participation or otherwise) any right, title, or interest in respect of any interests in the Credit Agreement that the Qualified Marketmaker acquires from a holder of such interests who is not a Consenting Lender without the requirement that the transferee be or become a Consenting Lender.  For these purposes, a "<u>Qualified Marketmaker</u>" means an entity that (x) holds itself out to the market as standing ready in the ordinary course of its business to

12

purchase from customers and sell to customers claims against the Eagle Entities (including debt securities or other debt) or enter with customers into long and short positions in claims against the Eagle Entities (including debt securities or other debt), in its capacity as a dealer or market maker in such claims against the Eagle Entities, and (y) is in fact regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

13.     RSA Fee.  In exchange for the Consenting Lenders' agreement to pursue the Restructuring on the terms set forth in the Plan and entry into this Agreement, each Consenting Lender shall earn a cash fee equal to 3.0% of the total outstanding principal amount of Loans owed to such Consenting Lender (the "**RSA Fee**").  Payment of the RSA Fee shall be deferred so long as this Agreement remains in full force and effect, provided, however, that the RSA Fee shall automatically be cancelled, discharged, and forfeited by each Consenting Lender (a) upon the Consummation Date of the Plan, or (b) if EBS commenced the Chapter 11 Case and the Minimum Consenting Lender Condition (as defined below) no longer remains satisfied (unless the failure to satisfy the Minimum Consenting Lender Condition is based on the Consenting Lenders' termination of this Agreement pursuant to Section 7 hereof); provided, further, that each Consenting Lender's respective portion of the RSA Fee automatically shall be cancelled, discharged and forfeited if such Consenting Lender (i) breaches any of its material obligations under this Agreement, or (ii) breaches any of the representations, warranties, or covenants of such Consenting Lender set forth in Section 16(a) of this Agreement.  If the RSA Fee becomes due and payable, then, at the Company's election, the RSA Fee may be converted on a dollar-for-dollar basis into additional PIK Loans for each Consenting Lender entitled to the RSA Fee; provided, however, that if this Agreement is terminated by virtue of the Company's entry into and consummation of an Alternative Transaction, the RSA Fee shall be paid in cash upon the substantial consummation of such Alternative Transaction.

"**Minimum Consenting Lender Condition**" as that term is used herein means that the Required Lenders remain party to and bound by this Agreement.

14.     Professional Fees and Expenses.  Until the occurrence of a Termination Date, the Company shall pay or reimburse when due all reasonable and documented fees and expenses of the Consenting Lenders incurred by the following advisors to the Consenting Lenders in connection with the Restructuring:  (i) Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss") as set forth in that certain fee letter, dated as of January 1, 2014, between Eagle and Paul Weiss; (ii) Houlihan Lokey Capital, Inc. ("Houlihan") as set forth in that certain letter agreement, dated as of February 1, 2014, among Eagle, Houlihan, Paul Weiss, and the Lender Group (as defined therein); (iii) maritime and appropriate foreign counsel engaged by Paul Weiss; and (iv) to the extent reasonably necessary, local counsel.  For the avoidance of doubt, nothing in this Section 14 shall be construed as limiting any of the Company's obligations under the Credit Agreement.

15.     Acknowledgment.  No securities of the Company are being offered or sold hereby and this Agreement neither constitutes an offer to sell nor a solicitation of an offer to buy any securities of the Company.  This Agreement is not, and shall not be deemed to be, a solicitation of a vote for the acceptance of the Plan.  The acceptance of the Plan by each of the Consenting Lenders will not be solicited until such Parties have received the Disclosure Statement and related ballots in accordance with applicable law (including as provided under sections 1125(g) and 1126(b) of the Bankruptcy Code) and will be subject to sections 1125, 1126, and 1127 of the

Bankruptcy Code.

16.     <u>Representations and Warranties</u>.

(a)     Each of the Consenting Lenders hereby represents and warrants on a several and not joint basis for itself and not any other person or entity that the following statements are true, correct, and complete as of the date hereof:

    (i)     it is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its organization, and it has the requisite corporate power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement;

    (ii)    the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate or other organizational action on its part and no other proceedings on its part are necessary to authorize and approve this Agreement or any of the transactions contemplated herein;

    (iii)   this Agreement has been duly executed and delivered by the Consenting Lender and constitutes the legal, valid, and binding agreement of the Consenting Lender, enforceable against the Consenting Lender in accordance with its terms;

    (iv)    the execution, delivery, and performance by it of this Agreement does not and shall not (A) violate any provision of law, rule, or regulation applicable to it, or its certificate of incorporation or bylaws or other organizational documents, or (B) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it is a party;

    (v)     the execution, delivery, and performance by it of this Agreement does not and shall not require any registration or filing with, consent or approval of, notice to, or any other action to, with, or by any federal, state or other governmental authority or regulatory body, except (A) any of the foregoing as may be necessary and/or required for disclosure by the Securities and Exchange Commission and applicable state securities or "blue sky" laws, (B) any of the foregoing as may be necessary and/or required in connection with the Chapter 11 Cases, including the approval of the Disclosure Statement and confirmation of the Plan, (C) filings of amended certificates of incorporation or articles of formation or other organizational documents with applicable state authorities, and other registrations, filings, consents, approvals, notices, or other actions that are reasonably necessary to maintain permits, licenses, qualifications, and governmental approvals to carry on the business of the Company, and (D) any other registrations, filings, consents, approvals, notices, or other actions, the failure of which to make, obtain, or take, as applicable, would

14

not be reasonably likely, individually or in the aggregate, to materially delay or materially impair the ability of any Party hereto to consummate the transactions contemplated hereby;

(vi)     subject to the provisions of sections 1125 and 1126 of the Bankruptcy Code, this Agreement is the legally valid and binding obligation of it, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally, or by equitable principles relating to enforceability;

(vii)    it (A) is a sophisticated party with respect to the transactions described herein with sufficient knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of owning and investing in securities of the Company (including any securities that may be issued in connection with the Restructuring), making an informed decision with respect thereto, and evaluating properly the terms and conditions of the Plan and this Agreement, (B) has been represented and advised by legal and financial advisors in connection with this Agreement, (C) has been afforded the opportunity to discuss the Plan, the Disclosure Statement and other information concerning the Company with the Company's representatives, (D) has independently and without reliance upon the Company or any officer, employee, agent, or representative thereof, and based on such information as the Consenting Lender has deemed appropriate, made its own analysis and decision to enter into this Agreement and will not seek rescission or revocation of this Agreement, and (E) acknowledges that it has entered into this Agreement voluntarily and of its own choice and not under coercion or duress;

(viii)   it (A) is the sole legal or beneficial owner of the principal amount of claims set forth on **Exhibit G**, has all necessary investment or voting discretion with respect to such claims, or otherwise has the power and authority to bind any other legal or beneficial holder of such claims, free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal or other limitation on disposition, or encumbrances of any kind, and (B) is exclusively entitled (for its own accounts or for the accounts of such other legal or beneficial owners) to all of the rights and economic benefits of such claims; and

(ix)     it has made no prior assignment, sale, participation, grant, conveyance, or other transfer of, and has not entered into any other agreement to assign, sell, participate, grant, convey, or otherwise transfer, in whole or in part, any portion of its right, title, or interest in any claim set forth on **Exhibit G**, except to the extent such agreement is in accordance with the terms of this Agreement.

(b)     Each of the Eagle Entities hereby represents and warrants on a several and not joint basis for itself and not any other person or entity that the following

statements are true, correct, and complete as of the date hereof:

(i)     it is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its organization, and it has the requisite corporate power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement;

(ii)    the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate or other organizational action on its part, including approval of each of the independent director(s) of each of the corporate entities that comprise the Eagle Entities;

(iii)   the execution, delivery, and performance by it of this Agreement does not and shall not (A) violate any provision of law, rule, or regulation applicable to it, or its certificate of incorporation or bylaws or other organizational documents, or (B) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it is a party (other than, for the avoidance of doubt, a default that would be triggered as a result of the Chapter 11 Case(s) or any Eagle Entity's undertaking to implement the Restructuring through the Chapter 11 Case(s))

(iv)    this Agreement has been duly executed and delivered by the Company and constitutes the legal, valid, and binding agreement of the Company, enforceable against the Company in accordance with its terms;

(v)     the execution, delivery, and performance by it of this Agreement does not and shall not require any registration or filing with, consent or approval of, notice to, or any other action to, with, or by any federal, state or other governmental authority or regulatory body, except (A) any of the foregoing as may be necessary and/or required for disclosure by the Securities and Exchange Commission and applicable state securities or "blue sky" laws, (B) any of the foregoing as may be necessary and/or required in connection with the Chapter 11 Cases, including the approval of the Disclosure Statement and confirmation of the Plan, (C) filings of amended certificates of incorporation or articles of formation or other organizational documents with applicable state authorities, and other registrations, filings, consents, approvals, notices, or other actions that are reasonably necessary to maintain permits, licenses, qualifications, and governmental approvals to carry on the business of the Company, and (D) any other registrations, filings, consents, approvals, notices, or other actions, the failure of which to make, obtain or take, as applicable, would not be reasonably likely, individually or in the aggregate, to materially delay or materially impair the ability of any Party hereto to consummate the transactions contemplated hereby;

(vi)     it (A) is a sophisticated party with respect to the transactions described herein with sufficient knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of the Restructuring, making an informed decision with respect thereto, and evaluating properly the terms and conditions of the Plan and this Agreement, (B) has been represented and advised by legal and financial advisors in connection with this Agreement, (C) has independently and without reliance upon the Consenting Lenders or any officer, employee, agent, or representative thereof, and based on such information as the Company has deemed appropriate, made its own analysis and decision to enter into this Agreement and will not seek rescission or revocation of this Agreement, and (D) acknowledges that it has entered into this Agreement voluntarily and of its own choice and not under coercion or duress;

(vii)    subject to the provisions of sections 1125 and 1126 of the Bankruptcy Code, this Agreement is the legally valid and binding obligation of it, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally, or by equitable principles relating to enforceability; and

(viii)   except as disclosed to the Consenting Lenders and described on **Schedule 1** annexed hereto, it has no knowledge of any "Default" or "Event of Default" under the Credit Agreement which has occurred and is continuing.

17.     Right to Solicit Alternative Transactions.  The Company shall not be entitled to solicit, encourage, and initiate any offer or proposal from, enter into any agreement with, or engage in any discussions or negotiations with, any person or entity concerning any actual or proposed transaction involving any or all of (i) another financial and/or corporate restructuring of any Eagle Entity, (ii) the issuance, sale, or other disposition of any equity or debt interests, or any material assets, of any Eagle Entity, (iii) a merger, consolidation, business combination, liquidation, recapitalization, refinancing, or similar transaction involving any Eagle Entity, and/or (iv) any chapter 11 plan of reorganization other than the Plan (each, an "**Alternative Transaction**"); provided, however, that the Company may respond to any proposal or offer for an Alternative Transaction to the extent that the board of directors of the Company determines in good faith, and consistent with its fiduciary duties, that such a response is necessary; provided, further, however, that the Company shall promptly, and in no event later than 4 calendar days after receipt, provide copies of all such documentations and materials received by the Company concerning such an Alternative Transaction to the advisors to the Consenting Lenders.

18.     Survival of Agreement.  Each of the Parties acknowledges and agrees that this Agreement is being executed in connection with negotiations concerning a possible financial restructuring of the Company and in contemplation of possible chapter 11 filings by the Company and the rights granted in this Agreement are enforceable by each signatory hereto without approval of any court, including the Bankruptcy Court.

19.     No Waiver or Admissions.  If the transactions contemplated herein are or are not

17

consummated, or if this Agreement is terminated for any reason, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights, remedies, or interests, and the Parties expressly reserve any and all of their respective rights, remedies, and interests. This Agreement shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever. Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert. No Party shall have, by reason of this Agreement, a fiduciary relationship in respect of any other Party or any person or entity, and nothing in this Agreement, expressed or implied, is intended to or shall be so construed as to impose upon any Party any obligations in respect of this Agreement except as expressly set forth herein. This Agreement and the Restructuring are part of a proposed settlement of a dispute among the Parties. Except as otherwise expressly provided herein, including, but not limited to, Section 33 hereof, pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding involving enforcement of the terms of this Agreement.

20.    <u>Relationship Among Parties</u>. Notwithstanding anything herein to the contrary, the duties and obligations of the Parties under this Agreement shall be several, not joint. No prior history, pattern, or practice of sharing confidences among or between Parties shall in any way affect or negate this understanding and Agreement.

21.    <u>Specific Performance; Remedies Cumulative</u>. Each Party acknowledges and agrees that the exact nature and extent of damages resulting from a breach of this Agreement are uncertain at the time of entering into this Agreement and that any such breach of this Agreement would result in damages that would be difficult to determine with certainty. It is understood and agreed by the Parties that money damages may not be a sufficient remedy for any breach of this Agreement by any Party, and that each non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief as a remedy of any such breach, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder. Such remedy shall not be deemed to be the exclusive remedy for the breach of this Agreement by any Party or its representatives. All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy by any Party hereto shall not preclude the simultaneous or later exercise of any other such right, power, or remedy hereunder.

22.    <u>Governing Law & Jurisdiction</u>. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to such state's choice of law provisions which would require the application of the law of any other jurisdiction. By its execution and delivery of this Agreement, each of the Parties irrevocably and unconditionally agrees for itself that any legal action, suit, or proceeding against it with respect to any matter arising under, arising out of, or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit, or proceeding, shall be brought in either the United States District Court for the Southern District of New York or any New York State court sitting in New York City, and by execution and delivery of this Agreement, each of the Parties irrevocably accepts and submits itself to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding.

Notwithstanding the foregoing, if the Chapter 11 Cases are commenced, each Party agrees that the Bankruptcy Court shall have exclusive jurisdiction of all matters arising under, arising out of, or in connection with this Agreement. By execution and delivery of this Agreement, and upon commencement of the Chapter 11 Cases, each of the Parties irrevocably and unconditionally submits to the personal jurisdiction of the Bankruptcy Court solely for purposes of any action, suit, or proceeding or other contested matter arising under, arising out of, or in connection with this Agreement, or for recognition or enforcement of any judgment rendered or order entered in any such action, suit, proceeding, or other contested matter.

23.     <u>Waiver of Right to Trial by Jury</u>. Each of the Parties waives any right to have a jury participate in resolving any dispute, whether sounding in contract, tort, or otherwise, between any of them arising out of, arising under, in connection with, relating to, or incidental to the relationship established between any of them in connection with this Agreement. Instead, any disputes resolved in court shall be resolved in a bench trial without a jury.

24.     <u>Successors and Assigns</u>. This Agreement shall inure to the benefit of and be binding upon each of the Parties and their respective successors, assigns, heirs, transferees, executors, administrators, and representatives, in each case solely as such parties are permitted under this Agreement; <u>provided</u>, <u>however</u>, that nothing contained in this <u>Section 24</u> shall be deemed to permit any transfer, tender, vote, or consent of any claims other than in accordance with the terms of this Agreement.

25.     <u>No Third-Party Beneficiaries</u>. This Agreement shall be solely for the benefit of the Parties hereto (or any other party that may become a Party to this Agreement pursuant to <u>Section 11</u> of this Agreement), and no other person or entity shall be a third-party beneficiary of this Agreement.

26.     <u>Notices</u>. All notices (including, without limitation, any notice of termination) and other communications from any Party given or made pursuant to this Agreement shall be in writing and shall be deemed to have been duly given: (a) upon personal delivery to the Party to be notified, (b) when sent by confirmed electronic mail if sent during normal business hours of the recipient, and if not so confirmed, on the next business day, (c) three (3) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) business day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be sent:

(a)     To the Company:

Eagle Bulk Shipping Inc.
477 Madison Avenue
New York, NY 10022
Attn:   Adir Katzav, Chief Financial Officer
Tel:     (212) 785-2500
Fax:     (212) 785-3311
Email: akatzav@eagleships.com

*With a copy (which shall not constitute notice) to:*

19

Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP
601 S. Figueroa St., 30th Floor
Los Angeles, CA 90017
Attn:   Paul S. Aronzon
Tel:    (213) 892-4377
Fax:    (213) 629-5063
Email: paronzon@milbank.com

Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP
1 Chase Manhattan Plaza
New York, NY 10005
Attn:   Tyson M. Lomazow
Tel:    (212) 530-5367
Fax:    (212) 822-5367
Email: tlomazow@milbank.com

(b)     To the address set forth on each Consenting Lender's signature page (or as directed by any transferee thereof), as the case may be, with a copy (which shall not constitute notice) to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
Attn:   Andrew N. Rosenberg
Tel:    (212) 373-3158
Fax:    (212) 492-0158
Email: arosenberg@paulweiss.com
Attn:   Alice B. Eaton
Tel:    (212) 373-3125
Fax:    (212) 492-0125
Email: aeaton@paulweiss.com

27.    <u>Entire Agreement</u>.  This Agreement, including the Exhibits and Schedules hereto, constitutes the entire agreement of the Parties with respect to the subject matter of this Agreement, and supersedes all other prior negotiations, agreements, representations, warranties, term sheets, proposals, and understandings, whether written, oral, or implied, among the Parties with respect to the subject matter of this Agreement; <u>provided</u>, <u>however</u>, that any confidentiality agreement executed by any Party shall survive this Agreement and shall continue in full force and effect, subject to the terms thereof, irrespective of the terms hereof.

28.    <u>Time Periods</u>.  If any time period or other deadline provided in this Agreement expires on a day that is not a business day, then such time period or other deadline, as applicable, shall be deemed extended to the next succeeding business day.

29.    <u>Severability of Provisions</u>.  If any provision of this Agreement for any reason is held by a court of competent jurisdiction to be invalid, illegal, or unenforceable in any respect, the remaining provisions shall remain in full force and effect if the essential terms and conditions of this Agreement for each party remain valid, binding, and enforceable.

30.    <u>Amendments</u>.  Except as otherwise provided herein, this Agreement may not be modified, amended, or supplemented without the prior written consent of the Company and the Majority Consenting Lenders.

31.    <u>Reservation of Rights</u>.  If the transactions contemplated by this Agreement and the Plan are not consummated as provided herein, if a Termination Event occurs, or if this Agreement is otherwise terminated for any reason, the Consenting Lenders and the Company each fully reserve any and all of their respective rights, remedies, and interests under the Credit Agreement (and all documents executed and delivered in connection therewith), applicable law, and in equity.

32.    <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which, when so executed, shall be deemed an original and all of which shall constitute one and the same Agreement.  The signatures of all of the Parties need not appear on the same counterpart.  Delivery of an executed signature page of this Agreement by facsimile or electronic mail shall be effective as delivery of a manually executed signature page of this Agreement.

33.    <u>Public Disclosure</u>.  The Company may, in its sole discretion, disclose this Agreement (including the signature pages hereto) in a press release and/or public filing, including the Chapter 11 Case; <u>provided</u>, <u>however</u>, that after the commencement of the Chapter 11 Case, the Parties may disclose the existence of, or the terms of, this Agreement, the Plan, the Disclosure Statement, or any other material term of the transaction contemplated herein without the express written consent of the other Parties.

34.    <u>Headings</u>.  The section headings of this Agreement are for convenience only and shall not affect the interpretation hereof.  References to sections, unless otherwise indicated, are references to sections of this Agreement.

35.    <u>Interpretation</u>.  This Agreement constitutes a fully negotiated agreement among commercially sophisticated parties and therefore shall not be construed or interpreted for or against any Party, and any rule or maxim of construction to such effect shall not apply to this Agreement.

*[Signatures and exhibits follow]*

**BORROWER:**                    **EAGLE BULK SHIPPING INC.,**


By: _____/s/ Adir Katzav_____
   Name:  Adir Katzav
   Title:   Chief Financial Officer


**GUARANTORS:**                    **AVOCET SHIPPING LLC**
                    **BITTERN SHIPPING LLC**
                    **CANARY SHIPPING LLC**
                    **CARDINAL SHIPPING LLC**
                    **CONDOR SHIPPING LLC**
                    **CRANE SHIPPING LLC**
                    **CRESTED EAGLE SHIPPING LLC**
                    **CROWNED EAGLE SHIPPING LLC**
                    **EGRET SHIPPING LLC**
                    **FALCON SHIPPING LLC**
                    **GANNET SHIPPING LLC**
                    **GOLDEN EAGLE SHIPPING LLC**
                    **GOLDENEYE SHIPPING LLC**
                    **GREBE SHIPPING LLC**
                    **HARRIER SHIPPING LLC**
                    **HAWK SHIPPING LLC**
                    **IBIS SHIPPING LLC**
                    **IMPERIAL EAGLE SHIPPING LLC**
                    **JAEGER SHIPPING LLC**
                    **JAY SHIPPING LLC**
                    **KESTREL SHIPPING LLC**
                    **KINGFISHER SHIPPING LLC**
                    **KITE SHIPPING LLC**
                    **KITTIWAKE SHIPPING LLC**
                    **MARTIN SHIPPING LLC**
                    **MERLIN SHIPPING LLC**
                    **NIGHTHAWK SHIPPING LLC**
                    **ORIOLE SHIPPING LLC**
                    **OSPREY SHIPPING LLC**
                    **OWL SHIPPING LLC**
                    **PEREGRINE SHIPPING LLC**
                    **PETREL SHIPPING LLC**
                    **PUFFIN SHIPPING LLC**
                    **REDWING SHIPPING LLC**
                    **ROADRUNNER SHIPPING LLC**
                    **SANDPIPER SHIPPING LLC**
                    **SHRIKE SHIPPING LLC**
                    **SKUA SHIPPING LLC**

*[Signature Page to Restructuring Support Agreement]*

**SPARROW SHIPPING LLC**
**STELLAR EAGLE SHIPPING LLC**
**TERN SHIPPING LLC**
**THRASHER SHIPPING LLC**
**THRUSH SHIPPING LLC**
**WOODSTAR SHIPPING LLC**
**WREN SHIPPING LLC**
**GRIFFON SHIPPING LLC**
**HERON SHIPPING LLC**
**EAGLE BULK (DELAWARE) LLC**
**EAGLE SHIPPING INTERNATIONAL
(USA) LLC**


By:  Eagle Bulk Shipping Inc., its Sole Member


By: _____ /s/ Adir Katzav _____
    Name:  Adir Katzav
    Title:   Chief Financial Officer


**EAGLE MANAGEMENT CONSULTANTS
LLC**
**EAGLE SHIP MANAGEMENT LLC**

By:  Eagle Shipping International (USA) LLC,
its Sole Member
By:  Eagle Bulk Shipping Inc., its Sole Member


By: _____ /s/ Adir Katzav _____
    Name:  Adir Katzav
    Title:   Chief Financial Officer


**AGALI SHIPPING S.A.**
**KAMPIA SHIPPING S.A.**
**MARMARO SHIPPING S.A.**
**MESTA SHIPPING S.A.**
**MYLOS SHIPPING S.A.**
**NAGOS SHIPPING S.A.**
**RAHI SHIPPING S.A.**
**SIRIKARI SHIPPING S.A.**
**SPILIA SHIPPING S.A.**

*[Signature Page to Restructuring Support Agreement]*

**ANEMI MARITIME SERVICES S.A.**


By: _____/s/ Adir Katzav_____
    Name:  Adir Katzav
    Title:   Attorney-In-Fact



**EAGLE BULK PTE. LTD.**
**EAGLE MANAGEMENT CONSULTANCY PTE. LTD.**


By: ___/s/ Adir Katzav_____
    Name:  Adir Katzav
    Title:   Attorney-In-Fact

*[Signature Page to Restructuring Support Agreement]*

**EXECUTION VERSION**

\*\*\*CONSENTING LENDER SIGNATURE
PAGES INTENTIONALLY OMITTED\*\*\*

EXECUTION VERSION

## Exhibit A

## to the Restructuring Support Agreement

## TERM SHEET

**Summary of Proposed Restructuring
Terms and Conditions for Eagle Bulk Shipping Inc.**

This preliminary term sheet (the "***Term Sheet***") summarizes the material terms and conditions of certain transactions to take place in connection with a proposed restructuring (the "***Restructuring***") of the capital structure and financial obligations of Eagle Bulk Shipping Inc., a Marshall Islands company ("***Eagle***"), and all of its direct and indirect subsidiaries (collectively, with Eagle, the "***Company***").  The regulatory, tax, accounting, and other legal and financial matters and effects related to the Restructuring have not been fully evaluated, and any such evaluation may affect the terms and structure of any Restructuring.   The transactions contemplated in this Term Sheet are subject in all respects to the negotiation, execution, and delivery of definitive documentation.

THIS TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY CHAPTER 11 PLAN, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF ALL APPLICABLE LAW.  THIS TERM SHEET DOES NOT ADDRESS ALL TERMS THAT WOULD BE REQUIRED IN CONNECTION WITH ANY POTENTIAL RESTRUCTURING AND ENTRY INTO OR THE CREATION OF ANY BINDING AGREEMENT IS SUBJECT TO THE EXECUTION OF DEFINITIVE DOCUMENTATION IN FORM AND SUBSTANCE CONSISTENT WITH THIS TERM SHEET AND OTHERWISE ACCEPTABLE TO THE COMPANY.  THIS TERM SHEET HAS BEEN PRODUCED FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY AND IS SUBJECT TO THE PROVISIONS OF RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND OTHER SIMILAR APPLICABLE STATE AND FEDERAL RULES (INCLUDING, WITHOUT LIMITATION, RULES APPLICABLE IN THE MARSHALL ISLANDS AND/OR SINGAPORE) PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL INFORMATION AND INFORMATION EXCHANGED IN THE CONTEXT OF SETTLEMENT DISCUSSIONS.   THIS TERM SHEET AND THE INFORMATION CONTAINED HEREIN IS STRICTLY CONFIDENTIAL AND SHALL NOT BE SHARED WITH ANY OTHER PARTY ABSENT THE PRIOR WRITTEN CONSENT OF THE COMPANY OR ITS COUNSEL.

| **OVERVIEW** |
| --- |

| **Parties** | Eagle and all of its direct and indirect subsidiaries. |
| --- | --- |
| | Those certain lenders under the Fourth Amended and Restated Credit Agreement, dated as of June 20, 2012, by and among Eagle, as borrower, the financial institutions listed therein, as original lenders, the subsidiaries of Eagle listed therein, as original guarantors, The Royal Bank of Scotland plc ("***RBS***"), as original Agent and Security Trustee (as amended from time to time, the "***Credit Agreement***"), holding the Term Loans[1] and the PIK Loans in an amount sufficient to consummate the transactions set forth |

---

[1]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Credit Agreement.

<table>
<tr><td></td><td>herein under the terms of the Credit Agreement (collectively, the "**Consenting Lenders**"), and Wilmington Trust (London) Limited ("**Wilmington**"), as successor Agent and Security Trustee under the Credit Agreement.</td></tr>
<tr><td>**Economic Terms of Restructuring**</td><td>The principal economic terms of the Restructuring shall consist of the following:</td></tr>
</table>

    i.   The Loans (and any Amended Lender Warrant Shares (defined below)) shall be exchanged for (a) cash, on a *pro rata* basis, in an amount up to the amount of any New Debt (as defined below) *less* (1) the amount of any Outstanding Trade Obligations (defined below) and (2) any amount necessary to fully fund a working capital reserve equal to the Minimum Liquidity Amount (defined below) upon consummation of the Restructuring following payment of the Restructuring Expenses (defined below) (such cash payment to the Lenders, the "**Lender Cash Distribution**") and (b) new shares, on a *pro rata* basis, of Common Stock that will provide the Lenders with 99.5% of the total outstanding Common Stock of the Company after such issuance (the "**Lender Shares Issuance**"), subject to dilution by the Management Incentive Plan and the Equity Warrants (as such terms are described below).

   ii.   The Company shall incur senior secured indebtedness in an amount up to forty percent (40%) of the appraised value of the fleet with a new, third-party senior secured credit facility (the "**New Debt**"), which shall be on market terms and conditions, which terms and conditions shall be acceptable to the Company and the Consenting Lenders.

  iii.   Holders of unsecured claims shall be paid in full, <u>provided</u> that no material unsecured claims exist except as incurred in the ordinary course of business or as specifically identified herein; <u>provided</u>, <u>further</u>, that subject to the consent of the Majority Consenting Lenders[2], up to $12 million in unsecured obligations of the Company (whether a direct obligation of Eagle or any of its direct or indirect subsidiaries) outstanding on the effective date of the Restructuring shall be paid from the proceeds of the New Debt (the "**Outstanding Trade Obligations**").

  iv.   The Management Incentive Plan (as described below) shall be implemented.

   v.   Current holders of Common Stock (other than Consenting

---

[2]   "**Majority Consenting Lenders**" means at least four (4) Consenting Lenders who are not affiliates of each other and who hold, in the aggregate, at least 66 2/3% of the principal amount of total outstanding Loans under the Credit Agreement held by all Consenting Lenders.

Lenders who hold Amended Lender Warrants or Amended Lender Warrant Shares) shall receive or retain (as applicable), on a *pro rata* basis, (a) shares equal to 0.5% of the total outstanding Common Stock of the Company after the Lender Shares Issuance, subject to dilution by the Management Incentive Plan and the Equity Warrants, and (b) warrants (the "***Equity Warrants***") providing the right to acquire 7.5% of the Common Stock at an exercise price equal to the face amount of the principal of the Loans outstanding immediately prior to the consummation of the Restructuring (this assumes all accrued interest will be paid in cash).[3] The Equity Warrants shall expire seven (7) years after the effective date of the Restructuring. Customary terms for public company warrants to be agreed.

"***Amended Lender Warrant Shares***" as that term is used herein means the shares issued on account of an exercise of the Amended Lender Warrants.

"***Amended Lender Warrants***" as that term is used herein means the Warrants issued in respect of "Exercise Commencement Date B" and "Exercise Commencement Date C" (each, as denoted on Schedule 1 to the Warrant Agreement), as such warrants were amended pursuant to that certain Amendment No. 1 to Warrant Agreement, dated as of July 2, 2014, by and between Eagle and the majority holders of the Warrants.

| | |
|---|---|
| **IMPLEMENTATION OF THE RESTRUCTURING** | |
| **Restructuring Support Agreement** | The Company and the Consenting Lenders shall execute a restructuring support agreement (the "***RSA***") with standard terms and conditions evidencing their intent to support consummation of the Restructuring. |
| **Prepackaged Plan of Reorganization and Chapter 11 Case** | The Restructuring shall be implemented pursuant to a prepackaged chapter 11 plan of reorganization for (the "***Plan***") and a voluntary case commenced by Eagle and, if necessary, one or more of Eagle's direct or indirect subsidiaries (the "***Chapter 11 Case(s)***") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (as amended, the "***Bankruptcy Code***") in the United States Bankruptcy Court for the Southern District of New York (the "***Bankruptcy Court***"). |
| **GENERAL TERMS OF THE RESTRUCTURING** | |
| **New Liquidity Facility; Application of New Debt** | The Company may enter into a new revolving credit facility for working capital purposes (the "***New Liquidity Facility***") in the principal amount of up to $50 million. The New Liquidity Facility |

---

[3]    The Equity Warrants will be structured such that decisions regarding the timing for issuance of the New Debt and how the proceeds of such New Debt will be used will be value neutral to the Equity Warrants.

| | |
|---|---|
| **Proceeds** | may be provided by third party financing sources, and the Consenting Lenders shall have no obligation to provide such financing.

If the Company is unable to implement the New Liquidity Facility in connection with the consummation of the Restructuring, then the Lender Cash Distribution will be adjusted accordingly to fully fund a working capital reserve equal to the Minimum Liquidity Amount upon consummation of the Restructuring following payment of any Outstanding Trade Obligations and the Restructuring Expenses.

For the avoidance of doubt, (a) the minimum liquidity reserve (inclusive of any minimum liquidity requirements under the New Debt) based on the cash on hand and borrowing availability under the New Liquidity Facility, if applicable, immediately following the consummation of the Restructuring (including, but not limited to, following payment of or allocation for the Lender Cash Distribution, the Outstanding Trade Obligations, and the Restructuring Expenses) shall be no less than $72.5 million (the "***Minimum Liquidity Amount***") and (b) any proceeds of the New Debt shall first be applied towards the payment in full of (i) the Outstanding Trade Obligations and (ii) any amount necessary to satisfy the Minimum Liquidity Amount following payment of the fees and expenses incurred in connection with the Restructuring, as well as the funding obligations under the Plan (the "***Restructuring Expenses***").[4] |
| **Management Incentive Plan** | As part of the Restructuring, Eagle shall institute a new management incentive plan reserving certain Common Stock of Reorganized Eagle as follows, which plan will supersede any prior management or employee stock compensation plan of Eagle and any of its affiliates and subsidiaries (the "***New Management Incentive Plan***"). Upon completion of the Restructuring, senior management and certain other employees of the Company will:

(a) receive, pursuant to the vesting schedule described below, 2.0% of the Common Stock outstanding as of the effective date of the Restructuring on a fully-diluted basis (the "***MIP Shares***"); and

(b) be issued the following incentive awards (the "***MIP Options***") from the New Management Incentive Plan based on different levels of appreciation above Eagle's reorganization enterprise value (as determined by a bankruptcy court) (the "***Reorganization Enterprise Value***") as follows: (i) seven (7) year stock options to acquire 2.5% of Common Stock based on the |

---

[4] The working capital reserve shall include the amount of any unused availability under a New Liquidity Facility.

Reorganization Equity Value (defined below); and (ii) seven (7) year stock options to acquire 3.0% of Common Stock based on a premium to the Reorganization Equity Value equivalent to a 30.2% premium to the Reorganization Enterprise Value. For the avoidance of doubt, the amount of the premium referenced in the foregoing clause (ii) would be calculated by dividing (a) the amount in dollars that is equal to 30.2% of the Reorganization Enterprise Value into (b) the dollar amount of the Reorganized Equity Value. Such premium would then be applied to the Reorganization Equity Value to derive the applicable strike price on the tranche of warrants in the foregoing clause (ii). "***Reorganization Equity Value***" as used herein means, on the effective date of the Restructuring, the Reorganization Enterprise Value less the New Debt incurred.[5]

The MIP Shares and the MIP Options will generally vest over four (4) years through annual installments, each in an amount equal to 25% of such shares or options, as applicable, commencing on the first anniversary of the Restructuring.

In addition, no less than 2.5% of the shares of Common Stock of Reorganized Eagle (on a fully diluted basis), subject to upward adjustment as may be agreed to by Eagle and the Majority Consenting Lenders prior to the effective date of the Restructuring, will be reserved for future issuances by Reorganized Eagle to senior management and certain other employees of Reorganized Eagle at the direction of the Reorganized Eagle's Board of Directors.

The Company's Chief Executive Officer shall receive not less than 60% of the total compensation to be awarded under the Management Incentive Plan. Other terms with respect to the MIP Shares and the MIP Options for the Company's Chief Executive Officer shall be determined in connection with the employment agreement, and applicable award agreements, as set forth on Exhibit A.

Participants in the Management Incentive Plan will be entitled to the Minority Shareholder Protections discussed below.

The Management Incentive Plan will be structured as an omnibus incentive plan and will contain provisions consistent with this Term Sheet and other provisions, including without limitation adjustment provisions to reflect any transaction involving company shares, including as a result of dividends,

---

[5]    The calculation of the actual strike price of the management options will be set to take into account the Reorganization Enterprise Value and the amount of the New Debt and the use of the proceeds thereof.

| | |
|---|---|
| | recapitalization, stock split, etc., so as to prevent any diminution or enlargement of the holder's rights under the award.  In addition, awards that expire or are forfeited or cancelled will again be available for issuance under the Management Incentive Plan and awards may not be materially amended in an adverse manner without the consent of any holder who is senior management.  The MIP Shares will have the right to receive dividends or other distributions at the same time and in the same form as a holder of Common Stock; <u>provided</u> that (i) dividends or other distributions in respect of unvested MIP Shares will be paid at the same time as underlying MIP Shares are settled and (ii) provided further than the MIP Shares will not receive a dividend from the proceeds of the New Debt if the New Debt is incurred after closing.  The senior management will also have the right to elect a net settlement (<u>i.e.</u>, on a cashless basis) with respect to both the MIP Shares and the MIP Options. |
| **Releases** | The Plan shall provide for customary mutual releases and/or waivers, including standard carveouts, among the Company, each of the Consenting Lenders, RBS, as original Agent and Security Trustee under the Credit Agreement, Wilmington, as successor Agent and Security Trustee under the Credit Agreement, and each of their respective directors, officers, funds, affiliates, members, employees, partners, managers, agents, representatives, principals, consultants, and professional advisors (each in their capacity as such) (collectively, the "***Released Parties***") of any and all claims, obligations (contractual or otherwise), suits, judgments, damages, rights, liabilities, or causes of action, whether known or unknown, foreseen or unforeseen, relating to any actions, transactions, events, or omissions before the effective date of the Restructuring in any way relating to the Company, the obligations under the Credit Agreement, or the Restructuring, that a Released Party would have been legally entitled to assert in their own right or on behalf of another party (including, for the avoidance of doubt, the Company) against another Released Party. |
| **Employment Agreements** | Upon and following any consummation of the Restructuring, the Employment Agreement between Eagle, Eagle Shipping International (USA) LLC, a Marshall Islands Company, and Sophocles Zoullas, dated June 19, 2008 (as amended, modified or restated from time to time, the "***Zoullas Employment Agreement***") shall be amended as set forth on <u>Exhibit A</u>. |
| **Board of Directors** | The Board of Directors shall consist of seven (7) members, one of whom shall be Eagle's Chief Executive Officer (Sophocles Zoullas), who also shall serve as Chairman of the Board.  The remaining six (6) directors shall be selected by the Majority Consenting Lenders in their sole discretion; <u>provided</u> that the Consenting Lenders shall consult in good faith with management and the independent board committee concerning the individuals |

| | |
|---|---|
| | selected; <u>provided</u>, <u>further</u>, that sufficient independent directors will be selected to comply with any applicable listing requirements. <br><br> The Board may appoint a non-executive, independent lead director with responsibilities customary for an independent lead director. |
| **Senior Officers** | The senior officers ("**Senior Officers**") of the Company shall be: <br><br> Chief Executive Officer: <br><br>    • Sophocles Zoullas <br><br> Chief Financial Officer: <br><br>    • Adir Katzav <br><br> President of Eagle Shipping International (USA) LLC: <br><br>    • Alexis Zoullas |
| **Amended Articles & Bylaws** | The Company's existing articles and bylaws will be subject to customary amendments and modifications and shall include certain rights and protections for minority shareholders customary for a listed public company (collectively, the "***Minority Shareholder Protections***") as well as the maximum protections available with respect to affiliate transactions for public companies, including any merger, consolidation or reorganization of the Company, any sale, transfer or other disposition of all or substantially all of the assets of the Company, any other change in control of the Company or all or substantially all of its assets involving an affiliate (any such transactions, "***Material Transactions***"). |
| **Registration Rights** | The Company and the Consenting Lenders shall negotiate in good faith a registration rights agreement providing for (1) the right of shareholders requiring registration rights to require the Company to register with the SEC shares of Common Stock and Equity Warrants and shares of Common Stock underlying Equity Warrants, in each case issued to them pursuant to the Restructuring, and (2) "piggy-back" registration rights with customary cutbacks for such shareholders. |
| **Public Status** | Eagle shall remain a public company and shall file reports under the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder. |
| **Listing Status** | Eagle shall remain listed on the Nasdaq Global Select Market. To ensure Eagle's continued listing, the Consenting Lenders shall provide Eagle with sufficient time and cooperation to take the necessary steps to comply with all applicable Nasdaq requirements, as shall be reasonably agreed between the parties. In the event that Eagle loses its Nasdaq listing for any reason prior to the consummation of the Restructuring, (i) the Consenting |

| | |
|---|---|
| | Lenders agree to support Eagle's good faith efforts to become relisted on Nasdaq and (ii) Eagle shall use commercially reasonable efforts to comply with listing requirements while delisted, subject to the terms and conditions of the Restructuring. |
| **Fees & Expenses / Expense Reimbursement** | The Company shall pay the fees and expenses incurred by the following advisors to the Consenting Lenders and Wilmington, as successor Agent and Security Trustee under the Credit Agreement, acting jointly: (i) Paul, Weiss, Rifkind, Wharton & Garrison LLP ("***Paul Weiss***") as set forth in that certain fee letter, dated as of January 1, 2014, between Eagle and Paul Weiss; (ii) Houlihan Lokey Capital, Inc.  ("***Houlihan***") as set forth in that certain letter agreement, dated as of February 1, 2014, among Eagle, Houlihan, Paul Weiss, and the Lender Group (as defined therein), and (iii) maritime and appropriate foreign counsel engaged by Paul Weiss. |
| **Right to Solicit Alternative Restructurings** | Notwithstanding anything to the contrary herein, the Company shall not be entitled to solicit, encourage, and initiate any offer or proposal from, enter into any agreement with, or engage in any discussions or negotiations with, any person or entity concerning any actual or proposed transaction involving any or all of (i) another financial and/or corporate restructuring of any member of the Company, (ii) the issuance, sale, or other disposition of any equity or debt interests, or any material assets, of any member of the Company, or (iii) a merger, consolidation, business combination, liquidation, recapitalization, refinancing, or similar transaction involving any member of the Company (each, an "***Alternative Transaction***"); provided, however, that the Company may respond to any proposal or offer for an Alternative Transaction to the extent that the Board of Directors of the Company determines in good faith, and consistent with its fiduciary duties, that such a response is necessary; provided, further, however, that the Company shall promptly provide copies of all such documentations and materials received by the Company concerning such an Alternative Transaction to Paul Weiss. |
| **Tax, Securities, and Corporate Matters** | The issuance of shares and the transactions discussed herein are subject to ongoing tax diligence, securities compliance, and other corporate review. |
| **Insurance** | All insurance premiums on existing policies shall be paid as of the effective date of the closing of the Restructuring or when earlier due.  On or before the closing of the Restructuring, the Company shall obtain reasonably sufficient tail coverage (i.e., D&O insurance coverage that extends beyond the end of the policy period through the end of any applicable statute of limitations period) under a directors' and officers' liability insurance policy for the Company's current and former directors, officers, and managers. |

| | |
|---|---|
| **Delphin Management Agreement** | The Company shall use its best efforts to amend the Management Agreement between Eagle Bulk and Delphin Shipping LLC on terms and conditions acceptable to the Company and the Consenting Lenders, provided that if the parties are unable to do so, the Company, at the direction of the Consenting Lenders, shall take reasonably necessary steps to not renew the management agreement.<br><br>If the Delphin management agreement is not amended as set forth herein, it will be rejected in the Chapter 11 Case; <u>provided</u> that the foregoing terms and requirements with respect to the Delphin management agreement may be waived by the Company and the Consenting Lenders. |
| **Other Terms and Conditions** | The Plan, the definitive documentation and other material agreements shall be in form and substance satisfactory to the Consenting Lenders and shall contain such other terms and conditions as are customary for transactions of this type. |

**Exhibit A to Term Sheet**

**EAGLE BULK SHIPPING INC.**

**EXHIBIT A:**
**Employment Agreement Term Sheet**

The following sets forth the principal terms of the current employment agreement (the "Agreement") between Sophocles M. Zoullas (the "Executive"), Eagle Shipping International (USA) LLC, a Marshall Islands limited liability company (the "Company") and its parent, Eagle Bulk Shipping Inc., a Marshall Islands corporation (the "Parent"), as well as proposed changes to the Agreement. Except as otherwise provided in this term sheet, the terms of the current employment agreement between the Executive and the Company (the "Existing Agreement) will be incorporated into the Agreement. Certain defined terms have the meanings given to them in the Existing Agreement. **THIS TERM SHEET DOES NOT BY ITSELF CREATE ANY RIGHTS OR OBLIGATIONS AND IS SUBJECT TO THE EXECUTION OF A DEFINITIVE WRITTEN AGREEMENT REGARDING THE SUBJECT MATTER DESCRIBED HEREIN.**

| Provision | Current Agreement Description |
|---|---|
| **Title/Position** | Executive shall serve as the Chief Executive Officer of the Company and the Executive shall continue to serve as the Chairman; provided that the Board may add a position of a non-executive, independent lead director or may elect to separate the positions of Chief Executive Officer and Chairman, and neither action will constitute Good Reason. |
| **Term** | Current term to end on June 18, 2017, subject to automatic 1 year extensions on each anniversary thereof, unless either party provides 90 days' advance written. <br><br> Non-renewal is to be treated the same as a termination by the Company without Cause/by the Executive for Good Reason. |
| **Duties** | During the Term, Executive shall devote substantially all of his business time and attention to the business and affairs of the Company and the Parent and use his reasonable best efforts to faithfully perform his duties and responsibilities; but notwithstanding the foregoing, nothing in the Agreement shall preclude the Executive (i) from engaging, consistent with his duties and responsibilities hereunder, in charitable, educational and community affairs, including serving on the board of directors of any charitable, educational or community organization, (ii) from managing his personal passive investments, (iii) upon approval of the Board, which approval shall not be unreasonably withheld, from serving as a director of another company; (iv) from engaging in activities approved by |

| Provision | Current Agreement Description |
|---|---|
| | the Board and (v) from managing his investment in Delphin Shipping LLC, provided that such management does not materially interfere with the Executive's duties with the Company. The Executive agrees not to take personal advantage of any business opportunities relating to general shipping which may arise during the Executive's employment hereunder which could reasonably be expected to be business opportunities that the Company or the Parent might pursue.

The following language will be clarified to provide that Executive will not have any majority ownership interest or active day-to-day management role in any opportunity that the Board elects not to participate in:

"The Executive further agrees to disclose all such opportunities, and the material facts attendant thereto, to the Board for consideration by the Company and the Parent. If within 15 business days of the Executive disclosing such business opportunities to the Board, the Board fails to adopt a resolution (and to provide a copy of same to the Executive) that it may pursue such business opportunity, the Company and the Parent will be deemed to have declined to pursue such opportunity, in which event the Executive shall be free to pursue it." |
| **Base Salary and Annual Cash Bonus Opportunity** | $850,000 base salary per annum.

Base Salary shall be reviewed for increase at such time, and in the same manner as the salaries of senior officers of the Company are reviewed generally.

For first two years of contract term, the Executive will be eligible for a target annual cash bonus opportunity equal to 50% of base salary with a maximum annual cash bonus opportunity of 75% base salary.

Performance goals to be set by Compensation committee following reasonable consultation with Executive. |
| **Equity Vesting on Termination: Death/Disability** | One year additional vesting in equity-based awards; provided that, in all cases, no less than two years of total vesting. |
| **Termination by the Company w/o Cause or by** | • Accrued Obligations;<br><br>• Severance equal to **2X** the sum of Executive's Base Salary plus bonus (for purposes of this calculation, |

| Provision | Current Agreement Description |
|---|---|
| **Executive with Good Reason** | bonus is to be equal to (i) 62.5% of Base Salary if such separation occurs during the first two years following the effective date of the Agreement and (ii) 100% of Base Salary thereafter) payable in a **lump sum** within 60 days following the termination;<br><br>• Continued medical and life insurance benefits for **two years**, subject to Executive's continued payment of required contributions as if an active employee; and<br><br>• One year additional vesting in equity-based awards; provided that, in all cases, no less than two years of total vesting. |
| **Termination by the Company w/o Cause or by Executive with Good Reason *within 2 years following a Change in Control*** | <u>No</u> enhanced severance upon a termination following a Change in Control.  The 2x severance will apply if there is a termination following a Change in Control. |
| **280G Golden Parachute** | 280G best-net provision. |
| **Clawback** | Clawback provision shall be inserted, applicable to the extent required by applicable law (including without limitation Section 304 of the Sarbanes Oxley Act and Section 954 of the Dodd Frank Act). |
| **Non-Competition and Non-Solicitation** | <u>Non-compete and non-solicit (employees and customers)</u>:  During the Term and for <u>one</u> year post termination for any reason.<br><br>Competitive Activity definition to be read as follows:<br><br>**"Competitive Activity"** means involvement in the management or operation of or control, direct or indirect, of a company that operates vessels, of which at least 80% (by number of ships) are **dry bulk vessels**, wherever such business is located in the world if such business is or reasonably could become a competitor of the Company at the time the Executive becomes affiliated with such company. |

| Provision | Current Agreement Description |
|---|---|
| **Indemnification** | Subject to the Executive's review of final language, indemnification provision to be updated to provide for a carve-out that no indemnification will be provided for any claims initiated by the Executive against the Company, the Board or its officers and directors unless approved in advance in writing by the Board.<br><br>Language to be consistent for all senior executive officers and directors. |

**EXECUTION VERSION**

## **<u>Exhibit B</u>**

## **<u>to the Restructuring Support Agreement</u>**

## **PLAN**

[Exhibit Omitted – Filed Separately]

**EXECUTION VERSION**

## <u>Exhibit C</u>

## <u>to the Restructuring Support Agreement</u>

## DISCLOSURE STATEMENT

[Exhibit Omitted – Filed Separately]

## **Exhibit D**

## **to the Restructuring Support Agreement**

## **INTERIM FINANCING ORDER**

[Exhibit Omitted – Filed Separately]

**Exhibit E**

**to the Restructuring Support Agreement**

**CONSUMMATION DOCUMENTS[2]**

1. Rejection Schedule

2. New Eagle Charter

3. New Eagle By-Laws

4. New Eagle MIP Option Agreements

5. New Eagle MIP Primary Equity Agreements

6. New Eagle Equity Warrant Agreement

7. Identity and affiliations of the officers and members of the New Board of the Reorganized Debtor

8. List of retained Causes of Action

9. Management Incentive Program

10. New CEO Employment Agreement

11. Registration Rights Agreement

12. Exit Financing Facility Credit Agreement

13. Delphin Management Agreement, as amended

---

[2] Capitalized terms used in this Exhibit E shall have the meanings ascribed to such terms in the Plan.

<u>**Exhibit F**</u>

**to the Restructuring Support Agreement**

**Form of Transferee Joinder**

This joinder (this "<u>**Joinder**</u>") to the Restructuring Support Agreement (the "<u>**Agreement**</u>"), dated as of April __, 2014, entered into by and among (i) Eagle Bulk Shipping Inc. ("<u>**EBS**</u>") and each of its direct and indirect subsidiaries (each an "<u>**Eagle Entity**</u>" and, collectively, the "<u>**Eagle Entities**</u>" or the "<u>**Company**</u>") and (ii) the lenders under the Credit Agreement that are (or may become in accordance with <u>Section 11</u> thereof) signatories thereto (the "<u>**Consenting Lenders**</u>"), is executed and delivered by [_____] (the "<u>**Joining Party**</u>") as of [_____], 2014.  Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Agreement.

1. <u>Agreement to be Bound</u>.  The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is annexed to this Joinder as <u>**Annex I**</u> (as the same has been or may be hereafter amended, restated, or otherwise modified from time to time in accordance with the provisions hereof).  The Joining Party shall hereafter be deemed to be a Party and a Consenting Lender for all purposes under the Agreement.

2. <u>Representations and Warranties</u>.  With respect to the aggregate amount of debt outstanding under the Credit Agreement held by the Joining Party upon consummation of the sale, assignment, transfer, hypothecation, or other disposition of such debt, the Joining Party hereby (a) represents and warrants to each other Party to the Agreement that it is the legal or beneficial holder of, or holder of investment authority over (with authority to bind such holder), the debt outstanding under the Credit Agreement in the amounts as identified below its name on the signature page hereof and (b) makes the representations and warranties set forth in <u>Section 15</u> of the Agreement to each other Party.

3. <u>Governing Law</u>.  This Joinder shall be governed by and construed in accordance with the laws of the State of New York, without regard to any conflicts of law provisions which would require the application of the law of any other jurisdiction.

4. <u>Notice</u>.  All notices and other communications given or made pursuant to the Agreement shall be sent to:

To the Joining Party at:

[JOINING PARTY]
[ADDRESS]
Attn:
Facsimile: [FAX]
EMAIL:

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as of the date first written above.

**[JOINING PARTY]**

By: _____

    Name:

    Title:

Holdings: $_____ of Revolving

       Commitments Under the Credit Agreement

Holdings: $_____ of Term Loans

       Under the Credit Agreement

Holdings: $_____ of PIK Loans

       Under the Credit Agreement

Acknowledgements:

By: _____

    Name:

    Title:

**<u>Annex I</u> to the Form of Transferee Joinder**

**<u>Agreement</u>**

## Exhibit G

## to the Restructuring Support Agreement

## Claims of Consenting Lenders

| Aggregate Claims as of August 6, 2014[1]: | $1,025,998,898.98 |
|---|---|

---

[1] Calculated based on term loan and PIK loan amounts as of July 31, 2014, excluding uncapitalized interest and accrued but unpaid interest.

## Schedule 1

## to the Restructuring Support Agreement

1. An Event of Default arising under Section 26.3(a) of the Credit Agreement, due to the failure to supply the Agent with a consolidated balance sheet and related consolidated statements of income, equity and cash flows within 90 days of the end of each financial year that does not include a "going concern" qualification or any qualification or exception as to the scope of the audit performed by PricewaterhouseCoopers or another independent certified public accountant, as required in Section 19.1(a) of the Credit Agreement.

2. An Event of Default arising under Section 26.2 of the Credit Agreement, due to the failure to meet the Leverage Ratio specified for the Accounting Period ending December 31, 2013 and each quarter thereafter, as required in Section 20.1 of the Credit Agreement.

3. An Event of Default arising under Section 26.2 of the Credit Agreement, due to the failure to meet the Minimum Interest Coverage Ratio specified for the Accounting Period ending March 31, 2014 and each quarter thereafter, as required in Section 20.2 of the Credit Agreement.

4. An Event of Default arising under Section 26.1 of the Credit Agreement, due to the failure to make the Cash Pay Interest payment scheduled for June 30, 2014 on or before such date.

5. Any related Event of Default with respect to the foregoing or which would result from the failure to give notice with respect to any of the foregoing.