Paul S. Aronzon (admitted *pro hac vice*)
Haig M. Maghakian (admitted *pro hac vice*)
MILBANK, TWEED, HADLEY & M<sup>C</sup>CLOY LLP
601 S. Figueroa St., 30th Floor
Los Angeles, CA 90017
(213) 892-4000

- and -

Tyson M. Lomazow
Matthew Brod
MILBANK, TWEED, HADLEY & M<sup>C</sup>CLOY LLP
One Chase Manhattan Plaza
New York, NY 10005
(212) 530-5000

*Proposed Counsel to Debtor and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) |
| | ) Chapter 11 |
| EAGLE BULK SHIPPING INC., | ) |
| | ) Case No. 14-12303 (SHL) |
| Debtor. | ) |
| | ) |

**NOTICE OF FILING OF REVISED PLAN SUPPLEMENT FOR THE**
**DEBTOR'S PREPACKAGED PLAN OF REORGANIZATION**
**PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.       On August 6, 2014 (the "Petition Date"), Eagle Bulk Shipping Inc., debtor and debtor in possession (the "Debtor") in the above captioned chapter 11 case, filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

2.       On the Petition Date, the Debtor filed the *Debtor's Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* (the "Plan")[1] [Docket No. 15] and the *Disclosure Statement for Debtor's Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* (the "Disclosure Statement") [Docket No. 16].

---

[1]       Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

3.      On August 28, 2014, the Debtor filed the *Notice of Filing of Plan Supplement for the Debtor's Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* (the "Plan Supplement") [Docket No. 54].

4.      The Debtor hereby files the following additional and/or revised Plan Supplement documents, **which are subject to continued review and modification, which modifications may be both material and substantial:**

- Exhibit A: New Eagle Charter

- Exhibit B: New Eagle By-Laws

- Exhibit C: New Eagle Equity Warrant Agreement

- Exhibit D: Registration Rights Agreement

- Exhibit E: Management Incentive Program

- Exhibit G: New Eagle MIP Option Agreements

- Exhibit I: New CEO Employment Agreement

- Exhibit J: Exit Financing Facility – Debt Arrangement Mandate Letter

- Exhibit K: Amended and Restated Delphin Management Agreement

5.      Copies of the Plan Supplement, Plan, and Disclosure Statement may be accessed either through the Bankruptcy Court website at www.nysb.uscourts.gov or through the Debtor's bankruptcy website at www.EagleBulkRestructuring.com.

6.      On **September 18, 2014 at 10:00 a.m. (Eastern time)**, a combined hearing will be held before the Honorable Sean H. Lane, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004, to consider the adequacy of the Disclosure Statement and confirmation of the Plan.

2

Dated:  New York, New York
        September 15, 2014

/s/ Tyson M. Lomazow

Paul S. Aronzon (admitted *pro hac vice*)
Haig M. Maghakian (admitted *pro hac vice*)
MILBANK, TWEED, HADLEY & M<sup>C</sup>CLOY LLP
601 S. Figueroa St., 30th Floor
Los Angeles, CA 90017
Telephone: (213) 892-4000
Facsimile: (213) 892-5063

 - and -

Tyson M. Lomazow
Matthew Brod
MILBANK, TWEED, HADLEY & M<sup>C</sup>CLOY LLP
One Chase Manhattan Plaza
New York, NY 10005
Telephone: (212) 530-5000
Facsimile: (212) 822-5000

*Proposed Counsel to Debtor and Debtor in Possession*

**Exhibit A**

**New Eagle Charter**

*DRAFT*

SECOND AMENDED AND RESTATED
ARTICLES OF INCORPORATION
OF
EAGLE BULK SHIPPING INC.

---

Pursuant to the
Marshall Islands Business Corporations Act

---

Eagle Bulk Shipping Inc. (the "Corporation"), a corporation organized and existing under the Business Corporations Act of 1990, as amended, of the Republic of the Marshall Islands (the "BCA"), does hereby certify as follows:

(1)    The name of the Corporation is Eagle Bulk Shipping Inc. The original articles of incorporation of the Corporation were filed with the office of the Registrar of Corporations of the Republic of the Marshall Islands on March 23, 2005 under the name Eagle Bulk Shipping Inc., and were amended and restated as of June 3, 2005 (the "Amended and Restated Articles of Incorporation"), as further amended as of May 21, 2012.  A Statement of Designations with respect to the Amended and Restated Articles of Incorporation was filed with the office of the Registrar of Corporations of the Republic of the Marshall Islands of as of November 12, 2007.

(2)    These Second Amended and Restated Articles of Incorporation were authorized and adopted in accordance with the Marshal Islands Business Corporations Act.

(3)    The Amended and Restated Articles of Incorporation, as heretofore amended or supplemented, are hereby replaced in their entirety by these Second Amended and Restated Articles of Incorporation to read in their entirety as follows:

FIRST:        Name.  The name of the Corporation is Eagle Bulk Shipping Inc. (the "Corporation").

SECOND:    Registered Agent.  The address of the registered office of the Corporation in the Republic of the Marshall Islands is Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands MH96960.  The name of its registered agent at that address is The Trust Company of the Marshall Islands, Inc.

THIRD:        Permissible Activities.  The purpose of the Corporation is to engage in any lawful act or activity for which a corporation may now or hereafter be organized under the Marshal Islands Business Corporations Act (the "BCA").

FOURTH:    (a) Authorized Capital Stock.  The total number of shares of stock which the Corporation shall have authority to issue is [___] shares of capital stock, consisting of

#4836-0878-3644

(i) [___]¹ shares of common stock, par value US$.01 per share (the "Common Stock"), and

(ii) [___]² shares of preferred stock, par value US$.01 per share (the "Preferred Stock").

(b)    Common Stock.  The powers, preferences and rights, and the qualifications, limitations and restrictions, of the Common Stock are as follows:

(1)    The powers, preferences and rights of the holders of the Common Stock, and the qualifications, limitations and restrictions thereof, shall be in all respects identical.

(2)    The holders of shares of Common Stock shall not have cumulative voting rights (as defined in Division 7, Section 71(2) of the BCA).

(3)    Subject to the rights of the holders of Preferred Stock, and subject to any other provisions of these Second Amended and Restated Articles of Incorporation, as it may be amended from time to time, holders of shares of Common Stock shall be entitled to receive such dividends and other distributions in cash, stock or property of the Corporation when, as and if declared thereon by the Board of Directors from time to time out of assets or funds of the Corporation legally available therefor.

(4)    In the event of any liquidation, dissolution or winding up (either voluntary or involuntary) of the Corporation, the holders of shares of Common Stock shall be entitled to receive the assets and funds of the Corporation available for distribution after payments to creditors and to the holders of any Preferred Stock of the Corporation that may at the time be outstanding, in proportion to the number of shares held by them, respectively.

(5)    No holder of shares of Common Stock shall be entitled to preemptive or subscription rights.

(6)    The Board of Directors is hereby expressly authorized to provide for the issuance of all or any shares of the Preferred Stock in one or more classes or series, and to fix for each such class or series such voting powers, full or limited, or no voting powers, and such designations, preferences and relative, participating, optional or other special rights and such qualifications, limitations or restrictions thereof, as shall be stated and expressed in the resolution or resolutions adopted by the Board of Directors providing for the issuance of such class or series, including, without limitation, the authority to provide that any such class or series may be (i) subject to redemption at such time or times and at such price or prices; (ii) entitled to receive dividends (which may be cumulative or non-cumulative) at such rates, on such conditions, and at such times, and payable in preference to, or in such relation to, the dividends payable on any other class or classes or any other series; (iii) entitled to such rights upon the dissolution of, or upon any distribution of the assets of, the Corporation; or (iv) convertible into, or exchangeable for, shares of any other class or classes of stock, or of any other series of the same or any

---

¹ Note to Draft: Number of shares of common stock to be authorized to equal 100 million more shares than will be issued to stockholders upon emergence from bankruptcy.

² Note to Draft: To equal the number of shares of preferred stock having a liquidation value of $[300] million.

2

other class or classes of stock, of the Corporation at such price or prices or at such rates of exchange and with such adjustments; all as may be stated in such resolution or resolutions, which shall be filed with the Registrar of Corporations in accordance with Section 35(5) of the BCA.

(c)    Non-Voting Stock.  The Corporation shall not issue any non-voting equity securities as and to the extent prohibited by Section 1123(a)(6) of Chapter 11 Title 11 of the United States Code  as in effect on the date of these Second Amended and Restated Articles of Incorporation; provided, however, that the foregoing (i) will not have any further force or effect beyond that required under Section 1123(a)(6), (ii) will have such force and effect only for so long as such 1123(a)(6)  is in effect and applicable to the Corporation, and (iii) in all events may be amended or eliminated in accordance with applicable law from time to time in effect.

FIFTH:    Board of Directors.  The following provisions are inserted for the management of the business and the conduct of the affairs of the Corporation, and for further definition, limitation and regulation of the powers of the Corporation and of its directors and shareholders:

(a)    The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors, which may exercise all such powers of the Corporation and do all such lawful acts and things as are not by law or the By-Laws of the Corporation (as in effect from time to time, the "By-Laws") or by these Second Amended and Restated Articles of Incorporation directed or required to be exercised or done by the shareholders of the Corporation.

(b)    The Board of Directors shall consist of not less than one or more than fifteen (15) members, with the exact number of directors that constitute the entire Board of Directors (such number of directors, irrespective of any vacancies in such authorized directorships, the "Whole Board") fixed from time to time by resolution adopted by the affirmative vote of a majority of the entire Board of Directors.  The number of directors that constitutes the Whole Board shall initially be seven (7).

(c)    The identity of the members of the initial Board of Directors shall be determined pursuant to the Prepackaged Plan of Reorganization of the Corporation under Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, including all exhibits and schedules thereto and the plan supplement(s) filed with respect thereto), as confirmed by that certain order, dated [_____], 2014, of the United States Bankruptcy Court for the Southern District of New York.  The term of the initial directors shall terminate on the date of the 2015 annual meeting.

(d)    A director shall hold office until the next annual meeting of shareholders and until his or her successor shall be elected and shall qualify, subject, however, to prior death, resignation, retirement, disqualification or removal from office.

(e)    Subject to the terms of any one or more classes or series of Preferred Stock, any vacancy on the Board of Directors that results from an increase in the number of directors may be filled by a majority of the Board of Directors then in office, provided

3

that a quorum is present, and any other vacancy occurring on the Board of Directors may be filled by a majority of the Board of Directors then in office, even if less than a quorum, or by a sole remaining director.  Any director elected to fill a vacancy resulting from an increase in the number of directors shall hold office until the next annual meeting of shareholders, but in no case will a decrease in the number of directors shorten the term of any incumbent director.  Any director elected to fill a vacancy not resulting from an increase in the number of directors shall have the same remaining term as that of his predecessor.

(f)        Except as otherwise required by applicable law and subject to the rights, if any, of the holders of shares of Preferred Stock then outstanding, any director or the entire Board of Directors may be removed from office at any time, but only for cause, and only by the affirmative vote of the holders of shares representing a majority of the votes entitled to be cast by the holders of all of the then-outstanding shares of Common Stock and any other class or series of capital stock of the Corporation entitled to vote generally in the election of directors (such shares, collectively, the "Voting Stock").

(g)        Notwithstanding the foregoing, the election, term, removal and filling of vacancies with respect to directors elected separately by the holders of one or more series of Preferred Stock shall not be governed by this Article FIFTH, but rather shall be as provided for in the resolutions adopted by the Board of Directors creating and establishing such series of Preferred Stock, and such directors so elected shall not be divided into classes pursuant to this Article FIFTH unless expressly provided by the terms of such resolutions.

(h)        In addition to the powers and authority hereinbefore or by statute expressly conferred upon them, the directors are hereby empowered to exercise all such powers and do all such acts and things as may be exercised or done by the Corporation, subject, nevertheless, to the provisions of the BCA, these Second Amended and Restated Articles of Incorporation, and any By-Laws adopted by the shareholders; provided, however, that no By-Laws hereafter adopted by the shareholders shall invalidate any prior act of the directors which would have been valid if such By-Laws had not been adopted.

SIXTH:        Limitation on Liability.  No director shall be personally liable to the Corporation or any of its shareholders for monetary damages for breach of fiduciary duty as a director, except to the extent such exemption from liability or limitation thereof is not permitted under the BCA as the same exists or may hereafter be amended.  If the BCA is amended hereafter to authorize the further elimination or limitation of the liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent authorized by the BCA, as so amended.  Any repeal or modification of this Article SIXTH shall not adversely affect any right or protection of a director of the Corporation existing at the time of such repeal or modification with respect to acts or omissions occurring prior to such repeal or modification.

SEVENTH:   Indemnification.  The Corporation shall indemnify its directors and officers to the fullest extent authorized or permitted by law, as now or hereafter in effect, as provided more fully in the By-Laws, and such right to indemnification shall continue as to a person who has ceased to be a director or officer of the Corporation and shall inure to the benefit of his or her heirs, executors and personal and legal representatives; provided, however, that,

4

#4836-0878-3644

except for proceedings to enforce rights to indemnification, the Corporation shall not be obligated to indemnify any director or officer (or his or her heirs, executors or personal or legal representatives) in connection with a proceeding (or part thereof) initiated by such person unless such proceeding (or part thereof) was authorized or consented to by the Board of Directors.  The right to indemnification conferred by this Article SEVENTH shall include the right to be paid by the Corporation the expenses incurred in defending or otherwise participating in any proceeding in advance of its final disposition.

The Corporation may, to the extent authorized from time to time by the Board of Directors, provide rights to indemnification and to the advancement of expenses to employees and agents of the Corporation similar to those conferred in this Article SEVENTH to directors and officers of the Corporation.

The rights to indemnification and to the advance of expenses conferred in this Article SEVENTH shall not be exclusive of any other right which any person may have or hereafter acquire under these Second Amended and Restated Articles of Incorporation, the By-Laws, any statute, agreement, vote of shareholders or disinterested directors or otherwise.

Any repeal or modification of this Article SEVENTH shall not adversely affect any rights to indemnification and to the advancement of expenses of a director or officer of the Corporation existing at the time of such repeal or modification with respect to any acts or omissions occurring prior to such repeal or modification.

EIGHTH:     Action by Shareholders.  Any action required or permitted to be taken by the shareholders of the Corporation may be effected only at a duly called annual or special meeting of the shareholders of the Corporation.  Meetings of shareholders may be held within or without the Republic of the Marshall Islands, as the By-Laws may provide.  Except as otherwise mandated by law, the ability of shareholders of the Corporation to consent in writing to the taking of any action is hereby specifically denied.

NINTH:     Special Shareholder Meetings.  Except as otherwise required by law, special meetings of shareholders of the Corporation for any purpose or purposes may be called at any time only by (i) the Chairman of the Board of Directors, (ii) the Board of Directors pursuant to a resolution duly adopted by a majority of the Whole Board (as defined below) which states the purpose or purposes thereof, or (iii) any one or more shareholders who Beneficially Owns (as defined below), in the aggregate, fifteen percent (15%) or more of the aggregate voting power of all then-outstanding shares of Voting Stock.  Other than as set forth in clause (iii) of the preceding sentence, any power of the shareholders to call a special meeting of shareholders is hereby specifically denied.  The notice of any such special meeting shall include the purpose or purposes for which the meeting is called, and no business other than that stated in the notice of such meeting (or any supplement thereto) shall be transacted at any such special meeting.  As used in these Second Amended and Restated Articles of Incorporation, "Beneficially Own" shall have the meaning given to such term in Rule 13d-3 under the U.S. Securities Exchange Act of 1934, as amended, and any Person's beneficial ownership of securities shall be calculated in accordance with the provisions of such Rule.

5

TENTH:        Books and Records.  The books of the Corporation may be kept (subject to any provision contained in the BCA) outside the Republic of the Marshall Islands at such place or places as may be designated from time to time by the Board of Directors or in the By-Laws, and for so long as the corporate headquarters of the Company is located in the United States, the books of the Corporation shall be kept at the corporate headquarters.

ELEVENTH:  Affiliate Transactions.

(a)        General.  Neither the Corporation nor its Subsidiaries or Affiliates shall enter into any Affiliate Transaction or any agreement with respect thereto, unless:

(1)        With respect to any Affiliate Transaction or series of related Affiliate Transactions that (A) involves any merger, consolidation, share exchange or any other business combination transaction, (B) involves the sale, transfer, disposition or lease of all or substantially of the assets of the Corporation or any of its Subsidiaries, or (C) is otherwise required to be submitted to the shareholders of the Corporation for approval pursuant to any applicable law or regulation (including, without limitation, rules or regulations promulgated under applicable securities laws or stock exchange rules), (x) approval by a majority of the Disinterested Directors on the Board of Directors shall have been obtained [and][3] (y) Minority Shareholder Approval shall have been obtained.

(2)        With respect to any Affiliate Transaction or series of related Affiliate Transactions that involves or could reasonably be expected to involve aggregate payments and/or other consideration or value in excess of US$1,000,000.00, approval by a majority of the Disinterested Directors on the Board of Directors shall have been obtained.

(b)        Certain Definitions.  Capitalized terms that are used in this Article ELEVENTH but are not otherwise defined in these Second Amended and Restated Articles of Incorporation shall have the following meanings:

(1)        "Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such Person as of the date on which, or at any time during the period for which, the determination of affiliation is being made (including any investment fund the primary investment advisor to which is such person or its Affiliate).  For purposes of this definition, the term "control" (including the correlative meanings of the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

(2)        "Affiliate Transaction" shall mean any contract, agreement, transaction or other arrangement (whether written or oral), between the Corporation and/or any of its Subsidiaries or Affiliates, on the one hand, and any Affiliate or

---

[3]  NTD: It is currently under discussion whether this will be an "and" or an "or."

6

Significant Shareholder or any Related Party thereof, on the other hand; provided, however, that this definition shall not include any contract, agreement, transaction or arrangement that is solely between or among the Corporation and/or one or more of its wholly-owned Subsidiaries.

(3)     "Disinterested Directors" shall mean the members of the Board of Directors that were not appointed or nominated by and that are not otherwise Affiliated with or engaged by the Significant Shareholder or Related Party to which such Affiliate Transaction relates; provided, that for purposes of this definition (A) a director shall be considered to be Affiliated with a Significant Shareholder if he or she serves (or served at any time during the 36 months immediately preceding the date of determination) on the board of directors of, or is employed or engaged by (or was employed or engaged by at any time during the 36 months immediately preceding the date of determination), or is otherwise Affiliated with, such Significant Shareholder or any Related Parties of such Significant Shareholder and (B) if applicable, a director shall not be considered to be Affiliated with a Significant Shareholder solely on account of such Significant Shareholder's participation, as a Majority Consenting Lender (as defined in the Plan of Reorganization), in the selection of such individual as one of the initial directors seated as of the "Effective Date" under the Plan of Reorganization.

(4)     "Minority Shareholder Approval" means, with respect to any Affiliate Transaction, the affirmative approval by Shareholders who Beneficially Own shares of Voting Stock that represent more than fifty percent (50%) of the aggregate voting power of all then-outstanding shares of Voting Stock, excluding from such calculation all shares held by the Significant Shareholder to which such Affiliated Transaction relates and all shares held by such Significant Shareholder's Related Parties.[4]

(5)     "Person" means any individual, corporation, partnership, limited liability company, joint venture, association, joint stock company, trust, unincorporated organization or other entity, or government or any agency or political subdivision thereof.

(6)     "Plan of Reorganization" means the Corporation's Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code, as confirmed pursuant to the order entered by the United States Bankruptcy Court for the Southern District of New York on [__], 2014.

(7)     "Related Fund" means, with respect to any Person, any fund, account or investment vehicle that is controlled or managed by such Person, by any Affiliate of such Person, or, if applicable, by the investment manager (or substantially equivalent role) of such Person.

(8)     "Related Party" shall mean, with respect to any Shareholder, any of its Affiliates or Related Funds, or any portfolio company of any of the foregoing.

---

[4]     Additional quorum mechanics to be added.

7

(9)      "Shareholder" shall mean any Person who, at the time of determination, Beneficially Owns any outstanding shares of Voting Stock.

(10)      "Significant Shareholder" means any Shareholder who Beneficially Owns a number of shares of Voting Stock that, together with shares of Voting Stock Beneficially Owned by such Shareholder's Related Parties, represent at least fifteen percent (15%) of the aggregate voting power of all then-outstanding shares of Voting Stock.

(11)      "Subsidiary" shall mean, as to any Person, any other Person in which such first-referenced Person beneficially owns (directly or indirectly) fifty percent (50%) or more of the outstanding voting stock, voting power, partnership interests or similar voting interests.

TWELFTH:    By-Laws.  In furtherance and not in limitation of the powers conferred upon it by the laws of the Republic of the Marshall Islands, the Board of Directors shall have the power to adopt, amend, alter or repeal the By-Laws.  The affirmative vote of at least a majority of the entire Board of Directors shall be required to adopt, amend, alter or repeal the By-Laws.  The By-Laws also may be adopted, amended, altered or repealed by the affirmative vote of the holders of shares representing not less than a majority of the total votes entitled to be cast by the total outstanding shares of Voting Stock; [provided, however, that any proposed alteration, amendment or repeal of, or the adoption of any By-Law inconsistent with, Sections 3, 9, 14 or 15 of Article II of the By-Laws or Sections 1,2 or 6 of Article III of the By-Laws or Article IX of the By-Laws by the shareholders shall require the affirmative vote of the holders of shares representing not less than sixty-six and two-thirds percent (66 2/3%) of the votes entitled to be cast by the Voting Stock.][5]

THIRTEENTH:      Exclusive Forum. Unless the Corporation consents in writing to the selection of alternative forum, the U.S. federal courts located in the Southern District of New York or, if such court lacks jurisdiction, the state courts of the State of New York, shall be the sole and exclusive forum for (a) any derivative action or proceeding brought on behalf of the Corporation, (b) any action asserting a claim of breach of a fiduciary duty owed by any director, officer or other employee of the Corporation to the Corporation or the Corporation's stockholders, (c) any action asserting a claim arising pursuant to any provision of the BCA or (d) any action asserting a claim governed by the internal affairs doctrine. Any person or entity purchasing or otherwise acquiring any interest in shares of capital stock of the Corporation shall be deemed to have notice of consented to the provision of this Article THIRTEENTH.

FOURTEENTH:      Amendments.  The Corporation, with the affirmative vote of holders of shares representing not less than a majority of the total votes entitled to be cast by the total outstanding shares of Voting Stock, reserves the right at any time and from time to time to amend, alter, change or repeal any provision contained in these Second Amended and Restated Articles of Incorporation in the manner now or hereafter prescribed in these Second Amended and Restated Articles of Incorporation, the By-Laws or the BCA, and all rights, preferences and

---

[5]   NTD: It is currently under discussion which provisions require supermajority vote to amend.

8

#4836-0878-3644

privileges herein conferred upon shareholders, directors or any other Person are granted subject to such reservation; [provided, however, that the affirmative vote of holders of shares representing not less than (a) sixty-six and two-thirds percent (66 2/3%) of the total votes entitled to be cast by the total outstanding shares of Voting Stock shall be required to amend, alter, change or repeal (or to adopt any provision as part of these Second Amended and Restated Articles of Incorporation inconsistent with the purpose and intent of) Articles FIFTH, SIXTH, SEVENTH, EIGHTH, NINTH, TWELFTH, THIRTEENTH of these Second Amended and Restated Articles of Incorporation or this Article FOURTEENTH and (b) seventy-five percent (75%) of the total votes entitled to be cast by the total outstanding shares of Voting Stock shall be required to amend, alter, change or repeal (or to adopt any provision as part of these Second Amended and Restated Articles of Incorporation inconsistent with the purpose and intent of) Article ELEVENTH of these Second Amended and Restated Articles of Incorporation.][6]

[*Remainder of page intentionally left blank*]

---

[6]  NTD: It is currently under discussion which provisions require supermajority vote to amend.

9

IN WITNESS WHEREOF, the Corporation has caused these Second Amended and Restated Articles of Incorporation to be executed on its behalf this [__] day of [__], 2014.

EAGLE BULK SHIPPING INC.


By: _____
       Name:  Sophocles N. Zoullas
       Title:   Chief Executive Officer, President and
                 Chairman of the Board of Directors

#4836-0878-3644

**<u>Exhibit B</u>**

**New Eagle By-Laws**

*DRAFT*

SECOND AMENDED AND RESTATED

BY-LAWS

OF

EAGLE BULK SHIPPING INC.

A Marshall Islands Corporation

Effective [___], 2014

#4811-7100-8285

# TABLE OF CONTENTS

**Page**

ARTICLE I OFFICES ............................................................................................................ 1

    Section 1.    Registered Office ................................................................................ 1

    Section 2.    Other Offices .................................................................................... 1

ARTICLE II MEETINGS OF SHAREHOLDERS ............................................................ 1

    Section 1.    Place of Meetings ............................................................................ 1

    Section 2.    Annual Meetings .............................................................................. 1

    Section 3.    Special Meetings .............................................................................. 2

    Section 4.    Notice ............................................................................................... 3

    Section 5.    Adjournments ................................................................................... 3

    Section 6.    Quorum ............................................................................................ 4

    Section 7.    Voting ............................................................................................... 4

    Section 8.    Proxies ............................................................................................. 5

    Section 9.    Consent of Shareholders in Lieu of Meeting ............................... 5

    Section 10.    List of Shareholders Entitled to Vote ........................................... 5

    Section 11.    Record Date ...................................................................................... 6

    Section 12.    Organization; Conduct of Meetings ............................................... 7

    Section 13.    Inspectors of Election ..................................................................... 7

    Section 14.    Nomination of Directors ................................................................. 8

    Section 15.    Business at Annual Meetings ......................................................... 10

ARTICLE III DIRECTORS .................................................................................................. 12

    Section 1.    Number and Election of Directors ................................................. 12

    Section 2.    Vacancies ......................................................................................... 12

    Section 3.    Duties and Powers ........................................................................... 13

#4811-7100-8285

Section 4.      Meetings................................................................................ 13

Section 5.      Organization.......................................................................... 13

Section 6.      Resignations and Removals of Directors................................. 14

Section 7.      Quorum ................................................................................. 14

Section 8.      Actions of the Board by Written Consent................................ 15

Section 9.      Meetings by Means of Conference Telephone ......................... 15

Section 10.     Standing Committees .............................................................. 15

Section 11.     Committees ............................................................................ 16

Section 12.     Compensation ........................................................................ 17

Section 13.     Chairman of the Board of Directors......................................... 18

Section 14.     Lead Director ......................................................................... 18

Section 15.     Interested Directors ................................................................ 19

Section 16.     Board Observers..................................................................... 19

ARTICLE IV OFFICERS.......................................................................................... 21

Section 1.      General................................................................................... 21

Section 2.      Election ................................................................................. 21

Section 3.      Voting Securities Owned by the Corporation.......................... 22

Section 4.      President................................................................................. 22

Section 5.      Vice Presidents...................................................................... 23

Section 6.      Secretary ............................................................................... 23

Section 7.      Treasurer ............................................................................... 24

Section 8.      Assistant Secretaries ............................................................. 25

Section 9.      Assistant Treasurers............................................................... 25

Section 10.     Other Officers ....................................................................... 26

ARTICLE V STOCK................................................................................................ 26

ii

#4811-7100-8285

Section 1.    Form and Issuance ......................................................................... 26

Section 2.    Signatures................................................................................... 26

Section 3.    Lost Certificates ........................................................................... 26

Section 4.    Transfers ..................................................................................... 27

Section 5.    Dividend Record Date.................................................................. 27

Section 6.    Record Owners............................................................................ 27

Section 7.    Transfer and Registry Agents ..................................................... 28

ARTICLE VI NOTICES............................................................................................. 28

Section 1.    Notices ......................................................................................... 28

Section 2.    Waivers of Notice ....................................................................... 28

ARTICLE VII GENERAL PROVISIONS................................................................. 29

Section 1.    Dividends ..................................................................................... 29

Section 2.    Disbursements.............................................................................. 29

Section 3.    Fiscal Year ................................................................................... 29

Section 4.    Corporate Seal............................................................................. 29

ARTICLE VIII INDEMNIFICATION ...................................................................... 30

Section 1.    Right to Indemnification .............................................................. 30

Section 2.    Right to Advancement of Expenses............................................. 31

Section 3.    Right of Indemnitee to Bring Suit............................................... 31

Section 4.    Reliance; Standard of Conduct ................................................... 32

Section 5.    Non-Exclusivity of Rights .......................................................... 32

Section 6.    Insurance ...................................................................................... 33

Section 7.    Indemnification of Employees and Agents of the Corporation ................ 33

Section 8.    Nature of Rights........................................................................... 33

Section 9.    Certain Definitions....................................................................... 34

iii

ARTICLE IX AMENDMENTS ............................................................................................... 35

    Section 1.    Amendments ............................................................................. 35

#4811-7100-8285

SECOND AMENDED AND RESTATED

BY-LAWS

OF

EAGLE BULK SHIPPING INC.

(hereinafter called the "Corporation")

ARTICLE I

OFFICES

Section 1.      Registered Office.  The registered office of the Corporation in the Marshall Islands is Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands MH96960.

Section 2.      Other Offices.  The Corporation may also have offices at such other places, both within and without the Republic of the Marshall Islands, as the Board of Directors may from time to time determine.

ARTICLE II

MEETINGS OF SHAREHOLDERS

Section 1.      Place of Meetings.  Meetings of the shareholders for the election of directors or for any other purpose shall be held at such time and place, either within or without the Republic of the Marshall Islands, as shall be designated from time to time by the Board of Directors.

Section 2.      Annual Meetings.  The annual meeting of shareholders for the election of directors shall be held on such date and at such time as shall be designated from time to time by the Board of Directors.  Any other proper business may be transacted at the annual meeting of shareholders.

#4811-7100-8285

Section 3.   Special Meetings; Certain Definitions.  Unless otherwise required by law or by the articles of incorporation of the Corporation, as amended and restated from time to time (the "Articles of Incorporation"), special meetings of shareholders of the Corporation, for any purpose or purposes, may be called at any time only by (i) the Chairman of the Board of Directors, (ii) the Board of Directors pursuant to a resolution duly adopted by a majority of the Whole Board (as defined below) which states the purpose or purposes thereof, or (iii) any one or more shareholders who Beneficially Own (as defined below), in the aggregate, fifteen percent (15%) or more of the aggregate voting power of all then-outstanding shares of Voting Stock (as defined below).  Other than as set forth in clause (iii) of the preceding sentence, any power of the shareholders to call special meetings of shareholders is specifically denied.  The notice of any such special meeting shall include the purpose or purposes for which the meeting is called, and no business other than that stated in the notice of such meeting (or any supplement thereto) shall be transacted at any such special meeting.  For the purposes of these By-Laws:

(a)   "Beneficially Own" shall have the meaning given to such term in Rule 13d-3 under the U.S. Securities Exchange Act of 1934, as amended (the "Exchange Act"), and any Person's beneficial ownership of securities shall be calculated in accordance with the provisions of such Rule.

(b)   "Person" means any individual, corporation, partnership, limited liability company, joint venture, association, joint stock company, trust, unincorporated organization or other entity, or government or any agency or political subdivision thereof.

(c)   "Subsidiary" shall mean, as to any Person, any other Person in which such first-referenced Person Beneficially Owns (directly or indirectly) fifty percent

2

#4811-7100-8285

(50%) or more of the outstanding voting stock, voting power, partnership interests or similar voting interests.

(d) "Voting Stock" shall mean, collectively, all shares of Common Stock and any other class or series of capital stock of the Corporation entitled to vote generally in the election of directors.

(e) "Whole Board" shall have the meaning given to such term in the Articles of Incorporation.

Section 4. Notice. Whenever shareholders are required or permitted to take any action at a meeting, a written notice of the meeting shall be given which shall state the place, date and hour of the meeting, and, in the case of a Special Meeting, the purpose or purposes for which the meeting is called. Unless otherwise required by law, written notice of any meeting shall be given not less than fifteen (15) nor more than sixty (60) days before the date of the meeting to each shareholder entitled to notice of and to vote at such meeting.

Section 5. Adjournments. Any meeting of the shareholders may be adjourned from time to time by the chairman of such meeting, to reconvene at the same or some other place, and notice need not be given of any such adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken. At the adjourned meeting, the Corporation may transact any business which might have been transacted at the original meeting. If the adjournment is for more than thirty (30) days, or if after the adjournment a new record date is fixed for the adjourned meeting, notice of the adjourned meeting in accordance with the requirements of Section 4 of this Article II shall be given to each shareholder of record entitled to notice of and to vote at the meeting.

3

#4811-7100-8285

Section 6.     Quorum.  Unless otherwise required by applicable law or the Articles of Incorporation, the holders of a majority of the Corporation's capital stock issued and outstanding and entitled to vote thereat, present in person or represented by proxy, shall constitute a quorum at all meetings of the shareholders for the transaction of business.  A quorum, once established, shall not be broken by the withdrawal of enough votes to leave less than a quorum.  If, however, such quorum shall not be present or represented at any meeting of the shareholders, the shareholders entitled to vote thereat, present in person or represented by proxy, shall have power to adjourn the meeting from time to time, in the manner provided in Section 5 of this Article II, until a quorum shall be present or represented.

Section 7.     Voting.  Unless otherwise required by law, the Articles of Incorporation, these By-Laws, or the rules of any stock exchange upon which the Corporation's securities are listed, any question brought before any meeting of the shareholders, other than the election of directors, shall be decided by the vote of the holders of a majority of the aggregate voting power of the outstanding shares of Voting Stock entitled to vote and who are present, in person or proxy, voting as a single class.  All elections of directors shall be determined by a plurality of the votes cast.  Unless otherwise provided in the Articles of Incorporation, and subject to Section 10 of this Article II, each shareholder represented at a meeting of the shareholders shall be entitled to cast one (1) vote for each share of the capital stock entitled to vote thereat held by such shareholder.  Such votes may be cast in person or by proxy as provided in Section 8 of this Article II.  The Board of Directors, in its discretion, or the officer of the Corporation presiding at a meeting of the shareholders, in such officer's discretion, may require that any votes cast at such meeting shall be cast by written ballot.

4

Section 8.        Proxies.  Each shareholder entitled to vote at a meeting of the shareholders may authorize another person or persons to act for such shareholder as proxy by an instrument in writing or by a transmission permitted by law filed in accordance with the procedure established for the meeting.  Any copy, facsimile telecommunication or other reliable reproduction of the writing or transmission created pursuant to this paragraph may be substituted or used in lieu of the original writing or transmission for any and all purposes for which the original writing or transmission could be used, provided that such copy, facsimile telecommunication or other reproduction shall be a complete reproduction of the entire original writing or transmission.  No such proxy shall be voted upon after eleven (11) months from its date, unless such proxy provides for a longer period.  A duly executed proxy shall be irrevocable if it states that it is irrevocable and if, and only as long as, it is coupled with an interest sufficient in the law of the Marshall Islands to support an irrevocable power.  A shareholder may revoke any proxy which is not irrevocable by attending the meeting and voting in person or by filing an instrument in writing revoking the proxy or another duly executed proxy bearing a later date with the Secretary of the Corporation.

Section 9.        Consent of Shareholders in Lieu of Meeting.  Any action required or permitted to be taken by the shareholders of the Corporation may be effected only at a duly called annual or special meeting of the shareholders of the Corporation.  Except as otherwise mandated by law, the ability of shareholders of the Corporation to consent in writing to the taking of any action is hereby specifically denied.

Section 10.       List of Shareholders Entitled to Vote.  The officer of the Corporation who has charge of the stock ledger of the Corporation shall prepare and make, at least fifteen (15) days before every meeting of the shareholders, a complete list of the

5

#4811-7100-8285

shareholders entitled to vote at the meeting, arranged in alphabetical order, and showing the address of each shareholder and the number of shares registered in the name of each shareholder. Such list shall be open to the examination of any shareholder, for any purpose germane to the meeting, during ordinary business hours, for a period of at least fifteen (15) days prior to the meeting (i) either at a place within the city where the meeting is to be held, which place shall be specified in the notice of the meeting, or, if not so specified, at the place where the meeting is to be held or (ii) during ordinary business hours, at the principal place of business of the Corporation. The list shall also be produced and kept at the time and place of the meeting during the whole time thereof, and may be inspected by any shareholder of the Corporation who is present.

Section 11.    Record Date. In order that the Corporation may determine the shareholders entitled to notice of or to vote at any meeting of the shareholders or any adjournment thereof, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall not be more than sixty (60) nor less than fifteen (15) days before the date of such meeting. If no record date is fixed by the Board of Directors, the record date for determining shareholders entitled to notice of or to vote at a meeting of the shareholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held. A determination of shareholders of record entitled to notice of or to vote at a meeting of the shareholders shall apply to any adjournment of the meeting; provided, however, that the Board of Directors may fix a new record date for the adjourned meeting.

6

#4811-7100-8285

Section 12.    Organization; Conduct of Meetings.  At any meeting of the shareholders, the Chairman of the Board of Directors, or, in his or her absence or disability, the Chief Executive Officer or, in his or her absence or disability, such person as is chosen by a majority of the members of the Board of Directors present at such meeting, shall call to order any meeting of the shareholders and act as chairman of such meeting.  The Board of Directors of the Corporation may adopt by resolution such rules and regulations for the conduct of any meeting of the shareholders as it shall deem appropriate.  Except to the extent inconsistent with such rules and regulations, the chairman of any meeting of the shareholders shall have the right and authority to prescribe such rules, regulations and procedures and to do all such acts as, in the judgment of such chairman, are appropriate for the proper conduct of the meeting, and which may include, without limitation, the following:  (i) the establishment of an agenda or order of business for the meeting; (ii) the determination of when the polls shall open and close for any given matter to be voted on at the meeting; (iii) rules and procedures for maintaining order at the meeting and the safety of those present; (iv) limitations on attendance at or participation in the meeting to shareholders of record of the Corporation, their duly authorized and constituted proxies or such other persons as the chairman of the meeting shall determine; (v) restrictions on entry to the meeting after the time fixed for the commencement thereof; and (vi) limitations on the time allotted to questions or comments by participants.  The date and time of the opening and closing of the polls for each matter upon which the shareholders will vote at the meeting shall be announced at the meeting.  In the absence of the Secretary of the Corporation, the secretary of the meeting shall be such person as the chairman of the meeting appoints.

Section 13.    Inspectors of Election.  In advance of any meeting of the shareholders, the Board of Directors may appoint one or more inspectors to act at the meeting or

7

#4811-7100-8285

any adjournment thereof.  If inspectors are not so appointed, the person presiding at a shareholders' meeting may, and on the request of any shareholder entitled to vote thereat shall, appoint one or more inspectors.  In case any person appointed fails to appear or act, the vacancy may be filled by appointment made by the Board of Directors in advance of the meeting or at the meeting by the person presiding thereat.  Each inspector, before entering upon the discharge of the duties of inspector, shall take an oath faithfully to execute the duties of inspector at such meeting.  The inspector shall have the duties prescribed by applicable law (including the BCA) and shall take charge of the polls and, when the vote is completed, shall make a certificate of the result of the vote taken and of such other facts as may be required by applicable law.

Section 14.    Nomination of Directors.  (a) Only persons who are nominated in accordance with the following procedures shall be eligible for election as directors of the Corporation, except as may be otherwise provided in the Articles of Incorporation with respect to the right of holders of preferred stock of the Corporation to nominate and elect a specified number of directors in certain circumstances.  Nominations of persons for election to the Board of Directors may be made at any annual meeting of shareholders (x) by or at the direction of the Board of Directors (or any duly authorized committee thereof) or (y) by any shareholder of the Corporation (i) who is a shareholder of record on the date of the giving of the notice provided for in this Section 14.and on the record date for the determination of shareholders entitled to notice of and to vote at such annual meeting and (ii) who complies with the notice procedures set forth in this Section 14.

(b)    In addition to any other applicable requirements, for a nomination to be made by a shareholder, such shareholder must have given timely notice thereof in proper written form to the Secretary of the Corporation.

8

#4811-7100-8285

(c)     To be timely, a shareholder's notice to the Secretary must be delivered to or mailed and received at the principal executive offices of the Corporation not less than sixty (60) days nor more than ninety (90) days prior to the anniversary date of the immediately preceding annual meeting of shareholders; provided, however, that in the event that the annual meeting is called for a date that is not within thirty (30) days before or after such anniversary date, notice by the shareholder in order to be timely must be so received not later than the close of business on the tenth (10th) day following the day on which such notice of the date of the annual meeting was mailed or such public disclosure of the date of the annual meeting was made, whichever first occurs.

(d)     To be in proper written form, a shareholder's notice to the Secretary must set forth (a) as to each person whom the shareholder proposes to nominate for election as a director (i) the name, age, business address and residence address of the person, (ii) the principal occupation or employment of the person, (iii) the class or series and number of shares of capital stock of the Corporation which are owned beneficially or of record by the person and (iv) any other information relating to the person that would be required to be disclosed in a proxy statement or other filings required to be made in connection with solicitations of proxies for election of directors pursuant to Section 14 of the Exchange Act, and the rules and regulations promulgated thereunder; and (b) as to the shareholder giving the notice (i) the name and record address of such shareholder, (ii) the class or series and number of shares of capital stock of the Corporation which are owned beneficially or of record by such shareholder, (iii) a description of all arrangements or understandings between such shareholder and each proposed nominee and any other person or persons (including their names) pursuant to which the nomination(s) are to be made by such shareholder, (iv) a representation that such

9

#4811-7100-8285

shareholder intends to appear in person or by proxy at the meeting to nominate the persons named in its notice and (v) any other information relating to such shareholder that would be required to be disclosed in a proxy statement or other filings required to be made in connection with solicitations of proxies for election of directors pursuant to Section 14 of the Exchange Act and the rules and regulations promulgated thereunder.  Such notice must be accompanied by a written consent of each proposed nominee to being named as a nominee and to serve as a director if elected.

(e)      No person shall be eligible for election as a director of the Corporation unless nominated in accordance with the procedures set forth in this Section 14.  If the Chairman of the annual meeting determines that a nomination was not made in accordance with the foregoing procedures, the Chairman shall declare to the meeting that the nomination was defective and such defective nomination shall be disregarded.

Section 15.      <u>Business at Annual Meetings</u>.

(a)      No business may be transacted at an annual meeting of shareholders, other than business that is either (a) specified in the notice of meeting (or any supplement thereto) given by or at the direction of the Board of Directors (or any duly authorized committee thereof), (b) otherwise properly brought before the annual meeting by or at the direction of the Board of Directors (or any duly authorized committee thereof), or (c) otherwise properly brought before the annual meeting by any shareholder of the Corporation (i) who is a shareholder of record on the date of the giving of the notice provided for in this Section 15 and on the record date for the determination of shareholders entitled to notice of and to vote at such annual meeting and (ii) who complies with the notice procedures set forth in this Section 15.

#4811-7100-8285

(b)    In addition to any other applicable requirements, for business to be properly brought before an annual meeting by a shareholder, such shareholder must have given timely notice thereof in proper written form to the Secretary of the Corporation.

(c)    To be timely, a shareholder's notice to the Secretary must be delivered to or mailed and received at the principal executive offices of the Corporation not less than sixty (60) days nor more than ninety (90)  days prior to the anniversary date of the immediately preceding annual meeting of shareholders; provided, however, that in the event that the annual meeting is called for a date that is not within thirty (30) days before or after such anniversary date, notice by the shareholder in order to be timely must be so received not later than the close of business on the tenth (10th) day following the day on which such notice of the date of the annual meeting was mailed or such public disclosure of the date of the annual meeting was made, whichever first occurs.

(d)    To be in proper written form, a shareholder's notice to the Secretary must set forth as to each matter such shareholder proposes to bring before the annual meeting (i) a brief description of the business desired to be brought before the annual meeting and the reasons for conducting such business at the annual meeting, (ii) the name and record address of such shareholder, (iii) the class or series and number of shares of capital stock of the Corporation which are owned beneficially or of record by such shareholder, (iv) a description of all arrangements or understandings between such shareholder and any other person or persons (including their names) in connection with the proposal of such business by such shareholder and any material interest of such shareholder in such business and (v) a representation that such shareholder intends to appear in person or by proxy at the annual meeting to bring such business before the meeting.

11

#4811-7100-8285

(e)        No business shall be conducted at the annual meeting of shareholders except business brought before the annual meeting in accordance with the procedures set forth in this Section 15; provided, however, that, once business has been properly brought before the annual meeting in accordance with such procedures, nothing in this Section 15shall be deemed to preclude discussion by any shareholder of any such business.  If the chairman of an annual meeting determines that business was not properly brought before the annual meeting in accordance with the foregoing procedures, the chairman shall declare to the meeting that the business was not properly brought before the meeting and such business shall not be transacted.

## ARTICLE III

## DIRECTORS

Section 1.        Number and Election of Directors.  (a) The Board of Directors shall consist of not less than one nor more than fifteen members, the exact number of which shall initially be fixed at seven (7) and may thereafter be adjusted from time to time by the Board of Directors as provided in the Articles of Incorporation.

(b)        The directors shall be elected as provided in the Articles of Incorporation.  Any director may resign at any time upon written notice to the Corporation.  Directors need not be shareholders.

Section 2.        Vacancies.  Subject to the terms of any one or more classes or series of preferred stock of the Corporation, any vacancy on the Board of Directors (including, without limitation, any vacancy that results from an increase in the number of directors or the removal or death of or resignation of a director) shall be filled by a majority of the Board of Directors then in office, even if less than a quorum, or by a sole remaining director, and not by shareholders, directors so chosen shall serve for a term expiring at the annual meeting of

12

#4811-7100-8285

shareholders or until such director's successor shall have been duly elected and qualified.  In no case will a decrease in the number of directors shorten the term of any incumbent director.

Section 3.      Duties and Powers.  The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors which may exercise all such powers of the Corporation and do all such lawful acts and things as are not by statute or by the Articles of Incorporation or by these By-Laws required to be exercised or done by the shareholders.

Section 4.      Meetings.  The Board of Directors may hold meetings, both regular and special, either within or without the Republic of the Marshall Islands.  Regular meetings of the Board of Directors may be held without notice at such time and at such place as may from time to time be determined by the Board of Directors.  Special meetings of the Board of Directors may be called by (i) the Chairman of the Board of Directors or (ii) the Board of Directors pursuant to a resolution duly adopted by a majority of the Whole Board (as defined below) which states the purpose or purposes thereof.  Notice thereof stating the place, date and hour of the meeting shall be given to each director either by mail not less than forty- eight (48) hours before the date of the meeting, by telephone, facsimile or electronic mail on twenty-four (24) hours' notice, or on such shorter notice as the person or persons calling such meeting may deem necessary or appropriate in the circumstances.

Section 5.      Organization.  At each meeting of the Board of Directors, the Chairman of the Board of Directors, or, in his or her absence or disability, a director chosen by a majority of the directors present, shall act as chairman.  The Secretary of the Corporation shall act as secretary at each meeting of the Board of Directors.  In case the Secretary shall be absent from any meeting of the Board of Directors, an Assistant Secretary shall perform the duties of

13

#4811-7100-8285

secretary at such meeting; and in the absence from any such meeting of the Secretary and all the Assistant Secretaries, the chairman of the meeting may appoint any person to act as secretary of the meeting.

Section 6.        Resignations and Removals of Directors.  Any director of the Corporation may resign at any time, by giving notice in writing to the Chairman of the Board of Directors, the President or the Secretary of the Corporation.  Such resignation shall take effect at the time therein specified or, if no time is specified, immediately; and, unless otherwise specified in such notice, the acceptance of such resignation shall not be necessary to make it effective. Except as otherwise required by applicable law and subject to the rights, if any, of the holders of shares of preferred stock then outstanding, any director or the entire Board of Directors may be removed from office at any time, but only for cause, and only by the affirmative vote of the holders of shares representing a majority of the votes entitled to be cast by the Voting Stock. Notwithstanding the foregoing, the election, term, removal and filling of vacancies with respect to directors elected separately by the holders of one or more series of Preferred Stock shall not be governed by this Section 6, but rather shall be as provided for in the resolutions adopted by the Board of Directors creating and establishing such series of Preferred Stock, and such directors so elected shall not be divided into classes unless expressly provided by the terms of such resolutions.

Section 7.        Quorum.  Except as otherwise required by law or the Articles of Incorporation, at all meetings of the Board of Directors, a majority of the Whole Board shall constitute a quorum for the transaction of business and the act of a majority of the directors present at any meeting at which there is a quorum shall be the act of the Board of Directors.  If a quorum shall not be present at any meeting of the Board of Directors, the directors present

14

#4811-7100-8285

thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting of the time and place of the adjourned meeting, until a quorum shall be present.

Section 8.       Actions of the Board by Written Consent.  Unless otherwise provided in the Articles of Incorporation or these By-Laws, any action required or permitted to be taken at any meeting of the Board of Directors or of any committee thereof may be taken without a meeting, if all the members of the Board of Directors or committee, as the case may be, consent thereto in writing, and the writing or writings are filed with the minutes of proceedings of the Board of Directors or committee.

Section 9.       Meetings by Means of Conference Telephone.  Unless otherwise provided in the Articles of Incorporation or these By-Laws, members of the Board of Directors of the Corporation, or any committee thereof, may participate in a meeting of the Board of Directors or such committee by means of a conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other, and participation in a meeting pursuant to this Section 9 shall constitute presence in person at such meeting.

Section 10.      Standing Committees.  In accordance with applicable legal, regulatory and stock exchange listing requirements ("Requirements"), the Board of Directors shall have the following standing committees:  (a) an Audit Committee, (b) a Compensation Committee, and (c) a Nominating and Corporate Governance Committee (the "Standing Committees"), and such other committees as may be required from time to time by the Requirements.  The Audit Committee (and such other Standing Committees as may be mandated by the Requirements) shall be composed entirely of "independent directors" within the meaning of the Requirements applicable to such committee.  Except as may be required by the

15

#4811-7100-8285

Requirements, each Standing Committee shall consist of three (3) (or such greater number as the Board of Directors may designate) directors, and the composition of each such Standing Committee shall be in compliance with the applicable Requirements. Each Standing Committee shall have a written charter, which shall be approved by the Board of Directors and state the purpose and authority of such committee. Standing Committee charters shall be reviewed not less frequently than annually to reflect the activities of the respective committees, changes in applicable Requirements and other relevant considerations, and proposed revisions to such charters shall be approved by the Board of Directors. The Nominating and Corporate Governance Committee shall be responsible, after consultation with the Chairman of the Board of Directors and taking into account the desires of individual Board members, for making recommendations to the Board of Directors with respect to the assignment of directors to the Standing Committees. After reviewing the Nominating and Corporate Governance Committee's recommendations, the Board of Directors shall be responsible for appointing committee members and designating committee chairs on an annual basis. The Nominating and Corporate Governance Committee shall annually review committee assignments with a view toward balancing the benefits derived from continuity against the benefits derived from the diversity of experience and viewpoints of the various directors, subject in any case to applicable Requirements.

Section 11.    Committees. The Board of Directors may, by resolution adopted by a majority of the Whole Board, designate one or more committees (in addition to the mandatory Standing Committees as set forth in Section 10 of this Article III), each such other committee shall consist of three or more of the directors of the Corporation, and the composition of each such other committee shall be in compliance with the applicable Requirements. With

16

#4811-7100-8285

respect to all Board committees (including Standing Committees), the Board of Directors may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of any such committee.  With respect to all Board committees (including Standing Committees), in the absence or disqualification of a member of a committee, and in the absence of a designation by the Board of Directors of an alternate member to replace the absent or disqualified member, the member or members thereof present at any meeting and not disqualified from voting, whether or not such member or members constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in the place of any absent or disqualified member.  Any committee (including any Standing Committee), to the extent permitted by law (including the Requirements) and provided in the resolution establishing such committee, shall have and may exercise all the powers and authority of the Board of Directors in the management of the business and affairs of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers which may require it.  Each committee (including each Standing Committee) shall keep regular minutes and report to the Board of Directors when required.

Section 12.    Compensation.  The directors may be paid their reasonable and documented expenses, if any, of attendance at each meeting of the Board of Directors and may be paid a fixed sum for attendance at each meeting of the Board of Directors or a stated salary for service as director, payable in cash or securities.  No such payment shall preclude any director from serving the Corporation in any other capacity and receiving compensation therefor. Members of special or standing committees may be allowed like compensation for service as committee members.

17

#4811-7100-8285

Section 13.     Chairman of the Board of Directors.  The Chairman of the Board of Directors shall preside at all meetings of the shareholders and of the Board of Directors except as otherwise provided herein.  Except where by law the signature of the President is required, the Chairman of the Board of Directors shall possess the same power as the President to sign all contracts, certificates and other instruments of the Corporation which may be authorized by the Board of Directors.  During the absence or disability of the President, the Chairman of the Board of Directors shall exercise all the powers and discharge all the duties of the President.  The Chairman of the Board of Directors shall also perform such other duties and may exercise such other powers as may from time to time be assigned by these By-Laws or by the Board of Directors.

Section 14.     Lead Director.  At any time while the Chief Executive Officer  or President is serving as Chairman of the Board of Directors, the Board of Directors may appoint from among its members a non-executive director who shall be designated as the Lead Director (the "Lead Director"). The Lead Director shall consult with and act as a liaison between the Board of Directors, on the one hand, and the Chairman of the Board of Directors and the Chief Executive Officer and/or President, on the other hand, and perform such duties and have such other powers as the Board of Directors may from time to time prescribe.  Notwithstanding anything contained in Article II, Sections 3 or 12, or Article III, Sections 4, 5 or 13, or otherwise herein to the contrary, the powers and duties of the Lead Director may include, without limitation, the power to call meetings of the Board of Directors or shareholders, preside at meetings of the Board of Directors or shareholders, and set meeting agendas.   All meetings of the non-executive members of the Board of Directors shall be presided over by the Lead Director (if one has been appointed), or in the absence or disability of the Lead Director, by an

18

#4811-7100-8285

independent director selected by a majority of such non-executive members to preside at such meeting.

Section 15.     Interested Directors.  No contract or transaction between the Corporation and one or more of its directors or officers, or between the Corporation and any other corporation, partnership, association or other organization in which one or more of its directors or officers are directors or officers or have a financial interest, shall be void or voidable solely for this reason, or solely because the director or officer is present at or participates in the meeting of the Board of Directors or committee thereof which authorizes the contract or transaction, or solely because any such director's or officer's vote is counted for such purpose if: (i) the material facts as to the director's or officer's relationship or interest and as to the contract or transaction are disclosed or are known to the Board of Directors or the committee, and the Board of Directors or committee in good faith authorizes the contract or transaction by the affirmative votes of a majority of the disinterested directors, even though the disinterested directors be less than a quorum; or (ii) the material facts as to the director's or officer's relationship or interest and as to the contract or transaction are disclosed or are known to the shareholders entitled to vote thereon, and the contract or transaction is specifically approved in good faith by vote of the shareholders; or (iii) the contract or transaction is fair as to the Corporation as of the time it is authorized, approved or ratified by the majority vote of the disinterested directors, a committee of the Board of Directors or the shareholders.  Common or interested directors may be counted in determining the presence of a quorum at a meeting of the Board of Directors or of a committee which authorizes the contract or transaction.

Section 16.     Board Observers.  Any shareholder who  Beneficially Owned (including all shares Beneficially Owned by its Affiliates) ten percent (10%) or more of the total

19

#4811-7100-8285

outstanding shares of Voting Stock as of the "Effective Date" under the Plan of Reorganization (as defined below) shall, for so long as it continues to Beneficially Own (including all shares Beneficially Owned by its Affiliates) at least ten percent (10%) of the total outstanding shares of Voting Stock (each, an "Initial 10% Holder"), have the right to request, by written notice to the Secretary of the Corporation, the right to appoint a non-voting observer to the Board of Directors (each such observer, a "Board Observer").  The Board of Directors shall grant any such request, but may establish such duties and restrictions on each Board Observer as it deems necessary or appropriate, including, without limitation, (a) requiring that the Board Observer be subject to the same obligations as directors with respect to confidentiality, conflicts of interest and misappropriation of corporate opportunities, (b) giving the Corporation the right to withhold information or materials from the Board Observer and to exclude the Board Observer from any meetings (or portions thereof) of the Board of Directors or any committee thereof, if the Corporation determines in good faith that the Board Observer's access to such information or materials or attendance at such meeting, as applicable, could reasonably be expected to (i) adversely affect the attorney-client privilege or work product privilege between the Corporation and its counsel or (ii) result in a conflict of interest, and (c) requiring that the Board Observer enter into a confidentiality agreement and/or such other agreements or undertakings as the Corporation may reasonably request, in form and substance satisfactory to the Corporation, with respect to such duties and restrictions.  Subject to such duties and restrictions as the Board of Directors may establish pursuant to the immediately preceding sentence, each Board Observer (A) shall be allowed to be present at all meetings of the Board of Directors and all committees thereof (other than the audit committee and executive sessions of the Board and any committee thereof) and (B) shall receive from the Company the same notice and information with respect to

20

meetings of the Board of Directors and all committees thereof (other than the audit committee and executive sessions of the Board of Directors and any committee thereof).  If at any time an Initial 10% Holder ceases to Beneficially Own (including all shares Beneficially Owned by its Affiliates) at least ten percent (10%) of the total outstanding shares of Voting Stock, (1) all of such Initial 10% Holder's rights (and the rights of any Board Observer appointed by such shareholder) under this paragraph shall thereupon automatically terminate and cease to be of any further force or effect and (2) such Initial 10% Holder shall give prompt written notice thereof to the Secretary of the Corporation. As used herein, "Plan of Reorganization" means the Corporation's Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code, as confirmed pursuant to the order entered by the United States Bankruptcy Court for the Southern District of New York on [__], 2014.

ARTICLE IV

OFFICERS

Section 1.      General.  The officers of the Corporation shall be chosen by the Board of Directors and shall be a President (or Chief Executive Officer), a Secretary and a Treasurer (or Chief Financial Officer).  The Board of Directors, in its discretion, also may choose a Chairman of the Board of Directors (who must be a director), a Lead Director (who must be a director), and one or more Vice Presidents, Assistant Secretaries, Assistant Treasurers and other officers.  Any number of offices may be held by the same person, unless otherwise prohibited by law, the Articles of Incorporation or these By-Laws.  The officers of the Corporation need not be shareholders or directors of the Corporation.

Section 2.      Election.  The Board of Directors, at its first meeting held after each annual meeting of shareholders (or action by written consent of shareholders in lieu of the

21

#4811-7100-8285

annual meeting of shareholders, to the extent applicable) shall elect the applicable officers of the Corporation who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Board of Directors; and each officer of the Corporation shall hold office until such officer's successor is elected and qualified, or until such officer's earlier death, resignation or removal.  Any officer elected by the Board of Directors may be removed, with or without cause, at any time by the Board of Directors.  Any vacancy occurring in any office of the Corporation shall be filled by the Board of Directors.  The salaries of all officers of the Corporation shall be fixed by the Board of Directors.

Section 3.      Voting Securities Owned by the Corporation.  Powers of attorney, proxies, waivers of notice of meeting, consents and other instruments relating to securities owned by the Corporation may be executed in the name of and on behalf of the Corporation by the President or any Vice President or any other officer authorized to do so by the Board of Directors and any such officer may, in the name of and on behalf of the Corporation, take all such action as any such officer may deem advisable to vote in person or by proxy at any meeting of security holders of any corporation in which the Corporation may own securities and at any such meeting shall possess and may exercise any and all rights and power incident to the ownership of such securities and which, as the owner thereof, the Corporation might have exercised and possessed if present.  The Board of Directors may, by resolution, from time to time confer like powers upon any other person or persons.

Section 4.      President.  The President shall subject to the control of the Board of Directors and have general supervision of the business of the Corporation and shall see that all orders and resolutions of the Board of Directors are carried into effect. The President shall execute all bonds, mortgages, contracts and other instruments of the Corporation requiring a seal,

22

#4811-7100-8285

under the seal of the Corporation, except where required or permitted by law to be otherwise signed and executed and except that the other officers of the Corporation may sign and execute documents when so authorized by these By-Laws, the Board of Directors or the President. Unless the Board of Directors shall determine otherwise, the President shall be the Chief Executive Officer of the Corporation.  The President shall also perform such other duties and may exercise such other powers as may from time to time be assigned to such officer by these By-Laws or by the Board of Directors.

Section 5.      Vice Presidents.  At the request of the President or in the President's absence or in the event of the President's inability or refusal to act (and if there be no Chairman of the Board of Directors or Lead Director appointed with such powers), the Vice President, or the Vice Presidents if there are more than one (in the order designated by the Board of Directors), shall perform the duties of the President, and when so acting, shall have all the powers of and be subject to all the restrictions upon the President.  Each Vice President shall perform such other duties and have such other powers as the Board of Directors from time to time may prescribe.  If there be no Chairman of the Board of Directors, no Lead Director appointed with such powers,  and no Vice President, the Board of Directors shall designate the officer of the Corporation who, in the absence of the President or in the event of the inability or refusal of the President to act, shall perform the duties of the President, and when so acting, shall have all the powers of and be subject to all the restrictions upon the President.

Section 6.      Secretary.  The Secretary shall attend all meetings of the Board of Directors and all meetings of the shareholders and record all the proceedings thereat in a book or books to be kept for that purpose; the Secretary shall also perform like duties for committees of the Board of Directors when required.  The Secretary shall give, or cause to be given, notice of

23

#4811-7100-8285

all meetings of the shareholders and special meetings of the Board of Directors, and shall

perform such other duties as may be prescribed by the Board of Directors or the President, under

whose supervision the Secretary shall be.  If the Secretary shall be unable or shall refuse to cause

to be given notice of all meetings of the shareholders and special meetings of the Board of

Directors, and if there be no Assistant Secretary, then either the Board of Directors or the

President may choose another officer to cause such notice to be given.  The Secretary shall have

custody of the seal of the Corporation and the Secretary or any Assistant Secretary, if there be

one, shall have authority to affix the same to any instrument requiring it and when so affixed, it

may be attested by the signature of the Secretary or by the signature of any such Assistant

Secretary.  The Board of Directors may give general authority to any other officer to affix the

seal of the Corporation and to attest to the affixing by such officer's signature.  The Secretary

shall see that all books, reports, statements, certificates and other documents and records required

by law to be kept or filed are properly kept or filed, as the case may be.

Section 7.      Treasurer.  The Treasurer shall have the custody of the corporate

funds and securities and shall keep full and accurate accounts of receipts and disbursements in

books belonging to the Corporation and shall deposit all moneys and other valuable effects in the

name and to the credit of the Corporation in such depositories as may be designated by the Board

of Directors.  The Treasurer shall disburse the funds of the Corporation as may be ordered by the

Board of Directors, taking proper vouchers for such disbursements, and shall render to the

President and the Board of Directors, at its regular meetings, or when the Board of Directors so

requires, an account of all transactions as Treasurer and of the financial condition of the

Corporation.  If required by the Board of Directors, the Treasurer shall give the Corporation a

bond in such sum and with such surety or sureties as shall be satisfactory to the Board of

24

#4811-7100-8285

Directors for the faithful performance of the duties of the office of the Treasurer and for the restoration to the Corporation, in case of the Treasurer's death, resignation, retirement or removal from office, of all books, papers, vouchers, money and other property of whatever kind in the Treasurer's possession or under the Treasurer's control belonging to the Corporation.

Section 8.      Assistant Secretaries.  Assistant Secretaries, if there be any, shall perform such duties and have such powers as from time to time may be assigned to them by the Board of Directors, the President, any Vice President, if there be one, or the Secretary, and in the absence of the Secretary or in the event of the Secretary's inability or refusal to act, shall perform the duties of the Secretary, and when so acting, shall have all the powers of and be subject to all the restrictions upon the Secretary.

Section 9.      Assistant Treasurers.  Assistant Treasurers, if there be any, shall perform such duties and have such powers as from time to time may be assigned to them by the Board of Directors, the President, any Vice President, if there be one, or the Treasurer, and in the absence of the Treasurer or in the event of the Treasurer's inability or refusal to act, shall perform the duties of the Treasurer, and when so acting, shall have all the powers of and be subject to all the restrictions upon the Treasurer.  If required by the Board of Directors, an Assistant Treasurer shall give the Corporation a bond in such sum and with such surety or sureties as shall be satisfactory to the Board of Directors for the faithful performance of the duties of the office of Assistant Treasurer and for the restoration to the Corporation, in case of the Assistant Treasurer's death, resignation, retirement or removal from office, of all books, papers, vouchers, money and other property of whatever kind in the Assistant Treasurer's possession or under the Assistant Treasurer's control belonging to the Corporation.

25

#4811-7100-8285

Section 10.    Other Officers.  Such other officers as the Board of Directors may choose shall perform such duties and have such powers as from time to time may be assigned to them by the Board of Directors.  The Board of Directors may delegate to any officer of the Corporation the power to choose such other officers and to prescribe their respective duties and powers.

ARTICLE V

STOCK

Section 1.    Form and Issuance.  The shares of stock of the Corporation may be issued in book-entry form or represented by certificates in a form meeting the requirements of law and approved by the Board of Directors.  Certificates shall be registered in the name of the respective owner of shares and shall be signed by (i) by the Chairman of the Board of Directors, or the President or a Vice President and (ii) by the Treasurer or an Assistant Treasurer, or the Secretary or an Assistant Secretary of the Corporation, certifying the number of shares represented by such certificate.

Section 2.    Signatures.  Any or all of the signatures on a certificate may be a facsimile.  In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the Corporation with the same effect as if such person were such officer, transfer agent or registrar at the date of issue.

Section 3.    Lost Certificates.  The Board of Directors may direct a new certificate to be issued in place of any certificate theretofore issued by the Corporation alleged to have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the person claiming the certificate of stock to be lost, stolen or destroyed.  When authorizing such issue of a new certificate, the Board of Directors may, in its discretion and as a condition precedent to the

26

#4811-7100-8285

issuance thereof, require the owner of such lost, stolen or destroyed certificate, or such owner's

legal representative, to advertise the same in such manner as the Board of Directors shall require

and/or to give the Corporation a bond in such sum as it may direct as indemnity against any

claim that may be made against the Corporation on account of the alleged loss, theft or

destruction of such certificate or the issuance of such new certificate.

Section 4.      Transfers.  Transfers of stock shall be made only upon the transfer

books of the Corporation kept at an office of the Corporation or by transfer agents designated to

transfer shares of the stock of the Corporation.  Except where a certificate is issued in accordance

with this Article V, an outstanding certificate for the number of shares involved, if one has been

issued,  shall be surrendered for cancellation before a new certificate, if any, is issued therefor.

Section 5.      Dividend Record Date.  In order that the Corporation may

determine the shareholders entitled to receive payment of any dividend or other distribution or

allotment of any rights or the shareholders entitled to exercise any rights in respect of any

change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board

of Directors may fix a record date, which record date shall not precede the date upon which the

resolution fixing the record date is adopted, and which record date shall be not more than sixty

(60) days prior to such action.  If no record date is fixed, the record date for determining

shareholders for any such purpose shall be at the close of business on the day on which the Board

of Directors adopts the resolution relating thereto.

Section 6.      Record Owners.  With respect to any shares of capital stock of the

Corporation, the Corporation shall be entitled to recognize the exclusive right of the person

registered on its books as the owner of such shares for purposes of receiving dividends and

voting with respect to such shares, and shall not be bound to recognize any equitable or other

27

#4811-7100-8285

claim to or interest in such share or shares on the part of any other Person, whether or not it shall have express or other notice thereof, except as otherwise required by law.

Section 7.      Transfer and Registry Agents.  The Corporation may from time to time maintain one or more transfer agents  for the shares of the Corporation's capital stock, as may be determined from time to time by the Board of Directors.

ARTICLE VI

NOTICES

Section 1.      Notices.  Whenever written notice is required by law, the Articles of Incorporation or these By-Laws, to be given to any director, member of a committee or shareholder, such notice may be given by mail, addressed to such director, member of a committee or shareholder, at such person's address as it appears on the records of the Corporation, with postage thereon prepaid, and such notice shall be deemed to be given at the time when the same shall be deposited in the United States mail.  Written notice may also be given personally or by facsimile or electronic mail at such person's facsimile number or electronic mail address as it appears on the records of the Corporation.

Section 2.      Waivers of Notice.  Whenever any notice is required by applicable law, the Articles of Incorporation or these By-Laws, to be given to any director, member of a committee or shareholder, a waiver thereof in writing, signed by the person or persons entitled to notice, whether before or after the time stated therein, shall be deemed equivalent thereto. Attendance of a person at a meeting, present in person or represented by proxy, shall constitute a waiver of notice of such meeting, except where the person attends the meeting for the express purpose of objecting at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened.  Neither the business to be transacted at, nor the purpose of, any annual or special meeting of shareholders or any regular or special meeting of

28

#4811-7100-8285

the directors or members of a committee of directors need be specified in any written waiver of notice unless so required by law, the Articles of Incorporation or these By-Laws.

## ARTICLE VII

### GENERAL PROVISIONS

Section 1.    Dividends.  Dividends upon the capital stock of the Corporation, subject to the requirements of the Business Corporations Law of the Republic of the Marshall Islands (the "BCA") and the provisions of the Articles of Incorporation, if any, may be declared by the Board of Directors at any regular or special meeting of the Board of Directors (or any action by written consent in lieu thereof in accordance with Section 8 of Article III hereof), and may be paid in cash, in property, or in shares of the Corporation's capital stock.  Before payment of any dividend, there may be set aside out of any funds of the Corporation available for dividends such sum or sums as the Board of Directors from time to time, in its absolute discretion, deems proper as a reserve or reserves to meet contingencies, or for purchasing any of the shares of capital stock, warrants, rights, options, bonds, debentures, notes, scrip or other securities or evidences of indebtedness of the Corporation, or for equalizing dividends, or for repairing or maintaining any property of the Corporation, or for any proper purpose, and the Board of Directors may modify or abolish any such reserve.

Section 2.    Disbursements.  All checks or demands for money and notes of the Corporation shall be signed by such officer or officers or such other person or persons as the Board of Directors may from time to time designate.

Section 3.    Fiscal Year.  The fiscal year of the Corporation shall be fixed by resolution of the Board of Directors.

Section 4.    Corporate Seal.  The corporate seal shall have inscribed thereon the name of the Corporation, the year of its organization and the words "Corporate Seal,

29

#4811-7100-8285

Republic of the Marshall Islands".  The seal may be used by causing it or a facsimile thereof to be impressed or affixed or reproduced or otherwise.

ARTICLE VIII

INDEMNIFICATION

Section 1.    Right to Indemnification.  Each person who was or is made a party or is threatened to be made a party to or is otherwise involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "Proceeding"), by reason of the fact that he or she is or was a director or an officer of the Corporation or is or was serving at the request of the Corporation as a director,  officer or trustee of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to an employee benefit plan (hereinafter an "Indemnitee"), whether the basis of such Proceeding is alleged action in an official capacity as a director, officer or trustee or in any other capacity on behalf of the Corporation while serving as a director, officer or trustee, shall be indemnified and held harmless by the Corporation to the fullest extent permitted by Marshall Islands law, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than such law permitted the Corporation to provide prior to such amendment), against all expense, liability and loss (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid in settlement) reasonably incurred by such Indemnitee in connection therewith; provided, however, that, except as provided in Section 3 of this Article VIII with respect to Proceedings to enforce rights to indemnification, the Corporation shall indemnify any such Indemnitee in connection with a Proceeding (or part thereof) initiated by such Indemnitee only if such Proceeding (or part thereof) was authorized by the Board of Directors.

30

#4811-7100-8285

Section 2.    Right to Advancement of Expenses.  To the extent not prohibited by applicable law, in addition to the right to indemnification conferred in Section 1 of this Article VIII, an Indemnitee shall also have the right to be paid by the Corporation the expenses (including attorney's fees) incurred in defending any such Proceeding in advance of its final disposition (hereinafter an "advancement of expenses"); provided, however, that, to the extent required by the BCA, an advancement of expenses incurred by an Indemnitee in his or her capacity as a director or officer (and not in any other capacity in which service was or is rendered by such Indemnitee, including, without limitation, service to an employee benefit plan) shall be made only upon delivery to the Corporation of an undertaking (hereinafter an "Undertaking"), by or on behalf of such Indemnitee, to repay all amounts so advanced if it shall ultimately be determined by final judicial decision from which there is no further right to appeal (hereinafter a "Final Adjudication") that such Indemnitee is not entitled to be indemnified for such expenses under this Section 2 or otherwise.

Section 3.    Right of Indemnitee to Bring Suit.  If a claim under Section 1 or 2 of this Article VIII is not paid in full by the Corporation within sixty (60) days after a written claim has been received by the Corporation, except in the case of a claim for an advancement of expenses, in which case the applicable period shall be twenty (20) days, the Indemnitee may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim. To the fullest extent permitted by law, if successful in whole or in part in any such suit, or in a suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an Undertaking, the Indemnitee shall be entitled to be paid also the expense of prosecuting or defending such suit.  In any suit brought by the Indemnitee to enforce a right to indemnification or to an advancement of expenses hereunder, or brought by the Corporation to recover an

31

advancement of expenses pursuant to the terms of an Undertaking, the burden of proving that the Indemnitee is not entitled to be indemnified, or to such advancement of expenses, under this Article VIII or otherwise shall be on the Corporation.

Section 4.       Reliance; Standard of Conduct.  For purposes of any determination as to whether an Indemnitee has met the applicable standard for indemnification under the BCA, an Indemnitee shall be deemed to have acted in good faith and in a manner such Indemnitee reasonably believed to be in or not opposed to the best interests of the Corporation, or, with respect to any criminal action or proceeding, to have had no reasonable cause to believe such Indemnitee's conduct was unlawful, if such Indemnitee's action is based on such Indemnitee's good faith reliance upon the records or books of account of the Corporation or upon such information, opinions, reports or statements supplied to such Indemnitee by any of the officers, employees or committees of the Corporation or by any other person as to matters the Indemnitee reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by the Corporation  The provisions of this Section 4 shall not be deemed to be exclusive or to limit in any way the circumstances in which an Indemnitee may be deemed to have met the applicable standard of conduct under the BCA.

Section 5.       Non-Exclusivity of Rights.  The rights to indemnification and to the advancement of expenses conferred in this Article VIII shall not be exclusive of any other right which any Indemnitee or other person may have or hereafter acquire under any statute, the Articles of Incorporation, these  By-Laws (as amended or amended and restated from time to time), agreement, vote of shareholders or directors or otherwise, both as to action in such Indemnitee or other person's official capacity and as to action in another capacity on behalf of the Corporation while holding such office, it being the policy of the Corporation that

32

indemnification of the Indemnitees shall be made to the fullest extent permitted by law.  The provisions of this Article VIII shall not be deemed to preclude the indemnification of any person who is not an Indemnitee but whom the Corporation has the power or obligation to indemnify under the provisions of the BCA, or otherwise.

Section 6.    Insurance.  The Corporation may maintain insurance, at its expense, to protect itself and/or for the benefit of any person who is or was a director, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise, against any expense, liability or loss, whether or not the Corporation would have the power or the obligation to indemnify such person against such expense, liability or loss under the provisions of this Article VIII or under the BCA.

Section 7.    Indemnification of Employees and Agents of the Corporation.  The Corporation may, to the extent authorized from time to time by the Board of Directors, grant rights to indemnification and to the advancement of expenses to any employee or agent of the Corporation, to the fullest extent of the provisions of this Article VIII and in the manner permitted under applicable law.

Section 8.    Nature of Rights.  The rights conferred upon Indemnitees in this Article VIII shall be contract rights and such rights shall continue as to an Indemnitee who has ceased to be a director, officer, employee or agent and shall inure to the benefit of the Indemnitee's heirs, executors and administrators.  Any amendment, alteration or repeal of this Article VIII that adversely affects any right of an Indemnitee or its successors shall be prospective only and shall not limit, eliminate, or impair any such right with respect to any Proceeding involving any occurrence or alleged occurrence of any action or omission to act that took place prior to such amendment or repeal.

33

Section 9.       Certain Definitions.  For purposes of this Article VIII, references to "the Corporation" shall include, in addition to the resulting corporation, any constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its directors or officers, so that any person who is or was a director or officer of such constituent corporation, or is or was a director or officer of such constituent corporation serving at the request of such constituent corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, shall stand in the same position under the provisions of this Article VIII with respect to the resulting or surviving corporation as such person would have with respect to such constituent corporation if its separate existence had continued.  The term "another enterprise" as used in this Article VIII shall mean any other corporation or any partnership, joint venture, trust, employee benefit plan or other enterprise of which such person is or was serving at the request of the Corporation as a director, officer, employee or agent.  For purposes of this Article VIII, references to "fines" shall include any excise taxes assessed on a person with respect to an employee benefit plan; and references to "serving at the request of the Corporation" shall include any service as a director, officer, employee or agent of the Corporation which imposes duties on, or involves services by, such director or officer with respect to an employee benefit plan, its participants or beneficiaries; and a person who acted in good faith and in a manner such person reasonably believed to be in the interest of the participants and beneficiaries of an employee benefit plan shall be deemed to have acted in a manner "not opposed to the best interests of the Corporation" as referred to in this Article VIII.

#4811-7100-8285

## ARTICLE IX

## AMENDMENTS

Section 1.     Amendments.  These By-Laws may be altered, amended or repealed, in whole or in part, or new By-Laws may be adopted (i) by the affirmative vote of the shares representing not less than a majority of the votes entitled to be cast by the Voting Stock; [provided, however, that any proposed alteration, amendment or repeal of, or the adoption of any By-Law inconsistent with, Sections 3, 9, 14 or 15 of Article II of these By-Laws or Sections 1, 2 or 6 of Article III of these By-Laws or this Article IX, by the shareholders shall require the affirmative vote of the holders of shares representing not less than sixty-six and two-thirds percent (66 2/3%) of the votes entitled to be cast by the Voting Stock, or (ii) by action of the Board of Directors;][1] provided, however, that notice of such alteration, amendment, repeal or adoption of new By-Laws be contained in the notice of the applicable meeting of the shareholders or Board of Directors, as the case may be.  The provisions of this Section 1 are subject to any contrary provisions and any provisions requiring a greater vote that are set forth in the Articles of Incorporation.

\* \* \*

Adopted as of:  [__], 2014

---

[1]   It is currently being reviewed as to which section of these By-laws will require a supermajority vote to amend.

35

#4811-7100-8285

**Exhibit C**

**New Eagle Equity Warrant Agreement**

*DRAFT*

## WARRANT AGREEMENT

THIS WARRANT AGREEMENT (this "Agreement"), dated as of [__], 2014, is by and among Eagle Bulk Shipping Inc., a Marshall Islands corporation (the "Company"), and Computershare Inc., a Delaware corporation ("Computershare") and its wholly owned subsidiary Computershare Trust Company N.A., a federally chartered trust company (together with Computershare, the "Warrant Agent").

**WHEREAS,** on August 6, 2014, the Company (the "Debtor") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") under the case 14-12303 (SHL);

**WHEREAS,** on August 6, 2014, the Debtor filed the *Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* (as amended or supplemented from time to time, the "Plan of Reorganization");

**WHEREAS,** on [__], 2014, the Bankruptcy Court entered an order confirming the Plan of Reorganization, and the Company emerged from its chapter 11 bankruptcy proceedings on [__], 2014 (the "Effective Date");

**WHEREAS**, pursuant to the Plan of Reorganization, the Company will issue on or as soon as practicable after the Effective Date, warrants (the "Warrants") to purchase shares of the common stock of the reorganized Company ("Common Stock"), representing an aggregate total of 7.5% of the total number of shares of New Eagle Common Stock issuable pursuant to the Plan (subject to dilution as set forth in the Plan of Reorganization) to holders of Equity Interests (as defined in the Plan of Reorganization);

**WHEREAS**, the Company desires to provide for the form and provisions of the Warrants, the terms upon which they shall be issued and exercised, and the respective rights, limitation of rights, and immunities of the Company, the Warrant Agent, and the holders of the Warrants;

**WHEREAS**, the Company desires the Warrant Agent to act on behalf of the Company, and the Warrant Agent is willing to so act, in connection with the issuance, registration, transfer, exchange, call, exercise and cancellation of the Warrants; and

**WHEREAS**, all acts and things have been done and performed which are necessary to make the Warrants, when executed on behalf of the Company and countersigned, either by manual or facsimile signature, by or on behalf of the Warrant Agent, as provided herein, the valid, binding and legal obligations of the Company, and to authorize the execution and delivery of this Agreement.

**NOW, THEREFORE**, in consideration of the mutual agreements herein contained, the parties hereto agree as follows:

#4852-9646-6204

## ARTICLE I

## DEFINITIONS

Section 1.1     Definition of Terms.  As used in this Agreement, the following capitalized terms shall have the following respective meanings:

(a)     "Affiliate" has the meaning set forth in Rule 12b-2 of the Exchange Act.

(b)     "Appropriate Officer" has the meaning set forth in Section 3.2(a) hereof.

(c)     "Beneficial Holder" means, with respect to any Warrants represented by a Global Warrant Certificate, any person or entity that "beneficially owns" (as such term is defined under and determined pursuant to Rule 13d-3 promulgated under the Exchange Act) such Warrants.

(d)     "Board of Directors" means the Board of Directors of the Company.

(e)     "Book-Entry Warrants" has the meaning set forth in Section 3.1(c) hereof.

(f)     "Business Day" shall mean any day on which commercial banks are not authorized or permitted to close in the City of New York, Borough of Manhattan [and the State of New Jersey].

(g)     "Certificated Warrants"   has the meaning set forth in Section 3.1(c) hereof.

(h)     "Current Sale Price" of the Common Stock on any date of determination means:

(i)     if the Common Stock is listed on the New York Stock Exchange or The NASDAQ Stock Market on such date, the average closing sale price per share of the Common Stock (or if no closing sale price is reported, the average of the closing bid and closing ask prices or, if more than one in either case, the average of the average closing bid and the average closing ask prices) for the ten (10) consecutive trading days immediately prior to such date of determination, as reported by the New York Stock Exchange or The NASDAQ Stock Market, as applicable;

(ii)     if the Common Stock is not listed on the New York Stock Exchange or The NASDAQ Stock Market on such date, the average closing sale price per share of the Common Stock (or if no closing sale price is reported, the average of the high bid and low asked prices or, if more than one in either case, the average of the average high bid and low asked prices) for the ten (10) consecutive trading days immediately prior to such date of determination, as reported in composite transactions for the principal U.S. national or regional securities exchange on which the Common Stock is traded;

#4852-9646-6204

2

(iii)    if the Common Stock is not listed on a U.S. national or regional securities exchange, the average last quoted sale price for the Common Stock (or, if no sale price is reported, the average of the high bid and low asked price for such date) for the ten (10) consecutive trading days immediately prior to such date of determination, in the over-the-counter market as reported by OTC Markets Group Inc. or other similar organization; or

(iv)    in all other cases, as determined in good faith by the Board of Directors.

The Closing Sale Price shall be determined without reference to early hours, after hours or extended market trading.

The Current Sale Price shall be appropriately adjusted by the Company in good faith if the "ex date" (as hereinafter defined) for any event (other than the issuance or distribution requiring such computation) occurs during the ten consecutive trading days immediately prior to the day as of which the Current Sale Price is being determined.

For these purposes the term "ex date", when used:

(i)    with respect to any issuance or distribution, means the first date on which the Common Stock trades regular way on the relevant exchange or in the relevant market from which the sale price or bid and ask prices, as applicable, were obtained without the right to receive such issuance or distribution;

(ii)    with respect to any subdivision or combination of shares of Common Stock, means the first date on which the Common Stock trades regular way on such exchange or in such market after the time at which such subdivision or combination becomes effective; and

(iii)    with respect to any tender or exchange offer, means the first date on which the Common Stock trades regular way on such exchange or in such market after the expiration time of such offer.

Whenever such adjustments shall be made to the Current Sale Price as may be necessary or appropriate to effectuate the intent of this Warrant Agreement and to avoid unjust or inequitable results as determined in good faith by the Board of Directors.

(i)    "Common Stock" has the meaning set forth in the Recitals, and shall include any successor security as a result of any recapitalization, reorganization, reclassification or similar transaction involving the Company.

(j)    "Computershare" has the meaning set forth in the preamble.

(k)    "Date of Issuance" has the meaning set forth in Section 3.1(a) hereof.

(l)    "Depositary" has the meaning set forth in Section 3.1(c) hereof.

#4852-9646-6204                                              3

(m)   "Direct Registration Warrants" has the meaning set forth in Section 3.1(c) hereof.

(n)   "Effective Date" has the meaning set forth in the Recitals.

(o)   "Exchange Act" means the Securities Exchange Act of 1934, as amended.

(p)   "Exercise Date" means any date, on or prior to the expiration of the Exercise Period, on which the Registered Holder exercises the right to purchase the Warrant Exercise Shares, in whole or in part, pursuant to and in accordance with the terms and conditions described herein.

(q)   "Exercise Form" has the meaning set forth in Section 4.3(b) hereof.

(r)   "Exercise Price" has the meaning set forth in Section 4.1 hereof.

(s)   "Exercise Period" has the meaning set forth in Section 4.2 hereof.

(t)   "Fully Diluted" means all Common Stock outstanding as of the applicable measurement date together with all Common Stock then issuable upon (i) the conversion of convertible securities of the Company at the then applicable conversion rate, and (ii) the exercise of any options or warrants then exercisable for Common Stock; provided that, for purposes of clauses (i) and (ii), all conditions to the convertibility and/or exercisability of convertible securities, options and warrants of the Company, shall be deemed to have been satisfied.

(u)   "Global Warrant Certificates" has the meaning set forth in Section 3.1(c) hereof.

(v)   "Governmental Authority" means any (i) government, (ii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official or entity and any court or other tribunal) or (iii) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power of any nature, in each case, whether federal, state, local, municipal, foreign, supranational or of any other jurisdiction.

(w)   "Holder" has the meaning set forth in Section 4.1 hereof.

(x)   "Law" means all laws, statutes, rules, regulations, codes, injunctions, decrees, orders, ordinances, registration requirements, disclosure requirements and other pronouncements having the effect of law of the United States, the Republic of the Marshall Islands, any foreign country or any domestic or foreign state, county, city or other political subdivision or of any Governmental Authority.

(y)   "Organic Change" means any recapitalization, reorganization, reclassification, consolidation, merger, sale of a majority of the Company's assets or other transaction, in each case which is effected in such a way that the holders of Common Stock are entitled to receive (either directly or upon subsequent liquidation) cash, stock, securities or other

#4852-9646-6204

assets or property with respect to or in exchange for Common Stock, other than a transaction which triggers an adjustment pursuant to Sections 5.1(a), (b) or (c).

(z)    "Person" means any individual, firm, corporation, partnership, limited partnership, limited liability company, association, indenture trustee, organization, joint stock company, joint venture, estate, trust, governmental unit or any political subdivision thereof, or any other entity (as such term is defined in the Bankruptcy Code).

(aa)    "Plan of Reorganization" has the meaning set forth in the Recitals.

(bb)    "Pro Rata Repurchase Offer" means any offer to purchase shares of Common Stock by the Company or any Affiliate thereof pursuant to (i) any tender offer or exchange offer subject to Section 13(e) or 14(e) of the Exchange Act or Regulation 14E promulgated thereunder or (ii) any other offer available to substantially all holders of Common Stock to purchase or exchange their shares of Common Stock, in the case of both (i) or (ii), whether for cash, shares of capital stock of the Company, other securities of the Company, evidences of indebtedness of the Company or any other Person, or any other property (including, without limitation, shares of capital stock, other securities or evidences of indebtedness of a Subsidiary), or any combination thereof, effected while the Warrants are outstanding.  The "effective date" of a Pro Rata Repurchase Offer shall mean the date of acceptance of shares for purchase or exchange by the Company under any tender or exchange offer which is a Pro Rata Repurchase Offer or the date of purchase with respect to any Pro Rata Repurchase Offer that is not a tender or exchange offer.

(cc)    "Registered Holder" has the meaning set forth in Section 3.4(d) hereof.

(dd)    "Requisite Holders" means Registered Holders of Warrants exercisable for a majority of the Common Stock issuable upon exercise of all Warrants then outstanding.

(ee)    "SEC" means the Securities and Exchange Commission or any other federal agency at the time administering the Securities Act or the Exchange Act.

(ff)    "Securities Act" means the Securities Act of 1933, as amended.

(gg)    "Subsidiary" means, with respect to any Person, any corporation, partnership, limited liability company or other business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (ii) if a partnership, limited liability company or other business entity (other than a corporation), a majority of the partnership, limited liability company or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof.  For purposes hereof, a Person or Persons shall be deemed to have a majority ownership interest in a partnership, limited liability company or other business entity if such Person or Persons shall be allocated a majority of partnership, limited liability company or other business entity gains or losses or shall be or control the general partner, the managing member or entity performing similar functions of such partnership, limited liability company or other business entity.

(hh)    "Third Party Cash Sale" means in any such case with a purchaser that is not an Affiliate of the Company: (i) any merger, consolidation, or other similar transaction or series of transactions to which the Company is a party and pursuant to which the Company is not the surviving Person in such transaction and the consideration received by the Company's shareholders (directly or indirectly) consists solely of cash or (ii) the sale or other disposition of all or substantially all of the assets of the Company and its Subsidiaries, taken as a whole and the consideration received by the Company's shareholders (directly or indirectly) consists solely of cash.

(ii)    "Third Party Sale Closing" has the meaning set forth in Section 5.1(e) hereof.

(jj)    "Third Party Sale Price" means, with respect to any Third Party Cash Sale, the quotient of (x) the aggregate cash consideration received by the shareholders (directly or indirectly) in connection with the applicable Third Party Cash Sale, divided by (y) the number of Fully Diluted Shares of Common Stock outstanding immediately before the Third Party Sale Closing.

(kk)    "Warrant Agent" has the meaning set forth in the preamble and shall include any successor to the Warrant Agent pursuant to Section 8.1 hereof.

(ll)    "Warrant Certificate" has the meaning set forth in Section 3.1(c) hereof.

(mm)    "Warrant Exercise Shares" means the shares of Common Stock issued upon the applicable exercise of a Warrant.

(nn)    "Warrant Register" has the meaning set forth in Section 3.4(c) hereof.

(oo)    "Warrant Restrictions" has the meaning set forth in Section 3.1(c) hereof.

(pp)    "Warrant Statements" has the meaning set forth in Section 3.1(c) hereof.

(qq)    "Warrants" has the meaning set forth in the Recitals.

Section 1.2    Rules of Construction.

(a)    The singular form of any word used herein, including the terms defined in Section 1.1 hereof, shall include the plural, and vice versa.  The use herein of a word of any gender shall include correlative words of all genders.

(b)    Unless otherwise specified, references to Articles, Sections and other subdivisions of this Agreement are to the designated Articles, Sections and other subdivision of this Agreement as originally executed.  The words "hereof," "herein," "hereunder" and words of similar import refer to this Agreement as a whole.

(c)    References to "$" are to dollars in lawful currency of the United States of America.

#4852-9646-6204

6

(d)     The Exhibits attached hereto are an integral part of this Agreement.

## ARTICLE II

## APPOINTMENT OF WARRANT AGENT

Section 2.1     Appointment.  The Company hereby appoints the Warrant Agent to act as agent for the Company for the Warrants in accordance with the express terms and subject to the conditions set forth in this Agreement (and no implied terms or conditions), and the Warrant Agent hereby accepts such appointment and agrees to perform the same in accordance with the express terms and conditions set forth in this Agreement.

## ARTICLE III

## WARRANTS

Section 3.1     Issuance of Warrants.

(a)     On the terms and subject to the conditions of this Agreement and in accordance with the terms of the Plan of Reorganization, on or as soon as practicable after the Effective Date (such date, the "Date of Issuance"), the Company will issue and distribute the Warrants.

(b)     The maximum number of shares of Common Stock issuable pursuant to exercise of the Warrants shall be [__][1] shares, as such amount may be adjusted from time to time pursuant to this Agreement.

(c)     Unless otherwise provided in this Agreement, the Warrants (such Warrants being referred to as "Book-Entry Warrants") shall be issued through the book-entry facilities of The Depository Trust Company, as depositary (the "Depositary"), in the form of one or more global warrant certificates ("Global Warrant Certificates"), duly executed on behalf of the Company and countersigned, either by manual or facsimile signature, by the Warrant Agent, in the manner set forth in Section 3.2(b) below, which the Company shall deliver, or cause to be delivered to the Depositary, on or promptly after the Effective Date.  Notwithstanding the foregoing, any Warrants which are not issuable through the mandatory reorganization function of the Depositary shall either be (x) represented by certificates (including the Global Warrant Certificates, "Warrant Certificates"; and any Warrant represented by a Warrant Certificate, other than a Global Warrant Certificate, being referred to as a "Certificated Warrant") or (y) issued by electronic entry registration on the books of the Warrant Agent ("Direct Registration Warrants") and shall be reflected on statements issued by the Warrant Agent from time to time to the holders thereof (the "Warrant Statements"); provided that any Certificated Warrants or Direct Registration Warrants that are not subject to any restriction on transfer or exercise, or are not subject to any vesting requirements (such restrictions or requirements, "Warrant Restrictions"), may be exchanged at any time for a corresponding number of Book-Entry Warrants, in

---

[1] NTD:  Insert number equal to 7.5% of the of the total number of shares of Common Stock issuable pursuant to the Plan of Reorganization.

accordance with Section 6.1(c) and the applicable procedures of the Depositary and the Warrant Agent.

Section 3.2     Form of Warrant.

(a)     Subject to Section 6.1 of this Agreement, the Global Warrant Certificates, with the forms of election to exercise and of assignment printed on the reverse thereof, shall be in substantially the form set forth in Exhibit A-1 attached hereto.  The Warrant Certificates, with the forms of election to exercise and of assignment printed on the reverse thereof, shall be in substantially the form set forth in Exhibit A-2 attached hereto. The Warrant Certificates may bear such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Agreement, and may have such letters, numbers or other marks of identification or designation and such legends, summaries, or endorsements placed thereon as may be required by the Depositary (including as provided in Section 3.2(b)) or to comply with any Law or with any rules or regulations made pursuant thereto or with any rules of any securities exchange or as may, consistently herewith, or, be determined by the Chief Executive Officer or Chief Financial Officer of the Company (each, an "Appropriate Officer") executing such Warrant Certificates, as evidenced by their execution of the Warrant Certificates, provided any such insertions, omissions, substitutions or variations shall be reasonably acceptable to the Warrant Agent; and provided further, in each case, that they do not affect the rights, duties, obligations, responsibilities, liabilities or indemnities of the Warrant Agent.

(b)     The Global Warrant Certificates shall bear a legend substantially in the form indicated therefor on Exhibit A-1.  The Global Warrant Certificates shall be deposited on or after the Date of Issuance with the Warrant Agent and registered in the name of Cede & Co., as the nominee of the Depositary.  Each Global Warrant Certificate shall represent such number of the outstanding Warrants as specified therein, and each shall provide that it shall represent the aggregate amount of outstanding Warrants from time to time endorsed thereon and that the aggregate amount of outstanding Warrants represented thereby may from time to time be reduced or increased, as appropriate, in accordance with the terms of this Agreement.

Section 3.3     Execution of Warrant Certificates.

(a)     The Warrant Certificates shall be signed on behalf of the Company by an Appropriate Officer.  Each such signature upon the Warrant Certificates may be in the form of a facsimile signature of any such Appropriate Officer and may be imprinted or otherwise reproduced on the Warrant Certificates and for that purpose the Company may adopt and use the facsimile signature of any Appropriate Officer.

(b)     If any Appropriate Officer who shall have signed any of the Warrant Certificates shall cease to be such Appropriate Officer before the Warrant Certificates so signed shall have been countersigned, either by manual or facsimile signature, by the Warrant Agent or delivered or disposed of by or on behalf of the Company, such Warrant Certificates nevertheless may be countersigned and delivered or disposed of with the same force and effect as though such Appropriate Officer had not ceased to be such Appropriate Officer of the Company; and any Warrant Certificate may be signed on behalf of the Company by any person who, at the actual date of the execution of such Warrant Certificate, shall be a proper Appropriate Officer of the

Company to sign such Warrant Certificate, although at the date of the execution of this Agreement any such person was not such Appropriate Officer.

(c)     A Warrant Certificate shall be, and shall remain, subject to the provisions of this Agreement until such time as all of the Warrants evidenced thereby shall have been duly exercised or shall have expired or been canceled in accordance with the terms hereof.

Section 3.4     Registration and Countersignature.

(a)     Upon receipt of a written order of the Company signed by an Appropriate Officer instructing the Warrant Agent to do so, the Warrant Agent (i) shall upon receipt of Warrant Certificates, including the Global Warrant Certificates, duly executed on behalf of the Company, countersign, either by manual or facsimile signature, such Warrant Certificates evidencing Warrants, and record such Warrant Certificates, including the Registered Holders thereof, in the Warrant Register, and (ii) shall register in the Warrant Register any Direct Registration Warrants in the names of the initial Registered Holders thereof.  Such written order of the Company shall specifically state the number of Warrants that are to be issued as Certificated Warrants or Direct Registration Warrants and the name of the Registered Holders thereof, and the number of Warrants that are to be issued as Book-Entry Warrants, and the Warrant Agent may rely conclusively on such written order.  [Notwithstanding the foregoing or anything else in this Agreement to the contrary, the Company shall not instruct the Warrant Agent to register any Direct Registration Warrants unless and until the Warrant Agent shall notify the Company in writing that it has the capabilities to accommodate Direct Registration Warrants.][2]

(b)     No Warrant Certificate shall be valid for any purpose, and no Warrant evidenced thereby shall be exercisable, until such Warrant Certificate has been countersigned by the manual or facsimile signature of the Warrant Agent.  Such signature by the Warrant Agent upon any Warrant Certificate executed by the Company shall be conclusive evidence that such Warrant Certificate so countersigned has been duly issued hereunder.

(c)     The Warrant Agent shall keep or cause to be kept, at an office designated for such purpose, books (the "Warrant Register") in which, subject to such reasonable regulations as it may prescribe, it shall register the Certificated Warrants or Direct Registration Warrants, and the Warrants represented by Global Warrant Certificates, and exchanges, cancellations and transfers of outstanding Warrants in accordance with the procedures set forth in Section 6.1 of this Agreement, all in a form satisfactory to the Company and the Warrant Agent.  No service charge shall be made for any exchange or registration of transfer of the Warrants, but the Company may require payment of a sum sufficient to cover any stamp or other tax or other charge that may be imposed on any Registered Holder in connection with any such exchange or registration of transfer.  The Warrant Agent shall have no obligation to effect an exchange or register a transfer unless and until it is satisfied that any payments required by the immediately preceding sentence have been made.

---

[2] NTD:  To be confirmed with Computershare.

(d)      Prior to due presentment for registration of transfer or exchange of any Warrants in accordance with the procedures set forth in this Agreement, the Company and the Warrant Agent may deem and treat the person in whose name such Warrants are registered upon the Warrant Register (the "Registered Holder" of such Warrants) as the absolute owner of such Warrants, for all purposes including, without limitation, for the purpose of any exercise thereof, any distribution to the holder thereof and for all other purposes, and neither the Warrant Agent nor the Company shall be affected by notice to the contrary. Neither the Company nor the Warrant Agent will be liable or responsible for any registration or transfer of any Warrants that are registered or to be registered in the name of a fiduciary or the nominee of a fiduciary.

## ARTICLE IV

### TERMS AND EXERCISE OF WARRANTS

Section 4.1      Exercise Price.      Each Warrant shall entitle (i) in the case of the Certificated Warrants or Direct Registration Warrants, the Registered Holder thereof and (ii) in the case of Book-Entry Warrants, the Beneficial Holder thereof ((i) and (ii) collectively, the "Holder"), subject to the provisions of the Warrants and this Agreement, the right to purchase from the Company one share of Common Stock (subject to adjustment from time to time as provided in Article V hereof), at the price of $[__] per share (subject to adjustment from time to time as provided in Article V, the "Exercise Price").

Section 4.2      Exercise Period.      Warrants may be exercised by the Holder thereof, in whole or in part (but not as to a fractional share of Common Stock), at any time and from time to time after the Date of Issuance and prior to 5:00 P.M., New York time on the seventh (7th) anniversary of the Effective Date (the "Exercise Period").   To the extent that a Warrant or portion thereof is not exercised prior to the expiration of the Exercise Period, it shall be automatically cancelled with no action by any Person, and with no further rights thereunder, upon such expiration.

Section 4.3      Method of Exercise.

(a)      In connection with the exercise of any Warrant, the Exercise Price shall be paid as provided in this Section 4.3(a).   In connection with the exercise of any Warrants, the Holder of such Warrants shall exchange the Common Stock purchase rights represented thereby by surrendering such Warrant (or portion thereof) to the Warrant Agent for the number of Warrant Exercise Shares being exercised, up to the aggregate number of Warrant Exercise Shares for which the Warrants are exercisable, from which the Company shall withhold and not issue to such Holder, in payment of the Exercise Price thereof, a number of such Warrant Exercise Shares equal to (x) the number of Warrant Exercise Shares for which the Warrants are being exercised, multiplied by (y) the Exercise Price, and divided by (z) the Current Sale Price on the Exercise Date (and such withheld shares shall no longer be issuable under such Warrants, and the Holder shall not have any rights or be entitled to any payment with respect to such withheld shares).   Upon exercise of any Warrants, the Warrant Agent will promptly deliver written notice to the Company to confirm the number of shares of Common Stock issuable in connection with the cashless exercise. The Company shall calculate and transmit to the Warrant Agent in a written notice, and the Warrant Agent shall have no duty, responsibility or obligation

#4852-9646-6204                                          10

to calculate, the number of shares of Common Stock issuable in connection with any cashless exercise.  The Warrant Agent shall be entitled to rely conclusively on any such written notice provided by the Company, and the Warrant Agent shall not be liable for any action taken, suffered or omitted to be taken by it in accordance with such written instructions or pursuant to this Agreement.  Such written notice from the Company shall also set forth the cost basis for such shares of Common Stock issued pursuant to such cashless exercise.

(b)    Subject to the terms and conditions of the Warrants and this Agreement, the Holder of any Warrants may exercise, in whole or in part, such Holder's right to purchase the Warrant Exercise Shares issuable upon exercise of such Warrants by: (x) in the case of Certificated Warrants, properly completing and duly executing the exercise form for the election to exercise such Warrants (including the exercise forms referred to in clauses (y) and (z) below, an "Exercise Form") appearing on the reverse side of the Warrant Certificates, (y) in the case of Direct Registration Warrants, providing an Exercise Form substantially in the form of Exhibit B hereto, properly completed and duly executed by the Registered Holder thereof, to the Warrant Agent, and (z) in the case of Book-Entry Warrants, providing an Exercise Form substantially in the form of Exhibit C hereto or otherwise complying with the practices and procedures of the Depositary and its direct and indirect participants, as applicable.

(c)    Any exercise of Warrants pursuant to the terms of this Agreement shall be irrevocable and shall constitute a binding agreement between the Holder and the Company, enforceable in accordance with the terms of the Warrants and this Agreement.

(d)    In the case of Certificated Warrants, upon receipt of the Warrant Certificate with the properly completed and duly executed Exercise Form, or in the case of Direct Registration Warrants, upon receipt of an Exercise Form, in each case pursuant to Section 4.3(b), the Warrant Agent shall:

(i)    examine the Exercise Form and all other documents delivered to it by or on behalf of Holders as contemplated hereunder to ascertain whether or not, on their face, such Exercise Form and any such other documents have been executed and completed in accordance with their terms and the terms hereof;

(ii)    if an Exercise Form or other document appears, on its face, to have been improperly completed or executed or some other irregularity in connection with the exercise of the Warrants exists, endeavor to inform the appropriate parties (including the person submitting such instrument) of the need for fulfillment of all requirements, specifying those requirements which appear to be unfulfilled;

(iii)    inform the Company of and cooperate with and assist the Company in resolving any reconciliation problems between the information provided on any Exercise Form received and the information on the Warrant Register;

(iv)    advise the Company no later than three (3) Business Days after receipt of an Exercise Form, of (A) the receipt of such Exercise Form and the number of Warrant Exercise Shares in respect of which the Warrants are requested to be exercised in accordance with the terms and conditions of this Agreement, (B) the instructions with

respect to delivery of the Common Stock deliverable upon such exercise, subject to timely receipt of such information by the Warrant Agent, and (C) such other information as the Company shall reasonably request; and

(v)      subject to Common Stock being made available to the Warrant Agent by or on behalf of the Company, and written instructions from the Company, liaise with the transfer agent for the Common Stock for the issuance and registration (in electronic entry form, in the case of Direct Registration Warrants) of the number of shares of Common Stock issuable upon exercise of the Warrants in accordance with the Exercise Form.

The Company reserves the right reasonably to reject any and all Exercise Forms that it determines, in its sole discretion, are not in proper form or for which any corresponding agreement by the Company to exchange would, in the opinion of the Company, be unlawful. Any such determination by the Company shall be final and binding on the Holders of the Warrants, absent manifest error.  Moreover, the Company reserves the absolute right to waive any of the conditions to any particular exercise of Warrants or any defects in the Exercise Form(s) with regard to any particular exercise of Warrants.  The Company shall provide prompt written notice to the Warrant Agent of any such rejection or waiver.

(e)      In the case of Book-Entry Warrants, the Company and the Warrant Agent shall cooperate with the Depositary and its direct and indirect participants in order to effectuate the exercise of such Warrants, in accordance with the applicable practices and procedures of the Depositary and such participants, including the manner of delivery of notice of exercise by the Beneficial Holders thereof, which may be substantially in the form of Exhibit C or in such other form as shall be prescribed by such participants, as applicable.

(f)      Neither the Company nor the Warrant Agent shall be under any duty to give notice to the Holders of the Warrants of any irregularities in any exercise of Warrants, nor shall it incur any liability for the failure to give such notice.

Section 4.4      Issuance of Common Stock.

(a)      Upon the effectiveness of any exercise of any Warrants pursuant to Section 4.3, the Company shall, subject to Section 4.6, promptly at its expense, and in no event later than five (5) Business Days thereafter, cause to be issued as directed by the Holder of such Warrants the total number of whole shares of Common Stock for which such Warrants are being exercised (as the same may be hereafter adjusted pursuant to Article V) in such denominations as are requested by the Holder as set forth below:

(i)      in the case of the exercise of any Certificated Warrants or Direct Registration Warrants by the Registered Holder thereof, by electronic entry on the books of the Company's transfer agent, registered as directed by the Holder, and

(ii)      in the case of the exercise of any Book-Entry Warrants by the Beneficial Holder thereof, by same-day or next-day credit to the Depositary in accordance with the practices and procedures of the Depositary and its respective participants, delivered to such account as directed by the Holder.

#4852-9646-6204                                          12

(b)     Notwithstanding the five (5) Business Day period set forth in Section 4.4(a), the Warrant Exercise Shares shall be deemed to have been issued at the time at which all of the conditions to such exercise have been fulfilled, and the Holder, or other person to whom the Holder shall direct the issuance thereof, shall be deemed for all purposes to have become the holder of such Warrant Exercise Shares at such time.

Section 4.5     Reservation of Shares.   The Company shall at all times reserve and keep available out of its authorized but unissued shares of Common Stock solely for the purpose of issuance upon the exercise of the Warrants, a number of shares of Common Stock equal to the aggregate Warrant Exercise Shares issuable upon the exercise of all outstanding Warrants.  The Company shall use commercially reasonable efforts to take all such actions as may be necessary to assure that all such shares of Common Stock may be so issued without violating the Company's governing documents or any requirements of any national securities exchange upon which shares of Common Stock may be listed.  The Company shall not take any action which would cause the number of authorized but unissued shares of Common Stock to be less than the number of such shares required to be reserved hereunder for issuance upon exercise of the Warrants.

Section 4.6     Fractional Shares.   Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not be required to issue any fraction of a share of its capital stock in connection with the exercise of any Warrants, and in any case where a Registered Holder of Warrants would, except for the provisions of this Section 4.6, be entitled under the terms thereof to receive a fraction of a share upon the exercise of such Warrants, the Company shall, upon the exercise of such Warrants, issue or cause to be issued only the largest whole number of Warrant Exercise Shares issuable upon such exercise (and such fraction of a share will be disregarded, and the Holder shall not have any rights or be entitled to any payment with respect to such fraction of a share); provided that the number of whole Warrant Exercise Shares which shall be issuable upon the contemporaneous exercise of any Warrants shall be computed on the basis of the aggregate number of Warrant Exercise Shares issuable upon exercise of all such Warrants.

Section 4.7     Close of Books; Par Value.   The Company shall not close its books against the transfer of any Warrants or any Warrant Exercise Shares in any manner which interferes with the timely exercise of such Warrants.  The Company shall use commercially reasonable efforts to, from time to time, take all such action as may be necessary to assure that the par value per share of the unissued shares of Common Stock acquirable upon exercise of the Warrants is at all times equal to or less than the Exercise Price then in effect.

Section 4.8     Payment of Taxes.   In connection with the exercise of any Warrants, the Company shall not be required to pay any tax or other charge imposed in respect of any transfer involved in the Company's issuance and delivery of shares of Common Stock (including certificates therefor) (or any payment of cash or other property in lieu of such shares) to any recipient other than the Holder of the Warrants being exercised, and in case of any such tax or other charge, the Warrant Agent and the Company shall not be required to issue or deliver any such shares (or cash or other property in lieu of such shares) until (x) such tax or charge has been paid or an amount sufficient for the payment thereof has been delivered to the Warrant Agent or the Company or (y) it has been established to the Company's and the Warrant Agent's

#4852-9646-6204                               13

satisfaction that any such tax or other charge that is or may become due has been paid. For the avoidance of doubt, the Warrant Agent shall not have any duty or obligation to take any action under any section of this Agreement that requires the payment of taxes or charges, unless and until the Warrant Agent is satisfied that all such taxes and/or charges have been paid.

## ARTICLE V

### ADJUSTMENT OF EXERCISE PRICE AND NUMBER OF WARRANT EXERCISE SHARES

In order to prevent dilution of the rights granted under the Warrants, the Exercise Price shall be subject to adjustment from time to time as provided in this <u>Article V</u>, and the number of shares of Common Stock issuable upon exercise of each Warrant shall be subject to adjustment from time to time as provided in this <u>Article V</u>.

Section 5.1    <u>Adjustments</u>.

(a)    <u>Subdivision or Combination of Common Stock</u>.  If the Company at any time after the issuance of the Warrants but prior to the expiration of the Exercise Period subdivides (by any stock split, stock dividend or reclassification) the Common Stock into a greater number of shares, the Exercise Price in effect immediately prior to such subdivision shall be proportionately reduced, and the number of Warrant Exercise Shares issuable upon exercise of each Warrant shall be proportionately increased.  If the Company at any time prior to the expiration of the Exercise Period combines (by reverse stock split or reclassification) the Common Stock into a smaller number of shares, the Exercise Price in effect immediately prior to such subdivision shall be proportionately increased, and the number of Warrant Exercise Shares issuable upon exercise of each Warrant shall be proportionately decreased.  Any adjustment under this Section 5.1(a) shall become effective immediately upon the effectiveness of such subdivision or combination.

(b)    <u>Distributions</u>. If the Company at any time after the issuance of the Warrants but prior to the expiration of the Exercise Period fixes a record date for the making of a distribution to all holders of shares of the Common Stock of securities, evidences of indebtedness, assets, cash, rights or warrants (excluding dividends or distributions referred to in <u>Section 5.1(a)</u>), then, in each such case, the Exercise Price in effect prior to such record date shall be adjusted thereafter to the price determined by the following formula:

$$EP_1 = EP_0 \ x \ (CP_0 - FV)/CP_0$$

where

$EP_1$ = the Exercise Price in effect immediately following the application of the adjustments in this <u>Section 5.1(b)</u>;

$EP_0$ = the Exercise Price in effect immediately prior to the application of the adjustments in this <u>Section 5.1(b)</u>;

$CP_0$ = the Current Sale Price of the Common Stock on the last trading

#4852-9646-6204

14

day preceding the first date on which the Common Stock trades regular way without the right to receive such distribution; and

FV    =    the amount of cash and/or the fair market value of the securities, evidences of indebtedness, assets, rights or warrants to be so distributed in respect of one share of Common Stock, as determined by the Board of Directors, acting in good faith.

Such adjustment shall be made successively whenever such a record date is fixed. In such event, the number of Warrant Exercise Shares issuable upon the exercise of each Warrant shall be increased to the number obtained by dividing (x) the product of (1) the number of Warrant Exercise Shares issuable upon the exercise of each Warrant before such adjustment, and (2) the Exercise Price in effect immediately prior to the adjustment by (y) the new Exercise Price immediately following such adjustment.

In the event that such distribution is not so made, the Exercise Price and the number of Warrant Exercise Shares issuable upon exercise of the Warrants then in effect shall be readjusted, effective as of the date when the Board of Directors determines not to distribute such shares, evidences of indebtedness, assets, rights, cash or warrants, as the case may be, to the Exercise Price that would then be in effect and the number of Warrant Exercise Shares that would then be issuable upon exercise of the Warrants if such record date had not been fixed.

(c)    Pro Rata Repurchase Offer of Common Stock.  If at any time after the issuance of the Warrants but prior to the expiration of the Exercise Period the Company consummates a Pro Rata Repurchase Offer of Common Stock, then the Exercise Price shall be reduced to the price determined by the following formula:

$$EP_1 = EP_0 \; x \; \frac{(OS_0 \, x \, CP_0) - AP}{(OS_0 - SP) \, x \, CP_0}$$

where

EP$_1$    =    the Exercise Price in effect immediately following the application of the adjustments in this Section 5.1(c) (but in no event greater than EP$_0$);

EP$_0$    =    the Exercise Price in effect immediately prior to the application of the adjustments in this Section 5.1(c);

OS$_0$    =    the number of Fully Diluted shares of Common Stock outstanding immediately before consummation of such Pro Rata Repurchase Offer;

CP$_0$    =    the Current Sale Price of a share of Common Stock on the trading day immediately preceding the first public announcement by the Company or any of its Affiliates of the intent to effect such Pro Rata Repurchase Offer;

> AP = the aggregate purchase price (including the fair market value, as determined in good faith by the Board of Directors, of any non-cash consideration included therein) paid for the shares of Common Stock in the Pro Rata Repurchase Offer; and
>
> SP = the number of shares of Common Stock so repurchased in the Pro Rata Repurchase Offer.

In such event, the Warrant Exercise Shares issuable upon the exercise of each Warrant shall be increased to the number obtained by dividing (x) the product of (1) the Warrant Exercise Shares issuable upon the exercise of each Warrant before such adjustment, and (2) the Exercise Price in effect immediately prior to the adjustment by (y) the new Exercise Price immediately following such adjustment. For the avoidance of doubt, no increase to the Exercise Price or decrease in the Warrant Exercise Shares issuable upon exercise of the Warrants shall be made pursuant to this Section 5.1(c).

(d)    Reorganization, Reclassification, Consolidation, Merger or Sale.   In connection with any Organic Change prior to the expiration of the Exercise Period, the Company shall make appropriate provision to ensure that the Holders of the Warrants shall have the right to acquire and receive, upon exercise of such Warrants, such cash, stock, securities or other assets or property as would have been issued or payable in such Organic Change (if the holder had exercised such Warrant immediately prior to such Organic Change) with respect to or in exchange, as applicable, for the number of Warrant Exercise Shares that would have been issued upon exercise of such Warrants, if such Warrants had been exercised immediately prior to the occurrence of such Organic Change.

(e)    Third Party Cash Sale.   Notwithstanding Section 5.1(d) or anything contained in this Agreement, in the event of any Third Party Cash Sale, the Company shall pay (or cause to be paid) to the Holders, with respect to each unexercised Warrant outstanding immediately prior to the consummation of such Third Party Cash Sale (the "Third Party Sale Closing"), cash in an amount equal to the excess, if any, of the Third Party Sale Price over the Exercise Price; provided, however, that no Holder shall be entitled to any payment hereunder with respect to any portion of the Third Party Sale Price that is contingent, deferred or escrowed unless and until such amounts are actually paid to the holders of Common Stock or to the Company or its Subsidiaries, as applicable.  Upon the occurrence of a Third Party Sale Closing, all unexercised Warrants outstanding immediately prior to the Third Party Sale Closing shall automatically be terminated and cancelled and the Company shall thereupon cease to have any further obligations or liability with respect to the Warrants, except as required by this Section 5.1(e).  For the avoidance of doubt, the Holders shall not be entitled to any payment or consideration with respect to any Third Party Cash Sale with respect to which the Third Party Sale Price is equal to or less than the Exercise Price.

Section 5.2    Notices.  Whenever the number and/or kind of Warrant Exercise Shares or the Exercise Price is adjusted as herein provided, the Company shall (i) prepare and deliver, or cause to be prepared and delivered, forthwith to the Warrant Agent a written statement setting forth the adjusted number and/or kind of shares issuable upon the exercise of Warrants and the Exercise Price of such shares after such adjustment, the facts requiring such adjustment and the

computation by which adjustment was made, and (ii) cause the Warrant Agent to give written notice to each Registered Holder in the manner provided in Section 9.2 below, of the record date or the effective date of the event.  Failure to give such notice, or any defect therein, shall not affect the legality or validity of such event.  The Warrant Agent shall be fully protected in relying upon any such written notice delivered in accordance with this Section 5.2, and on any adjustment therein contained, and shall not be deemed to have knowledge of any such adjustment unless and until it shall have received such written notice.  Notwithstanding anything to the contrary contained herein, the Warrant Agent shall have no duty or obligation to investigate or confirm whether the information contained in any such written notice complies with the terms of this Agreement or any other document, including the Warrant Certificates.  The Warrant Agent shall have no duty to determine when an adjustment under this Article V should be made, how any such adjustment should be calculated, or the amount of any such adjustment.

Section 5.3    Form of Warrant After Adjustments.  The form of the Warrant Certificate need not be changed because of any adjustments in the Exercise Price or the number and/or kind of shares issuable upon exercise of the Warrants, and Warrant Certificates theretofore or thereafter issued may continue to express the same price and number and kind of shares as are stated therein, as initially issued.  The Company, however, may at any time in its sole discretion make any change in the form of Warrant Certificate that it may deem appropriate to give effect to such adjustments and that does not affect the substance of the Warrant Certificate (including the rights, duties, liabilities or obligations of the Warrant Agent), and any Warrant Certificate thereafter issued, whether in exchange or substitution for an outstanding Warrant Certificate, may be in the form so changed.

Section 5.4    Deferral or Exclusion of Certain Adjustments   No adjustment to the Exercise Price or the number of Warrant Exercise Shares shall be required hereunder unless such adjustment together with other adjustments carried forward as provided below, would result in an increase or decrease of at least one percent (1%) of the applicable Exercise Price or the number of Warrant Exercise Shares; provided that any adjustments which by reason of this Section 5.4 are not required to be made shall be carried forward and taken into account in any subsequent adjustment. No adjustment need be made for a change in the par value of the shares of Common Stock. All calculations under this Section shall be made to the nearest one one-thousandth (1/1,000) of one cent ($0.01) or to the nearest one one-thousandth (1/1,000) of a share, as the case may be.

## ARTICLE VI

## TRANSFER AND EXCHANGE
## OF WARRANTS

Section 6.1    Registration of Transfers and Exchanges.

(a)    *Transfer and Exchange of Book-Entry Warrants*.  The Transfer (as defined below) and exchange of Book-Entry Warrants shall be effected through the Depositary and its direct and indirect participants, in accordance with the practices and procedures therefor of the Depositary and such participants.  As used herein, "Transfer" means any transfer, sale, assignment or other disposition.

#4852-9646-6204                                17

(b)     *Exchange of Book-Entry Warrants for Certificated Warrants or Direct Registration Warrants*.  If at any time:

(i)     the Depositary for the Global Warrant Certificates notifies the Company that the Depositary is unwilling or unable to continue as Depositary for the Global Warrant Certificates and a successor Depositary for the Global Warrant Certificates is not appointed by the Company within 90 days after delivery of such notice; or

(ii)     the Company, in its sole discretion, notifies the Warrant Agent in writing that it elects to exclusively cause the issuance of Certificated Warrants or Direct Registration Warrants under this Agreement, then upon written instructions signed by an Appropriate Officer of the Company, the Warrant Agent shall register and issue Certificated Warrants, or shall register Direct Registration Warrants, in an aggregate number equal to the number of Book-Entry Warrants represented by the Global Warrant Certificates, in accordance with such written instructions.  Such written instructions provided by the Company shall state that the Certificated Warrants or Direct Registration Warrants issued in exchange for Book-Entry Warrants pursuant to this Section 6.1(a) shall be registered in such names and in such amounts as the Depositary, pursuant to instructions from its direct or indirect participants or otherwise, shall instruct the Warrant Agent.

(c)     *Transfer and Exchange of Certificated Warrants or Direct Registration Warrants*.  When Certificated Warrants or Direct Registration Warrants are presented to the Warrant Agent with a written request:

(i)     to register the Transfer of such Certificated Warrants or Direct Registration Warrants; or

(ii)     to exchange such Certificated Warrants or Direct Registration Warrants for an equal number of Certificated Warrants or Direct Registration Warrants, respectively, of other authorized denominations,

the Warrant Agent shall register the Transfer or make the exchange, and in the case of Certificated Warrants shall issue such new Warrant Certificates, as requested if its customary requirements for such transactions are met, provided, that (A) the Warrant Agent shall have received (x) a written instruction of Transfer in form satisfactory to the Warrant Agent, duly executed by the Registered Holder thereof or by his attorney, duly authorized in writing, (y) a written order of the Company signed by an Appropriate Officer authorizing such exchange and (z) in the case of Certificated Warrants, surrender of the Warrant Certificate or Certificate(s) representing same duly endorsed for Transfer or exchange.

(d)     *Exchange of Certificated Warrants or Direct Registration Warrants for Book-Entry Warrants*. Certificated Warrants or Direct Registration Warrants that are not subject to any Warrant Restrictions or subject to the restrictions set forth in Section 6.4, may be exchanged for Book-Entry Warrants upon satisfaction of the requirements set forth below.  Upon

#4852-9646-6204                                                    18

receipt by the Warrant Agent of appropriate written instruments of transfer with respect to such Certificated Warrants or Direct Registration Warrants, in form satisfactory to the Warrant Agent, and in the case of Certificated Warrants, surrender of the Warrant Certificate or Certificate(s) representing same duly endorsed for Transfer or exchange, together with written instructions directing the Warrant Agent to make, or to direct the Depositary to make, an endorsement on the Global Warrant Certificate to reflect an increase in the number of Warrants represented by the Global Warrant Certificate equal to the number of Warrants represented by such Certificated Warrants or Direct Registration Warrants, then the Warrant Agent shall cancel such Certificated Warrants or Direct Registration Warrants on the Warrant Register and cause, or direct the Depositary to cause, in accordance with the standing instructions and procedures existing between the Depositary and the Warrant Agent, the number of Book-Entry Warrants represented by the Global Warrant Certificate to be increased accordingly.  If no Global Warrant Certificates are then outstanding, or if the Global Warrant Certificates then outstanding cannot be used for such purposes, the Company shall issue and the Warrant Agent shall countersign, by either manual or facsimile signature, a new Global Warrant Certificate representing the appropriate number of Book-Entry Warrants.  Any such transfer shall be subject to the Company's prior written approval.

(e)     *Restrictions on Transfer and Exchange of Global Warrant Certificates*. Notwithstanding any other provisions of this Agreement (other than the provisions set forth in Section 6.1(f)), unless and until it is exchanged in whole for Certificated Warrants or Direct Registration Warrants, a Global Warrant Certificate may not be transferred as a whole except by the Depositary to a nominee of the Depositary or by a nominee of the Depositary to the Depositary or another nominee of the Depositary or by the Depositary or any such nominee to a successor Depositary or a nominee of such successor Depositary.

(f)     *Restrictions on Transfer*.  No Warrants or Warrant Exercise Shares shall be sold, exchanged or otherwise transferred in violation of the Securities Act or state securities Laws or the Company's articles of incorporation.

(g)     *Exchange of Global Warrant Certificate*.  A Global Warrant Certificate may be exchanged for another Global Warrant Certificate of like or similar tenor for purposes of complying with the practices and procedures of the Depositary.

(h)     *Cancellation of Global Warrant Certificate*.  At such time as all beneficial interests in a Global Warrant Certificates have either been exchanged for Certificated Warrants or Direct Registration Warrants, redeemed, repurchased or cancelled, the Global Warrant Certificate shall be returned to, or retained and cancelled pursuant to applicable Law by, the Warrant Agent, upon written instructions from the Company satisfactory to the Warrant Agent.

Section 6.2     Obligations with Respect to Transfers and Exchanges of Warrants.

(a)     All Certificated Warrants or Direct Registration Warrants issued upon any registration of transfer or exchange of Certificated Warrants or Direct Registration Warrants, respectively, shall be the valid obligations of the Company, entitled to the same benefits under this Agreement as the Certificated Warrants or Direct Registration Warrants surrendered upon such registration of Transfer or exchange. No service charge shall be made to a Registered

#4852-9646-6204                              19

Holder for any registration, transfer or exchange of any Certificated Warrants or Direct Registration Warrants, but the Company or the Warrant Agent may require payment of a sum sufficient to cover any stamp or other tax or other charge that may be imposed on the Registered Holder in connection with any such exchange or registration of transfer. The Warrant Agent shall forward any such sum collected by it to the Company or to such persons as the Company shall specify by written notice.  The Warrant Agent shall have no obligation to effect an exchange or register a transfer unless and until it is satisfied that all such taxes and/or charges have been paid.

(b)    So long as the Depositary, or its nominee, is the registered owner of a Global Warrant Certificate, the Depositary or such nominee, as the case may be, shall be considered by the Company, the Warrant Agent, and any agent of the Company or the Warrant Agent as the sole owner or holder of the Warrants represented by such Global Warrant Certificate for all purposes under this Agreement.  Neither the Company nor the Warrant Agent, in its capacity as registrar for such Warrants, will have any responsibility or liability for any aspect of the records relating to beneficial interests in a Global Warrant Certificate or for maintaining, supervising or reviewing any records relating to such beneficial interests. Notwithstanding the foregoing, nothing herein shall prevent the Company, the Warrant Agent, or any agent of the Company or the Warrant Agent from giving effect to any written certification, proxy, or other authorization furnished by the Depository or impair the operation of customary practices of the Depository governing the exercise of the rights of a holder of a beneficial interest in a Global Warrant Certificate.

(c)    Subject to Sections 6.1 (c), and this Section 6.2, the Warrant Agent shall,

(ii)    in the case of Certificated Warrants, upon receipt of all information required to be delivered hereunder, from time to time register the transfer of any outstanding Certificated Warrants in the Warrant Register, upon delivery by the Registered Holder thereof, at the Warrant Agent's office designated for such purpose, of the Warrant Certificate representing such Certificated Warrants, properly completed and duly endorsed for transfer, by the Registered Holder thereof or by the duly appointed legal representative thereof or by a duly authorized attorney, such endorsement to be guaranteed by a participant in a Medallion Signature Guarantee Program at a guarantee level acceptable to the Warrant Agent; and upon any such registration of transfer, a new Warrant Certificate shall be issued to the transferee.

(ii)    in the case of Direct Registration Warrants, upon receipt of all information required to be delivered hereunder, from time to time register the transfer of any outstanding Direct Registration Warrants in the Warrant Register, upon delivery by the Registered Holder thereof, at the Warrant Agent's office designated for such purpose, of a form of assignment substantially in the form of Exhibit D hereto, properly completed and duly executed by the Registered Holder thereof or by the duly appointed legal representative thereof or by a duly authorized attorney, such signature to be guaranteed by a participant in a Medallion Signature Guarantee Program at a guarantee level acceptable to the Warrant Agent; and upon any such registration of transfer, new Direct Registration Warrants shall be issued to the transferee.

#4852-9646-6204                                           20

Section 6.3     Fractional Warrants.  The Warrant Agent shall not effect any registration of Transfer or exchange which will result in the issuance of a fraction of a Warrant.

Section 6.4     Restricted Warrants; Legends.  Notwithstanding anything contained in this Agreement, the Company will cause any Warrants that are distributed or issued under the Plan of Reorganization to any Person that the Company, in its sole discretion, determines may be deemed an "underwriter" under section 1145(b) of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), to be issued as Certificated Warrants represented by Warrant Certificates bearing a legend in substantially the following form, or as Direct Registration Warrants with a notation to a similar effect on the Warrant Register:

> THE WARRANTS REPRESENTED BY THIS CERTIFICATE WERE ISSUED IN RELIANCE UPON AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") AND HAVE NOT BEEN REGISTERED PURSUANT TO THE SECURITIES ACT OR OTHER APPLICABLE SECURITIES LAWS. THESE WARRANTS (AND THE SHARES OF COMMON STOCK ISSUABLE UPON EXERCISE THEREOF) MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, OR OTHERWISE DISPOSED EXCEPT (A) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS, OR (B) PURSUANT TO AN EXEMPTION FROM REGISTRATION THEREUNDER.

The Warrant Exercise Shares issued upon exercise of any such Warrants shall be issued in the form of registered stock certificates bearing a legend indicating that transfer may be restricted under United States federal and state securities laws, or in the form of an electronic entry on the stock register maintained by the transfer agent for the Common Stock with a notation to a similar effect.

The Holder (or its transferee, as applicable) of any such Warrants or Warrant Exercise Shares, as applicable, shall be entitled to receive from the Company, without expense, new securities of like tenor not bearing the restrictive legend set forth above when (a) all such Warrants or Warrant Exercise Shares, as applicable, shall have been (i) effectively registered under the Securities Act and disposed of in accordance with a registration statement covering such securities or (ii) disposed of pursuant to the provisions of Rule 144 or any comparable rule under the Securities Act or (b) when, in the written reasonable opinion of independent counsel for such Holder (which counsel shall be experienced in Securities Act matters and which counsel and opinion shall be reasonably satisfactory to the Company), such restrictions are no longer required in order to insure compliance with the Securities Act (including, without limitation, when all such Warrants or Warrant Exercise Shares, as applicable, could be sold in a single transaction pursuant to Rule 144 without restriction as to volume or manner of sale).

#4852-9646-6204                                        21

## ARTICLE VII

## OTHER PROVISIONS RELATING TO RIGHTS OF HOLDERS OF WARRANTS

Section 7.1    No Rights or Liability as Stockholder.  Nothing contained in the Warrants shall be construed as conferring upon the Holder or his, her or its transferees the right to vote or to receive dividends or to consent or to receive notice as a stockholder in respect of any meeting of stockholders for the election of directors of the Company or of any other matter, or any rights whatsoever as stockholders of the Company.  The vote or consent of any Holder shall not be required with respect to any action or proceeding of the Company and no Holder shall have any right not expressly conferred hereunder or under, or by applicable Law with respect to, the Warrants or any Warrant Certificates held by such Holder. No Holder, by reason of the ownership or possession of a Warrant or Warrant Certificate, shall have any right to receive any cash dividends, stock dividends, allotments or rights or other distributions paid, allotted or distributed or distributable to the holders of Common Stock prior to, or for which the relevant record date preceded, the date of the exercise of such Warrant. No provision thereof and no mere enumeration therein of the rights or privileges of the Holder shall give rise to any liability of such holder for the Exercise Price hereunder or as a stockholder of the Company, whether such liability is asserted by the Company or by creditors of the Company.

Section 7.2    Notice to Registered Holders.   The Company shall give notice to Registered Holders by regular mail or press release, and prompt written notice thereof to the Warrant Agent, if at any time prior to the expiration or exercise in full of the Warrants, any of the following events shall occur:

(a)    the payment of any dividend payable in any securities upon shares of Common Stock or the making of any distribution (other than a regular quarterly cash dividend) to all holders of Common Stock;

(b)    the issuance to all holders of Common Stock of any additional shares of Common Stock or of rights, options or warrants to subscribe for or purchase Common Stock or of any other subscription rights, options or warrants;

(c)    a Pro Rata Repurchase Offer;

(d)    an Organic Change, including a Third Party Cash Sale; or

(e)    a dissolution, liquidation or winding up of the Company.

Such giving of notice shall be initiated at least ten (10) days prior to the date fixed as the record date or the date of closing of the Company's stock transfer books for the determination of the stockholders entitled to such dividend, distribution or subscription rights, or of the stockholders entitled to vote on such Organic Change, dissolution, liquidation or winding up, or of the proposed date of a Third Party Sale Closing or the proposed effective date of such Pro Rata Repurchase Offer, as applicable.  Such notice shall specify such record date or the date of closing the stock transfer books or proposed effective date, as the case may be.  Failure to provide such notice shall not affect the validity of any action taken in connection with any such dividend, distribution or subscription rights, Pro Rata Repurchase Offer, Organic Change,

#4852-9646-6204                                                22

dissolution, liquidation or winding up.  For the avoidance of doubt, no such notice shall supersede or limit any adjustment called for by Section 5.1 by reason of any event as to which notice is required by this Section.

Section 7.3    Lost, Stolen, Mutilated or Destroyed Warrant Certificates.  If any Warrant Certificate is lost, stolen, mutilated or destroyed, the Company may issue, and upon written request by the Company, the Warrant Agent shall countersign, either by manual or facsimile signature, and deliver, in exchange and substitution for and upon cancellation of the mutilated Warrant Certificate, or in lieu of and substitution for the Warrant Certificate lost, stolen or destroyed, a new Warrant Certificate of like tenor in accordance with written instructions from the Company.  In the case of Warrant Certificates other than Global Warrant Certificates, the Company or the Warrant Agent may in its discretion require evidence reasonably satisfactory to it of the loss, theft or destruction of such Warrant Certificate, and indemnity satisfactory to it, and applicants for such substitute Warrant Certificates shall also comply with such other regulations and pay such other charges as the Company or the Warrant Agent may require.

Section 7.4    Cancellation of Warrants.  If the Company shall purchase or otherwise acquire Warrants, such Warrants shall be cancelled and retired, in the case of Certificated Warrants or Direct Registration Warrants, by appropriate notation on the Warrant Register, and, in the case of Book-Entry Warrants, in accordance with the practices and procedures of the Depositary, including if required by such practices and procedure by appropriate notation on the applicable Global Warrant Certificate.

## ARTICLE VIII

## CONCERNING THE WARRANT AGENT AND OTHER MATTERS

Section 8.1    Resignation, Consolidation or Merger of Warrant Agent.

(a)    *Appointment of Successor Warrant Agent.*  The Warrant Agent, or any successor to it hereafter appointed, may resign its duties and be discharged from all further duties and liabilities hereunder after giving sixty (60) days' notice in writing to the Company.  If the office of the Warrant Agent becomes vacant by resignation or incapacity to act or otherwise, the Company shall appoint in writing a successor Warrant Agent in place of the Warrant Agent.  If the Company shall fail to make such appointment within a period of sixty (60) days after it has been notified in writing of such resignation or incapacity by the Warrant Agent or by the Registered Holder of a Warrant, then the Registered Holder of any Warrant may apply to the Supreme Court of the State of New York for the County of New York for the appointment of a successor Warrant Agent at the Company's cost.  Any successor Warrant Agent, whether appointed by the Company or by such court, shall be a Person organized and existing under the Laws of the United States of America, or any state thereunder, in good standing.  After appointment, any successor Warrant Agent shall be vested with all the authority, powers, rights, immunities, duties and obligations of its predecessor Warrant Agent with like effect as if originally named as Warrant Agent hereunder, without any further act or deed; but if for any reason it becomes necessary or appropriate, the predecessor Warrant Agent shall execute and deliver, at the expense of the Company, an instrument transferring to such successor Warrant Agent all the authority, powers, rights, immunities, duties and obligations of such predecessor

#4852-9646-6204                                        23

Warrant Agent hereunder; and upon request of any successor Warrant Agent, the Company shall make, execute, acknowledge and deliver any and all instruments in writing for more fully and effectually vesting in and confirming to such successor Warrant Agent all such authority, powers, rights, immunities, duties and obligations.

(b)      *Notice of Successor Warrant Agent*.   In the event a successor Warrant Agent shall be appointed, the Company shall (i) give notice thereof to the predecessor Warrant Agent and the transfer agent for the Common Stock not later than the effective date of any such appointment, and (ii) cause written notice thereof to be delivered to each Registered Holder at such Holder's address appearing on the Warrant Register.   Failure to give any notice provided for in this Section 8.1(b) or any defect therein shall not affect the legality or validity of the removal of the Warrant Agent or the appointment of a successor Warrant Agent, as the case may be.

(c)      *Merger, Consolidation or Name Change of Warrant Agent*.

(i)      Any Person into which the Warrant Agent may be merged or with which it may be consolidated or any Person resulting from any merger or consolidation to which the Warrant Agent shall be a party shall be the successor Warrant Agent under this Agreement, without any further act or deed, if such person would be eligible for appointment as a successor Warrant Agent under the provisions of Section 8.1(a).  If any of the Warrant Certificates have been countersigned but not delivered at the time such successor to the Warrant Agent succeeds under this Agreement, any such successor to the Warrant Agent may adopt the countersignature of any previous Warrant Agent; and if at that time any of the Warrant Certificates shall not have been countersigned, any successor to the Warrant Agent may countersign such Warrant Certificates either in the name of the predecessor Warrant Agent or in the name of the successor Warrant Agent; and in all such cases such Warrant Certificates shall have the full force provided in the Warrant Certificates and in this Agreement.

(ii)      If at any time the name of the Warrant Agent is changed and at such time any of the Warrant Certificates have been countersigned but not delivered, the Warrant Agent whose name has changed may adopt the countersignature under its prior name; and if at that time any of the Warrant Certificates have not been countersigned, the Warrant Agent may countersign such Warrant Certificates either in its prior name or in its changed name; and in all such cases such Warrant Certificates shall have the full force provided in the Warrant Certificates and in this Agreement.

Section 8.2      Fees and Expenses of Warrant Agent.

(a)      *Remuneration*.  The Company agrees to pay the Warrant Agent reasonable remuneration for its services as Warrant Agent and will reimburse the Warrant Agent upon demand for all reasonable and documented out-of-pocket expenses (including reasonable counsel fees and expenses), taxes and governmental charges and other charges of any kind and nature incurred by the Warrant Agent in connection with the negotiation, preparation, delivery, administration, execution, modification, waiver, delivery, enforcement or amendment of this of this Agreement and the exercise and performance of its duties hereunder.

#4852-9646-6204                                                  24

(b)    *Further Assurances*.    The Company agrees to perform, execute, acknowledge and deliver or cause to be performed, executed, acknowledged and delivered all such further and other acts, instruments, and assurances as may reasonably be required by the Warrant Agent for the carrying out or performing of the provisions of this Agreement.

Section 8.3    Duties of Warrant Agent.

(a)    *Covered Persons*. References to the Warrant Agent in this Section 8.3 shall include the Warrant Agent and its affiliates, principles, directors, officers, employees, agents, representatives, attorneys, accountants, advisors and other professionals.

(b)    *Liability*.

(i)    The Warrant Agent shall not be liable for or by reason of any of the statements of fact or recitals contained in this Agreement, the Warrant Statements or in the Warrant Certificates (except, in each case, its countersignature thereof) or be required to verify the same, but all such statements and recitals are and shall be deemed to have been made by the Company only. The Warrant Agent shall not be under any responsibility in respect of the validity or sufficiency of this Agreement or the execution and delivery hereof or in respect of the validity or execution of any Warrant Certificate (except, in each case, its countersignature thereof); nor shall the Warrant Agent be responsible for any breach by the Company of any covenant or condition contained in this Agreement or in any Warrant Certificate to be complied with by the Company; nor shall the Warrant Agent be responsible for the making of any adjustment in the Exercise Price or the number and/or kind of shares issuable upon the exercise of a Warrants required under the provisions of Article V or be responsible for the manner, method or amount of any such change or the ascertaining of the existence of facts that would require any such change; nor shall the Warrant Agent by any act hereunder be deemed to make any representation or warranty as to the authorization or reservation of any Warrant Exercise Shares to be issued pursuant to this Agreement or any Warrant or as to whether any Warrant Exercise Shares will, when issued, be validly issued and fully paid and non-assessable.    The Warrant Agent shall not be accountable or under any duty or responsibility for the use by the Company of any Warrant Certificate authenticated by the Warrant Agent and delivered by it to the Company pursuant to this Agreement or for the application by the Company of the proceeds of the issue and sale, or exercise, of the Warrants.

(ii)    The Warrant Agent shall have no liability under, and no duty to inquire as to, the provisions of any agreement, instrument or document other than this Agreement, including any Warrant Certificate.

(iii)    The Warrant Agent may rely on and shall incur no liability or responsibility to the Company, any Holder, or any other Person for any action taken, suffered or omitted to be taken by it upon any notice, instruction, request, resolution, waiver, consent, order, certificate, affidavit, statement, or other paper, document or instrument furnished to the Warrant Agent hereunder and believed by it to be genuine and to have been signed, sent or presented by the proper party or parties. The Warrant Agent

#4852-9646-6204                                                      25

shall be under no duty to inquire into or investigate the validity, accuracy or content of any such notice, instruction, request, resolution, waiver, consent, order, certificate, affidavit, statement, or other paper, document or instrument.  The Warrant Agent shall not take any instructions or directions except those given in accordance with this Agreement.

(iv)    The Warrant Agent shall act hereunder solely as agent for the Company and in a ministerial capacity and does not assume any obligation or relationship of agency or trust with any of the owners or holders of the Warrants, and its duties shall be determined solely by the provisions hereof. The Warrant Agent shall not be liable for any action taken, suffered or omitted to be taken in connection with this Agreement except to the extent that a court of competent jurisdiction determines that its own gross negligence, willful misconduct or bad faith (as each is determined by a final, nonappealable judgment) was the primary cause of any loss.

(v)    Anything in this Agreement to the contrary notwithstanding, in no event shall the Warrant Agent be liable for any special, incidental, punitive, indirect or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Warrant Agent has been advised of the likelihood of such loss or damage.  Any liability of the Warrant Agent under this Agreement shall be limited to the amount of annual fees paid by the Company to the Warrant Agent hereunder.

(vi)    All rights and obligations contained in this Section 8.3 shall survive the termination of this Agreement and the resignation, replacement, incapacity or removal of the Warrant Agent. All fees and expenses incurred by the Warrant Agent prior to the resignation, replacement, incapacity or removal of the Warrant Agent shall be paid by the Company in accordance with this Section 8.3 of this Agreement notwithstanding such resignation, replacement, incapacity or removal of the Warrant Agent.

(vii)    The Warrant Agent shall not be under any liability for interest on any monies at any time received by it pursuant to the provisions of this Agreement.

(viii)    In no event shall the Warrant Agent be responsible or liable for any failure or delay in the performance of its obligations under this Agreement arising out of or caused by, directly or indirectly, forces beyond its reasonable control, including without limitation strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software or hardware) services.

(ix)    In the event the Warrant Agent believes any ambiguity or uncertainty exists hereunder or in any notice, instruction, direction, request or other communication, paper or document received by the Warrant Agent hereunder, the Warrant Agent, may, in its sole discretion, refrain from taking any action, and shall be fully protected and shall not be liable in any way to the Company or any Holder or other person or entity for refraining from taking such action, unless the Warrant Agent receives

#4852-9646-6204                              26

written instructions signed by the Company which eliminates such ambiguity or uncertainty to the satisfaction of Warrant Agent.

(c)       *Reliance on Company Statement*.   Whenever in the performance of its duties under this Agreement, the Warrant Agent shall deem it necessary or desirable that any fact or matter be proved or established by the Company prior to taking or suffering any action hereunder, such fact or matter (unless other evidence in respect thereof be herein specifically prescribed) may be deemed to be conclusively proved and established by a statement signed by an Appropriate Officer of the Company and delivered to the Warrant Agent.  The Warrant Agent may rely upon such statement for any action taken or suffered by it pursuant to the provisions of this Agreement. The Company will perform, execute, acknowledge and deliver or cause to be performed, executed, acknowledged and delivered all such further and other acts, instruments and assurances as may reasonably be required by the Warrant Agent for the carrying out or performing by the Warrant Agent of the provisions of this Agreement.

(d)       *Indemnity*.   The Company agrees to indemnify, defend, protect and save the Warrant Agent and hold it harmless from and against any and all losses, damages, claims, liabilities, penalties, judgments, settlements, actions, suits, proceedings, litigation, investigations, costs or expenses, including without limitation reasonable fees and disbursements of counsel, that may be imposed on, incurred by, or asserted against such Person, at any time, and in any way  relating to or arising out of or in connection with, directly or indirectly, the execution, delivery or performance of this Agreement, the enforcement of any rights or remedies under or in connection with this Agreement, or as may arise by reason of any act, omission or error of such Person; provided, however, that no such Person shall be entitled to be so indemnified, defended, protected, saved and kept harmless to the extent such loss was caused by its own gross negligence, bad faith or willful misconduct, each as determined by a final judgment of a court of competent jurisdiction.  Notwithstanding the foregoing, the Company shall not be responsible for any settlement made without its written consent, which written consent shall not be unreasonably conditioned, withheld or delayed.

(e)       *Exclusions*.   The Warrant Agent shall have no responsibility with respect to the validity of this Agreement or with respect to the validity or execution of any Warrant (except, in each case, its countersignature thereof); nor shall it be responsible for any breach by the Company of any covenant or condition contained in this Agreement or in any Warrant; nor shall it be responsible to make any adjustments required under the provisions of Article V hereof or responsible for the manner, method or amount of any such adjustment or the ascertaining of the existence of facts that would require any such adjustment; nor shall it by any act hereunder be deemed to make any representation or warranty as to the authorization or reservation of any Common Stock to be issued pursuant to this Agreement or any Warrant or as to whether any Common Stock will, when issued, be valid and fully paid and nonassessable. The Warrant Agent will not be under any duty or responsibility to ensure compliance with any applicable federal or state securities laws in connection with the issuance, transfer or exchange of Warrants.

(f)       The Warrant Agent may execute and exercise any of the rights or powers hereby vested in it or perform any duty hereunder either itself or by or through its attorneys, agents or employees, and the Warrant Agent shall not be answerable or accountable for any act, default, neglect or misconduct of any such attorneys, agents or employees or for any loss to the

Company resulting from such neglect or misconduct, <u>provided</u> that the Warrant Agent acts without gross negligence, willful misconduct or bad faith (each as determined by a final judgment of a court of competent jurisdiction) in connection with the selection of such attorneys, agents or employees.

(g)       The Warrant Agent may consult at any time with legal counsel satisfactory to it (who may be legal counsel for the Company) and the advice of such counsel shall be full and complete authorization and protection to the Warrant Agent as to any action taken or omitted by such parties in accordance with such advice.

(h)       The Warrant Agent may buy, sell, or deal in any of the Warrants or other securities of the Company freely as though it was not Warrant Agent under this Agreement. Nothing contained herein shall preclude the Warrant Agent from acting in any other capacity for the Company or for any other Person.

(i)       The Warrant Agent shall not be required to use or risk its own funds in the performance of any of its obligations or duties or the exercise of any of its rights or powers, and shall not be required to take any action which, in the Warrant Agent's sole and absolute judgment, could involve it in expense or liability unless furnished with security and indemnity satisfactory to it.

## ARTICLE IX

## MISCELLANEOUS PROVISIONS

Section 9.1     <u>Binding Effects; Benefits</u>.  This Agreement shall inure to the benefit of and shall be binding upon the Company, the Warrant Agent and the Holders and their respective heirs, legal representatives, successors and assigns.  Nothing in this Agreement, expressed or implied, is intended to or shall confer on any person other than the Company, the Warrant Agent and the Holders, or their respective heirs, legal representatives, successors or assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement.

Section 9.2     <u>Notices</u>.  Unless a provision herein permits notice by way of a press release, any notice or other communication required or which may be given hereunder shall be in writing and shall be sent by certified or regular mail (return receipt requested, postage prepaid), by private national courier service, by personal delivery or by facsimile transmission.  Such notice or communication shall be deemed given (i) if mailed, two (2) days after the date of mailing, (ii) if sent by national courier service, one (1) Business Day after being sent, (iii) if delivered personally, when so delivered, or (iv) if sent by facsimile transmission, on the Business Day after such facsimile is transmitted, in each case as follows:

if to the Warrant Agent, to:

Computershare Inc.
480 Washington Boulevard, 29th Floor
Jersey City, New Jersey 07310
Facsimile: [__]
Attention: [__]

with copies (which shall not constitute notice) to:

Computershare Inc.
480 Washington Boulevard, 29th Floor
Jersey City, New Jersey 07310
Facsimile: (201) 680-4610
Attention: Legal Department

if to the Company, to:

Eagle Bulk Shipping Inc.
477 Madison Avenue
New York, New York 10022
Facsimile: (212) 785-3311
Attention: Adir Katzav

with copies (which shall not constitute notice) to:

Milbank, Tweed, Hadley & McCloy LLP
601 South Figueroa Street
Los Angeles, CA 90017
Facsimile: (213) 629-5063
Attention: Paul S. Aronzon

if to Registered Holders, at their addresses as they appear in the Warrant Register or in the records of the transfer agent or registrar for the Common Stock.

Section 9.3    Persons Having Rights under this Agreement.  Nothing in this Agreement expressed and nothing that may be implied from any of the provisions hereof is intended, or shall be construed, to confer upon, or give to, any person or corporation other than the parties hereto and the Holders, any right, remedy, or claim under or by reason of this Agreement or of any covenant, condition, stipulation, promise, or agreement hereof.  All covenants, conditions, stipulations, promises, and agreements contained in this Agreement shall be for the sole and exclusive benefit of the parties hereto, their successors and assigns and the Holders.

Section 9.4    Examination of this Agreement.  A copy of this Agreement shall be available at all reasonable times at an office designated for such purpose by the Warrant Agent, for examination by the Registered Holder of any Warrant.  Prior to such examination, the Warrant Agent may require any such Holder to submit evidence that such Holder is a Registered Holder of a Warrant.

Section 9.5    Counterparts.  This Agreement may be executed in any number of original or facsimile or electronic PDF counterparts and each of such counterparts shall for all purposes be deemed to be an original, and all such counterparts shall together constitute but one and the same instrument.

Section 9.6    Effect of Headings.  The section headings herein are for convenience only and are not part of this Agreement and shall not affect the interpretation hereof.

#4852-9646-6204

29

Section 9.7    Amendments.

(a)    Subject to Section 9.7(b) below, this agreement may not be amended except in writing signed by the Company and the Warrant Agent.

(b)    The Company and the Warrant Agent may from time to time supplement or amend this Agreement or the Warrants, as follows:

(i)    without the approval of any Holder in order to cure any ambiguity, manifest error or other mistake in this Agreement or the Warrants, or to correct or supplement any provision contained herein or in the Warrants that may be defective or inconsistent with any other provision herein or in the Warrants, or to make any other provisions in regard to matters or questions arising hereunder that the Company may deem necessary or desirable and that shall not adversely affect, alter or change the interests of the Holders in any material respect, or

(ii)    with the prior written consent of Requisite Holders.

(c)    Notwithstanding anything to the contrary herein, upon the delivery of a certificate from an Appropriate Officer which states that the proposed supplement or amendment is in compliance with the terms of this Section 9.7, the Warrant Agent shall execute such supplement or amendment; provided that the Warrant Agent may, but shall not be obligated to, execute any amendment or supplement that affects Warrant Agent's rights, duties, immunities, liabilities or obligations hereunder.  Any amendment, modification or waiver effected pursuant to and in accordance with the provisions of this Section 9.7 shall be binding upon all Holders and upon each future Holder, the Company and the Warrant Agent.  In the event of any amendment, modification or waiver, the Company shall give prompt notice thereof to all Registered Holders and, if appropriate, notation thereof shall be made on all Warrant Certificates thereafter surrendered for registration of transfer or exchange.  Any failure of the Company to give such notice or any defect therein shall not, however, in any way impair or affect the validity of any such amendment.

Section 9.8    No Inconsistent Agreements; No Impairment.  The Company shall not, on or after the date hereof, enter into any agreement with respect to its securities which conflicts with the rights granted to the Holders in the Warrants or the provisions hereof.  The Company represents and warrants to the Holders that the rights granted hereunder do not in any way conflict with the rights granted to holders of the Company's securities under any other agreements.  The Company shall not, by amendment of its articles of incorporation or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed hereunder by the Company, but will at all times in good faith assist in the carrying out of all the provisions of the Warrants and in the taking of all such action as may be necessary in order to preserve the exercise rights of the Holders against impairment.

Section 9.9    Integration/Entire Agreement.  This Agreement (and solely with respect to the Warrants), is intended by the parties as a final expression of their agreement and intended to

#4852-9646-6204                                            30

be a complete and exclusive statement of the agreement and understanding of the Company, the Warrant Agent and the Holders in respect of the subject matter contained herein. There are no restrictions, promises, warranties or undertakings, other than those set forth or referred to herein, with respect to the Warrants. This Agreement and the Warrants supersede all prior agreements and understandings between the parties with respect to such subject matter.

Section 9.10   Governing Law, Etc. This Agreement and each Warrant issued hereunder shall be deemed to be a contract made under the Laws of the State of New York and for all purposes shall be governed by and construed in accordance with the Laws of such State. Each party hereto consents and submits to the exclusive jurisdiction of the courts of the State of New York located in New York County and of the U.S. federal courts located in the Southern District of New York in connection with any action or proceeding brought against it that arises out of or in connection with, that is based upon, or that relates to this Agreement or the transactions contemplated hereby. In connection with any such action or proceeding in any such court, each party hereto hereby waives personal service of any summons, complaint or other process and hereby agrees that service thereof may be made in accordance with the procedures for giving notice set forth in Section 9.2 hereof. Each party hereto hereby waives any objection to jurisdiction or venue in any such court in any such action or proceeding and agrees not to assert any defense based on forum *non conveniens* or lack of jurisdiction or venue in any such court in any such action or proceeding.

Section 9.11   Termination. This Agreement will terminate on the earlier of (i) such date when all Warrants have been exercised with respect to all shares subject thereto, or (ii) the expiration of the Exercise Period. The provisions of Section 8.3 and this Article IX shall survive such termination and the resignation, replacement or removal of the Warrant Agent.

Section 9.12   Waiver of Trial by Jury. Each party hereto, including each Holder by its receipt of a Warrant, hereby irrevocably and unconditionally waives the right to a trial by jury in any action, suit, counterclaim or other proceeding (whether based on contract, tort or otherwise) arising out of, connected with or relating to this Agreement and the transactions contemplated hereby.

Section 9.13   Remedies. The Company hereby agrees that, in the event that the Company violates any provisions of the Warrants (including the obligation to deliver shares of Common Stock upon the exercise thereof), the remedies at law available to the Holder of such Warrant may be inadequate. In such event, the Requisite Holders and, with the prior written consent of the Requisite Holders, the holder of such Warrants, shall have the right, in addition to all other rights and remedies any of them may have, to specific performance and/or injunctive or other equitable relief to enforce the provisions of this Agreement and the Warrants.

Section 9.14   Severability. In the event that any one or more of the provisions contained in this Agreement or in the Warrants, or the application thereof in any circumstances, is held invalid, illegal or unenforceable, the validity, legality and enforceability of any such provisions in every other respect and of the remaining provisions contained herein and therein shall not be affected or impaired thereby; provided, however, that if any such excluded provision shall adversely affect the rights, immunities, duties or obligations of the Warrant Agent, the Warrant Agent shall be entitled to immediately resign.

#4852-9646-6204                                               31

Section 9.15    Customer Identification Program.  The Company acknowledges that the Warrant Agent is subject to the customer identification program ("Customer Identification Program") requirements under the USA PATRIOT Act and its implementing regulations, and that the Warrant Agent must obtain, verify and record information that allows the Warrant Agent to identify the Company.  Accordingly, prior to accepting an appointment hereunder, the Warrant Agent may request information from the Company that will help the Warrant Agent to identify the Company, including without limitation the Company's physical address, tax identification number, organizational documents, certificate of good standing, license to do business, or any other information that the Warrant Agent deems necessary.  The Company agrees that the Warrant Agent cannot accept an appointment hereunder unless and until the Warrant Agent verifies the Company's identity in accordance with the Customer Identification Program requirements.

[*Signature Page Follows*]

#4852-9646-6204                                                             32

IN WITNESS WHEREOF, this Agreement has been duly executed by the undersigned parties hereto as of the date first above written.

EAGLE BULK SHIPPING INC.


By: _____
     Name:
     Title:


COMPUTERSHARE INC., as Warrant Agent


By: _____
     Name:
     Title:


COMPUTERSHARE TRUST COMPANY N.A.,
as Warrant Agent


By: _____
     Name:
     Title:

**EXHIBIT A-1**

FACE OF GLOBAL WARRANT CERTIFICATE

VOID AFTER 5:00 P.M., NEW YORK CITY TIME, ON [__], 2021

This Global Warrant Certificate is held by The Depository Trust Company (the "Depositary") or its nominee in custody for the benefit of the beneficial owners hereof, and is not transferable to any person under any circumstances except that (i) this Global Warrant Certificate may be exchanged in whole but not in part pursuant to Section 6.1(g) of the Warrant Agreement, (ii) this Global Warrant Certificate may be delivered to the Warrant Agent for cancellation pursuant to Section 6.1(h) of the Warrant Agreement and (iii) this Global Warrant Certificate may be transferred to a successor Depositary with the prior written consent of the Company.

Unless this Global Warrant Certificate is presented by an authorized representative of the Depositary to the Company or the Warrant Agent for registration of transfer, exchange or payment and any certificate issued is registered in the name of Cede & Co. or such other entity as is requested by an authorized representative of the Depositary (and any payment hereon is made to Cede & Co. or to such other entity as is requested by an authorized representative of the Depositary), any transfer, pledge or other use hereof for value or otherwise by or to any person is wrongful because the registered owner hereof, Cede & Co., has an interest herein.

Transfers of this Global Warrant Certificate shall be limited to transfers in whole, but not in part, to nominees of the Depositary or to a successor thereof or such successor's nominee.

No registration or transfer of the securities issuable pursuant to the Warrant will be recorded on the books of the Company until such provisions have been complied with.

#4852-9646-6204

THE SECURITIES REPRESENTED BY THIS WARRANT CERTIFICATE (INCLUDING THE SECURITIES ISSUABLE UPON EXERCISE OF THE WARRANT) ARE SUBJECT TO ADDITIONAL AGREEMENTS SET FORTH IN THE WARRANT AGREEMENT DATED AS OF [__], 2014, BY AND BETWEEN THE COMPANY AND THE WARRANT AGENT (THE "WARRANT AGREEMENT").

THIS WARRANT WILL BE VOID IF NOT EXERCISED PRIOR TO
5:00 P.M., NEW YORK CITY TIME, ON [__], 2021

**WARRANT TO PURCHASE**

**_____ SHARES OF COMMON STOCK OF**

**EAGLE BULK SHIPPING INC.**＊

CUSIP # [__]
ISSUE DATE:  **[__], 2014**

No. W-1

This certifies that, for value received, Cede & Co. and its registered assigns (collectively, the "Registered Holder"), is entitled to purchase from Eagle Bulk Shipping Inc., a Marshall Islands corporation (the "Company"), subject to the terms and conditions hereof, at any time before 5:00 p.m., New York time, on [__], 2021, the number of fully paid and non-assessable shares of Common Stock of the Company set forth above at the Exercise Price (as defined in the Warrant Agreement).  The Exercise Price and the number and kind of shares purchasable hereunder are subject to adjustment from time to time as provided in Article V of the Warrant Agreement.  The initial Exercise Price shall be $[__].

This Warrant Certificate shall not be valid unless countersigned by the Warrant Agent.

---

＊   Exercisable for [__] shares of Common Stock for all Warrants in the aggregate, subject to adjustment in accordance with Article V of the Warrant Agreement.

#4852-9646-6204

IN WITNESS WHEREOF, this Warrant has been duly executed by the Company under its corporate seal as of the [__] day of [__], 2014.

EAGLE BULK SHIPPING INC.

By: _____

Print Name: _____

Title: _____

Attest: _____

Computershare Inc.,
as Warrant Agent

By: _____
    Name:
    Title:

Address of Registered Holder for Notices (until changed in accordance with this Warrant):
Cede & Co.
55 Water Street
New York, New York 10041

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS WARRANT CERTIFICATE SET FORTH ON THE REVERSE HEREOF.  SUCH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS THOUGH FULLY SET FORTH AT THIS PLACE.

#4852-9646-6204

REVERSE OF GLOBAL WARRANT CERTIFICATE

The Warrants evidenced by this Warrant Certificate are part of a duly authorized issue of Warrants to purchase _____¤ shares of Common Stock issued pursuant to the Warrant Agreement, as dated [__], 2014 (the "Warrant Agreement"), by and among Eagle Bulk Shipping Inc. (the "Company"), and Computershare Inc. and Computershare Trust Company N.A. (together, the "Warrant Agent").  A copy of the Warrant Agreement may be inspected at the office of the Warrant Agent designated for such purpose.  The Warrant Agreement hereby is incorporated by reference in and made a part of this instrument and is hereby referred to for a description of the rights, limitation of rights, obligations, duties and immunities thereunder of the Warrant Agent, the Company and the Registered Holders of the Warrants.  All capitalized terms used in this Global Warrant Certificate that are not defined herein but are defined in the Warrant Agreement shall have the meanings given to them in the Warrant Agreement.

The Company shall not be required to issue fractions of Common Stock or any certificates that evidence fractional Common Stock.

No Warrants may be sold, exchanged or otherwise transferred in violation of the Securities Act or state securities laws.

This Warrant does not entitle the Registered Holder to any of the rights of a stockholder of the Company.

The Company and Warrant Agent may deem and treat the Registered Holder hereof as the absolute owner of this Warrant Certificate (notwithstanding any notation of ownership or other writing hereon made by anyone) for the purpose of any exercise hereof and for all other purposes, and neither the Company nor the Warrant Agent shall be affected by any notice to the contrary.

---

¤   Exercisable for [__] shares of Common Stock for all Warrants in the aggregate, subject to adjustment in accordance with Article V of the Warrant Agreement.

#4852-9646-6204

EXHIBIT A-2

FACE OF WARRANT CERTIFICATE

VOID AFTER 5:00 P.M., NEW YORK CITY TIME, ON [__], 2021

THE SECURITIES REPRESENTED BY THIS WARRANT CERTIFICATE (INCLUDING THE SECURITIES ISSUABLE UPON EXERCISE OF THE WARRANT) ARE SUBJECT TO ADDITIONAL AGREEMENTS SET FORTH IN THE WARRANT AGREEMENT DATED AS OF [__], 2014, BY AND BETWEEN THE COMPANY AND THE WARRANT AGENT (THE "WARRANT AGREEMENT").

Certificate Number _____                          Warrants _____
                                                              CUSIP _____

This certifies that


is the holder of


WARRANTS TO PURCHASE COMMON STOCK OF
EAGLE BULK SHIPPING INC.

transferable on the books of the Corporation by the holder hereof in person or by duly authorized attorney upon surrender of the certificate properly endorsed.  Each Warrant entitles the holder and its registered assigns (collectively, the "Registered Holder")  to purchase by cashless exercise from Eagle Bulk Shipping Inc., a Marshall Islands corporation (the "Company"), subject to the terms and conditions hereof, at any time before 5:00 p.m., New York time, on [__], 2021, one fully paid and non-assessable share of Common Stock of the Company  at the Exercise Price (as defined in the Warrant Agreement).  The Exercise Price and the number and kind of shares purchasable hereunder are subject to adjustment from time to time as provided in Article V of the Warrant Agreement.  The initial Exercise Price shall be $[__].

This certificate is not valid unless countersigned and registered by the Transfer Agent and Registrar.

**WITNESS** the facsimile seal of the Corporation and the facsimile signatures of its duly authorized officers.

                                                              DATED

_____

Authorized Officer

Attest:                              [Corporate seal]         COUNTERSIGNED AND REGISTERED
                                                              **COMPUTERSHARE INC,**
                                                              WARRANT AGENT.
_____

Secretary                                                     By_____
                                                                   AUTHORIZED SIGNATURE

#4852-9646-6204

REVERSE OF WARRANT CERTIFICATE

EAGLE BULK SHIPPING INC.

The Warrants evidenced by this Warrant Certificate are a part of a duly authorized issue of Warrants to purchase [__] shares of Common Stock issued pursuant to the Warrant Agreement, as dated [__], 2014 (the "Warrant Agreement"), by and among Eagle Bulk Shipping Inc. (the "Company"), and Computershare Inc. and Computershare Trust Company N.A. (together, the "Warrant Agent"). A copy of the Warrant Agreement may be inspected at the office of the Warrant Agent designated for such purpose. The Warrant Agreement is incorporated by reference in and made a part of this instrument and is hereby referred to for a description of the rights, limitation of rights, obligations, duties and immunities thereunder of the Warrant Agent, the Company and the Registered Holders of the Warrants. All capitalized terms used in this Warrant Certificate that are not defined herein but are defined in the Warrant Agreement shall have the meanings given to them in the Warrant Agreement.

The Company shall not be required to issue fractions of Common Stock or any certificates that evidence fractional Common Stock. No Warrants may be sold, exchanged or otherwise transferred in violation of the Securities Act or state securities laws. The Warrants represented by this Warrant Certificate do not entitle the Registered Holder to any of the rights of a stockholder of the Company. The Company and Warrant Agent may deem and treat the Registered Holder hereof as the absolute owner of this Warrant Certificate (notwithstanding any notation of ownership or other writing hereon made by anyone) for the purpose of any exercise hereof and for all other purposes, and neither the Company nor the Warrant Agent shall be affected by any notice to the contrary.

The following abbreviations, when used in the inscription on the face of this certificate, shall be construed as though they were written out in full according to applicable laws or regulations.

Ten COM – as tenants in common

TEN ENT – as tenants by the entireties

JT TEN –    as joint tenants with right of survivorship and not as tenants in common

UNIF GIFT MIN ACT - _____ Custodian _____
                          (Cust)                                    (Minor)
under Uniform Gifts to Minor Act
                                          _____
                                                  (State)

UNIF GIFT MIN ACT - _____ Custodian (until age) _____
                          (Cust)

_____ under Uniform Transfers to Minors Act _____
        (Minor)                                                          (State)

FORM OF ASSIGNMENT

For value received, _____ hereby sells, assigns and transfers the Warrants to purchase shares of Eagle Bulk Shipping Inc. represented by this Warrant Certificate to:

Social Security or Other Taxpayer  Identification Number

_____
                                    Print name and address

and does hereby irrevocably constitute and appoint _____ attorney, to transfer said Warrants on the Warrant Register maintained for the purpose of registration thereof, with full power of substitution in the premises:

Dated: _____ , 20__                        Signature: _____

                                              Name: _____

Note: The above signature and name should correspond exactly with the name of the holder as it appears on the face of the certificate, in every particular without alteration or enlargement or any change whatsoever. The signature of the holder hereof must be guaranteed.

#4852-9646-6204

EXERCISE FORM

The undersigned Registered Holder of this Warrant Certificate hereby irrevocably elects to exercise _____ Warrants for the purchase of _____ shares of Common Stock, pursuant to the cashless exercise provisions of Section 4.3(a) of the Warrant Agreement (the total number of shares of Common Stock for which the Warrants represented hereby are being exercised before withholding for the Exercise Price), and requests that the net number of shares of Common Stock issuable upon exercise be registered as follows:

Social Security or Other Taxpayer  Identification Number

_____
Print name and address

If such Warrants shall not constitute all of the Warrants represented hereby, the undersigned requests that a new Warrant Certificate of like tenor and date for the balance of the Warrants represented hereby be issued and delivered as follows:

Social Security or Other Taxpayer  Identification Number

_____
Print name and address

Dated:   _____ , 20__                   Signature: _____
                                          Name: _____

Note: The above signature and name should correspond exactly with the name of the holder as it appears on the face of the certificate, in every particular without alteration or enlargement or any change whatsoever.

Note: If the Common Stock, or a new Warrant Certificate representing any portion of the Warrants not exercised, is to be registered in a name other than that in which this Warrant Certificate is registered, the signature of the holder hereof must be guaranteed.

Signature(s) Guaranteed:  Medallion Guarantee Stamp
THE SIGANTURE(S) SHOULD BE GUARANTEED BY AN ELIGIBLE GUARANTOR INSTITUTION (Banks, Stockbrokers, Savings and Loan Associations and Credit Unions) WITH MEMBERSHIP IN AN APPROVED SIGNATURE GUARANTEE MEDALLION PROGRAM, PURSUANT TO S.E.C. RULE 17Ad-15.

#4852-9646-6204

**EXHIBIT B**

EXERCISE FORM FOR REGISTERED HOLDERS
OF DIRECT REGISTRATION WARRANTS
(To be executed upon exercise of Warrants)

NOTE:  THIS EXERCISE NOTICE MUST BE DELIVERED TO THE WARRANT AGENT, PRIOR TO 5:00 P.M., EASTERN TIME, ON [__], 2021.

The undersigned Registered Holder, being the holder of Direct Registration Warrants of Eagle Bulk Shipping Inc., issued pursuant to that certain Warrant Agreement, as dated [__], 2014 (the "Warrant Agreement"), by and among Eagle Bulk Shipping Inc. (the "Company"), and Computershare Inc. and Computershare Trust Company N.A. (together, the "Warrant Agent"), hereby irrevocably elects to exercise the number of Direct Registration Warrants indicated below, for the purchase of the number of shares of Common Stock indicated below, pursuant to the cashless exercise provisions of Section 4.3(a) of the Warrant Agreement.  All capitalized terms used in this Exercise Form that are not defined herein but are defined in the Warrant Agreement shall have the meanings given to them in the Warrant Agreement.

Number of Warrants:                          _____

Number of Shares of Common Stock:      _____
(Total number of shares of Common Stock for which the Direct Registration Warrant is being exercised, before withholding for the Exercise Price.)

The undersigned requests that the net number of shares of Common Stock issuable upon exercise of the Warrants be registered, and a statement in respect thereof be delivered, as follows:

Name: _____          Address: _____
                                                                        _____
Social Security or Other Taxpayer
Identification Number:

_____

Dated: _____, 20____          Signature: _____

                                                        Name:_____

Note: If any of the shares of Common Stock issuable upon exercise of the Warrant are to be registered in a name other than that in which the Direct Registration Warrants are registered, the signature of the holder hereof must be guaranteed.

<table>
<tr><td>Signature(s) Guaranteed:  Medallion Guarantee Stamp<br>THE SIGANTURE(S) SHOULD BE GUARANTEED BY AN ELIGIBLE GUARANTOR INSTITUTION (Banks, Stockbrokers, Savings and Loan Associations and Credit Unions) WITH MEMBERSHIP IN AN APPROVED SIGNATURE GUARANTEE MEDALLION PROGRAM, PURSUANT TO S.E.C. RULE 17Ad-15.</td></tr>
</table>

#4852-9646-6204

**EXHIBIT C**

EXERCISE FORM FOR BENEFICIAL HOLDERS
HOLDING WARRANTS THROUGH THE DEPOSITORY TRUST COMPANY


TO BE COMPLETED BY DIRECT PARTICIPANT
IN THE DEPOSITORY TRUST COMPANY
(To be executed upon exercise of Warrants)

NOTE:  THIS EXERCISE NOTICE MUST BE DELIVERED TO THE WARRANT AGENT, PRIOR TO 5:00 P.M., EASTERN TIME, ON [__], 2021.

The undersigned, being the beneficial holder of Book-Entry Warrants issued pursuant to that certain Warrant Agreement, as dated [__], 2014 (the "Warrant Agreement"), by and among Eagle Bulk Shipping Inc. (the "Company"), and Computershare Inc. and Computershare Trust Company N.A. (together, the "Warrant Agent") and held for its benefit through the book-entry facilities of The Depository Trust Company (the "Depositary"), hereby irrevocably elects to exercise the number of Book-Entry Warrants indicated below, for the purchase the number of shares of Common Stock indicated below, pursuant to the cashless exercise provisions of Section 4.3(a) of the Warrant Agreement. All capitalized terms used in this Exercise Form that are not defined herein but are defined in the Warrant Agreement shall have the meanings given to them in the Warrant Agreement.

Number of Warrants:                               _____

Number of Shares of Common Stock:        _____
                                                              (Total number of shares of Common Stock
                                                              for which the Book-Entry Warrants are
                                                              being exercised before withholding for the
                                                              Exercise Price.)

The undersigned requests that the shares of Common Stock issuable upon exercise of the Warrants be delivered the account at the Depositary specified below.

THE WARRANT AGENT SHALL NOTIFY YOU (THROUGH THE CLEARING SYSTEM) OF (1) THE WARRANT AGENT'S ACCOUNT AT THE DEPOSITARY TO WHICH YOU MUST DELIVER YOUR WARRANTS ON THE EXERCISE DATE AND (2) THE ADDRESS, PHONE NUMBER AND FACSIMILE NUMBER WHERE YOU CAN CONTACT THE WARRANT AGENT AND TO WHICH WARRANT EXERCISE NOTICES ARE TO BE SUBMITTED.

| | |
|---|---|
| AUTHORIZED SIGNATURE: | _____ |
| NAME: | _____ |
| CAPACITY IN WHICH SIGNING: | _____ |
| DATED: | _____ |
| NAME OF PARTICIPANT: | _____ |
| ADDRESS: | _____ |
| CONTACT NAME (if different than above): | _____ |
| TELEPHONE (INCLUDING INTERNATIONAL CODE): | _____ |
| FAX (INCLUDING INTERNATIONAL CODE): | _____ |
| E-MAIL ADDRESS: | _____ |
| DEPOSITARY ACCOUNT NO.: | _____ |

#4852-9646-6204

**EXHIBIT D**

FORM OF ASSIGNMENT

FOR REGISTERED HOLDERS
HOLDING DIRECT REGISTRATION WARRANTS
(To be executed only upon assignment of Warrants)

For value received, the undersigned Registered Holder of Direct Registration Warrants issued pursuant to that certain Warrant Agreement, as dated [__], 2014, by and among Eagle Bulk Shipping Inc. (the "Company"), and Computershare Inc. and Computershare Trust Company N.A., hereby sells, assigns and transfers unto the Assignee(s) named below the number of Direct Registration Warrants listed opposite the respective name(s) of the Assignee(s) named below, and all other rights of the Registered Holder under said Direct Registration Warrants, and does hereby irrevocably constitute and appoint _____ attorney, to transfer said Direct Registration Warrants, as and to the extent set forth below, on the Warrant Register maintained for the purpose of registration thereof, with full power of substitution in the premises:

| Name(s) of Assignee(s) | Address of Assignee(s) | Number of Warrants |
|---|---|---|
| _____ | _____ | _____ |

Dated:      _____ , 20__

Signature: _____

Name: _____

Note: The above signature and name should correspond exactly with the name of the Holder of the Direct Registration Warrants as it appears on the Warrant Register.

> Signature(s) Guaranteed:  Medallion Guarantee Stamp
> THE SIGANTURE(S) SHOULD BE GUARANTEED BY AN ELIGIBLE GUARANTOR INSTITUTION (Banks, Stockbrokers, Savings and Loan Associations and Credit Unions) WITH MEMBERSHIP IN AN APPROVED SIGNATURE GUARANTEE MEDALLION PROGRAM, PURSUANT TO S.E.C. RULE 17Ad-15.

#4852-9646-6204

**Exhibit D**

**Registration Rights Agreement**

*DRAFT*

REGISTRATION RIGHTS AGREEMENT

BY AND AMONG

EAGLE BULK SHIPPING INC.

AND

THE OTHER PARTIES LISTED

ON SCHEDULE I HERETO

Dated as of [•], 2014

#4852-3043-6381

**TABLE OF CONTENTS**

**Page**

ARTICLE I

SECTION 1.01.    Defined Terms                                                          2
SECTION 1.02.    Other Interpretive Provisions                                          5

ARTICLE II

SECTION 2.01.    Demand Registration                                                    6
SECTION 2.02.    Shelf Registration                                                     8
SECTION 2.03.    Piggyback Registration                                                12
SECTION 2.04.    Black-out Periods                                                     13
SECTION 2.05.    Registration Procedures                                               14
SECTION 2.06.    Underwritten Offerings                                                18
SECTION 2.07.    No Inconsistent Agreements; Additional Rights                         19
SECTION 2.08.    Registration Expenses                                                 19
SECTION 2.09.    Indemnification                                                       20
SECTION 2.10.    Rules 144 and 144A and Regulation S                                   23
SECTION 2.11.    Limitation on Registrations and Underwritten Offerings                23
SECTION 2.12.    Clear Market                                                          23
SECTION 2.13.    In-Kind Distributions                                                 23

ARTICLE III

SECTION 3.01.    Term                                                                  23
SECTION 3.02.    Injunctive Relief                                                     24
SECTION 3.03.    Notices                                                               24
SECTION 3.04.    Recapitalization                                                      24
SECTION 3.05.    Amendment                                                             25
SECTION 3.06.    Successors, Assigns and Transferees                                   25
SECTION 3.07.    Binding Effect                                                        25
SECTION 3.08.    Third Party Beneficiaries                                             25
SECTION 3.09.    Governing Law; Jurisdiction; Agent For Service                        25
SECTION 3.10.    Waiver of Jury Trial                                                  26
SECTION 3.11.    Immunity Waiver                                                       26
SECTION 3.12.    Entire Agreement                                                      26
SECTION 3.13.    Severability                                                          26
SECTION 3.14.    Counterparts                                                          26
SECTION 3.15.    Headings                                                              26
SECTION 3.16.    Joinder                                                               26

#4852-3043-6381

## <u>REGISTRATION RIGHTS AGREEMENT</u>

This Registration Rights Agreement (the "<u>Agreement</u>"),  dated as of [•], 2014, is by and among Eagle Bulk Shipping Inc., a Marshall Islands corporation (including any of its successors by merger, acquisition, reorganization, conversion or otherwise, the "<u>Company</u>"), and the Persons set forth on <u>Schedule I</u> hereto.  Unless otherwise indicated, capitalized terms used herein shall have the meanings ascribed to such terms in <u>Section 1.01</u>.

### <u>WITNESSETH:</u>

WHEREAS, the parties hereto desire to provide for, among other things, the grant of registration rights with respect to the Registrable Securities (as defined below).

NOW, THEREFORE, in consideration of the foregoing and the mutual promises, covenants and agreements of the parties hereto, and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, and subject to the satisfaction or waiver of the conditions hereof, the parties hereto agree as follows:

ARTICLE I

DEFINITIONS

SECTION 1.01.        Defined Terms.  As used in this Agreement, the following terms shall have the following meanings:

"<u>Adverse Disclosure</u>" means public disclosure of material non-public information that, in the Board of Directors' good faith judgment, after consultation with independent outside counsel to the Company, would be required to be made in any Registration Statement filed with the Commission by the Company so that such Registration Statement would not contain a material misstatement of fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading, would not be required to be publicly disclosed at such time but for the filing of such Registration Statement, and which information the Company has a bona fide business purpose for not disclosing publicly at such time.

"<u>Affiliate</u>" has the meaning specified in Rule 12b-2 under the Exchange Act; <u>provided</u> that no Holder shall be deemed an Affiliate of the Company or its Subsidiaries for purposes of this Agreement; <u>provided further</u> that neither portfolio companies (as such term is commonly used in the private equity industry) of a Holder nor limited partners, non-managing members or other similar direct or indirect investors in a Holder shall be deemed to be Affiliates of such Holder.  The term "<u>Affiliated</u>" has a correlative meaning.

"<u>Agreement</u>" has the meaning set forth in the preamble.

"<u>Authorized Agent</u>" has the meaning set forth in <u>Section 3.10</u>.

"<u>Automatic Shelf Registration Statement</u>" means an "automatic shelf registration statement" as defined in Rule 405 promulgated under the Securities Act.

"<u>Board of Directors</u>" means the board of directors of the Company.

"<u>Business Day</u>" means any day other than a Saturday, Sunday or a day on which commercial banks located in New York, New York are required or authorized by law or executive order to be closed.

"<u>Closing Price</u>" means, with respect to the Registrable Securities, as of any date of determination, (i) if the Registrable Securities are listed on a national securities exchange, the closing price per share of a Registrable Security on such date published in <u>The Wall Street Journal (National Edition)</u> or, if no such closing price on such date is published in <u>The Wall Street Journal (National Edition)</u>, the average of the closing bid and asked prices on such date, as officially reported on the principal national securities exchange on which the Registrable Securities are then listed or admitted to trading; or (ii) if the Registrable Securities are not listed or admitted to

1

trading on any national securities exchange, the last sale price or, if such last sale price is not reported, the average of the high bid and low asked prices in the over-the-counter market on such date, as reported by The Nasdaq Stock Market LLC or such other system then in use; or (iii) if on any such date the Registrable Securities are not quoted by any such organization, the average of the closing bid and asked prices as furnished by a professional market maker making a market in the Registrable Securities selected by the Company; or (iv) if none of (i), (ii) or (iii) is applicable, a market price per share determined in good faith by the Board of Directors.  If trading is conducted on a continuous basis on any exchange, then the closing price shall be as set forth at 4:00 p.m. New York City time.

"Commission" means the United States Securities and Exchange Commission.

"Common Stock" means shares of the Company's common stock, par value $0.01 per share.

"Company" has the meaning set forth in the preamble.

"Company Public Sale" has the meaning set forth in Section 2.03(a).

"Company Share Equivalents" means the Warrants and any other securities exercisable, exchangeable or convertible into Company Shares and any options, warrants or other rights to acquire Company Shares.

"Company Shares" means shares of Common Stock (including the Warrant Shares), any securities into which such shares of Common Stock shall have been changed, or any securities resulting from any reclassification, recapitalization or similar transactions with respect to such shares of Common Stock.

"Demand Registration" has the meaning set forth in Section 2.01(a).

"Determination Date" has the meaning set forth in Section 2.02(f).

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and any successor thereto, and any rules and regulations promulgated thereunder, all as the same shall be in effect from time to time.

"FINRA" means the Financial Industry Regulatory Authority, Inc.

"Foreign Private Issuer" means a "foreign private issuer," as defined in Rule 405 under the Securities Act.

"Form S-1" means a registration statement on Form S-1 under the Securities Act.

"Form S-3" means a registration statement on Form S-3 under the Securities Act.

"Form S-4" means a registration statement on Form S-4 under the Securities Act.

"Form S-8" means a registration statement on Form S-8 under the Securities Act.

"Governmental Authority" means any United States federal, state, local (including county or municipal) or foreign governmental, regulatory or administrative authority, agency, division, instrumentality, commission, court, judicial or arbitral body or any securities exchange or similar self-regulatory organization.

"Holder" means any holder of Registrable Securities that is set forth on Schedule I hereto or that succeeds to rights hereunder pursuant to Section 3.06.

"Initiating Shelf Take-Down Holder" has the meaning set forth in Section 2.02(e)(i).

"Issuer Free Writing Prospectus" means an issuer free writing prospectus, as defined in Rule 433 under the Securities Act, relating to an offer of Registrable Securities.

2

#4852-3043-6381

"Loss" or "Losses" has the meaning set forth in Section 2.09(a).

"Market Price" means, on any date of determination, the average of the daily Closing Price of the Registrable Securities for the immediately preceding thirty (30) days on which the national securities exchanges are open for trading.

"Marketed Underwritten Shelf Take-Down" has the meaning set forth in Section 2.02(e)(iii).

"Marketed Underwritten Shelf Take-Down Notice" has the meaning set forth in Section 2.02(e)(iii).

"Maximum Offering Size" means, with respect to any offering that is underwritten, the number of securities that, in the good-faith opinion of the managing underwriter or underwriters in such offering (as evidenced by a written notice to the relevant Holders and the Company), can be sold in such offering without being likely to have a significant adverse effect on the price, timing or the distribution of the securities offered or the market for the securities offered.

"Participating Holder" means, with respect to any Registration, any Holder of Registrable Securities covered by the applicable Registration Statement.

"Permitted Assignee" has the meaning set forth in Section 3.06.

"Person" means any individual, partnership, corporation, limited liability company, unincorporated organization, trust or joint venture, or a Governmental Authority or political subdivision thereof or any other entity.

"Piggyback Registration" has the meaning set forth in Section 2.03(a).

"Postponing Officer's Certificate" has the meaning set forth in Section 2.01(b).

"Prospectus" means the prospectus included in any Registration Statement, all amendments and supplements to such prospectus, including pre- and post-effective amendments to such Registration Statement, and all other material incorporated by reference in such prospectus.

"Registrable Securities" means any Company Shares, Warrants, Warrant Shares,  or any other securities that may be issued or distributed or be issuable or distributable in respect of, or in substitution for, any Company Shares by way of conversion, exercise, dividend, stock split or other distribution, merger, consolidation, exchange, recapitalization or reclassification or similar transaction, in each case whether now owned or hereafter acquired by a Holder; provided, however, that any such Registrable Securities shall cease to be Registrable Securities to the extent (i) a Registration Statement with respect to the sale of such Registrable Securities has been declared effective under the Securities Act and such Registrable Securities have been disposed of in accordance with the plan of distribution set forth in such Registration Statement, (ii) such Registrable Securities have been distributed pursuant to Rule 144 or Rule 145 of the Securities Act (or any successor rule), (iii) a Registration Statement on Form S-8 covering such Registrable Securities is effective, (iv) all such Registrable Securities could be sold pursuant to Rule 144 without restriction as to volume or manner of sale or (v) such Registrable Securities are otherwise transferred, assigned, sold, conveyed or otherwise disposed of and thereafter such securities may be resold without subsequent Registration under the Securities Act.

"Registration" means a registration with the Commission of the offer and sale of the Company's securities to the public under a Registration Statement.  The term "Register" shall have a correlative meaning.

"Registration Expenses" has the meaning set forth in Section 2.08.

"Registration Statement" means any registration statement of the Company that covers the offer and sale of Registrable Securities pursuant to the provisions of this Agreement filed with, or to be filed with, the

3

Commission under the rules and regulations promulgated under the Securities Act, including the related Prospectus, amendments and supplements to such registration statement, including pre- and post-effective amendments, and all exhibits and all material incorporated by reference in such registration statement.

"Registration Statement Suspension" has the meaning set forth in Section 2.01(h).

"Representatives" means, with respect to any Person, any of such Person's officers, directors, employees, agents, attorneys, accountants, actuaries, consultants, equity financing partners or financial advisors or other Person associated with, or acting on behalf of, such Person.

"Requesting Holder(s)" means the Holders listed on Schedule II hereto[1].

"Requesting Shelf Registration Notice" has the meaning set forth in Section 2.02(a).

"Rule 144" means Rule 144 (or any successor provisions) under the Securities Act.

"SEC Guidance" means (i) any publicly available written or oral questions and answers, guidance, forms, comments, requirements or requests of the Commission or its staff, (ii) the Securities Act and (iii) any other rules and regulations of the Commission.

"Securities Act" means the Securities Act of 1933, as amended, and any successor thereto, and any rules and regulations promulgated thereunder, all as the same shall be in effect from time to time.

"Shelf Period" has the meaning set forth in Section 2.02(b).

"Shelf Registration" has the meaning set forth in Section 2.02(a).

"Shelf Registration Notice" has the meaning set forth in Section 2.02(a).

"Shelf Registration Statement" means a Registration Statement filed with the Commission on either (i) Form S-3 or (ii) solely if the Company is not permitted to file a Registration Statement on Form S-3 or register all Registrable Securities on such form, an evergreen Registration Statement on Form S-1 (which, in the case the Company is not permitted to register all Registrable Securities on Form S-3, shall register any such shares not registered on Form S-3), in each case for an offering to be made on a continuous basis pursuant to Rule 415 under the Securities Act (or any successor provision) covering the offer and sale of all or any portion of the Registrable Securities, as applicable.

"Shelf Take-Down" has the meaning set forth in Section 2.02(e)(i).

"Special Registration" has the meaning set forth in Section 2.12.

"Specified Courts" has the meaning set forth in Section 3.10.

"Stockholder Party" has the meaning set forth in Section 2.09(a).

"Subsidiary" means, with respect to any Person, any entity of which (i) a majority of the total voting power of shares of stock or equivalent ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, trustees or other members of the applicable governing body thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (ii) if no such governing body exists at such entity, a majority of the total voting power of shares of stock or equivalent ownership interests of the entity is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a

---

[1] NTD: Schedule II to list each Holder who, together with its Affiliates and related funds, is entitled to receive a number of shares of Common Stock under the Plan equal to ten percent (10%) or more of the total number of shares issuable under the Plan.

4

#4852-3043-6381

combination thereof.  For purposes hereof, a Person or Persons shall be deemed to have a majority ownership interest in a limited liability company, partnership, association or other business entity if such Person or Persons shall be allocated a majority of limited liability company, partnership, association or other business entity gains or losses or shall be or control the managing member or general partner of such limited liability company, partnership, association or other business entity.

"Suspending Officer's Certificate" has the meaning set forth in Section 2.01(h).

"Underwritten Offering" means a Registration in which securities of the Company are sold to an underwriter or underwriters (or other counterparty) for reoffering to the public.

"Underwritten Shelf Take-Down Notice" has the meaning set forth in Section 2.02(e)(ii).

"Valid Business Reason" has the meaning set forth in Section 2.02(b).

"Warrants" means the warrants, exercisable for shares of Common Stock, issued by the Company under the Company's Prepackaged Plan of Reorganization pursuant to Chapter 11 of the United States Bankruptcy Code, dated August 6, 2014, as confirmed by the United States Bankruptcy Court for the Southern District of New York on [__], 2014.

"Warrant Shares" means the shares of Common Stock issuable upon exercise of the Warrants.

"Well-Known Seasoned Issuer" means a "well-known seasoned issuer" as defined in Rule 405 promulgated under the Securities Act and which (a) (i) is a "well-known seasoned issuer" under paragraph (1)(i)(A) of such definition or (ii) is a "well-known seasoned issuer" under paragraph (1)(i)(B) of such definition and is also eligible to Register a primary offering of its securities relying on General Instruction I.B.1 of Form S-3 under the Securities Act and (b) is not an "ineligible issuer" as defined in Rule 405 promulgated under the Securities Act.

SECTION 1.02.    Other Interpretive Provisions.  (a)  In this Agreement, except as otherwise provided:

(i)    A reference to an Article, Section, Schedule or Exhibit is a reference to an Article or Section of, or Schedule or Exhibit to, this Agreement, and references to this Agreement include any recital in or Schedule or Exhibit to this Agreement.

(ii)    The Schedules and Exhibits form an integral part of and are hereby incorporated by reference into this Agreement.

(iii)    Headings and the Table of Contents are inserted for convenience only and shall not affect the construction or interpretation of this Agreement.

(iv)    Unless the context otherwise requires, words importing the singular include the plural and vice versa, words importing the masculine include the feminine and vice versa, and words importing persons include corporations, associations, partnerships, joint ventures and limited liability companies and vice versa.

(v)    Unless the context otherwise requires, the words "hereof" and "herein," and words of similar meaning refer to this Agreement as a whole and not to any particular Article, Section or clause.  The words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation."

(vi)    A reference to any legislation or to any provision of or form or rule promulgated under any legislation shall include any amendment, modification, substitution or re-enactment thereof.

(vii)    If at any time the Company qualifies as a Foreign Private Issuer as defined under Rule 405 under the Securities Act, and if the Company so chooses to take advantage of such Foreign Private Issuer designation, any references in this Agreement to a form or filing that may be made by a domestic registrant shall be deemed to be references to the corresponding form or filing that may be made by an entity that is a Foreign Private Issuer.

5

#4852-3043-6381

(b)        The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intention or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

ARTICLE II

REGISTRATION RIGHTS

SECTION 2.01.        Demand Registration.

(a)        Request for Demand Registration.  At any time, and from time to time, a Requesting Holder (or Requesting Holders, as the case may be) may make a written request (a "Demand Registration Notice") to the Company to register, and the Company shall register, under the Securities Act (other than pursuant to a Registration Statement on Form S-4 or S-8), in accordance with the terms of this Agreement, the number of Registrable Securities stated in such request (a "Demand Registration"), provided, however, and subject to the provisions of Section 2.11, that the Company shall not be obligated to effect (i) more than three (3) such Demand Registrations in the aggregate for all Requesting Holders or (ii) any Demand Registration (A) with respect to  which the Requesting Holder (or Requesting Holders, as the case may be) proposes to sell Registrable Securities in such Demand Registration at an anticipated aggregate offering price (calculated based upon the Market Price of the Registrable Securities on the date on which the Company receives the written request for such Demand Registration) to the public of less than $50,000,000 unless such Demand Registration includes all of the then-outstanding Registrable Securities, B) if the Registrable Securities that the Requesting Holder (or Requesting Holders, as the case may be) proposes to sell in such Demand Registration are already covered by an existing and effective Demand Registration Statement which may be utilized for the offering and sale of the Registrable Securities requested to be registered, or (C) if a Registration Statement shall have previously been initially declared effective by the Commission within the one hundred eighty (180) days immediately preceding the date of the Demand Registration Notice; provided, however, that such Demand Registration shall not be considered a Demand Registration for the purposes of subclause (a)(i) above if the Maximum Offering Size determined in accordance with Section 2.01(f) is less than fifty percent (50 %) of the Registrable Securities of the Requesting Holder(s) sought to be included in such Demand Registration.  Each request for a Demand Registration by a Requesting Holder (or Requesting Holders, as the case may be) shall state the amount of the Registrable Securities proposed to be sold and the intended method of disposition thereof.  With respect to any Demand Registration request, if at the time of such request the Company is eligible to use Form S-3 under the Securities Act in connection with a secondary public offering of its equity securities, the Requesting Holder (or Requesting Holders, as the case may be) may require, by including a statement to such effect in the Demand Registration Notice, that the Demand Registration be in the form of a Shelf Registration Statement pursuant to Section 2.02 of this Agreement.  If, after a Registration Statement filed pursuant to a Demand Registration becomes effective, the Commission issues a stop order, injunction or other similar order with respect to the use of such Registration Statement, then (1) the period during which the Company is required to maintain the effectiveness of such Registration Statement shall be extended by the number of days that such order or injunction is in effect and (2) if the aggregate number of Registrable Securities sold pursuant to such Registration Statement by the Requesting Holder (or Requesting Holders, as the case may be) initiating such Demand Registration is less than fifty percent (50 %) of the aggregate number of Registrable Securities that such  Requesting Holder(s) sought to include in such Demand Registration, then at any time during the effectiveness of such order or injunction, such Requesting Holder(s) shall be entitled to withdraw the Demand Registration request by written notice to the Company and, if such request is withdrawn, it shall not count as a Demand Registration hereunder and the Company shall not have any obligation under this Agreement maintain the effectiveness of such Registration Statement.

(b)        Limitations on Demand Registrations.  If the Board of Directors, in its good faith judgment, determines that the registration of Registrable Securities pursuant to a Demand Registration, or the amendment or supplement of a Registration Statement filed pursuant to a Demand Registration, would materially interfere with any material financing, acquisition, corporate reorganization or merger or other material transaction involving the Company or would require the Company to make an Adverse Disclosure (a "Valid Business Reason"), and the Company furnishes to the Requesting Holder (or Requesting Holders, as the case may be) a certificate

6

signed by the Chief Executive Officer or any other senior executive officer of the Company stating such (the "Postponing Officer's Certificate"), (i) the Company may postpone the filing or effectiveness of the Registration Statement (but not the preparation of the Registration Statement) relating to such Demand Registration until such Valid Business Reason ceases to exist and (ii) in the case of a Registration Statement that has been filed with respect to a Demand Registration, the Company may postpone amending or supplementing such Registration Statement, in the case of (i) or (ii) until such Valid Business Reason ceases to exist, but in no event shall any such postponement be for more than sixty (60) days after the later of the date of the Demand Registration Notice and the occurrence of the Valid Business Reason. In the event of any such postponement, the Requesting Holder (or requesting Holders, as the case may be) initiating such Demand Registration shall be entitled to withdraw the Demand Registration request by written notice to the Company and, if such request is withdrawn, it shall not count as a Demand Registration hereunder. In addition to the Postponing Officer's Certificate discussed above, the Company shall promptly give written notice to the Requesting Holder (or Requesting Holders, as the case may be) once the Valid Business Reason for such postponement no longer exists. Notwithstanding anything to the contrary contained herein, the Company may not postpone a filing, amendment or supplement under this Section 2.01(b) due to a Valid Business Reason, or suspend the use of a Registration Statement pursuant to Section 2.01(h), more than three (3) times, or for more than an aggregate of one hundred twenty (120) days, in each case, during any 12-month period.

(c)    Incidental or "Piggy-Back" Rights with Respect to a Demand Registration. Each of the Holders (other than the Requesting Holder(s) that requested the relevant Demand Registration under Section 2.01(a)) may offer such Holder's Registrable Securities under any such Demand Registration pursuant to this Section 2.01(c). The Company shall (i) as promptly as practicable, but in no event later than five (5) Business Days after the receipt of a request for a Demand Registration from any Requesting Holder(s), give written notice thereof to all of the Holders (other than such Requesting Holder(s)), which notice shall specify the number of Registrable Securities subject to the request for Demand Registration, the name of the Requesting Holder(s) and the intended method of disposition of such Registrable Securities and (ii) subject to Section 2.01(f), include in the Registration Statement filed pursuant to such Demand Registration all of the Registrable Securities requested by such Holders for inclusion in such Registration Statement from whom the Company has received a written request for inclusion therein within ten (10) days after the receipt by such Holders of such written notice referred to in clause (i) above. Each such request by such Holders shall specify the number of Registrable Securities proposed to be registered. Any Holder may waive its rights under this Section 2.01(c) prior to the expiration of such ten (10) day period by giving written notice to the Company.

(d)    Effective Demand Registration. Subject to Sections 2.01(a) and (b), the Company shall use its commercially reasonable best efforts to file a Registration Statement relating to the Demand Registration as promptly as practicable (but in no event later than seventy-five (75) days thereafter) after it receives a Demand Registration Notice under Section 2.01(a) hereof, and shall use its commercially reasonable best efforts to cause such Registration Statement to become effective as promptly as practicable thereafter. Except as provided herein, the Company shall use its reasonable best efforts to keep any Demand Registration (other than a Shelf Registration) filed pursuant to Section 2.01(a) continuously effective under the Securities Act until the earliest of (i) the date as of which all Registrable Securities have been sold pursuant to such Demand Registration or another Registration Statement filed under the Securities Act, but in no event later than one hundred eighty (180) days from the date that such Demand Registration became effective under the Securities Act, (ii) the date on which this Agreement terminates under Section 3.01 with respect to all Participating Holders and (iii) such shorter period as all of the Participating Holders with respect to such Demand Registration shall agree in writing.

(e)    Expenses and Withdrawal. The Company shall pay all Registration Expenses in connection with a Demand Registration, whether or not such Demand Registration becomes effective or such Demand Registration is completed and whether or not all or any portion of the Registrable Securities originally requested to be included in such Demand Registration are ultimately included. Each Participating Holder (including the Requesting Holder(s)) shall be permitted to withdraw all or part of its Registrable Securities from a Demand Registration at any time prior to the execution of the underwriting agreement in connection with such Demand Registration.

(f)    Underwriting Procedures. If the Requesting Holder(s) making a Demand Registration request so elect in the Demand Registration Notice, the Company shall use its commercially reasonable best efforts to cause the offering made pursuant to such Demand Registration pursuant to this Section 2.01 to be in the form of a

7

firm commitment underwritten offering, provided that the anticipated aggregate offering price to the public (calculated based upon the Market Price of the Registrable Securities on the date on which the Company receives the Demand Registration Notice) of the Registrable Securities that the Requesting Holder(s) request to include in such Demand Registration is at least $50,000,000.  In connection with any Demand Registration under this Section 2.01 involving an underwritten offering, none of the Registrable Securities held by any Holder making a request for inclusion of such Registrable Securities pursuant to Sections 2.01(a) and (c) shall be included in such underwritten offering unless, at the request of the underwriters for such Demand Registration, such Holder enters into an underwriting agreement pursuant to the terms of Section 2.06(a) hereof and then only in such quantity as set forth below.  If the managing underwriter or underwriters of any proposed Demand Registration informs the Holders that have requested to participate in such Demand Registration in writing that, in its or their good-faith opinion, the number of securities which such Holders intend to include in such offering exceeds the Maximum Offering Size, then the aggregate number of securities to be included in such Demand Registration shall be the number of Registrable Securities equal to the Maximum Offering Size, which number shall be allocated (1) first to the Registrable Securities requested to be included in such Demand Registration by the Requesting Holder(s) (pro rata among them), and (2) second to the Registrable Securities requested to be included in such Demand Registration by any Holder who is not a Requesting Holder on a pro rata basis based on the relative number of Registrable Securities that each such Holder requested to be included in such Demand Registration (provided that any securities thereby allocated to a Holder that exceed such Holder's request shall be reallocated among the remaining requesting Holders in like manner).  The Holders of a majority of the Registrable Securities to be included in any Demand Registration shall have the right to select, subject to the prior written consent of the Company (not to be unreasonably withheld), the managing underwriter or underwriters to administer such offering.

(g)     Certain Undertakings.  Notwithstanding any other provisions of this Agreement to the contrary, the Company shall cause (i) each Demand Registration (as of the effective date of such Demand Registration), any amendment thereof (as of the effective date thereof) or supplement thereto (as of its date), (A) to comply in all material respects with applicable SEC Guidance and (B) not to contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances in which they were made, not misleading, and (ii) any related Prospectus (including any preliminary Prospectus) or Issuer Free Writing Prospectus and any amendment thereof or supplement thereto, as of its date, (A) to comply in all material respects with applicable SEC Guidance and (B) not to contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances in which they were made, not misleading; provided, however, the Company shall have no such obligations or liabilities with respect to any written information pertaining to any Holder and furnished in writing to the Company by or on behalf of such Holder specifically for inclusion therein.

(h)     Suspension for Valid Business Reason.  The Company shall have the right, at any time and from time to time (subject to the limitations set forth in Section 2.01(b)) to suspend the use of any Registration Statement (including any Shelf Registration Statement) filed pursuant to a Demand Registration or any Automatic Shelf Registration Statement, upon delivery to the Participating Holders of a certificate signed by the Chief Executive Officer or any other senior executive officer of the Company (a "Suspending Officer's Certificate") stating that the Board of Directors, in its good faith judgment, has determined that a Valid Business Reason exists to suspend the continued use of such Registration Statement (a "Registration Statement Suspension").  Each Holder hereby agrees that, upon delivery of any Suspending Officer's Certificate by the Company, such Holder will forthwith (i) discontinue disposition of Registrable Securities pursuant to the applicable Registration Statement until the Company informs such Holder in writing that the Registration Statement Suspension has been terminated and (ii) suspend use of the applicable Prospectus and any Issuer Free Writing Prospectus in connection with any sale or purchase of, or offer to sell or purchase, Registrable Securities, until the Holder either receives the copies of the supplemented or amended Prospectus or Issuer Free Writing Prospectus contemplated below or is advised in writing by the Company that the use of the Prospectus or Issuer Free Writing Prospectus may be resumed.  Each Holder shall keep confidential the fact that a Registration Statement Suspension is in effect, the certificate referred to above and its contents unless and until otherwise notified by the Company, except (A) for disclosure to such Holder's employees, agents and professional advisers who reasonably need to know such information for purposes of assisting the Holder with respect to its investment in the Company Shares and agree to keep it confidential, (B) for disclosures to the extent required in order to comply with reporting obligations to its limited partners or other direct or indirect investors who have agreed to keep such information confidential, (C) if and to the extent such matters are publicly disclosed by the Company or any of its Subsidiaries, (D) to the extent that disclosure of such information is

8

required by law, rule or regulation, provided that the Holder gives prior written notice to the Company of such requirement and the content of the proposed disclosure and (E) for disclosure to any other Holder.   The Company shall promptly notify the Holders upon the termination of any Registration Statement Suspension, and shall promptly amend or supplement the Prospectus and any Issuer Free Writing Prospectus, if necessary, so it does not contain a material misstatement of fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances in which they were made,  not misleading, and furnish to the Holders such numbers of copies of the Prospectus and any Issuer Free Writing Prospectus as so amended or supplemented as the Holders may reasonably request.  In the event of any Registration Statement Suspension, the period during which such Registration Statement is required to be maintained effective shall be extended by the number of days during the period from and including the date of the giving of the Suspending Officer's Certificate to and including the date when each seller of Registrable Securities covered by such Registration Statement either receives the copies of the supplemented or amended Prospectus or Issuer Free Writing Prospectus contemplated by the immediately preceding sentence or is advised in writing by the Company that the use of the Prospectus or Issuer Free Writing Prospectus may be resumed.

SECTION 2.02.     Shelf Registration.

(a)     Filing.  If at any time while the Company is eligible to use Form S-3 under the Securities Act in connection with a secondary public offering of its equity securities, the Company receives a Demand Registration Notice from a Requesting Holder (or Requesting Holders, as the case may be) requesting a Demand Registration in the form of a Shelf Registration Statement (a "Requesting Shelf Registration Notice"), the Company shall use its reasonable best efforts to prepare and file with the Commission, within sixty (60) days after it receives a Requesting Shelf Registration Notice, a Shelf Registration Statement covering the resale of all Registrable Securities that such Requesting Holder (or Requesting Holders, as the case may be) requests, pursuant to the Requesting Shelf Registration Notice, to include in such Shelf Registration Statement , and shall use its commercially reasonable best efforts to cause such Shelf Registration Statement to become effective as promptly as practicable thereafter.  Promptly upon delivery of such Requesting Shelf Registration Notice by such Requesting Holder(s) (but in no event more than five (5) Business Days thereafter), the Company shall promptly deliver a written notice (a "Shelf Registration Notice") of such Shelf Registration to all Holders (other than the Requesting Holder(s)), and the Company shall include in such Shelf Registration Statement all such Registrable Securities of such Holders for which the Company has received written requests, which requests must specify the aggregate amount of such Registrable Securities of such Holder to be included in the Shelf Registration Statement and such requests must be received within ten (10) days after the date that such Shelf Registration Notice has been delivered.  At any time the Company is (i) eligible for use of an Automatic Shelf Registration Statement, such Registration shall occur on such form and/or (ii) is eligible for use of Form S-3, such Registration shall be made on such form.  The Shelf Registration Statements described in this Section 2.02(a) shall relate to the offer and sale of the Registrable Securities by the Holders thereof from time to time in accordance with the methods of distribution set forth in the applicable Shelf Registration Statement (hereinafter the "Shelf Registration").  The Company shall use its reasonable best efforts to address any comments from the Commission regarding such Shelf Registration Statement and to advocate with the Commission for the Registration of all Registrable Securities in accordance with SEC Guidance. Notwithstanding the foregoing, if the Commission prevents the Company from including any or all of the Registrable Securities on any Shelf Registration Statement, such Shelf Registration Statement shall Register the resale of a number of Company Shares which is equal to the maximum number of shares as is permitted by the Commission.  In such event, the number of Company Shares to be Registered for each Holder in the applicable Shelf Registration Statement shall be reduced pro rata among all Holders.

(b)     Continued Effectiveness.  Except as provided herein, the Company shall use its reasonable best efforts to keep any Shelf Registration Statement filed pursuant to Section 2.02(a) continuously effective under the Securities Act until the earliest of (i) the date as of which all Registrable Securities have been sold pursuant to such Shelf Registration Statement or another Registration Statement filed under the Securities Act (but in no event prior to the applicable period referred to in Section 4(3) of the Securities Act and Rule 174 thereunder), (ii) the date that is three (3) years after the date that such Shelf Registration Statement became effective under the Securities Act, (iii) the date on which this Agreement terminates under Section 3.01 with respect to all Participating Holders and (iv) such shorter period as all of the Participating Holders with respect to such Shelf Registration shall agree in writing (such period of effectiveness, the "Shelf Period").

9

#4852-3043-6381

        (c)      Certain Undertakings.  Notwithstanding any other provisions of this Agreement to the contrary, the Company shall cause (i) each Shelf Registration Statement (as of the effective date of such Shelf Registration Statement), any amendment thereof (as of the effective date thereof) or supplement thereto (as of its date), (A) to comply in all material respects with applicable SEC Guidance and (B) not to contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances in which they were made, not misleading, and (ii) any related Prospectus (including any preliminary Prospectus) or Issuer Free Writing Prospectus and any amendment thereof or supplement thereto, as of its date, (A) to comply in all material respects with applicable SEC Guidance and (B) not to contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances in which they were made, not misleading; provided, however, the Company shall have no such obligations or liabilities with respect to any written information pertaining to any Holder and furnished in writing to the Company by or on behalf of such Holder specifically for inclusion therein.  The Company agrees, to the extent necessary, to supplement or make amendments to each Shelf Registration Statement if required by the registration form used by the Company for the applicable Registration or by SEC Guidance, or as may reasonably be requested by any Participating Holder.

        (d)      [Reserved].

        (e)      Shelf Take-Downs.

      (i)      Subject to Section 2.11, an offering or sale of Registrable Securities pursuant to a Shelf Registration Statement (each, a "Shelf Take-Down") may be initiated by any Holder (or Holders, as the case may be) that has Registrable Securities registered on such Shelf Registration Statement (an "Initiating Shelf Take-Down Holder").  Except as set forth in Section 2.02(e)(iii) with respect to Marketed Underwritten Shelf Take-Downs, each such Initiating Shelf Take-Down Holder shall not be required to permit the offer and sale of Registrable Securities by other Holders in connection with any such Shelf Take-Down initiated by such Initiating Shelf Take-Down Holder(s).

      (ii)      Subject to Section 2.11, if the Initiating Shelf Take-Down Holder(s) elects by written request to the Company, a Shelf Take-Down with respect to which the anticipated aggregate offering price to the public (calculated based upon the Market Price of the Registrable Securities on the date on which the Company receives such written request) of the Registrable Securities that the Initiating Shelf Take-Down Holder(s) request to include in such Shelf Take-Down is at least $50,000,000 shall be in the form of an Underwritten Offering (an "Underwritten Shelf Take-Down Notice"), and the Company shall amend or supplement the applicable Shelf Registration Statement for such purpose as soon as practicable.  Subject to clause (iii) below, such Initiating Shelf Take-Down Holder(s) shall have the right to select, subject to the prior written consent of the Company (not to be unreasonably withheld), the managing underwriter or underwriters to administer such offering.

      (iii)      If the plan of distribution set forth in any Underwritten Shelf Take-Down Notice includes a customary "road show" (including an "electronic road show") or other substantial marketing effort by the Company and the underwriters over a period expected to exceed 48 hours (a "Marketed Underwritten Shelf Take-Down"), promptly upon delivery of such Underwritten Shelf Take-Down Notice (but in no event more than five (5) Business Days thereafter), the Company shall promptly deliver a written notice (a "Marketed Underwritten Shelf Take-Down Notice") of such Marketed Underwritten Shelf Take-Down to all Holders (other than the Initiating Shelf Take-Down Holder(s)), and the Company shall include in such Marketed Underwritten Shelf Take-Down all such Registrable Securities of such Holders that are Registered on such Shelf Registration Statement for which the Company has received written requests, which requests must specify the aggregate amount of such Registrable Securities of such Holder to be offered and sold pursuant to such Marketed Underwritten Shelf Take-Down, for inclusion therein within ten (10) days after the date that such Marketed Underwritten Shelf Take-Down Notice has been delivered; provided, that if the managing underwriter or underwriters of any proposed Marketed Underwritten Shelf Take-Down informs the Holders that have requested to participate in such Marketed Underwritten Shelf Take-Down in writing that, in its or their good-faith opinion, the number of securities which such Holders intend to include in such offering exceeds the Maximum Offering Size, then the aggregate number of securities to be included in such Marketed Underwritten Shelf Take-Down shall be the number of Registrable Securities that, in the opinion of such managing underwriter or underwriters, can be sold without having such adverse effect in such Marketed Underwritten Shelf Take-Down, which number shall be allocated (1) first to the Registrable Securities requested to

10

be included in such Marketed Underwritten Shelf Take-Down by the Initiating Shelf Take-Down Holder(s) (pro rata among them), and (2) second to the Registrable Securities requested to be included in such Marketed Underwritten Shelf Take-Down by any Holder who is not an Initiating Shelf Take-Down Holder on a pro rata basis based on the relative number of Registrable Securities that each such Holder requested to be included in such Marketed Underwritten Shelf Take-Down (provided that any securities thereby allocated to a Holder that exceed such Holder's request shall be reallocated among the remaining requesting Holders in like manner).  The Holders of a majority of the Registrable Securities to be included in any Marketed Underwritten Shelf Take-Down shall have the right to select, subject to the prior written consent of the Company (not to be unreasonably withheld), the managing underwriter or underwriters to administer such offering.  No holder of securities of the Company shall be permitted to include such holder's securities in any Marketed Underwritten Shelf Take-Down except for Holders who timely request, in accordance with this clause (iii), to include Registrable Securities in such Marketed Underwritten Shelf Take-Down.

(iv)     The Company shall bear all Registration Expenses in connection with any Shelf Registration or any Shelf Take-Down, whether or not such Shelf Registration becomes effective or such Shelf Take-Down is completed and whether or not all or any portion of the Registrable Securities originally requested to be included in such Shelf Registration or Shelf Take-Down are ultimately included.  Each Holder shall be permitted to withdraw all or part of its Registrable Securities from a Marketed Underwritten Shelf Take-Down at any time prior to the execution of the underwriting agreement in connection with such Marketed Underwritten Shelf Take-Down.  Subject to Section 2.11, the number of Shelf Take-Downs that a Holder (or Holders, as the case may be) can initiate is unlimited.

(f)     Automatic Shelf Registration Statements.  Upon the Company becoming aware that it has become a Well-Known Seasoned Issuer (it being understood that the Company shall independently verify whether it has become a Well-Known Seasoned Issuer at the end of each calendar month ending after the first anniversary of the date of this Agreement), (i) the Company shall give written notice to all of the Holders as promptly as practicable but in no event later than ten (10) Business Days thereafter, and such notice shall describe, in reasonable detail, the basis on which the Company has become a Well-Known Seasoned Issuer, and (ii) the Company shall, as promptly as practicable and subject to any Registration Statement Suspension, Register, under an Automatic Shelf Registration Statement, the sale of all of the Registrable Securities in accordance with the terms of this Agreement.  The Company shall use its reasonable best efforts to file such Automatic Shelf Registration Statement as promptly as practicable but in no event later than twenty (20) Business Days after it becomes a Well-Known Seasoned Issuer, and to cause such Automatic Shelf Registration Statement to remain effective thereafter until the earlier of the date (x) on which all of the securities covered by such Shelf Registration Statement are no longer Registrable Securities and (y) on which the Company cannot extend the effectiveness of such Shelf Registration Statement because it is no longer eligible for use of Form S-3.  The Company shall give written notice of filing such Registration Statement to all of the Holders as promptly as practicable thereafter.  At any time after the filing of an Automatic Shelf Registration Statement by the Company, if it is reasonably likely that it will no longer be a Well-Known Seasoned Issuer as of a future determination date (the "Determination Date"), as promptly as practicable and at least thirty (30) days prior to such Determination Date, the Company shall (A) give written notice thereof to all of the Holders and (B) use its reasonable best efforts to file a Registration Statement with respect to a Shelf Registration in accordance with this Section 2.02, treating all selling stockholders identified as such in the Automatic Shelf Registration Statement (and amendments or supplements thereto) as Requesting Holders and use all reasonable best efforts to have such Registration Statement declared effective.  Any Registration pursuant to this Section 2.02(f) shall be deemed a Shelf Registration for purposes of this Agreement; provided, however that any Registration pursuant to this Section 2.02(f) shall not be counted as an additional Demand Registration for purposes of subclause (i) in Section 2.01(a).

SECTION 2.03.     Piggyback Registration.

(a)     Participation.  If the Company at any time proposes to file a Registration Statement with respect to any offering of its equity securities for its own account or for the account of any other Persons (other than pursuant to (i) a Registration under Section 2.01 or Section 2.02, it being understood that this clause (i) does not limit the rights of Holders to make written requests pursuant to Section 2.01 or Section 2.02 or otherwise limit the applicability thereof, (ii) a Registration Statement on Form S-4 or Form S-8, (iii) a Registration of securities solely relating to an offering and sale to employees, directors or consultants of the Company or its Subsidiaries pursuant to

11

any employee stock plan or other employee benefit plan arrangement, (iv) a Registration not otherwise covered by clause (ii) above pursuant to which the Company is offering to exchange its own securities for other securities, (v) a Registration Statement relating solely to dividend reinvestment or similar plans or (vi) a Shelf Registration Statement pursuant to which only the initial purchasers and subsequent transferees of debt securities of the Company or any of its Subsidiaries that are convertible or exchangeable for Company Shares and that are initially issued pursuant to Rule 144A and/or Regulation S (or any successor provisions) of the Securities Act may resell such debt securities and sell the Company Shares into which such debt securities may be converted or exchanged) (any such offering, other than pursuant to a Registration described in the foregoing clauses (i)-(vi), a "Company Public Sale"), then, (A) as soon as practicable (but in no event less than thirty (30) days prior to the proposed date of filing of such Registration Statement), the Company shall give written notice of such proposed filing to all Holders, and such notice shall offer each Holder the opportunity to Register under such Registration Statement such number of Registrable Securities as such Holder may request in writing delivered to the Company within ten (10) days of delivery of such written notice by the Company. Subject to Section 2.03(b), the Company shall include in such Registration Statement all such Registrable Securities that are requested by Holders to be included therein in compliance with the immediately foregoing sentence (a "Piggyback Registration"); provided, that if at any time after giving written notice of its intention to Register any equity securities and prior to the effective date of the Registration Statement filed in connection with such Piggyback Registration, the Company shall determine for any reason not to Register or to delay Registration of the equity securities covered by such Piggyback Registration, the Company shall give written notice of such determination to each Holder that had requested to Register its, his or her Registrable Securities in such Registration Statement and, thereupon, (1) in the case of a determination not to Register, shall be relieved of its obligation to Register any Registrable Securities in connection with such Registration (but not from its obligation to pay the Registration Expenses in connection therewith, to the extent payable) and (2) in the case of a determination to delay Registering, shall be permitted to delay Registering any Registrable Securities, for the same period as the delay in Registering the other equity securities covered by such Piggyback Registration. If the offering pursuant to such Registration Statement is to be underwritten, the Company shall so advise the Holders as a part of the written notice given pursuant this Section 2.03(a), and each Holder making a request for a Piggyback Registration pursuant to this Section 2.03(a) must, and the Company shall make such arrangements with the managing underwriter or underwriters so that each such Holder may, participate in such Underwritten Offering, subject to the conditions of Section 2.03(b). If the offering pursuant to such Registration Statement is to be on any other basis, the Company shall so advise the Holders as part of the written notice given pursuant to this Section 2.03(a), and each Holder making a request for a Piggyback Registration pursuant to this Section 2.03(a) must, and the Company shall make such arrangements so that each such Holder may, participate in such offering on such basis, subject to the conditions of Section 2.03(b). Each Holder shall be permitted to withdraw all or part of its Registrable Securities from a Piggyback Registration at any time prior to the effectiveness of such Registration Statement.

(b)     Priority of Piggyback Registration. If the managing underwriter or underwriters of any proposed Underwritten Offering of Registrable Securities included in a Piggyback Registration informs the Company and the Holders that have requested to participate in such Piggyback Registration in writing that, in its or their good-faith opinion, the number of securities which such Holders and any other Persons intend to include in such offering exceeds the Maximum Offering Size, then the aggregate number of securities to be included in such Registration shall be (i) first, 100% of the securities that the Company proposes to sell, (ii) second, the number of Registrable Securities that, in the good-faith opinion of such managing underwriter or underwriters, can be sold without exceeding the Maximum Offering Size, which number shall be allocated pro rata among the Holders that have requested to participate in such Registration based on the relative number of Registrable Securities that each such Holder requested to be included in such Piggyback Registration (provided that any securities thereby allocated to a Holder that exceed such Holder's request shall be reallocated among the remaining Holders in like manner) and (iii) third, any other securities eligible for inclusion in such Registration that, in the good-faith opinion of the managing underwriter or underwriters, can be sold without exceeding the Maximum Offering Size.

(c)     No Effect on Demand Registrations. No Registration of Registrable Securities effected pursuant to a request under this Section 2.03 shall be deemed to have been effected pursuant to Section 2.01 or Section 2.02 or shall relieve the Company of its obligations under Section 2.01 or Section 2.02.

SECTION 2.04.     Black-out Periods.

12

(a)      Black-out Periods for Holders.  In the event of a Registration of the Company's equity securities in an Underwritten Offering (including any Company Public Sale that is an Underwritten Offering), each of the Holders agrees with the Company, if requested by the managing underwriter or underwriters in such Underwritten Offering, not to (1) offer for sale, sell, pledge, or otherwise dispose of (or enter into any transaction or device that is designed to, or could be expected to, result in the disposition by any person at any time in the future of) any Company Shares (including Company Shares that may be deemed to be beneficially owned by the undersigned in accordance with the rules and regulations of the Commission and Company Shares that may be issued upon exercise of any Company Share Equivalents) or securities convertible into or exercisable or exchangeable for Company Shares or (2) enter into any swap or other derivatives transaction that transfers to another, in whole or in part, any of the economic benefits or risks of ownership of Company Shares, whether any such transaction described in clause (1) or (2) above is to be settled by delivery of Company Shares or other securities, in cash or otherwise, in each case, during the period that is ninety (90) days (or such greater or lesser period as may be reasonably requested by the managing underwriter or underwriters to accommodate regulatory restrictions on (i) the publication or other distribution of research reports and (ii) analyst recommendations and opinions, including, but not limited to, the restrictions contained in the FINRA rules or any successor provisions or amendments thereto) after the date of the commencement of such Underwritten Offering, to the extent timely notified in writing by the Company or the managing underwriter or underwriters (or such other period as may be reasonably requested by the managing underwriter or underwriters); provided, that the duration of the foregoing restrictions shall be no longer than the duration of the shortest restriction generally imposed by the underwriters on (i) the Company, (ii) the Chief Executive Officer and/or the Chief Financial Officer of the Company (or persons in substantially equivalent positions), in their capacities as such, or (iii) on any other holder of more than 5% of the Company Shares, in each case, in connection with such Underwritten Offering; provided, further, that nothing herein will prevent any Holder that is a partnership, limited liability company, corporation or other entity from making a distribution of Registrable Securities to the partners, members, stockholders or other equityholders thereof or a transfer to an Affiliate that is otherwise in compliance with the applicable securities laws, so long as such distributees or transferees agree to be bound by the restrictions set forth in this Section 2.04(a), or participating in any merger, acquisition or similar change of control transaction.  If requested by the managing underwriter or underwriters of any such Underwritten Offering, the Holders shall execute a separate lock-up agreement to the foregoing effect.  This Section 2.04 shall not prohibit any transaction by any Holder that is permitted by its lock-up agreement entered into in connection with an Underwritten Offering with the managing underwriter or underwriters in such Underwritten Offering (as such lock-up agreement is modified or waived by such managing underwriter or underwriters from time to time).  The Company may impose stop-transfer instructions with respect to the Company Shares (or other securities) subject to the foregoing restriction until the end of the period referenced above.

(b)      Black-out Period for the Company and Others.  In the case of an offering of Registrable Securities pursuant to Section 2.01 or Section 2.02 that is an Underwritten Offering, the Company and each of the Holders agree, if requested by a Requesting Holder (or Requesting Holders, as the case may be) or the managing underwriter or underwriters with respect to such Underwritten Offering, not to (1) offer for sale, sell, pledge, or otherwise dispose of (or enter into any transaction or device that is designed to, or could be expected to, result in the disposition by any person at any time in the future of) any Company Shares (including Company Shares that may be deemed to be beneficially owned by the undersigned in accordance with the rules and regulations of the Commission and Company Shares that may be issued upon exercise of any Company Share Equivalents) or securities convertible into or exercisable or exchangeable for Company Shares or (2) enter into any swap or other derivatives transaction that transfers to another, in whole or in part, any of the economic benefits or risks of ownership of Company Shares, whether any such transaction described in clause (1) or (2) above is to be settled by delivery of Company Shares or other securities, in cash or otherwise, in each case, during the period beginning seven (7) days before, and ending ninety (90) days (or such greater or lesser period as may be reasonably requested by the managing underwriter or underwriters and agreed to by the Requesting Holder(s)) (or such other period as may be reasonably requested by the managing underwriter or underwriters to accommodate regulatory restrictions on (i) the publication or other distribution of research reports and (ii) analyst recommendations and opinions, including, but not limited to, the restrictions contained in the FINRA rules or any successor provisions or amendments thereto) after, the date of the commencement of such Marketed Underwritten Shelf Take-Down, to the extent timely notified in writing by a Requesting Holder or the managing underwriter or underwriters, as the case may be; provided, that the duration of the foregoing restrictions shall be no longer than the duration of the shortest restriction generally imposed by the underwriters on (i) the Chief Executive Officer and/or the Chief Financial Officer of the Company (or persons in substantially equivalent positions), in their capacities as such, or (ii) on any other holder of more than 5% of the

13

#4852-3043-6381

Company Shares, in each case, in connection with such Marketed Underwritten Shelf Take-Down; provided, further, that nothing herein will prevent any Holder that is a partnership, limited liability company, corporation or other entity from making a distribution of Registrable Securities to the partners, members, stockholders or other equityholders thereof or a transfer to an Affiliate that is otherwise in compliance with the applicable securities laws, so long as such distributees or transferees agree to be bound by the restrictions set forth in this Section 2.04(b), or participating in any merger, acquisition or similar change of control transaction.  If requested by the Requesting Holder(s) or the managing underwriter or underwriters of any such Marketed Underwritten Shelf Take-Down, the Company and the Holders shall execute a separate lock-up agreement to the foregoing effect.  This Section 2.04 shall not prohibit any transaction by the Company or any Holder that is permitted by its lock-up agreement or provision entered into in connection with an Underwritten Offering with the managing underwriter or underwriters in such Underwritten Offering (as such lock-up agreement or provision is modified or waived by such managing underwriter or underwriters from time to time).  Notwithstanding the foregoing, the Company may effect a public sale or distribution of securities of the type described above and during the periods described above if such sale or distribution is made pursuant to Registrations on Form S-4 or Form S-8 or as part of any Registration of securities for offering and sale to employees, directors or consultants of the Company and its Subsidiaries pursuant to any employee stock plan or other employee benefit plan arrangement.

(c)      Other Shareholders.  The Company agrees to use its reasonable best efforts to obtain from each of its directors, officers and Affiliates, an agreement not to effect any public sale or distribution of such securities during any period referred to in this Section 2.04, except as part of any sales or distributions made pursuant to Registrations permitted under Section 2.04(b).  Without limiting the foregoing (but subject to Section 2.07), if after the date hereof the Company or any of its Subsidiaries grants any Person any rights to demand or participate in a Registration, the Company shall, and shall cause its Subsidiaries to, provide that the agreement with respect thereto shall include such Person's agreement to comply with any black-out period required by this Section 2.04 as if it were a Holder hereunder.  If requested by the Participating Holder(s) or the managing underwriter or underwriters of any such Underwritten Offering, the Company shall use reasonable best efforts to cause such persons referred to in the first sentence of this Section 2.04(c) to execute a separate agreement to the foregoing effect.  This Section 2.04 shall not prohibit any transaction by such person that is permitted by its lock-up agreement entered into in connection with an Underwritten Offering with the managing underwriter or underwriters in such Underwritten Offering (as such lock-up agreement is modified or waived by such managing underwriter or underwriters from time to time).  The Company may impose stop-transfer instructions with respect to the Company Shares (or other securities) subject to the foregoing restriction until the end of the period referenced above.

SECTION 2.05.      Registration Procedures.

(a)      In connection with the Company's Registration obligations under Sections 2.01, 2.02 and 2.03 and subject to the applicable terms and conditions set forth therein, the Company shall use its reasonable best efforts to effect such Registration to permit the sale of such Registrable Securities in accordance with the plan of distribution requested by the Participating Holder(s) and set forth in the applicable Registration Statement as expeditiously as reasonably practicable, and in connection therewith the Company shall:

(i)      prepare the required Registration Statement, including all exhibits and financial statements required under the Securities Act to be filed therewith, and before filing a Registration Statement, Prospectus or any Issuer Free Writing Prospectus, or any amendments or supplements thereto, (x) furnish to the underwriters, if any, and the Participating Holders, if any, copies of all documents prepared to be filed, and provide such underwriters and the Participating Holders and their respective counsel with a reasonable opportunity to review and comment on such documents prior to their filing and (y) except in the case of a Registration under Section 2.03, not file any Registration Statement or Prospectus or amendments or supplements thereto to which any Participating Holder or the underwriters, if any, shall reasonably object; provided, that, if the Registration is pursuant to a Registration Statement on Form S-1 or Form S-3 or any similar short-form Registration Statement, the Company shall include in such Registration Statement such additional information for marketing purposes as any Participating Holder or managing underwriter reasonably requests in writing; provided, that the Company may exclude such additional information from the Registration Statement if in its opinion, in consultation with outside legal counsel, such information contains a material misstatement of fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading;

14

(ii)        prepare and file with the Commission such pre- and post-effective amendments to such Registration Statement, supplements to the Prospectus and such amendments or supplements to any Issuer Free Writing Prospectus as may be (x) reasonably requested by any Participating Holder (to the extent such request relates to information relating to such Participating Holder), or (y) necessary to keep such Registration effective for the period of time required by this Agreement, and comply with provisions of the applicable securities laws and SEC Guidance with respect to the sale or other disposition of all securities covered by such Registration Statement during such period in accordance with the intended method or methods of disposition by the sellers thereof set forth in such Registration Statement, and prior to the filing of such amendments and supplements, furnish such amendments and supplements to the underwriters, if any, and the  Participating Holders, if any, and provide such underwriters and the Participating Holders and their respective   counsel with an adequate and appropriate opportunity to review and comment on such amendments and supplements prior to their filing;

(iii)       promptly notify the Participating Holders and the managing underwriter or underwriters, if any, and (if requested) confirm such advice in writing and provide copies of the relevant documents, as soon as reasonably practicable after notice thereof is received by the Company (A) when the applicable Registration Statement or any amendment thereto has been filed or becomes effective, and when the applicable Prospectus or Issuer Free Writing Prospectus or any amendment or supplement thereto has been filed, (B) of any written comments by the Commission or any request by the Commission or any other Governmental Authority for amendments or supplements to such Registration Statement, Prospectus or Issuer Free Writing Prospectus or for additional information, (C) of the issuance or threatened issuance by the Commission of any stop order suspending or threatening to suspend the effectiveness of such Registration Statement or any order by the Commission or any other regulatory authority preventing or suspending the use of any preliminary or final Prospectus or any Issuer Free Writing Prospectus or the initiation or threatening of any proceedings for such purposes, (D) if, at any time, the representations and warranties of the Company in any applicable underwriting agreement cease to be true and correct in all material respects, (E) of the receipt by the Company of any notification with respect to the suspension of the qualification of the Registrable Securities for offering or sale in any jurisdiction and (F) of the receipt by the Company of any notification with respect to the initiation or threatening of any proceeding for the suspension of the qualification of the Registrable Securities for offering or sale in any jurisdiction;

(iv)       promptly notify the Participating Holders and the managing underwriter or underwriters, if any, when the Company becomes aware of the happening of any event as a result of which the applicable Registration Statement, the Prospectus included in such Registration Statement (as then in effect) or any Issuer Free Writing Prospectus contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements therein (in the case of such Prospectus, any preliminary Prospectus or any Issuer Free Writing Prospectus, in light of the circumstances under which they were made) not misleading, when any Issuer Free Writing Prospectus includes information that may conflict with the information contained in the Registration Statement, or, if for any other reason it shall be necessary during such time period to amend or supplement such Registration Statement, Prospectus or Issuer Free Writing Prospectus in order to comply with the Securities Act and, in either case as promptly as reasonably practicable thereafter, prepare and file with the Commission, and furnish without charge to the Participating Holders and the managing underwriter or underwriters, if any, an amendment or supplement to such Registration Statement, Prospectus or Issuer Free Writing Prospectus which shall correct such misstatement or omission or effect such compliance;

(v)        use its reasonable best efforts to prevent, or obtain the withdrawal of, any stop order or other order suspending the use of any preliminary or final Prospectus or any Issuer Free Writing Prospectus;

(vi)       promptly incorporate in a Prospectus supplement, Issuer Free Writing Prospectus or post-effective amendment to the applicable Registration Statement such information as the managing underwriter or underwriters and the Participating Holder(s) agree should be included therein relating to the plan of distribution with respect to such Registrable Securities, and make all required filings of such Prospectus supplement, Issuer Free Writing Prospectus or post-effective amendment as soon as reasonably practicable after being notified of the matters to be incorporated in such Prospectus supplement, Issuer Free Writing Prospectus or post-effective amendment;

(vii)      furnish to each Participating Holder and each underwriter, if any, without charge, as many conformed copies as such Participating Holder or underwriter may reasonably request of the applicable Registration Statement and any amendment, post-effective amendment or supplement thereto, including financial statements and

15

schedules, all documents incorporated therein by reference and all exhibits (including any incorporated by reference), <u>provided</u>, that the Company, in its discretion, may satisfy its obligation to furnish any such documents to the Participating Holders and underwriters by filing such documents with the Commission so they are publicly available on the Commission's EDGAR website;

(viii)    deliver to each Participating Holder and each underwriter, if any, without charge, as many copies of the applicable Prospectus (including each preliminary Prospectus), any Issuer Free Writing Prospectus and any amendment or supplement thereto as such Participating Holder or underwriter may reasonably request (it being understood that the Company consents to the use of such Prospectus, any Issuer Free Writing Prospectus and any amendment or supplement thereto by such Participating Holder and the underwriters, if any, in connection with the offering and sale of the Registrable Securities thereby) and such other documents as such Participating Holder or underwriter may reasonably request in order to facilitate the disposition of the Registrable Securities by such Participating Holder or underwriter), <u>provided</u>, that the Company, in its discretion, may satisfy its obligation to deliver any such documents to the Participating Holders and underwriters by filing such documents with the Commission so they are publicly available on the Commission's EDGAR website;

(ix)    on or prior to the date on which the applicable Registration Statement is declared effective, use its reasonable best efforts to register or qualify, and cooperate with the Participating Holders, the managing underwriter or underwriters, if any, and their respective counsel, in connection with the registration or qualification of such Registrable Securities for offer and sale under the securities or "Blue Sky" laws of each state and other jurisdiction of the United States as any Participating Holder or managing underwriter or underwriters, if any, or their respective counsel reasonably request in writing and do any and all other acts or things reasonably necessary or advisable to keep such registration or qualification in effect for such period as required by <u>Section 2.01(d)</u> and <u>Section 2.02(b)</u>, whichever is applicable, <u>provided</u> that the Company shall not be required to qualify generally to do business in any jurisdiction where it is not then so qualified or to take any action which would subject it to taxation or general service of process in any such jurisdiction where it is not then so subject;

(x)    cooperate with the Participating Holders and the managing underwriter or underwriters, if any, to facilitate the timely preparation and delivery of certificates representing Registrable Securities to be sold and not bearing any restrictive legends, and enable such Registrable Securities to be in such denominations and registered in such names as the managing underwriters may request at least two (2) Business Days prior to any sale of Registrable Securities to the underwriters;

(xi)    use its reasonable best efforts to cause the Registrable Securities covered by the applicable Registration Statement to be registered with or approved by such other Governmental Authorities as may be necessary to enable the seller or sellers thereof or the underwriter or underwriters, if any, to consummate the disposition of such Registrable Securities;

(xii)    make such representations and warranties to the Participating Holders and the underwriters or agents, if any, in form, substance and scope as are customarily made by issuers in secondary underwritten public offerings;

(xiii)    enter into such customary agreements (including underwriting and indemnification agreements) and take all such other actions as any Participating Holder(s) or the managing underwriter or underwriters, if any, reasonably request in order to expedite or facilitate the Registration and disposition of such Registrable Securities;

(xiv)    obtain for delivery to the Participating Holders and to the underwriter or underwriters, if any, an opinion or opinions from counsel for the Company dated the effective date of the Registration Statement or, in the event of an Underwritten Offering, the date of the closing under the underwriting agreement, in customary form, scope and substance, which opinions shall be reasonably satisfactory to such Participating Holders or underwriters, as the case may be, and their respective counsel;

(xv)    in the case of an Underwritten Offering, obtain for delivery to the Company and the managing underwriter or underwriters, with copies to the Participating Holders, a cold comfort letter from the Company's independent certified public accountants in customary form and covering such matters of the type customarily covered by cold comfort letters as the managing underwriter or underwriters reasonably request, dated the date of

16

execution of the underwriting agreement and brought down to the date of the closing of the Underwritten Offering, as specified in the underwriting agreement;

(xvi)    cooperate with each Participating Holder and each underwriter, if any, participating in the disposition of such Registrable Securities and their respective counsel in connection with any filings required to be made with the FINRA;

(xvii)    use its reasonable best efforts to comply with all applicable securities laws and make available to its security holders, as soon as reasonably practicable, an earnings statement satisfying the provisions of Section 11(a) of the Securities Act and the rules and regulations promulgated thereunder;

(xviii)    provide and cause to be maintained a transfer agent and registrar for all Registrable Securities covered by the applicable Registration Statement from and after a date not later than the effective date of such Registration Statement;

(xix)    use its reasonable best efforts to cause all Registrable Securities covered by the applicable Registration Statement to be listed on each securities exchange on which any of the Company Shares are then listed or quoted and on each inter-dealer quotation system on which any of the Company Shares are then quoted;

(xx)    in connection with an Underwritten Offering, make available upon reasonable notice at reasonable times and for reasonable periods for inspection by any Participating Holder, by any underwriter participating in any disposition to be effected pursuant to such Registration Statement and by any attorney, accountant or other agent retained by such Participating Holder(s) or any such underwriter, all pertinent financial and other records, pertinent corporate documents and properties of the Company, and cause all of the Company's officers, directors and employees and the independent public accountants who have certified its financial statements to make themselves available to discuss the business of the Company and to supply all information reasonably requested by any such Person in connection with such Registration Statement as shall be necessary to enable them to exercise their due diligence responsibility; and

(xxi)    in the case of an Underwritten Offering of Registrable Securities with an anticipated aggregate offering price to the public (calculated based upon the Market Price of the Registrable Securities on the date on which the Company receives the Demand Registration Notice or written request for such Underwritten Shelf Take-Down, as the case may be) in an amount of at least $50,000,000, cause appropriate officers of the Company to participate in the customary "road show" presentations that may be reasonably requested by the managing underwriter or underwriters in any such Underwritten Offering and otherwise use commercially reasonable efforts to facilitate, cooperate with, and participate in each proposed Underwritten Offering contemplated herein and customary selling efforts related thereto; provided, that the Company shall have no obligation to participate in more than two (2) "road shows" in any twelve (12)-month period and such participation shall not unreasonably interfere with the business operations of the Company.

(b)    The Company may require each Participating Holder to furnish to the Company such information regarding the distribution of such securities and such other information relating to such Holder and its ownership of Registrable Securities as the Company may from time to time reasonably request in writing.  Each Participating Holder agrees to furnish such information to the Company and to cooperate with the Company as reasonably necessary to enable the Company to comply with the provisions of this Agreement.

(c)    Each Participating Holder agrees that, upon delivery of any notice by the Company of the happening of any event of the kind described in Section 2.05(a)(iii)(C), (D), or (E) or Section 2.05(a)(iv), such Participating Holder will forthwith discontinue disposition of Registrable Securities pursuant to such Registration Statement until (i) if such notice relates to an event of the kind described in Section 2.05(a)(iv), such Participating Holder's receipt of the copies of the supplemented or amended Prospectus or Issuer Free Writing Prospectus contemplated by Section 2.05(a)(iv), (ii) such Participating Holder is advised in writing by the Company that the use of the Prospectus or Issuer Free Writing Prospectus, as the case may be, may be resumed, (iii) if such notice relates to an event of the kind described in Section 2.05(a)(iii)(C) or (E), such Participating Holder is advised in writing by the Company of the termination, expiration or cessation of the applicable order or suspension, and (iv) if such notice relates to an event of the kind described in Section 2.05(a)(iii)(D), such Participating Holder is advised in writing by

17

#4852-3043-6381

the Company that the representations and warranties of the Company in the applicable underwriting agreement are true and correct in all material respects.  The Company may impose stop-transfer instructions with respect to the Registrable Securities subject to the foregoing restriction until the end of the period referenced above.  In the event the Company shall give any such notice, the period during which the applicable Registration Statement is required to be maintained effective shall be extended by the number of days during the period from and including the date of the giving of such notice to and including the date when each seller of Registrable Securities covered by such Registration Statement either receives the copies of the supplemented or amended Prospectus or Issuer Free Writing Prospectus contemplated by Section 2.05(a)(iv) or is advised in writing by the Company that the use of the Prospectus or Issuer Free Writing Prospectus may be resumed.

SECTION 2.06.    Underwritten Offerings.

(a)    Demand Registrations.  If requested by the underwriters for any Underwritten Offering requested by any Participating Holder pursuant to a Registration under Section 2.01, the Company shall enter into an underwriting agreement with such underwriters for such offering, such agreement to be reasonably satisfactory in substance and form to the Company, each Participating Holder and the underwriters, and to contain such representations and warranties by the Company and such other terms as are generally prevailing in agreements of that type, including indemnities no less favorable to the recipient thereof than those provided in Section 2.09.  Each Participating Holder shall cooperate reasonably with the Company in the negotiation of such underwriting agreement and shall give consideration to the reasonable suggestions of the Company regarding the form thereof.  The Participating Holders shall be parties to such underwriting agreement, which underwriting agreement shall (i) contain such representations and warranties by, and the other agreements on the part of, the Company to and for the benefit of such Participating Holders as are customarily made by issuers to selling stockholders in secondary underwritten public offerings and (ii) provide that any or all of the conditions precedent to the obligations of such underwriters under such underwriting agreement also shall be conditions precedent to the obligations of such Participating Holders.  Any such Participating Holder shall not be required to make any representations or warranties to, or agreements with, the Company or the underwriters in connection with such underwriting agreement other than customary representations, warranties or agreements regarding such Participating Holder (but, for the avoidance of doubt, not such Participating Holder's knowledge about the Company except to the extent required by the managing underwriter or underwriters), such Participating Holder's title to the Registrable Securities, such Participating Holder's authority to sell the Registrable Securities, such Participating Holder's intended method of distribution, absence of liens with respect to the Registrable Securities, receipt of all required consents and approvals with respect to the entry into such underwriting agreement and the sale of such Registrable Securities and any other representations required to be made by such Participating Holder under applicable law, rule or regulation, and the aggregate amount of the liability of such Participating Holder in connection with such underwriting agreement shall not exceed such Participating Holder's net proceeds after underwriting commissions and discounts (but before any taxes and expenses which may be payable by such Participating Holder) from such Underwritten Offering.

(b)    Shelf Registrations.  If requested by the underwriters for any Underwritten Offering requested by any Participating Holder pursuant to a Registration under Section 2.02, the Company shall enter into an underwriting agreement with such underwriters for such offering, such agreement to be reasonably satisfactory in substance and form to the Company, each Participating Holder and the underwriters, and to contain such representations and warranties by the Company and such other terms as are generally prevailing in agreements of that type, including indemnities no less favorable to the recipient thereof than those provided in Section 2.09.  Each Participating Holder shall cooperate reasonably with the Company in the negotiation of such underwriting agreement and shall give consideration to the reasonable suggestions of the Company regarding the form thereof.  The Participating Holders shall be parties to such underwriting agreement, which underwriting agreement shall (i) contain such representations and warranties by, and the other agreements on the part of, the Company to and for the benefit of such Participating Holders as are customarily made by issuers to selling stockholders in secondary underwritten public offerings and (ii) provide that any or all of the conditions precedent to the obligations of such underwriters under such underwriting agreement also shall be conditions precedent to the obligations of such Participating Holders.  Any such Participating Holder shall not be required to make any representations or warranties to, or agreements with, the Company or the underwriters in connection with such underwriting agreement other than customary representations, warranties or agreements regarding such Participating Holder (but, for the avoidance of doubt, not such Participating Holder's knowledge about the Company except to the extent required by the managing underwriter or underwriters), such Participating Holder's title to the Registrable Securities, such

#4852-3043-6381

Participating Holder's authority to sell the Registrable Securities, such Participating Holder's intended method of distribution, absence of liens with respect to the Registrable Securities, receipt of all required consents and approvals with respect to the entry into such underwriting agreement and the sale of such Registrable Securities and any other representations required to be made by such Participating Holder under applicable law, rule or regulation, and the aggregate amount of the liability of such Participating Holder in connection with such underwriting agreement shall not exceed such Participating Holder's net proceeds after underwriting commissions and discounts (but before any taxes and expenses which may be payable by such Participating Holder) from such Underwritten Offering.

(c)       Piggyback Registrations.  If the Company proposes to Register any of its securities under the Securities Act as contemplated by Section 2.03 and such securities are to be distributed in an Underwritten Offering through one or more underwriters, the Company shall, if requested by any Holder pursuant to Section 2.03 and subject to the provisions of Section 2.03(b), use its reasonable best efforts to arrange for such underwriters to include on the same terms and conditions that apply to the other sellers in such Registration all the Registrable Securities to be offered and sold by such Holder among the securities of the Company to be distributed by such underwriters in such Registration.  The Participating Holders shall be parties to the underwriting agreement between the Company and such underwriters, which underwriting agreement shall (i) contain such representations and warranties by, and the other agreements on the part of, the Company to and for the benefit of such Participating Holders as are customarily made by issuers to selling stockholders in secondary underwritten public offerings and (ii) provide that any or all of the conditions precedent to the obligations of such underwriters under such underwriting agreement also shall be conditions precedent to the obligations of such Participating Holders.  Any such Participating Holder shall not be required to make any representations or warranties to, or agreements with the Company or the underwriters in connection with such underwriting agreement other than customary representations, warranties or agreements regarding such Participating Holder, such Participating Holder's title to the Registrable Securities, such Participating Holder's authority to sell the Registrable Securities, such Participating Holder's intended method of distribution, absence of liens with respect to the Registrable Securities, receipt of all required consents and approvals with respect to the entry into such underwriting agreement and the sale of such Registrable Securities or any other representations required to be made by such Participating Holder under applicable law, rule or regulation, and the aggregate amount of the liability of such Participating Holder in connection with such underwriting agreement shall not exceed such Participating Holder's net proceeds after underwriting commissions and discounts (but before any taxes and expenses which may be payable by such Participating Holder) from such Underwritten Offering.

(d)       Participation in Underwritten Registrations.  Subject to the provisions of Sections 2.06(a), (b) and (c) above, no Person may participate in any Underwritten Offering hereunder unless such Person (i) agrees to sell such Person's securities on the basis provided in any underwriting arrangements approved by the Persons entitled to approve such arrangements and (ii) completes and executes all questionnaires, powers of attorney, indemnities, underwriting agreements and other documents reasonably required under the terms of such underwriting arrangements.

(e)       Price and Underwriting Discounts.  In the case of an Underwritten Offering under Section 2.01 or Section 2.02, the price, underwriting discount and other financial terms for the Registrable Securities shall be determined by the Requesting Holder(s) participating in such Underwritten Offering.

SECTION 2.07.       No Inconsistent Agreements; Additional Rights.  The Company is not currently a party to, and shall not hereafter enter into any agreement with respect to its securities that is inconsistent with the rights granted to the Holders by this Agreement, including allowing any other holder or prospective holder of any securities of the Company (a) registration rights in the nature or substantially in the nature of those set forth in Section 2.01,  Section 2.02  or Section 2.03 that would have priority over the Registrable Securities with respect to the inclusion of such securities in any Registration (except to the extent such registration rights are solely related to Registrations of the type contemplated by Section 2.03(a)(ii) through (iv)) or (b) demand registration rights in the nature or substantially in the nature of those set forth in Section 2.01 or Section 2.01 that are exercisable prior to such time as the Requesting Holders can first exercise their rights under Section 2.01 or Section 2.02.

SECTION 2.08.       Registration Expenses.  All expenses incident to the Company's performance of or compliance with this Agreement shall be paid by the Company (including, for the avoidance of doubt, in connection with any Demand Registration, Shelf Registration or any Shelf Take-Down, including (i) all

19

#4852-3043-6381

registration and filing fees, and any other fees and expenses associated with filings required to be made with the Commission or FINRA, including, if applicable, the reasonable and documented fees and expenses of any "qualified independent underwriter," as such term is defined in FINRA Rule 5121 (or any successor provision) and of its counsel (ii) all fees and expenses in connection with compliance with any securities or "Blue Sky" laws (including fees and disbursements of one firm of counsel for the underwriters in connection with "Blue Sky" qualifications of the Registrable Securities up to an aggregate maximum of $25,000), (iii) all printing, duplicating, word processing, messenger, telephone, facsimile and delivery expenses (including expenses of printing certificates for the Registrable Securities in a form eligible for deposit with The Depository Trust Company and of printing Prospectuses and Issuer Free Writing Prospectuses), (iv) all fees and disbursements of counsel for the Company and of all independent certified public accountants of the Company (including the expenses of any special audits incidental to or required by any Registration or qualification and cold comfort letters required by or incident to such performance), (v) Securities Act liability insurance or similar insurance if the Company so desires, (vi) all fees and expenses incurred in connection with the listing of Registrable Securities on any securities exchange or quotation of the Registrable Securities on any inter-dealer quotation system, (vii) all fees and expenses of any special experts or other Persons retained by the Company in connection with any Registration, (viii) all of the Company's internal expenses (including all salaries and expenses of its officers and employees performing legal or accounting duties), (ix) all expenses incurred by the Company and its directors and officers related to any analyst or investor presentations or any "road-shows" for any Underwritten Offering, including all travel, meals and lodging, (x) reasonable and documented fees, out-of-pocket costs and expenses of one firm of counsel selected by the Holder(s) of a majority of the Registrable Securities covered by each Registration Statement, (xi) fees and disbursements of underwriters customarily paid by issuers and sellers of securities, but excluding any underwriting fees, discounts and commissions attributable to the sale of Registrable Securities, (xii) transfer agents' and registrars' fees and expenses and the fees and expenses of any other agent or trustee appointed in connection with such offering, (xiii) fees and expense payable in connection with any ratings of the Registrable Securities, including expenses relating to any presentations to rating agencies and (xiv) any other fees and disbursements customarily paid by the issuers of securities.  All such fees and expenses are referred to herein as "Registration Expenses."  The Company shall not be required to pay any underwriting fees, discounts and commissions, or any transfer taxes or similar taxes or charges, if any, attributable to the sale of Registrable Securities, and all such fees, discounts, commissions, taxes and charges related to any Registrable Securities shall be the sole responsibility of the Holder of such Registrable Securities.

SECTION 2.09.    Indemnification.

(a)    Indemnification by the Company.  The Company agrees to indemnify and hold harmless, to the fullest extent permitted by law, each of the Holders, each of their respective direct or indirect partners, members or shareholders and each of such partner's, member's or shareholder's partners members or shareholders and, with respect to all of the foregoing Persons, each of their respective Affiliates, employees, directors, officers, trustees or agents and each Person who controls (within the meaning of the Securities Act or the Exchange Act) such Persons and each of their respective Representatives (collectively, the "Stockholder Parties") from and against any and all losses, penalties, judgments, suits, costs, claims, damages, liabilities and expenses, joint or several (including reasonable and documented costs and expenses of investigation and reasonable and documented attorneys', accountants' and experts' fees and expenses) (each, a "Loss" and collectively "Losses") insofar as such Losses arise out of or are relating to (i) any failure by the Company to comply with the covenants and agreements contained in this Agreement, (ii) any untrue or alleged untrue statement of a material fact contained in any Registration Statement under which such Registrable Securities were Registered under the Securities Act (including any final, preliminary or summary Prospectus contained therein or any amendment or supplement thereto or any documents incorporated by reference therein, which shall include any information that has been deemed to be a part of any Prospectus under Rule 159 under the Securities Act), any Issuer Free Writing Prospectus or amendment or supplement thereto, (iii) any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein (in the case of a Prospectus, preliminary Prospectus or Issuer Free Writing Prospectus, in light of the circumstances under which they were made) not misleading, and the Company will reimburse, as incurred, each such Stockholder Party for any legal and any other expenses reasonably incurred in connection with investigating or defending any such claim, loss, damage, liability or action; provided, that the Company shall not be liable to any Stockholder Party to the extent that any such Loss arises out of or is relating to an untrue statement or alleged untrue statement or omission or alleged omission made in any such Registration Statement or  other document in reliance upon and in conformity with written information furnished to the Company by such indemnified party expressly for use in the preparation thereof (including without limitation any written information

20

provided for inclusion in the Registration Statement pursuant to Section 2.05(a)(i)).   This indemnity shall be in addition to any liability the Company may otherwise have.  Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of such Holder or any Stockholder Party and shall survive the transfer of such securities by such Holder.

(b)        Indemnification by the Participating Holders.  Each Participating Holder agrees (severally and not jointly) to indemnify and hold harmless, to the fullest extent permitted by law, the Company, its directors and officers and each Person who controls the Company (within the meaning of the Securities Act or the Exchange Act), and each other Holder, each of such other Holder's respective direct or indirect partners, members or shareholders and each of such partner's, member's or shareholder's partners members or shareholders and, with respect to all of the foregoing Persons, each of their respective Affiliates, employees, directors, officers, trustees or agents and each Person who controls (within the meaning of the Securities Act or the Exchange Act) such Persons and each of their respective Representatives from and against any Losses resulting from (i) any untrue statement or alleged untrue statement of a material fact contained in any Registration Statement under which such Participating Holder's Registrable Securities were Registered under the Securities Act (including any final, preliminary or summary Prospectus contained therein or any amendment or supplement thereto or any documents incorporated by reference therein, which shall include any information that has been deemed to be a part of any Prospectus under Rule 159 under the Securities Act) or any Issuer Free Writing Prospectus or amendment or supplement thereto, or (ii) any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein (in the case of a Prospectus, preliminary Prospectus or Issuer Free Writing Prospectus, in light of the circumstances under which they were made) not misleading, in each case to the extent, but only to the extent, that such untrue statement or omission is contained in information furnished in writing by such Participating Holder to the Company specifically for inclusion in such Registration Statement (including, without limitation, any written information provided for inclusion in the Registration Statement pursuant to Section 2.05(a)(i)) and has not been corrected in a subsequent writing prior to or concurrently with the sale of the Registrable Securities to the Person asserting the claim and (iii) any use by a Participating Holder or any its Representatives of a Prospectus or Free Writing Prospectus in contravention of Sections 2.01(h) or 2.02(d), in the case of clauses (i) and (ii) to the extent, but only to the extent, that such untrue statement (or alleged untrue statement) or omission (or alleged omission) was made in such Registration Statement, Prospectus, offering circular, Issuer Free Writing Prospectus or other document, in reliance upon and in conformity with written information furnished to the Company by such Participating Holder expressly for use therein.  In no event shall the liability of such Participating Holder hereunder be greater in amount than the dollar amount of the net proceeds after underwriting commissions and discounts (but before any taxes and expenses which may be payable by such Participating Holder) received by such Participating Holder under the sale of Registrable Securities giving rise to such indemnification obligation.

(c)        Conduct of Indemnification Proceedings.  Any Person entitled to indemnification under this Section 2.09 shall (i) give prompt written notice to the indemnifying party of any claim with respect to which it seeks indemnification (provided that any failure to so notify the indemnifying party shall relieve the indemnifying party of its obligations hereunder only to the extent, if at all, that it is actually and materially prejudiced by reason of such failure) and (ii) permit such indemnifying party to assume the defense of such claim with counsel reasonably satisfactory to the indemnified party; provided that any Person entitled to indemnification hereunder shall have the right to select and employ separate counsel and to participate in the defense of such claim, but the fees and expenses of such counsel shall be at the expense of such Person unless (A) the indemnifying party has agreed in writing to pay such fees or expenses, (B) the indemnifying party shall have failed to assume the defense of such claim within a reasonable time after delivery of notice of such claim from the Person entitled to indemnification hereunder and employ counsel reasonably satisfactory to such Person, (C) the indemnified party has reasonably concluded (based upon advice of independent outside counsel) that there may be legal defenses available to it that are different from or in addition to those available to the indemnifying party, or (D) in the reasonable judgment of any such indemnified party (based upon advice of independent outside counsel), an actual or potential conflict of interest exists between such Person and the indemnifying party with respect to such claims (in which case, if the Person notifies the indemnifying party in writing that such Person elects to employ separate counsel at the expense of the indemnifying party, the indemnifying party shall not have the right to assume the defense of such claim on behalf of such Person).  If the indemnifying party assumes the defense, the indemnifying party shall not have the right to settle such action, consent to entry of any judgment or enter into any settlement, in each case without the prior written consent (not to be unreasonably withheld) of the indemnified party, unless the entry of such judgment or settlement (i) includes as an unconditional term thereof the giving by the claimant or plaintiff to such indemnified party of an

21

#4852-3043-6381

unconditional release from all liability in respect to such claim or litigation and (ii) does not include a statement as to or an admission of fault, culpability or a failure to act by or on behalf of such indemnified party, and provided that any sums payable in connection with such settlement are paid in full by the indemnifying party.  If such defense is not assumed by the indemnifying party, the indemnifying party will not be subject to any liability for any settlement made without its prior written consent, but such consent may not be unreasonably withheld.  It is understood that the indemnifying party or parties shall not, except as specifically set forth in this Section 2.09(c), in connection with any proceeding or related proceedings in the same jurisdiction, be liable for the reasonable fees, disbursements or other charges of more than one separate firm admitted to practice in such jurisdiction at any one time.

(d)        Contribution.  If for any reason the indemnification provided for in paragraphs (a) and (b) of this Section 2.09 is unavailable to an indemnified party or insufficient in respect of any Losses referred to therein, then the indemnifying party shall contribute to the amount paid or payable by the indemnified party as a result of such Loss in such proportion as is appropriate to reflect the relative fault of the indemnifying party on the one hand and the indemnified party or parties on the other hand in connection with the acts, statements or omissions that resulted in such losses, as well as any other relevant equitable considerations.  In connection with any Registration Statement filed with the Commission by the Company, the relative fault of the indemnifying party on the one hand and the indemnified party on the other hand shall be determined by reference to, among other things, whether any untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the indemnifying party or by the indemnified party and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.  The parties hereto agree that it would not be just or equitable if contribution pursuant to this Section 2.09(d) were determined by pro rata allocation or by any other method of allocation that does not take account of the equitable considerations referred to in this Section 2.09(d).  No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.  The amount paid or payable by an indemnified party as a result of the Losses referred to in Sections 2.09(a) and 2.09(b) shall be deemed to include, subject to the limitations set forth above, any legal or other expenses reasonably incurred by such indemnified party in connection with investigating or defending any such action or claim.  Notwithstanding the provisions of this Section 2.09(d), in connection with any Registration Statement filed by the Company, a Participating Holder shall not be required to contribute any amount in excess of the dollar amount of the net proceeds after underwriting commissions and discounts (but before any taxes and expenses which may be payable by such Participating Holder) received by such Participating Holder under the sale of Registrable Securities giving rise to such contribution obligation less any amount paid by such Participating Holders pursuant to Section 2.09(b).  Each Participating Holder's obligation to contribute pursuant to this Section 2.09 is several in the proportion that the proceeds of the offering received by such Participating Holder bears to the total proceeds of the offering received by all such Participating Holders and not joint. If indemnification is available under this Section 2.09, the indemnifying parties shall indemnify each indemnified party to the full extent provided in Sections 2.09(a) and 2.09(b) hereof without regard to the provisions of this Section 2.09(d).

(e)        No Exclusivity.  The remedies provided for in this Section 2.09 are not exclusive and shall not limit any rights or remedies which may be available to any indemnified party at law or in equity or pursuant to any other agreement.

(f)        Survival.  The indemnities provided in this Section 2.09 shall survive the transfer of any Registrable Securities by such Holder.

(g)        Other Indemnification. Indemnification similar to that specified herein (with appropriate modifications) shall be given by the Company and each Participating Holder with respect to any required registration or other qualification of securities under any law other than the Securities Act or the Exchange Act.

SECTION 2.10.        Rules 144 and 144A and Regulation S.  The Company covenants that it will file the reports required to be filed by it under the Securities Act and the Exchange Act and the rules and regulations adopted by the Commission thereunder (or, if the Company is not required to file such reports, it will, upon the reasonable request of any Holder, make publicly available such necessary information for so long as necessary to permit sales pursuant to Rules 144, 144A or Regulation S under the Securities Act), all to the extent required from time to time to enable the Holders to sell Registrable Securities without Registration under the Securities Act within the limitation of the exemptions provided by (i) Rules 144, 144A or Regulation S under the Securities Act, as such

22

Rules may be amended from time to time, or (ii) any similar rule or regulation hereafter adopted by the Commission.  Upon the reasonable request of a Holder, the Company will deliver to such Holder a written statement as to whether it has complied with such requirements and, if not, the specifics thereof.

SECTION 2.11.      Limitation on Registrations and Underwritten Offerings.  Notwithstanding the rights and obligations set forth in Section 2.01 and Section 2.02, in no event shall the Company be obligated to take any action to effect in the aggregate more than one Demand Registration or Underwritten Shelf Take-Down per calendar quarter.

SECTION 2.12.      [Clear Market.  With respect to any Underwritten Offerings of Registrable Securities by a Holder, the Company agrees not to effect (other than pursuant to the Registration applicable to such Underwritten Offering or pursuant to a Special Registration or pursuant to the exercise by another Holder of any of its rights under Section 2.01 or Section 2.02) any public sale or distribution, or to file any Registration Statement (other than pursuant to the Registration Statement applicable to such Underwritten Offering or pursuant to a Special Registration or pursuant to the exercise by a Holder of any of its rights under Section 2.01 or Section 2.02) covering any of its equity securities or any securities convertible into or exchangeable or exercisable for such securities, during the period not to exceed [ten] ([10]) days prior and [sixty] ([60]) days following the closing of such Underwritten Offering, or such longer period of up to [ninety] ([90]) days following the closing of such Underwritten Offering as may be requested by the managing underwriter for such Underwritten Offering; provided, that such period shall be waived by the Holders upon the Company's reasonable request if, in the good-faith opinion of the Company's managing underwriter or underwriters in connection with an Underwritten Offering, the Company's securities may be sold in such offering without being likely to have a significant adverse effect on the price, distribution or market of the Holder's securities offered.  "Special Registration" means the Registration of (A) equity securities and/or options or other rights in respect thereof solely Registered on Form S-4 or Form S-8 or (B) shares of equity securities and/or options or other rights in respect thereof to be offered to directors, employees, consultants, customers, lenders or vendors of the Company or its Subsidiaries or in connection with dividend reinvestment plans.]

SECTION 2.13.      In-Kind Distributions.  If any Holder seeks to effectuate an in-kind distribution of all or part of its Company Shares to such Holder's direct or indirect equityholders, the Company will reasonably cooperate with and assist such Holder, such equityholders and the Company's transfer agent to facilitate such in-kind distribution in the manner reasonably requested by such Holder (including the delivery of instruction letters by the Company or its counsel to the Company's transfer agent, the delivery of customary legal opinions by counsel to the Company and the delivery of Company Shares without restrictive legends, to the extent the restrictions set forth therein are no longer applicable).

ARTICLE III

MISCELLANEOUS

SECTION 3.01.      Term.  This Agreement shall terminate with respect to any Holder, (i) if such Holder and its Affiliates beneficially own less than one percent (1)% of the outstanding Company Shares, if all of the Registrable Securities then owned by such Holder and its Affiliates could be sold in any ninety (90)-day period pursuant to Rule 144 without restriction as to volume or manner of sale or (ii) if all of the Registrable Securities held by such Holder have been sold in a Registration pursuant to the Securities Act or pursuant to an exemption therefrom.

SECTION 3.02.      Injunctive Relief.  It is hereby agreed and acknowledged that it will be impossible to measure in money the damage that would be suffered if the parties fail to comply with any of the obligations herein imposed on them and that in the event of any such failure, an aggrieved Person will be irreparably damaged and will not have an adequate remedy at law.  Any such Person shall, therefore, be entitled (in addition to any other remedy to which it may be entitled in law or in equity) to injunctive relief, including specific performance, to enforce such obligations, and if any action should be brought in equity to enforce any of the provisions of this Agreement, none of the parties hereto shall raise the defense that there is an adequate remedy at law.

23

SECTION 3.03.        Notices.  Unless otherwise specified herein, all notices, consents, approvals, reports, designations, requests, waivers, elections and other communications authorized or required to be given pursuant to this Agreement shall be in writing and shall be deemed to have been given (a) when personally delivered, (b) when transmitted via facsimile, with confirmation of transmission, to the number set out below or on Schedule I, as applicable, (c) the day following the day (except if not a Business Day then the next Business Day) on which the same has been delivered prepaid to a reputable national overnight air courier service, (d) when transmitted via email (including via attached pdf document), with confirmation of receipt, to the email address set out below or on Schedule I, as applicable or (e) the third Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case to the respective parties as applicable, at the address set out below or on Schedule I (or such other address as such Holder may specify by notice to the Company in accordance with this Section 3.03) and the Company at the following addresses:

To the Company:

Eagle Bulk Shipping Inc.
477 Madison Avenue
Suite 1405
New York, NY 10022

Attention: Adir Katzav
Facsimile: (212) 785-3311
Email: akatzav@eagleships.com

with a copy (which shall not constitute notice) to:

Milbank, Tweed, Hadley & McCloy LLP
601 South Figueroa Street
Los Angeles, CA 90017
Attention: Paul S. Aronzon
Facsimile: (213) 629-5063
Email: paronzon@milbank.com

SECTION 3.04.        Recapitalization.  The provisions of this Agreement shall apply to the full extent set forth herein with respect to any and all equity securities of the Company or any successor or assign of the Company (whether by merger, consolidation, sale of assets or otherwise) which may be issued in respect of, in conversion of, in exchange for or in substitution of, the Registrable Securities and shall be appropriately adjusted for any stock dividends, splits, reverse splits, combinations, recapitalizations and the like occurring after the date hereof. The Company shall cause any successor or assign (whether by merger, consolidation, sale of assets or otherwise) to assume this Agreement or enter into a new registration rights agreement with the Holders on terms substantially the same as this Agreement as a condition of any such transaction.

SECTION 3.05.        Amendment.  The terms and provisions of this Agreement may only be amended, modified or waived at any time and from time to time by a writing executed by the Company and the Holders of a majority of the Registrable Securities then outstanding.

SECTION 3.06.        Successors, Assigns and Transferees.  The rights and obligations of each party hereto may not be assigned, in whole or in part, without the written consent of the Company and the Holders of a majority of the Registrable Securities then outstanding; provided, however, that notwithstanding the foregoing, (a) the rights and obligations set forth herein (other than a Requesting Holder's right to request a Demand Registration) may be assigned, in whole or in part, by any Holder to any transferee of Registrable Securities that holds (after giving effect to such transfer) in excess of one percent (1%) of the then-outstanding Company Shares and (b) a Requesting Holder's right to request a Demand Registration may only be assigned to an Affiliate of such Requesting Holder or in connection with any transfer by such Requesting Holder to a single transferee of a number of Registrable Securities equal to at least ten percent (10%) of the total then-outstanding shares of Common Stock, and in either case such transferee shall, with the consent of the transferring Holder, be treated as a "Holder" for all

24

#4852-3043-6381

purposes of this Agreement (each Person to whom the rights and obligations are assigned in compliance with this Section 3.06 is a "Permitted Assignee" and all such Persons, collectively, are "Permitted Assignees"); provided, further, that such transferee shall only be admitted as a party hereunder upon its, his or her execution and delivery of a joinder agreement [in substantially the form attached as Exhibit A hereto] / [, in form and substance acceptable to the Company and each Holder, agreeing to be bound by the terms and conditions of this Agreement as if such Person were a party hereto (together with any other documents the Holders determine are necessary to make such Person a party hereto)], whereupon such Person will be treated as a Holder for all purposes of this Agreement, with the same rights, benefits and obligations hereunder as the transferring Holder with respect to the transferred Registrable Securities (except that if the transferee was a Holder prior to such transfer, such transferee shall have the same rights, benefits and obligations with respect to such transferred Registrable Securities as were applicable to Registrable Securities held by such transferee prior to such transfer).

SECTION 3.07.      Binding Effect.  Except as otherwise provided in this Agreement, the terms and provisions of this Agreement shall be binding on and inure to the benefit of each of the parties hereto and their respective successors and permitted assigns.

SECTION 3.08.      Third Party Beneficiaries.  Nothing in this Agreement, express or implied, is intended or shall be construed to confer upon any Person not a party hereto (other than those Persons entitled to indemnity or contribution under Section 2.09, each of whom shall be a third party beneficiary thereof) any right, remedy or claim under or by virtue of this Agreement.

SECTION 3.09.      Governing Law; Jurisdiction; Agent For Service.  THIS AGREEMENT SHALL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO THE CONFLICTS OF LAW PRINCIPLES THEREOF.  EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY (I) AGREES THAT ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST THE COMPANY ARISING OUT OF OR BASED UPON THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY MAY BE INSTITUTED IN THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA LOCATED IN THE SOUTHERN DISTRICT OF NEW YORK OR THE COURTS OF THE STATE OF NEW YORK LOCATED IN THE CITY AND COUNTY OF NEW YORK (COLLECTIVELY, THE "SPECIFIED COURTS"), (II) WAIVES, TO THE FULLEST EXTENT IT MAY EFFECTIVELY DO SO, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR OTHER PROCEEDING IN THE SPECIFIED COURTS AND IRREVOCABLY AND UNCONDITIONALLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH SUIT, ACTION OR OTHER PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM AND (III) SUBMITS TO THE EXCLUSIVE JURISDICTION (EXCEPT FOR PROCEEDINGS INSTITUTED IN REGARD TO THE ENFORCEMENT OF A JUDGMENT OF ANY SUCH COURT, AS TO WHICH SUCH JURISDICTION IS NON-EXCLUSIVE) OF SUCH COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING.  THE COMPANY HEREBY IRREVOCABLY CONSENTS TO SERVICE OF PROCESS AT THE ADDRESS SPECIFIED IN SECTION 3.03 HEREOF, IN ANY MANNER PERMITTED BY THE LAWS OF THE STATE OF NEW YORK, IN ANY SUCH ACTION ARISING OUT OF OR BASED ON THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY WHICH MAY BE INSTITUTED IN ANY SPECIFIED COURT AND HEREBY WAIVES ANY REQUIREMENTS OF OR OBJECTIONS TO PERSONAL JURISDICTION WITH RESPECT THERETO.   SERVICE OF PROCESS UPON THE COMPANY AT THE ADDRESS SPECIFIED IN SECTION 3.03 HEREOF SHALL BE DEEMED, IN EVERY RESPECT, EFFECTIVE SERVICE OF PROCESS UPON THE COMPANY.

SECTION 3.10.      Waiver of Jury Trial.  EACH OF THE PARTIES HERETO HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY.  EACH OF THE PARTIES HEREBY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT,

25

#4852-3043-6381

AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 3.10</u>.

SECTION 3.11.    <u>Immunity Waiver</u>.  The Company hereby irrevocably waives, to the fullest extent permitted by law, any immunity to jurisdiction to which it may otherwise be entitled (including, without limitation, immunity to pre-judgment attachment, post-judgment attachment and execution) in any legal suit, action or proceeding against it arising out of or based on this Agreement.

SECTION 3.12.    <u>Entire Agreement</u>.  This Agreement sets forth the entire agreement among the parties hereto with respect to the subject matter hereof.  Any prior agreements or understandings among the parties hereto regarding the subject matter hereof, whether written or oral, are superseded by this Agreement.

SECTION 3.13.    <u>Severability</u>.  If any provision of this Agreement shall be held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

SECTION 3.14.    <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which shall constitute one and the same agreement.  A signed copy of this Agreement delivered by facsimile, email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

SECTION 3.15.    <u>Headings</u>.  The heading references herein and in the table of contents hereto are for convenience purposes only, do not constitute a part of this Agreement and shall not be deemed to limit or affect any of the provisions hereof.

SECTION 3.16.    <u>Joinder</u>.  Any Person that holds Company Shares may, with the prior written consent of the Company and [each Holder], be admitted as a party to this Agreement upon its execution and delivery of a joinder agreement [in substantially the form attached as <u>Exhibit A</u> hereto] / [, in form and substance acceptable to the Company and the Holders, agreeing to be bound by the terms and conditions of this Agreement as if such Person were a party hereto (together with any other documents the Holders determine are necessary to make such Person a party hereto)], whereupon such Person will be treated as a Holder for all purposes of this Agreement.

[*Remainder of Page Intentionally Blank*]

26

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

**EAGLE BULK SHIPPING INC.**


By: _____
Name:
Title:


*[Signature Page to Registration Rights Agreement]*

**HOLDERS:**

[•]

*[Signature Page to Registration Rights Agreement]*

#4852-3043-6381

**SCHEDULE I**

[•]

#4852-3043-6381

**<u>Exhibit E</u>**

**Management Incentive Program**

Draft

**EAGLE BULK SHIPPING INC.**
**2014 EQUITY INCENTIVE PLAN**

**ARTICLE I.**
**General**

### 1.1.    Purpose

The Eagle Bulk Shipping Inc. 2014 Equity Incentive Plan (the "Plan") is designed to provide certain Key Persons (as defined below), whose initiative and efforts are deemed to be important to the successful conduct of the business of Eagle Bulk Shipping Inc. (the "Company"), with incentives to (a) enter into and remain in the service of the Company or its Subsidiaries (as defined below), (b) acquire a proprietary interest in the success of the Company, (c) maximize their performance and (d) enhance the long-term performance of the Company.

### 1.2.    Administration

(a)    <u>Administration</u>.  The Plan shall be administered by the Compensation Committee of the Company's Board of Directors (the "Board"), or such other committee of the Board as may be designated by the Board to administer the Plan (the "Administrator"); <u>provided</u> that (i) the Administrator shall be composed solely of two or more directors who are "outside" directors for purposes of Section 162(m) of the Internal Revenue Code of 1986, as amended (the "Code"), (ii) in the event the Company is subject to Section 16 of the Securities Exchange Act of 1934, as amended (the "1934 Act"), the Administrator shall be composed of two or more directors, each of whom is a "Non-Employee Director" (a "Non-Employee Director") under Rule 16b-3 (as promulgated and interpreted by the Securities and Exchange Commission (the "SEC") under the 1934 Act, or any successor rule or regulation thereto as in effect from time to time ("Rule 16b-3)), and (iii) the Administrator shall be composed solely of two or more directors who are "independent directors" under the rules of any stock exchange on which the Company's Common Stock (as defined below) is traded; <u>provided further</u>, <u>however</u>, that, (A) the requirements in the preceding clauses (i) and (ii) shall, in each case, apply only when required to exempt an Award (as defined below) intended to qualify for an exemption under the applicable provisions referenced therein, (B) the requirement in the preceding clause (iii) shall apply only when required pursuant to the applicable rules of the applicable stock exchange and (C) if at any time the Administrator is not so composed as required by the preceding provisions of this sentence, that fact will not invalidate any grant made, or action taken, by the Administrator hereunder that otherwise satisfies the terms of the Plan.  Subject to the terms of the Plan, applicable law and the applicable rules and regulations of any stock exchange on which the Common Stock is listed for trading, and in addition to other express powers and authorizations conferred on the Administrator by the Plan, the Administrator shall have the full power and authority, in its sole and absolute discretion, to:  (1) designate the Persons (as defined below) to receive Awards under the Plan; (2) determine the types of Awards granted to a participant under the Plan and designate those Awards which shall constitute Performance Compensation Awards (as defined below); (3) determine the number of shares to be covered by, or with respect to which payments, rights or other matters are to be calculated with respect to, Awards; (4) determine the terms and conditions of any Awards; (5) determine whether, and to what extent, and under what circumstances, Awards may be settled or exercised in cash, shares, other

securities, other Awards or other property, or cancelled, forfeited or suspended, and the methods by which Awards may be settled, exercised, cancelled, forfeited or suspended; (6) determine whether, to what extent, and under what circumstances cash, shares, other securities, other Awards, other property and other amounts payable with respect to an Award shall be deferred, either automatically or at the election of the holder thereof or the Administrator; (7) construe, interpret and implement the Plan and any Award Agreement (as defined below); (8) prescribe, amend, rescind or waive rules and regulations relating to the Plan, including rules governing its operation, and appoint such agents as it shall deem appropriate for the proper administration of the Plan; (9) establish and administer Performance Goals (as defined below) and certify whether, and to what extent, they have been attained; (10) correct any defect, supply any omission and reconcile any inconsistency in the Plan or any Award Agreement; and (11) make any other determination and take any other action that the Administrator deems necessary or desirable for the administration of the Plan.  Unless otherwise expressly provided in the Plan, all designations, determinations, interpretations and other decisions under or with respect to the Plan or any Award shall be within the sole discretion of the Administrator, may be made at any time and shall be final, conclusive and binding upon all Persons.

(b)      General Right of Delegation.  Except to the extent prohibited by applicable law, the applicable rules of a stock exchange or any charter, by-laws or other agreement governing the Administrator, the Administrator may delegate all or any part of its responsibilities to any Person or Persons selected by it; provided, however, that in no event shall an officer of the Company be delegated the authority to grant Awards to, or amend Awards held by, the following individuals: (i) individuals who are subject to Section 16 of the 1934 Act, (ii) any officer or other employee (as determined in accordance with Section 3401(c) of the Code and the Treasury Regulations thereunder) of the Company or of any of its Subsidiaries who is, or could be, a "covered employee" within the meaning of Section 162(m) of the Code, to the extent the Administrator determines that Section 162(m) could be applicable thereto, or (iii) officers of the Company (or directors of the Company) to whom authority to grant or amend Awards has been delegated hereunder; provided, further, that any delegation of administrative authority shall only be permitted to the extent it is permissible under Section 162(m) of the Code, to the extent the Administrator determines that Section 162(m) could be applicable thereto, applicable securities laws (including, without limitation, Rule 16b-3, to the extent applicable), and the rules of any applicable stock exchange.  Any delegation hereunder shall be subject to the restrictions and limits that the Administrator specifies at the time of such delegation, and the Administrator may at any time rescind the authority so delegated or appoint a new delegate.  At all times, the delegatee appointed under this Section 1.2(b) shall serve in such capacity at the pleasure of the Administrator.

(c)      Indemnification.  No member of the Board, the Administrator or any officer or employee of the Company or any of its Subsidiaries or Affiliates (each such Person, a "Covered Person") shall be liable for any action taken or omitted to be taken or any determination made in good faith with respect to the Plan or any Award hereunder.  Each Covered Person shall be indemnified and held harmless by the Company against and from (i) any loss, cost, liability or expense (including attorneys' fees) that may be imposed upon or incurred by such Covered Person in connection with or resulting from any action, suit or proceeding to which such Covered Person may be a party or in which such Covered Person may be involved by reason of any action taken or omitted to be taken under the Plan or any Award Agreement and (ii) any and all

2

amounts paid by such Covered Person, with the Company's approval, in settlement thereof, or paid by such Covered Person in satisfaction of any judgment in any such action, suit or proceeding against such Covered Person; <u>provided</u> that the Company shall have the right, at its own expense, to assume and defend any such action, suit or proceeding and, once the Company gives notice of its intent to assume the defense, the Company shall have sole control over such defense with counsel of the Company's choice.  The foregoing right of indemnification shall not be available to a Covered Person to the extent that a court of competent jurisdiction in a final judgment or other final adjudication, in either case not subject to further appeal, determines that the acts or omissions of such Covered Person giving rise to the indemnification claim resulted from such Covered Person's bad faith, fraud or willful criminal act or omission or that such right of indemnification is otherwise prohibited by law or by the Company's Articles of Incorporation or Bylaws (in each case, as amended and/or restated).  The foregoing right of indemnification shall not be exclusive of any other rights of indemnification to which Covered Persons may be entitled under the Company's Articles of Incorporation or Bylaws (in each case, as amended and/or restated), as a matter of law, or otherwise, or any other power that the Company may have to indemnify such Persons or hold them harmless.

(d)      <u>Delegation of Authority to Senior Officers</u>.  The Administrator may, in accordance with and subject to the terms of Section 1.2(b), delegate, on such terms and conditions as it determines, to one or more senior officers of the Company the authority to make grants of Awards to Key Persons who are employees of the Company and its Subsidiaries (including any such prospective employee) or consultants of the Company and its Subsidiaries.

(e)      <u>Awards to Non-Employee Directors</u>.  Notwithstanding anything to the contrary contained herein, the Board may, in its sole discretion, at any time and from time to time, grant Awards to Non-Employee Directors or administer the Plan with respect to such Awards.  In any such case, the Board shall have all the authority and responsibility granted to the Administrator herein with respect to such Awards.

## 1.3.    Persons Eligible for Awards

The Persons eligible to receive Awards under the Plan are those officers, directors, and employees (including any prospective officer or employee) and consultants of the Company and its Subsidiaries (collectively, "Key Persons") as the Administrator shall select.

## 1.4.    Types of Awards

Awards may be made under the Plan in the form of (a) incentive stock options, (b) non-qualified stock options, (c) stock appreciation rights, (d) restricted stock, (e) restricted stock units, (f) dividend equivalents, (g) unrestricted stock, (h) other equity-based or equity-related Awards and (i) performance compensation awards that the Administrator determines are consistent with the purposes of the Plan and the interests of the Company, all as more fully set forth in the Plan.  The term "Award" means any of the foregoing that are granted under the Plan.  No incentive stock option (other than an incentive stock option that may be assumed or issued by the Company in connection with a transaction to which Section 424(a) of the Code applies) may be granted under the Plan to a Person who is not eligible to receive an incentive stock option under the Code.

3

**1.5.     Shares Available for Awards; Adjustments for Changes in Capitalization**

(a)     <u>Maximum Number</u>.  Subject to adjustment as provided in Section 1.5(c), the aggregate number of shares of common stock of the Company, par value $0.01 ("Common Stock"), with respect to which Awards may at any time be granted under the Plan shall be [____][1]. The following shares of Common Stock shall again become available for Awards under the Plan: (i) any shares that are subject to an Award under the Plan and that remain unissued upon the cancellation or termination of such Award for any reason whatsoever; (ii) any shares of restricted stock forfeited pursuant to the Plan or the applicable Award Agreement; <u>provided</u> that any dividend equivalent rights with respect to such shares that have not theretofore been directly remitted to the grantee are also forfeited; and (iii) any shares in respect of which an Award is settled for cash without the delivery of shares to the grantee.  Any shares tendered or withheld to satisfy the grant or exercise price or tax withholding obligation pursuant to any Award shall again become available to be delivered pursuant to Awards under the Plan.

(b)     <u>Source of Shares</u>.  Shares issued pursuant to the Plan may be authorized but unissued Common Stock or treasury shares.  The Administrator may direct that any stock certificate evidencing shares issued pursuant to the Plan shall bear a legend setting forth such restrictions on transferability as may apply to such shares.

(c)     <u>Adjustments</u>.

(i)     In the event that any dividend or other distribution (whether in the form of cash, Company shares, other securities or other property), stock split, reverse stock split, reorganization, merger, consolidation, split-up, combination, repurchase or exchange of Company shares or other securities of the Company, issuance of warrants or other rights to purchase Company shares or other securities of the Company, or other similar corporate transaction or event, other than an Equity Restructuring (as defined below), affects the Company shares such that an adjustment is determined by the Administrator to be appropriate in order to prevent dilution or enlargement of the benefits or potential benefits intended to be made available under the Plan or with respect to an Award, then the Administrator shall, in such manner as it may deem equitable, adjust any or all of the number of shares or other securities of the Company (or number and kind of other securities or property) with respect to which Awards may be granted under the Plan, including with respect to individual limitations in Sections 1.5(d) and 2.11.

(ii)     The Administrator is authorized to make adjustments in the terms and conditions of, and the criteria included in, Awards in recognition of unusual or nonrecurring events (including the events described in Section 1.5(c)(i) or the occurrence of a Change in Control (as defined below), other than an Equity Restructuring) affecting the Company, any of its Affiliates, or the financial statements of the Company or any of its Affiliates, or of changes in applicable rules, rulings, regulations or other requirements of any governmental body or securities exchange, accounting principles or law, whenever the Administrator determines that such adjustments are appropriate in order to prevent dilution or enlargement of the benefits or

---

[1] Such amount to represent [10.0]% of the Common Stock of the Company, on a fully diluted basis.  Currently bracketed as the reserved shares for future issuance may be increased.

4

#4821-2212-2011v10

potential benefits intended to be made available under the Plan or with respect to an Award, including providing for (A) adjustment to (1) the number of shares or other securities of the Company (or number and kind of other securities or property) subject to outstanding Awards or to which outstanding Awards relate and (2) the Exercise Price (as defined below) with respect to any Award and (B) a substitution or assumption of Awards, accelerating the exercisability or vesting of, or lapse of restrictions on, Awards, or accelerating the termination of Awards by providing for a period of time for exercise prior to the occurrence of such event, or, if deemed appropriate or desirable, providing for a cash payment to the holder of an outstanding Award in consideration for the cancellation of such Award (it being understood that, in such event, any option or stock appreciation right having a per share Exercise Price equal to, or in excess of, the Fair Market Value (as defined below) of a share subject to such option or stock appreciation right may be cancelled and terminated without any payment or consideration therefor); provided, however, in each case that with respect to Awards of incentive stock options no such adjustment shall be authorized to the extent that such adjustment would cause the Plan to violate Section 422(b) of the Code or any successor provision thereto; and, provided further, however, that with respect to options and stock appreciation rights, unless otherwise determined by the Administrator, such adjustment shall be made in accordance with the provisions of Section 424(h) of the Code.

(iii)    In the event of (A) a Change in Control, (B) a dissolution or liquidation of the Company, (C) a sale of all or substantially all the Company's assets or (D) a merger, reorganization or consolidation involving the Company or one of its Subsidiaries, the Administrator shall have the power to:

(1)    provide that outstanding options, stock appreciation rights, restricted stock units (including any related dividend equivalent right) and/or other Awards granted under the Plan shall either continue in effect, be assumed or an equivalent award shall be substituted therefor by the successor corporation or a parent corporation or subsidiary corporation; provided, that, a grantee who incurs a termination of employment or consultancy relationship with the Company and its Subsidiaries or dismissal from the Board for any reason, other than a termination or dismissal "for Cause", or a grantee who resigns for "Good Reason" (as defined in the Award Agreement or in an applicable employment agreement between the Company and the grantee), concurrent with or within one year following the Change in Control, may exercise any outstanding option or stock appreciation right, but only to the extent that the grantee was entitled to exercise the Award on the date of his or her termination of employment or consultancy relationship with the Company and its Subsidiaries or dismissal from the Board (after taking into account any accelerated vesting as determined by the Administrator), until the earlier of (A) the original expiration date of the Award and (B)  the later of (x) the date provided for under the terms of Section 2.4 without reference to this Section 1.5(c)(iii)(1) and (y) the date provided for under the applicable Award Agreement;

(2)    cancel, effective immediately prior to the occurrence of such event, options, stock appreciation rights, restricted stock units (including each dividend equivalent right related thereto) and/or other Awards granted under the Plan outstanding immediately prior to such event (whether or not then vested or exercisable) and, in full consideration of such cancellation, pay to the holder of such Award a cash payment in an amount equal to the excess, if any, of the Fair Market Value (as of a date specified by the Administrator) of the shares subject

5

#4821-2212-2011v10

to such Award (or the value of such Award, as determined by the Administrator, if not based on the Fair Market Value of shares) over the aggregate Exercise Price of such Award (or the grant price of such Award, if any, if applicable)(it being understood that, in such event, any option or stock appreciation right having a per share Exercise Price equal to, or in excess of, the Fair Market Value of a share subject to such option or stock appreciation right may be cancelled and terminated without any payment or consideration therefor); or

(3)     notify the holder of an option or stock appreciation right in writing or electronically that each option and stock appreciation right shall be fully vested and exercisable for a period of 30 days from the date of such notice, or such shorter period as the Administrator may determine to be reasonable, and the option or stock appreciation right shall terminate upon the expiration of such period (which period shall expire no later than immediately prior to the consummation of the corporate transaction).

(iv)     In connection with the occurrence of any Equity Restructuring, and notwithstanding anything to the contrary in the preceding provisions of this Section 1.5(c):

(A)     The number and type of securities or other property subject to each outstanding Award and the Exercise Price or grant price thereof, if applicable, shall be equitably adjusted;

(B)     The Administrator shall make such equitable adjustments, if any, as the Administrator may deem appropriate to reflect such Equity Restructuring with respect to the aggregate number and kind of shares that may be issued under the Plan (including, but not limited to, adjustments of the limitations set forth in Sections 1.5(a) and 1.5(d)).  The adjustments provided under this Section 1.5(c)(iv) shall be nondiscretionary and shall be final and binding on the affected participant and the Company.

(v)     Notwithstanding anything to the contrary in this Plan or in any Award Agreement, no dividends will be paid on any Awards as a result of any dividends paid on the Common Stock from the proceeds of the Company's New Exit Financing Facility (as defined in the Company's Chapter 11 Plan of Reorganization).

(d)     <u>Individual Limit</u>.  Except for the limits set forth in this Section 1.5(d) and Section 2.11(f)(vi), as applicable, no provision of this Plan shall be deemed to limit the number or value of shares of Common Stock with respect to which the Administrator may make Awards to any Key Person.  Subject to adjustment as provided in Section 1.5(c), (i) the total number of shares of Common Stock with respect to which Awards may be granted under the Plan to any one employee of the Company and its Subsidiaries during any one calendar year shall not exceed [_____][2], (ii) the total number of shares of Common Stock with respect to which Awards may be granted under the Plan in the form of options and stock appreciation rights to any one employee of the Company and its Subsidiaries during any one calendar year shall not exceed [_____][3] , (iii) the total number of shares of Common Stock with respect to which incentive stock options may be granted under the Plan to any one employee of the Company or a "parent corporation" or "subsidiary corporation" (as such terms are defined in Section 424 of the

---

[2] To be at least 60% of the total share pool.
[3] To be at least 60% of the total share pool.

6

Code) of the Company during any one calendar year shall not exceed [____][4], and (iv) the total number of shares of Common Stock with respect to which Awards may be granted under the Plan to any Non-Employee Director during any one calendar year shall not exceed [____][5]; provided, however, that notwithstanding the foregoing, the provisions of the preceding clauses (i) and (ii) shall not apply unless the Administrator determines that compliance with Section 162(m) of the Code is necessary.

### 1.6.    Definitions of Certain Terms

(a)    "Affiliate" shall mean, with respect to any Person, any other Person (directly or indirectly) controlling, controlled by or under common control with such Person or any other Person designated by the Administrator in which any Person has an interest.

(b)    "Change in Control" shall mean the occurrence of any of the following events: (A) the acquisition by any individual, entity or group (within the meaning of Section 13(d)(3) or 14(d)(2) of the 1934 Act) of beneficial ownership (within the meaning of Rule 13d-3 promulgated under the 1934 Act) of more than 50% of the then voting power; provided that the following acquisitions shall not constitute a Change in Control: (i) any such acquisition directly from the Company; (ii) any such acquisition by the Company; (iii) any such acquisition by any employee benefit plan (or related trust) sponsored or maintained by the Company or any Subsidiary; or (iv) any such acquisition pursuant to a transaction that complies with clauses (i), (ii) and (iii) of paragraph (C) below; (B) individuals who, as of the Effective Date, constitute the Board (the "Incumbent Board") cease for any reason (other than death or disability) to constitute at least a majority of the Board; provided, that any individual becoming a director subsequent to the Effective Date, whose election, or nomination for election by the Company's stockholders, was approved by a vote of the directors then comprising the Incumbent Board (either by a specific vote or by approval of the proxy statement of the Company in which such person is named as a nominee for director, without objection to such nomination) shall be considered as though such individual was a member of the Incumbent Board, but excluding for this purpose, any such individual whose initial assumption of office occurs as a result of or in connection with an actual or threatened election contest with respect to the election or removal of directors or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Board; (C) consummation of a reorganization, merger or consolidation or sale or other disposition of all or substantially all of the assets of the Company (a "Business Combination"), in each case, unless following such Business Combination, (i) all or substantially all of the individuals and entities who were the beneficial owners of the voting power immediately prior to such Business Combination beneficially own, directly or indirectly, more than 50% of, respectively, the then-outstanding shares of common stock and the combined voting power of the then-outstanding voting securities entitled to vote generally in the election of directors, as the case may be, of the entity resulting from such Business Combination (including, without limitation, an entity that as a result of such transaction owns the Company or substantially all of the Company's assets either directly or through one or more subsidiaries) in substantially the same proportions relative to each other as their ownership immediately prior to such Business Combination of the securities representing the voting power, (ii) no Person (excluding any entity

---

[4] To be at least 60% of the total share pool.
[5] To be at least 10% of the total share pool.

7

resulting from such Business Combination or any employee benefit plan (or related trust) sponsored or maintained by the Company or such entity resulting from such Business Combination) beneficially owns, directly or indirectly, more than 50% of, respectively, the then-outstanding shares of common stock of the entity resulting from such Business Combination, or the combined voting power of the then-outstanding voting securities of such corporation, except to the extent that such ownership existed prior to the Business Combination, and (iii) at least a majority of the members of the board of directors of the entity resulting from such Business Combination were members of the Incumbent Board at the time of the execution of the initial agreement, or the action of the Board providing for such Business Combination; or (D) approval by the stockholders of the Company of a complete liquidation or dissolution of the Company; provided, however, that for each Award subject to Section 409A of the Code and for which a Change in Control is a payment date, a Change in Control shall be deemed to have occurred under this Plan with respect to such Award only if a change in the ownership or effective control of the Company or a change in the ownership of a substantial portion of the assets of the Company shall also be deemed to have occurred under Section 409A of the Code, provided that such limitation shall apply to such Award only to the extent necessary to avoid adverse tax effects under Section 409A of the Code.

(c)     "Equity Restructuring" shall mean a non-reciprocal transaction between the Company and its stockholders, such as a stock dividend, stock split, reverse stock split, spin-off, rights offering or recapitalization through a large, nonrecurring cash dividend, that affects the shares of Common Stock (or other securities of the Company) or the share price thereof and causes a change in the per share value of the shares underlying outstanding Awards.

(d)     "Exercise Price" shall mean (i) in the case of options, the price specified in the applicable Award Agreement as the price-per-share at which such share can be purchased pursuant to the option or (ii) in the case of stock appreciation rights, the price specified in the applicable Award Agreement as the reference price-per-share used to calculate the amount payable to the grantee.

(e)     The "Fair Market Value" of a share of Common Stock on any day shall be the closing price on the Nasdaq Stock Market, or such other primary stock exchange upon which shares are then listed, as reported for such day in The Wall Street Journal (or, if not reported in The Wall Street Journal, such other reliable source as the Administrator may determine), or, if no such price is reported for such day, the average of the high bid and low asked price of Common Stock as reported for such day.  If no quotation is made for the applicable day, the Fair Market Value of a share of Common Stock on such day shall be determined in the manner set forth in the preceding sentence for the next preceding trading day.  Notwithstanding the foregoing, if there is no reported closing price or high bid/low asked price that satisfies the preceding sentences, or if otherwise deemed necessary or appropriate by the Administrator, the Fair Market Value of a share of Common Stock on any day shall be determined by such methods and procedures as shall be established from time to time by the Administrator.  The "Fair Market Value" of any property other than Common Stock shall be the fair market value of such property determined by such methods and procedures as shall be established from time to time by the Administrator.

8

#4821-2212-2011v10

(f)      Unless otherwise set forth in the applicable Award Agreement, in connection with a termination of employment or consultancy relationship or a dismissal from Board membership, for purposes of the Plan, the term "for Cause" shall be defined as follows:

(i)      if there is an employment, severance, consulting, change in control or other agreement governing the relationship between the grantee, on the one hand, and the Company or a Subsidiary, on the other hand, that contains a definition of "cause" (or similar phrase), for purposes of the Plan, the term "for Cause" shall mean those acts or omissions that would constitute "cause" under such agreement; or

(ii)      if the preceding clause (i) is not applicable to the grantee, for purposes of the Plan, the term "for Cause" shall mean any of the following:

(A)      any failure by the grantee substantially to perform the grantee's employment or consulting or Board membership duties;

(B)      any excessive unauthorized absenteeism by the grantee;

(C)      any refusal by the grantee to obey the lawful orders of the Board or any other Person to whom the grantee reports;

(D)      any act or omission by the grantee that is or may be injurious to the Company or any of its Affiliates, whether monetarily, reputationally or otherwise;

(E)      any act by the grantee that is inconsistent with the best interests of the Company or any of its Affiliates;

(F)      the grantee's gross negligence that is injurious to the Company or any of its Affiliates, whether monetarily, reputationally or otherwise;

(G)      the grantee's material violation of any of the Company's policies, including, without limitation, those policies relating to discrimination or sexual harassment;

(H)      the grantee's material breach of his or her employment or service contract with the Company or any of its Affiliates;

(I)      the grantee's unauthorized (1) removal from the premises of the Company or any of its Affiliates of any document (in any medium or form) relating to the Company or any of its Affiliates or the customers or clients of the Company or any of its Affiliates or (2) disclosure to any Person of any of the Company's, or any of its Affiliates', confidential or proprietary information;

(J)      the grantee's being convicted of, or entering a plea of guilty or nolo contendere to, any crime that constitutes a felony or involves moral turpitude; and

(K)      the grantee's commission of any act involving dishonesty or fraud.

9

#4821-2212-2011v10

Any rights the Company or any of its Affiliates may have under the Plan in respect of the events giving rise to a termination or dismissal "for Cause" shall be in addition to any other rights the Company or any of its Affiliates may have under any other agreement with a grantee or at law or in equity.  Any determination of whether a grantee's employment, consultancy relationship or Board membership is (or is deemed to have been) terminated "for Cause" shall be made by the Administrator or, if such a definition is contained in an employment, severance, consulting, change in control or other agreement governing the relationship between the grantee, on the one hand, and the Company or a Subsidiary, on the other hand, then the process for determining "Cause" under such agreement shall govern.

(g)    The term "incentive stock option" shall mean an option that is intended to qualify for special federal income tax treatment pursuant to Sections 421 and 422 of the Code as now constituted or subsequently amended, or pursuant to a successor provision of the Code, and which is so designated in the applicable Award Agreement.  Any option that is not specifically designated as an incentive stock option in the applicable Award Agreement shall under no circumstances be considered an incentive stock option.  Any option that is not an incentive stock option is referred to herein as a "non-qualified stock option."

(h)    Unless otherwise set forth in the applicable Award Agreement, "Disability" shall mean the grantee's being unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or can be expected to last for a continuous period of not less than 12 months, or the grantee's, by reason of any medically determinable physical or mental impairment that can be expected to result in death or can be expected to last for a continuous period of not less than 12 months, receiving income replacement benefits for a period of not less than three months under an accident and health plan covering employees of the grantee's employer.  The existence of a Disability shall be determined by the Administrator.

(i)    "Performance Compensation Award" shall mean any Award designated by the Administrator as a Performance Compensation Award pursuant to Section 2.11 of the Plan.

(j)    "Performance Criteria" shall mean the criterion or criteria that the Administrator shall select for purposes of establishing the Performance Goal(s) for a Performance Period with respect to any Performance Compensation Award under the Plan.

(k)    "Performance Formula" shall mean, for a Performance Period, the one or more objective formulas applied against the relevant Performance Goal to determine, with regard to the Performance Compensation Award of a particular Plan participant, whether all, some portion but less than all, or none of the Performance Compensation Award has been earned for the Performance Period.

(l)    "Performance Goal" shall mean, for a Performance Period, the one or more goals established by the Administrator for the Performance Period based upon the Performance Criteria.

(m)    "Performance Period" shall mean the one or more periods of time as the Administrator may select over which the attainment of one or more Performance Goals will be

10

#4821-2212-2011v10

measured for the purpose of determining a Plan participant's right to and the payment of a Performance Compensation Award.

(n)      "Person" shall mean any individual, firm, corporation, partnership, limited liability company, trust, incorporated or unincorporated association, joint venture, joint stock company, governmental body or other entity of any kind.

(o)      "Repricing" shall mean (i) lowering the Exercise Price of an option or a stock appreciation right after it has been granted, (ii) the cancellation of an option or a stock appreciation right in exchange for cash or another Award when the Exercise Price exceeds the Fair Market Value of the underlying shares subject to the Award and (iii) any other action with respect to an option or a stock appreciation right that is treated as a repricing under (A) generally accepted accounting principles or (B) any applicable stock exchange rules.

(p)      "Subsidiary" shall mean any entity in which the Company, directly or indirectly, has a 50% or more equity interest.

## ARTICLE II.
### Awards Under The Plan

### 2.1.    Agreements Evidencing Awards

Each Award granted under the Plan shall be evidenced by a written certificate ("Award Agreement"), which shall contain such provisions as the Administrator may deem necessary or desirable and which may, but need not, require execution or acknowledgment by a grantee.  The Award shall be subject to all of the terms and provisions of the Plan and the applicable Award Agreement.

### 2.2.    Grant of Stock Options and Stock Appreciation Rights

(a)      Stock Option Grants.  The Administrator may grant stock options ("options") to purchase shares of Common Stock from the Company to such Key Persons, and in such amounts and subject to such vesting and forfeiture provisions and other terms and conditions, as the Administrator shall determine, subject to the provisions of the Plan.  The Administrator shall determine whether the option will be an incentive stock option or a nonqualified stock option for purposes of the Code.  Incentive stock options may be granted to employees of the Company and any "parent corporation" or "subsidiary corporation" (as such terms are defined in Section 424 of the Code) of the Company.  In the case of incentive stock options, the terms and conditions of such Awards shall be subject to such applicable rules as may be prescribed by Sections 421, 422 and 424 of the Code and any regulations related thereto, as may be amended from time to time. If an option is intended to be an incentive stock option, and if for any reason such option (or any portion thereof) shall not qualify as an incentive stock option for purposes of Section 422 of the Code, then, to the extent of such non-qualification, such option (or portion thereof) shall be regarded as a non-qualified stock option appropriately granted under the Plan; provided that such option (or portion thereof) otherwise complies with the Plan's requirements relating to non-qualified stock options.  It shall be the intent of the Administrator to not grant an Award in the form of stock options to any Key Person who is then subject to the requirements of Section 409A of the Code with respect to such Award if the Common Stock underlying such Award does not

11

then qualify as "service recipient stock" for purposes of Section 409A.  Furthermore, it shall be the intent of the Administrator, in granting options to Key Persons who are subject to Section 409A and/or 457 of the Code, to structure such options so as to comply with the requirements of Section 409A and/or 457 of the Code, as applicable.

(b)      Stock Appreciation Right Grants; Types of Stock Appreciation Rights.  The Administrator may grant stock appreciation rights to such Key Persons, and in such amounts and subject to such vesting and forfeiture provisions and other terms and conditions, as the Administrator shall determine, subject to the provisions of the Plan.  The terms of a stock appreciation right may provide that it shall be automatically exercised for a payment upon the happening of a specified event that is outside the control of the grantee and that it shall not be otherwise exercisable.  Stock appreciation rights may be granted in connection with all or any part of, or independently of, any option granted under the Plan.  It shall be the intent of the Administrator to not grant an Award in the form of stock appreciation rights to any Key Person (i) who is then subject to the requirements of Section 409A of the Code with respect to such Award if the Common Stock underlying such Award does not then qualify as "service recipient stock" for purposes of Section 409A or (ii) if such Award would create adverse tax consequences for such Key Person under Section 457A of the Code.  Furthermore, it shall be the intent of the Administrator, in granting stock appreciation rights to Key Persons who are subject to Section 409A and/or 457 of the Code, to structure such options so as to comply with the requirements of Section 409A and/or 457 of the Code, to the extent applicable.

(c)      Nature of Stock Appreciation Rights.  The grantee of a stock appreciation right shall have the right, subject to the terms of the Plan and the applicable Award Agreement, to receive from the Company an amount equal to (i) the excess of the Fair Market Value of a share of Common Stock on the date of exercise of the stock appreciation right over the Exercise Price of the stock appreciation right, multiplied by (ii) the number of shares with respect to which the stock appreciation right is exercised.  Each Award Agreement with respect to a stock appreciation right shall set forth the Exercise Price of such Award and, unless otherwise specifically provided in the Award Agreement, the Exercise Price of a stock appreciation right shall equal the Fair Market Value of a share of Common Stock on the date of grant; provided that in no event may such Exercise Price be less than the greater of (A) the Fair Market Value of a share of Common Stock on the date of grant and (B) the par value of a share of Common Stock.  Payment upon exercise of a stock appreciation right shall be in cash or in shares of Common Stock (valued at their Fair Market Value on the date of exercise of the stock appreciation right) or any combination of both, all as the Administrator shall determine.  Upon the exercise of a stock appreciation right granted in connection with an option, the number of shares subject to the option shall be reduced by the number of shares with respect to which the stock appreciation right is exercised.  Upon the exercise of an option in connection with which a stock appreciation right has been granted, the number of shares subject to the stock appreciation right shall be reduced by the number of shares with respect to which the option is exercised.

(d)      Option Exercise Price.  Each Award Agreement with respect to an option shall set forth the Exercise Price of such Award and, unless otherwise specifically provided in the Award Agreement, the Exercise Price of an option shall equal the Fair Market Value of a share of Common Stock on the date of grant; provided that in no event may such Exercise Price be less

12

#4821-2212-2011v10

than the greater of (i) the Fair Market Value of a share of Common Stock on the date of grant and (ii) the par value of a share of Common Stock.

### 2.3.    Exercise of Options and Stock Appreciation Rights

Subject to the other provisions of this Article II and the Plan, each option and stock appreciation right granted under the Plan shall be exercisable as follows:

(a)    <u>Timing and Extent of Exercise</u>.  Options and stock appreciation rights shall be exercisable at such times and under such conditions as determined by the Administrator and set forth in the corresponding Award Agreement, but in no event shall any portion of such Award be exercisable subsequent to the seventh anniversary of the date on which such Award was granted. Unless the applicable Award Agreement otherwise provides, an option or stock appreciation right may be exercised from time to time as to all or part of the shares as to which such Award is then exercisable.

(b)    <u>Notice of Exercise</u>.  An option or stock appreciation right shall be exercised by the filing of a written notice with the Company or the Company's designated exchange agent (the "Exchange Agent"), on such form and in such manner as the Administrator shall prescribe.

(c)    <u>Payment of Exercise Price</u>.  Any written notice of exercise of an option shall be accompanied by payment for the shares being purchased.  Such payment shall be made:  (i) by certified or official bank check (or the equivalent thereof acceptable to the Company or its Exchange Agent) for the full option Exercise Price; (ii) as provided in the applicable Award Agreement or with the consent of the Administrator, which consent shall be given or withheld in the sole discretion of the Administrator, by delivery of shares of Common Stock having a Fair Market Value (determined as of the exercise date) equal to all or part of the option Exercise Price and a certified or official bank check (or the equivalent thereof acceptable to the Company or its Exchange Agent) for any remaining portion of the full option Exercise Price; or (iii) as provided in the applicable Award Agreement or at the sole discretion of the Administrator and to the extent permitted by law, by such other provision, consistent with the terms of the Plan, as the Administrator may from time to time prescribe (whether directly or indirectly through the Exchange Agent), or by any combination of the foregoing payment methods.

(d)    <u>Delivery of Certificates Upon Exercise</u>.  Subject to Sections 3.2, 3.4 and 3.13, promptly after receiving payment of the full option Exercise Price, or after receiving notice of the exercise of a stock appreciation right for which the Administrator determines payment will be made partly or entirely in shares, the Company or its Exchange Agent shall (i) deliver to the grantee, or to such other Person as may then have the right to exercise the Award, a certificate or certificates for the shares of Common Stock for which the Award has been exercised or, in the case of stock appreciation rights, for which the Administrator determines will be made in shares or (ii) establish an account evidencing ownership of the stock in uncertificated form.  If the method of payment employed upon an option exercise so requires, and if applicable law permits, an optionee may direct the Company or its Exchange Agent, as the case may be, to deliver the stock certificate(s) to the optionee's stockbroker.

13

(e)      No Stockholder Rights.  No grantee of an option or stock appreciation right (or other Person having the right to exercise such Award) shall have any of the rights of a stockholder of the Company with respect to shares subject to such Award until the issuance of a stock certificate to such Person for such shares.  Except as otherwise provided in Section 1.5(c), no adjustment shall be made for dividends, distributions or other rights (whether ordinary or extraordinary, and whether in cash, securities or other property) for which the record date is prior to the date such stock certificate is issued.

**2.4.    Termination of Employment/Service; Death Subsequent to a Termination of Employment/Service**

(a)      General Rule.  Except to the extent otherwise provided in the applicable Award Agreement or except to the extent otherwise provided in paragraphs (b), (c), (d), (e) or (f) of this Section 2.4, each outstanding option or stock appreciation right held by a grantee who incurs a termination of employment or consultancy relationship with the Company and its Subsidiaries or dismissal from the Board shall, to the extent not then vested and exercisable, be immediately forfeited, and, to the extent vested and exercisable may be exercised within 90 days after termination of employment or consultancy relationship or dismissal from the Board, but in no event after the original expiration date of the Award; it being understood that then outstanding options and stock appreciation rights shall not be affected by a change of employment or consultancy/service relationship with the Company and its Subsidiaries so long as the grantee continues to be a director, officer or employee of, or a consultant to, the Company or any of its Subsidiaries.

(b)      Dismissal "for Cause".  If a grantee incurs a termination of employment or consultancy relationship with the Company and its Subsidiaries or dismissal from the Board, in either case "for Cause", all options and stock appreciation rights not theretofore exercised, whether or not vested, shall immediately terminate upon such termination of employment or consultancy relationship or dismissal from the Board.

(c)      Retirement.  If a grantee incurs a termination of employment with the Company and its Subsidiaries as the result of his or her retirement (as defined below), then any outstanding option or stock appreciation right shall immediately become exercisable at the time of such retirement and shall remain exercisable for a period of three years after such retirement; provided that in no event may such option or stock appreciation right be exercised following the original expiration date of the Award.  For purposes of the Plan, unless otherwise set forth in the applicable Award Agreement, "retirement" shall mean a grantee's resignation of employment with the Company and its Subsidiaries, with the Company's or its applicable Subsidiary's prior consent, on or after (i) his or her 65th birthday, (ii) the date on which he or she has attained age 60 and completed at least five years of service with the Company and its Subsidiaries (using any method of calculation the Administrator deems appropriate) or (iii) if approved by the Administrator, on or after his or her having completed at least 20 years of service with the Company and its Subsidiaries (using any method of calculation the Administrator deems appropriate).

(d)      Disability.  If a grantee incurs a termination of employment or consultancy relationship with the Company and its Subsidiaries or a dismissal from the Board by reason of a

14

#4821-2212-2011v10

Disability, then any outstanding option or stock appreciation right shall immediately become vested and exercisable at the time of such termination as though the grantee had remained employed with the Company for an additional year, and remain exercisable for a period of one year after such termination; <u>provided</u> that in no event may such option or stock appreciation right be exercised following the original expiration date of the Award.

      (e)      <u>Death</u>.

      (i)      *Termination of Employment/Service as a Result of Grantee's Death*.  If a grantee incurs a termination of employment or consultancy relationship with the Company and its Subsidiaries or leaves the Board as the result of his or her death, then any outstanding option or stock appreciation right shall immediately become vested and exercisable at the time of such termination as though the grantee had remained employed with the Company for an additional year, and shall remain exercisable for a period of one year after such death; <u>provided</u> that in no event may such option or stock appreciation right be exercised following the original expiration date of the Award.

      (ii)      *Restrictions on Exercise Following Death*.  Any such exercise of an Award following a grantee's death shall be made only by the grantee's executor or administrator or other duly appointed representative reasonably acceptable to the Administrator, unless the grantee's will specifically disposes of such Award, in which case such exercise shall be made only by the recipient of such specific disposition.  If a grantee's personal representative or the recipient of a specific disposition under the grantee's will shall be entitled to exercise any Award pursuant to the preceding sentence, such representative or recipient shall be bound by all the terms and conditions of the Plan and the applicable Award Agreement which would have applied to the grantee.

      (f)      <u>Administrator Discretion</u>.  The Administrator may, in writing, waive or modify the application of the foregoing provisions of this Section 2.4, it being understood that any such action shall be subject to the provisions in Section 3.1(c) requiring consent of the grantee (or, upon the grantee's death, the Person having the right to exercise the Award) to the extent such action would materially impair the rights or materially increase the obligations of the grantee under then outstanding options or stock appreciation rights.

## 2.5.    Transferability of Options and Stock Appreciation Rights

Except as otherwise specifically provided in this Plan or the applicable Award Agreement evidencing an option or stock appreciation right, during the lifetime of a grantee, each such Award granted to a grantee shall be exercisable only by the grantee, and no such Award may be sold, assigned, transferred, pledged or otherwise encumbered or disposed of other than by will or by the laws of descent and distribution.  The Administrator may, in any applicable Award Agreement evidencing an option or stock appreciation right, permit a grantee to transfer all or some of the options or stock appreciation rights to (a) the grantee's spouse, children or grandchildren ("Immediate Family Members"), (b) a trust or trusts for the exclusive benefit of such Immediate Family Members or (c) other parties approved by the Administrator.  Following any such transfer, any transferred options and stock appreciation rights shall continue to be subject to the same terms and conditions as were applicable immediately prior to the transfer.

15

**2.6.    Grant of Restricted Stock**

(a)    <u>Restricted Stock Grants</u>.  The Administrator may grant restricted shares of Common Stock to such Key Persons, in such amounts and subject to such vesting and forfeiture provisions and other terms and conditions as the Administrator shall determine, subject to the provisions of the Plan.  A grantee of a restricted stock Award shall have no rights with respect to such Award unless such grantee accepts the Award within such period as the Administrator shall specify by accepting delivery of a restricted stock Award Agreement in such form as the Administrator shall determine.

(b)    <u>Issuance of Stock Certificate</u>.  Promptly after a grantee accepts a restricted stock Award in accordance with Section 2.6(a), subject to Sections 3.2, 3.4 and 3.13, the Company or its Exchange Agent shall issue to the grantee a stock certificate or stock certificates for the shares of Common Stock covered by the Award or shall establish an account evidencing ownership of the stock in uncertificated form.  Upon the issuance of such stock certificates, or establishment of such account, the grantee shall have the rights of a stockholder with respect to the restricted stock, subject to:  (i) the nontransferability restrictions and forfeiture provisions described in the Plan (including paragraphs (d) and (e) of this Section 2.6); (ii) a requirement, as set forth in the Award Agreement, that any dividends paid on such shares shall be held in escrow and, unless otherwise determined by the Administrator, shall remain forfeitable until all restrictions on such shares have lapsed; and (iii) any other restrictions and conditions contained in the applicable Award Agreement.

(c)    <u>Custody of Stock Certificate</u>.  Unless the Administrator shall otherwise determine, any stock certificates issued evidencing shares of restricted stock shall remain in the possession of the Company (or such other custodian as may be designated by the Administrator) until such shares are free of any restrictions specified in the applicable Award Agreement.  The Administrator may direct that such stock certificates bear a legend setting forth the applicable restrictions on transferability.

(d)    <u>Nontransferability</u>.  Shares of restricted stock may not be sold, assigned, transferred, pledged or otherwise encumbered or disposed of prior to the lapsing of all restrictions thereon, except as otherwise specifically provided in this Plan or the applicable Award Agreement.  The Administrator at the time of grant shall specify the date or dates (which may depend upon or be related to the attainment of performance goals and other conditions) on which the nontransferability of the restricted stock shall lapse.

(e)    <u>Consequence of Termination of Employment/Service</u>.  Unless otherwise set forth in the applicable Award Agreement, (i) a grantee's termination of employment or consultancy relationship with the Company and its Subsidiaries or dismissal from the Board for any reason other than death, Disability or a termination of employment without Cause shall cause the immediate forfeiture of all shares of restricted stock that have not yet vested as of the date of such termination of employment or consultancy relationship or dismissal from the Board and (ii) if a grantee incurs a termination of employment or consultancy relationship with the Company and its Subsidiaries or dismissal from the Board without Cause or as the result of his or her death or Disability, those shares of restricted stock that have not yet vested as of the date of such termination or departure from the Board but that would have vested had the grantee

16

#4821-2212-2011v10

remained employed for an additional year, shall immediately vest as of such date; it being understood that then outstanding restricted stock Awards shall not be affected by a change of employment or consultancy/service relationship with the Company and its Subsidiaries so long as the grantee continues to be a director, officer or employee of, or a consultant to, the Company or any of its Subsidiaries.  Unless otherwise determined by the Administrator, all dividends paid on shares forfeited under this Section 2.6(e) that have not theretofore been directly remitted to the grantee shall also be forfeited, whether by termination of any escrow arrangement under which such dividends are held or otherwise.  The Administrator may, in writing, waive or modify the application of the foregoing provisions of this Section 2.6(e) , it being understood that any such action shall be subject to the provisions in Section 3.1(c) requiring consent of the grantee (or, upon the grantee's death, the Person having the right to exercise the Award) to the extent such action would materially impair the rights or materially increase the obligations of the grantee under then outstanding restricted stock Awards.

### 2.7.   Grant of Restricted Stock Units

(a)   <u>Restricted Stock Unit Grants</u>.  The Administrator may grant restricted stock units to such Key Persons, and in such amounts and subject to such vesting and forfeiture provisions and other terms and conditions, as the Administrator shall determine, subject to the provisions of the Plan.  A restricted stock unit granted under the Plan shall confer upon the grantee a right to receive from the Company, conditioned upon the occurrence of such vesting event as shall be determined by the Administrator and specified in the Award Agreement, the number of such grantee's restricted stock units that vest upon the occurrence of such vesting event multiplied by the Fair Market Value of a share of Common Stock on the date of vesting.  Payment upon vesting of a restricted stock unit shall be in cash or in shares of Common Stock (valued at their Fair Market Value on the date of vesting) or both, all as the Administrator shall determine, and such payments shall be made to the grantee at such time as provided in the Award Agreement, which the Administrator shall intend to be (i) if Section 409A of the Code is applicable to the grantee, within the period required by Section 409A such that it qualifies as a "short-term deferral" pursuant to Section 409A and the Treasury Regulations issued thereunder, unless the Administrator shall provide for deferral of the Award intended to comply with Section 409A, (ii) if Section 457A of the Code is applicable to the grantee, within the period required by Section 457A(d)(3)(B) such that it qualifies for the exemption thereunder, or (iii) if Sections 409A and 457A of the Code are not applicable to the grantee, at such time as determined by the Administrator.

(b)   <u>Dividend Equivalents</u>.  The Administrator may include in any Award Agreement with respect to a restricted stock unit a dividend equivalent right entitling the grantee to receive amounts equal to the ordinary dividends that would be paid, during the time such Award is outstanding and unvested, and/or, if payment of the vested Award is deferred, during the period of such deferral following such vesting event, on the shares of Common Stock underlying such Award if such shares were then outstanding.  In the event such a provision is included in a Award Agreement, the Administrator shall determine whether such payments shall be (i) paid to the holder of the Award, as specified in the Award Agreement, either (A) at the same time as the underlying dividends are paid, regardless of the fact that the restricted stock unit has not theretofore vested, (B) at the time at which the Award's vesting event occurs, conditioned upon the occurrence of the vesting event, (C) once the Award has vested, at the same time as the

17

#4821-2212-2011v10

underlying dividends are paid, regardless of the fact that payment of the vested restricted stock unit has been deferred, and/or (D) at the time at which the corresponding vested restricted stock units are paid, (ii) made in cash, shares of Common Stock or other property and (iii) subject to such other vesting and forfeiture provisions and other terms and conditions as the Administrator shall deem appropriate and as shall be set forth in the Award Agreement.

(c)    Consequence of Termination of Employment/Service.  Unless otherwise set forth in the applicable Award Agreement, (i) a grantee's termination of employment or consultancy relationship with the Company and its Subsidiaries or dismissal from the Board for any reason other than death, Disability or a termination of employment without Cause shall cause the immediate forfeiture of all restricted stock units that have not yet vested as of the date of such termination of employment or consultancy relationship with the Company and its Subsidiaries or dismissal from the Board and (ii) if a grantee incurs a termination of employment or consultancy relationship with the Company and its Subsidiaries or dismissal from the Board without Cause or as the result of his or her death or Disability, those restricted stock units that have not yet vested as of the date of such termination or departure from the Board but that would have vested had such grantee remained employed for an additional year, shall immediately vest as of such date; it being understood that then outstanding restricted stock units shall not be affected by a change of employment or consultancy relationship with the Company and its Subsidiaries so long as the grantee continues to be a director, officer or employee of, or a consultant to, the Company or any of its Subsidiaries.  Unless otherwise determined by the Administrator, any dividend equivalent rights on any restricted stock units forfeited under this Section 2.7(c) that have not theretofore been directly remitted to the grantee shall also be forfeited, whether by termination of any escrow arrangement under which such dividends are held or otherwise.  The Administrator may, in writing, waive or modify the application of the foregoing provisions of this Section 2.7(c), it being understood that any such action shall be subject to the provisions in Section 3.1(c) requiring consent of the grantee (or, upon the grantee's death, the Person having the right to exercise the Award) to the extent such action would materially impair the rights or materially increase the obligations of the grantee under then outstanding restricted stock units.

(d)    No Stockholder Rights.  No grantee of a restricted stock unit shall have any of the rights of a stockholder of the Company with respect to such Award unless and until a stock certificate is issued with respect to such Award upon the vesting of such Award (it being understood that the Administrator shall determine whether to pay any vested restricted stock unit in the form of cash or Company shares or both), which issuance shall be subject to Sections 3.2, 3.4 and 3.13.  Except as otherwise provided in Section 1.5(c), no adjustment to any restricted stock unit shall be made for dividends, distributions or other rights (whether ordinary or extraordinary, and whether in cash, securities or other property) for which the record date is prior to the date such stock certificate, if any, is issued.

(e)    Transferability of Restricted Stock Units.  Except as otherwise specifically provided in this Plan or the applicable Award Agreement evidencing a restricted stock unit, no restricted stock unit granted under the Plan may be sold, assigned, transferred, pledged or otherwise encumbered or disposed of other than by will or by the laws of descent and distribution.  The Administrator may, in any applicable Award Agreement evidencing a restricted stock unit, permit a grantee to transfer all or some of the restricted stock units to (i) the grantee's Immediate Family Members, (ii) a trust or trusts for the exclusive benefit of such

18

#4821-2212-2011v10

Immediate Family Members or (iii) other parties approved by the Administrator. Following any such transfer, any transferred restricted stock units shall continue to be subject to the same terms and conditions as were applicable immediately prior to the transfer.

## 2.8.    Grant of Unrestricted Stock

The Administrator may grant (or sell at a purchase price at least equal to par value) shares of Common Stock free of restrictions under the Plan to such Key Persons and in such amounts and subject to such forfeiture provisions as the Administrator shall determine. Shares may be thus granted or sold in respect of past services or other valid consideration.

## 2.9.    Other Stock-Based Awards

Subject to the provisions of the Plan (including, without limitation, Section 3.15), the Administrator shall have the sole and complete authority to grant to Key Persons other equity-based or equity-related Awards in such amounts and subject to such terms and conditions as the Administrator shall determine; provided that any such Awards must comply with applicable law and, to the extent deemed desirable by the Administrator, Rule 16b-3.

## 2.10.   Dividend Equivalents

Subject to the provisions of the Plan (including, without limitation, Section 3.15), in the discretion of the Administrator, an Award, other than an option or stock appreciation right, may provide the Award recipient with dividends or dividend equivalents, payable in cash, shares, other securities, other Awards or other property, on a current or deferred basis, on such terms and conditions as may be determined by the Administrator, including, without limitation, payment directly to the Award recipient, withholding of such amounts by the Company subject to vesting of the Award, or reinvestment in additional shares, restricted shares or other Awards.

## 2.11.   Performance Compensation Awards

(a)     General. The Administrator shall have the authority, at the time of grant of any Award, to designate such Award (other than options and stock appreciation rights) as a Performance Compensation Award in order to qualify such Award as "qualified performance-based compensation" under Section 162(m) of the Code. Options and stock appreciation rights granted under the Plan shall not be included among Awards that are designated as Performance Compensation Awards under this Section 2.11.

(b)     Eligibility. The Administrator will, in its sole discretion, designate within the first 90 days of a Performance Period (or, if shorter, within the maximum period allowed under Section 162(m) of the Code) which Key Persons will be eligible to receive Performance Compensation Awards in respect of such Performance Period. However, designation of a Key Person eligible to receive an Award hereunder for a Performance Period shall not in any manner entitle the Key Person to receive payment in respect of any Performance Compensation Award for such Performance Period. The determination as to whether or not such Key Person becomes entitled to payment in respect of any Performance Compensation Award shall be decided solely in accordance with the provisions of this Section 2.11. Moreover, designation of a Key Person eligible to receive an Award hereunder for a particular Performance Period shall not require

19

#4821-2212-2011v10

designation of such Key Person eligible to receive an Award hereunder in any subsequent Performance Period and designation of one Person as a Key Person eligible to receive an Award hereunder shall not require designation of any other Person as a Key Person eligible to receive an Award hereunder in such period or in any other period.

(c)     Discretion of Administrator with Respect to Performance Compensation Awards. With regard to a particular Performance Period, the Administrator shall have full discretion to select the length of such Performance Period, the type(s) of Performance Compensation Awards to be issued, the Performance Criteria that will be used to establish the Performance Goal(s), the kind(s) and/or level(s) of the Performance Goals(s) that is (are) to apply to the Company or any of its Subsidiaries, Affiliates, divisions or operational units, or any combination of the foregoing, and the Performance Formula. Within the first 90 days of a Performance Period (or, if shorter, within the maximum period allowed under Section 162(m) of the Code), the Administrator shall, with regard to the Performance Compensation Awards to be issued for such Performance Period, exercise its discretion with respect to each of the matters enumerated in the immediately preceding sentence and record the same in writing.

(d)     Performance Criteria. Notwithstanding the foregoing, the Performance Criteria that will be used to establish the Performance Goal(s) shall be based on the attainment of specific levels of performance of the Company or any of its Subsidiaries, Affiliates, divisions or operational units, or any combination of the foregoing, and shall be limited to the following: (i) net income before or after taxes, (ii) earnings before or after taxes (including earnings before interest, taxes, depreciation and amortization), (iii) operating income, (iv) earnings per share, (v) return on shareholders' equity, (vi) return on investment, (vii) return on assets, (viii) level or amount of acquisitions, (ix) share price, (x) profitability/profit margins, (xi) market share, (xii) revenues or sales (based on units and/or dollars), (xiii) costs, (xiv) cash flow, (xv) working capital, (xvi) objective measures of customer satisfaction, (xvii) objective measures of employee satisfaction, (xviii) expense levels and expense ratios, (xix) gross margin and gross margin ratios, (xx) employee turnover, (xxi) implementation of systems, (xxii) completion of projects, (xxiii) level or amount of divestitures, (xxiv) objective goals related to capitalization or restructuring of the balance sheet and (xxv) objective goals related to management or expense restructuring. The Performance Criteria may be applied on an absolute basis and/or be relative to one or more peer companies or indices or any combination thereof. To the extent required under Section 162(m) of the Code, the Administrator shall, within the first 90 days of the applicable Performance Period (or, if shorter, within the maximum period allowed under Section 162(m) of the Code), define in an objective fashion the manner of calculating the Performance Criteria it selects to use for such Performance Period.

(e)     Performance Goals. The Administrator is authorized at any time during the first 90 days of a Performance Period (or, if shorter, within the maximum period allowed under Section 162(m) of the Code), or any time thereafter (but only to the extent the exercise of such authority after such 90-day period (or such shorter period, if applicable) would not cause the Performance Compensation Awards granted to any Key Person for the Performance Period to fail to qualify as "qualified performance-based compensation" under Section 162(m) of the Code), in its sole and absolute discretion, to adjust or modify the calculation of a Performance Goal for such Performance Period to the extent permitted under Section 162(m) of the Code (i) in the event of, or in anticipation of, any unusual or extraordinary corporate item, transaction,

20

event or development affecting the Company, or any of its Affiliates, Subsidiaries, divisions or operating units (to the extent applicable to such Performance Goal) or (ii) in recognition of, or in anticipation of, any other unusual or nonrecurring events affecting the Company or any of its Affiliates, Subsidiaries, divisions or operating units (to the extent applicable to such Performance Goal), or the financial statements of the Company or any of its Affiliates, Subsidiaries, divisions or operating units (to the extent applicable to such Performance Goal), or of changes in applicable rules, rulings, regulations or other requirements of any governmental body or securities exchange, accounting principles, law or business conditions.

(f)        Payment of Performance Compensation Awards.

(i)        Condition to Receipt of Payment.  An Award recipient must be employed by the Company on the last day of a Performance Period to be eligible for payment in respect of a Performance Compensation Award for such Performance Period.  Notwithstanding the foregoing, in the discretion of the Administrator, Performance Compensation Awards may be paid to Award recipients who have retired or whose employment has terminated after the beginning of the Performance Period for which a Performance Compensation Award is made, or to the designee or estate of an Award recipient who died prior to the last day of a Performance Period, but not unless and until the Administrator has certified attainment of the relevant Performance Goal(s) in accordance with Section 2.11(f)(iii).

(ii)        Limitation.  An Award recipient shall be eligible to receive payments in respect of a Performance Compensation Award only to the extent that (A) the Performance Goal(s) for such period are achieved and certified by the Administrator in accordance with Section 2.11(f)(iii) and (B) the Performance Formula as applied against such Performance Goal(s) determines that all or some portion of such Award recipient's Performance Compensation Award has been earned for the Performance Period.

(iii)        Certification.  Following the completion of a Performance Period, the Administrator shall meet to review and certify in writing whether, and to what extent, the Performance Goals for the Performance Period have been achieved and, if so, to calculate and certify in writing that amount of the Performance Compensation Awards earned for the period based upon the Performance Formula.  The Administrator shall then determine the actual size of each Award recipient's Performance Compensation Award for the Performance Period and, in so doing, may apply negative discretion as authorized by Section 2.11.

(iv)        Negative Discretion.  In determining the actual size of an individual Performance Compensation Award for a Performance Period, the Administrator may reserve in the applicable Award Agreement the ability to reduce or eliminate the amount of the Performance Compensation Award earned under the Performance Formula in the Performance Period.

(v)        Timing of Award Payments.  The Performance Compensation Awards granted for a Performance Period shall be paid to Award recipients as soon as administratively possible following completion of the certifications required by Section 2.11, but in any event within the period required by Section 409A of the Code such that it qualifies as a "short-term deferral" pursuant to Section 1.409A-1(b)(4) of the Department of Treasury

21

regulations, unless the Administrator shall determine that any Performance Compensation Award shall be deferred in compliance with Section 409A of the Code.

(vi)     Maximum Award Payable.  Notwithstanding any provision contained in this Plan to the contrary, the maximum Performance Compensation Award that may be granted to any one Key Person under the Plan in any fiscal year of the Company is [___][6] shares of Common Stock or, in the event the Performance Compensation Award is paid in cash, other securities, other Awards or other property, the equivalent cash value of [___][7] shares of Common Stock on the first day of the Performance Period to which such Award relates, in each case subject to adjustment as provided in Section 1.5(c).  Furthermore, any Performance Compensation Award that has been deferred shall not (between the date as of which the Award is deferred and the payment date) increase in a manner prohibited by Section 162(m) of the Code.

(vii)     Discretion.  In no event shall any discretionary authority granted to the Administrator by the Plan be used to (A) grant or provide payment in respect of Performance Compensation Awards for a Performance Period if the Performance Goals for such Performance Period have not been attained, (B) increase a Performance Compensation Award for any Key Person at any time after the first 90 days of the Performance Period (or, if shorter, the maximum period allowed under Section 162(m)) or (C) increase a Performance Compensation Award above the maximum amount payable under Sections 1.5(a), 1.5(d) or 2.11 of the Plan.

### ARTICLE III.
### Miscellaneous

**3.1.     Amendment of the Plan; Modification of Awards**

(a)     Amendment of the Plan.  The Board may from time to time suspend, discontinue, revise or amend the Plan in any respect whatsoever, except that no such amendment shall materially impair any rights or materially increase any obligations under any Award theretofore made under the Plan without the consent of the grantee (or, upon the grantee's death, the Person having the rights to the Award).

(b)     Stockholder Approval Requirement.  Stockholder approval shall be required with respect to any amendment to the Plan that (i) expands the types of Awards available under the Plan (provided such approval shall not be required if the Company is a "foreign private issuer", as defined in the rules of the SEC, or to the extent the Administrator determines that compliance with Section 162(m) of the Code would not be necessary), (ii) increases the number of shares which may be issued under the Plan (in the aggregate or to any individual), except as permitted pursuant to Section 1.5(c), (iii) expands the eligibility requirements of Persons eligible to receive Awards under the Plan, (iv) extends the term of the Plan or (v) is otherwise necessary to comply with any tax or regulatory requirement applicable to the Plan.

(c)     Modification of Awards.  The Administrator also may amend any outstanding Award Agreement in any manner, including, without limitation, by amendment which would: (i) cancel an Award, (ii) accelerate the time or times at which the Award becomes unrestricted,

---

[6] To be at least 10% of the total share pool.
[7] To be at least 10% of the total share pool.

22

vested or may be exercised; (iii) waive or amend any goals, restrictions or conditions set forth in the Award Agreement; or (iv) waive or amend the operation of Sections 2.4, 2.6(e) or 2.7(c) with respect to the termination of the Award upon termination of employment or consultancy relationship with the Company and its Subsidiaries or dismissal from the Board; provided, however, that no such amendment shall be made without shareholder approval if such approval is necessary to comply with any tax or regulatory requirement applicable to the Award. However, any such cancellation or amendment that materially impairs the rights or materially increases the obligations of a grantee under an outstanding Award shall be made only with the consent of the grantee (or, upon the grantee's death, the Person having the right to exercise the Award). In making any modification to an Award, the Administrator may consider the implications, if any, of such modification under the Code with respect to incentive stock options granted under the Plan and/or Sections 409A and 457A of the Code.

(d)     Repricing. The Board and/or the Administrator shall be permitted and authorized to modify or amend the Plan and/or any Awards granted under the Plan, or to take any other action, that results in a Repricing of then-outstanding Awards, provided that Repricing of options and stock appreciation rights granted under the Plan shall not be permitted to the extent such action could cause adverse tax consequences to the grantee under Sections 409A or 457A of the Code, to the extent applicable.

### 3.2.    Consent Requirement

(a)     No Plan Action Without Required Consent. If the Administrator shall at any time determine that any Consent (as defined below) is necessary or desirable as a condition of, or in connection with, the granting of any Award under the Plan, the issuance or purchase of shares or other rights thereunder, or the taking of any other action thereunder (each such action being hereinafter referred to as a "Plan Action"), then such Plan Action shall not be taken, in whole or in part, unless and until such Consent shall have been effected or obtained to the full satisfaction of the Administrator.

(b)     Consent Defined. The term "Consent" as used herein with respect to any Plan Action means (i) any and all listings, registrations or qualifications in respect thereof upon any securities exchange or under any federal, state or local law, rule or regulation, (ii) any and all written agreements and representations by the grantee with respect to the disposition of shares, or with respect to any other matter, which the Administrator shall deem necessary or desirable to comply with the terms of any such listing, registration or qualification or to obtain an exemption from the requirement that any such listing, qualification or registration be made and (iii) any and all consents, clearances and approvals in respect of a Plan Action by any governmental or other regulatory bodies.

### 3.3.    Nonassignability

Except as provided in Sections 2.4(e), 2.5, 2.6(d) or 2.7(e), (a) no Award or right granted to any Person under the Plan or under any Award Agreement shall be assignable or transferable other than by will or by the laws of descent and distribution and (b) all rights granted under the Plan or any Award Agreement shall be exercisable during the life of the grantee only by the grantee or the grantee's legal representative or the grantee's permissible successors or assigns (as

23

authorized and determined by the Administrator).  All terms and conditions of the Plan and the applicable Award Agreements will be binding upon any permitted successors or assigns.

### 3.4.    Taxes

(a)    <u>Withholding</u>.  A grantee or other Award holder under the Plan shall be required to pay, in cash, to the Company, and the Company and its Affiliates shall have the right and are hereby authorized to withhold from any Award, from any payment due or transfer made under any Award or under the Plan or from any compensation or other amount owing to such grantee or other Award holder, the amount of any applicable withholding taxes in respect of an Award, its grant, its exercise, its vesting, or any payment or transfer under an Award or under the Plan, and to take such other action as may be necessary in the opinion of the Company to satisfy all obligations for payment of such taxes.  Whenever shares of Common Stock are to be delivered pursuant to an Award under the Plan, with the approval of the Administrator or as provided in the applicable Award Agreement, which the Administrator shall have sole discretion whether or not to give, the grantee may satisfy the foregoing condition by electing to have the Company withhold from delivery shares having a value equal to the amount of minimum tax required to be withheld.  Such shares shall be valued at their Fair Market Value as of the date on which the amount of tax to be withheld is determined.  Fractional share amounts shall be settled in cash.  Such a withholding election may be made with respect to all or any portion of the shares to be delivered pursuant to an Award as may be approved by the Administrator in its sole discretion.

(b)    <u>Liability for Taxes</u>.  Grantees and holders of Awards are solely responsible and liable for the satisfaction of all taxes and penalties that may arise in connection with Awards (including, without limitation, any taxes arising under Sections 409A and 457A of the Code), and the Company shall not have any obligation to indemnify or otherwise hold any such Person harmless from any or all of such taxes.  The Administrator shall have the discretion to organize any deferral program, to require deferral election forms, and to grant or, notwithstanding anything to the contrary in the Plan or any Award Agreement, to unilaterally modify any Award in a manner that (i) conforms with the requirements of Sections 409A and 457A of the Code (to the extent applicable), (ii) voids any participant election to the extent it would violate Section 409A or 457A of the Code (to the extent applicable) and (iii) for any distribution event or election that could be expected to violate Section 409A of the Code, make the distribution only upon the earliest of the first to occur of a "permissible distribution event" within the meaning of Section 409A of the Code or a distribution event that the participant elects in accordance with Section 409A of the Code.  The Administrator shall have the sole discretion to interpret the requirements of the Code, including, without limitation, Sections 409A and 457A, for purposes of the Plan and all Awards.

### 3.5.    Operation and Conduct of Business

Nothing in the Plan or any Award Agreement shall be construed as limiting or preventing the Company or any of its Affiliates from taking any action with respect to the operation and conduct of their business that they deem appropriate or in their best interests, including any or all adjustments, recapitalizations, reorganizations, exchanges or other changes in the capital structure of the Company or any of its Affiliates, any merger or consolidation of the Company or any of its Affiliates, any issuance of Company shares or other securities or subscription rights,

24

#4821-2212-2011v10

any issuance of bonds, debentures, preferred or prior preference stock ahead of or affecting the Common Stock or other securities or rights thereof, any dissolution or liquidation of the Company or any of its Affiliates, any sale or transfer of all or any part of the assets or business of the Company or any of its Affiliates, or any other corporate act or proceeding, whether of a similar character or otherwise.

**3.6.   No Rights to Awards**

No Key Person or other Person shall have any claim to be granted any Award under the Plan.

**3.7.   Right of Discharge Reserved**

Nothing in the Plan or in any Award Agreement shall confer upon any grantee the right to continue his or her employment with the Company or any of its Affiliates, his or her consultancy relationship with the Company or any of its Affiliates, or his or her position as a director of the Company or any of its Affiliates, or affect any right that the Company or any of its Affiliates may have to terminate such employment or consultancy relationship or service as a director.

**3.8.   Non-Uniform Determinations**

The Administrator's determinations and the treatment of Key Persons and grantees and their beneficiaries under the Plan need not be uniform and may be made and determined by the Administrator selectively among Persons who receive, or who are eligible to receive, Awards under the Plan (whether or not such Persons are similarly situated).  Without limiting the generality of the foregoing, the Administrator shall be entitled, among other things, to make non-uniform and selective determinations, and to enter into non-uniform and selective Award Agreements, as to (a) the Persons to receive Awards under the Plan, (b) the types of Awards granted under the Plan, (c) the number of shares to be covered by, or with respect to which payments, rights or other matters are to be calculated with respect to, Awards and (d) the terms and conditions of Awards.

**3.9.   Other Payments or Awards**

Nothing contained in the Plan shall be deemed in any way to limit or restrict the Company from making any award or payment to any Person under any other plan, arrangement or understanding, whether now existing or hereafter in effect.

**3.10.   Headings**

Any section, subsection, paragraph or other subdivision headings contained herein are for the purpose of convenience only and are not intended to expand, limit or otherwise define the contents of such subdivisions.

**3.11.   Effective Date and Term of Plan**

25

#4821-2212-2011v10

(a)      Adoption; Stockholder Approval.  The Plan was adopted by the Board on [   ], and approved by the Company's stockholders on [   ].  The Board may, but need not, make the granting of any Awards under the Plan subject to the approval of the Company's stockholders.

(b)      Termination of Plan.  The Board may terminate the Plan at any time.  All Awards made under the Plan prior to its termination shall remain in effect until such Awards have been satisfied or terminated in accordance with the terms and provisions of the Plan and the applicable Award Agreements.  No Awards may be granted under the Plan following the tenth anniversary of the date on which the Plan was adopted by the Board.

### 3.12.    Restriction on Issuance of Stock Pursuant to Awards

The Company shall not permit any shares of Common Stock to be issued pursuant to Awards granted under the Plan unless such shares of Common Stock are fully paid and non-assessable under applicable law.  Notwithstanding anything to the contrary in the Plan or any Award Agreement, at the time of the exercise of any Award, at the time of vesting of any Award, at the time of payment of shares of Common Stock in exchange for, or in cancellation of, any Award, or at the time of grant of any unrestricted shares under the Plan, the Company and the Administrator may, if either shall deem it necessary or advisable for any reason, require the holder of an Award (a) to represent in writing to the Company that it is the Award holder's then-intention to acquire the shares with respect to which the Award is granted for investment and not with a view to the distribution thereof or (b) to postpone the date of exercise until such time as the Company has available for delivery to the Award holder a prospectus meeting the requirements of all applicable securities laws; provided, that, any postponement shall extend the term during which any options or stock appreciation rights may be exercised beyond the seventh anniversary, but in no case will such extension go beyond the tenth anniversary of the date of grant of any such options or stock appreciation rights; and no shares shall be issued or transferred in connection with any Award unless and until all legal requirements applicable to the issuance or transfer of such shares have been complied with to the satisfaction of the Company and the Administrator.  The Company and the Administrator shall have the right to condition any issuance of shares to any Award holder hereunder on such Person's undertaking in writing to comply with such restrictions on the subsequent transfer of such shares as the Company or the Administrator shall deem necessary or advisable as a result of any applicable law, regulation or official interpretation thereof, and all share certificates delivered under the Plan shall be subject to such stop transfer orders and other restrictions as the Company or the Administrator may deem advisable under the Plan, the applicable Award Agreement or the rules, regulations and other requirements of the SEC, any stock exchange upon which such shares are listed, and any applicable securities or other laws, and certificates representing such shares may contain a legend to reflect any such restrictions.  The Administrator may refuse to issue or transfer any shares or other consideration under an Award if it determines that the issuance or transfer of such shares or other consideration might violate any applicable law or regulation or entitle the Company to recover the same under Section 16(b) of the 1934 Act, and any payment tendered to the Company by a grantee or other Award holder in connection with the exercise of such Award shall be promptly refunded to the relevant grantee or other Award holder.  Without limiting the generality of the foregoing, no Award granted under the Plan shall be construed as an offer to sell securities of the Company, and no such offer shall be outstanding, unless and until the

26

#4821-2212-2011v10

Administrator has determined that any such offer, if made, would be in compliance with all applicable requirements of any applicable securities laws.

**3.13. Requirement of Notification of Election Under Section 83(b) of the Code or Upon Disqualifying Disposition Under Section 421(b) of the Code**

(a)     Notification of Election Under Section 83(b) of the Code.  If an Award recipient, in connection with the acquisition of Company shares under the Plan, makes an election under Section 83(b) of the Code (to include in gross income in the year of transfer the amounts specified in Section 83(b) of the Code), the grantee shall notify the Administrator of such election within ten days of filing notice of the election with the U.S. Internal Revenue Service, in addition to any filing and notification required pursuant to regulations issued under Section 83(b) of the Code.

(b)     Notification of Disqualifying Disposition of Incentive Stock Options.  If an Award recipient shall make any disposition of Company shares delivered pursuant to the exercise of an incentive stock option under the circumstances described in Section 421(b) of the Code (relating to certain disqualifying dispositions) or any successor provision of the Code, the grantee shall notify the Company of such disposition within ten days thereof.

**3.14. Severability**

If any provision of the Plan or any Award is or becomes or is deemed to be invalid, illegal, or unenforceable in any jurisdiction or as to any Person or Award, or would disqualify the Plan or any Award under any law deemed applicable by the Administrator, such provision shall be construed or deemed amended to conform to the applicable laws or, if it cannot be construed or deemed amended without, in the determination of the Administrator, materially altering the intent of the Plan or the Award, such provision shall be stricken as to such jurisdiction, Person or Award and the remainder of the Plan and any such Award shall remain in full force and effect.

**3.15. Sections 409A and 457A**

To the extent applicable, the Plan and Award Agreements shall be interpreted in accordance with Sections 409A and 457A of the Code and Department of Treasury regulations and other interpretive guidance issued thereunder.  Notwithstanding any provision of the Plan or any applicable Award Agreement to the contrary, in the event that the Administrator determines that any Award may be subject to Section 409A or 457A of the Code, the Administrator may adopt such amendments to the Plan and the applicable Award Agreement or adopt other policies and procedures (including amendments, policies and procedures with retroactive effect), or take any other actions, that the Administrator determines are necessary or appropriate to (i) exempt the Plan and Award from Sections 409A and 457A of the Code and/or preserve the intended tax treatment of the benefits provided with respect to the Award, or (ii) comply with the requirements of Sections 409A and 457A of the Code and related Department of Treasury guidance and thereby avoid the application of penalty taxes under Sections 409A and 457A of the Code.

**3.16. Forfeiture; Clawback**

27

#4821-2212-2011v10

The Administrator may specify in the applicable Award Agreement that any realized gain with respect to options or stock appreciation rights and any realized value with respect to other Awards shall be subject to forfeiture or clawback, in the event of (a) a grantee's breach of any non-competition, non-solicitation, confidentiality or other restrictive covenants with respect to the Company or its Subsidiaries, (b) a grantee's breach of any employment or consulting agreement with the Company or any of its Subsidiaries, (c) a grantee's termination of employment or consultancy relationship with the Company and its Subsidiaries for Cause or (d) a financial restatement that reduces the amount of compensation under the Plan previously awarded to a grantee that would have been earned had results been properly reported.

### 3.17.   No Trust or Fund Created

Neither the Plan nor any Award shall create or be construed to create a trust or separate fund of any kind or a fiduciary relationship between the Company or any Affiliate and an Award recipient or any other Person.  To the extent that any Person acquires a right to receive payments from the Company or any Affiliate pursuant to an Award, such right shall be no greater than the right of any unsecured general creditor of the Company or its Affiliate.

### 3.18.   No Fractional Shares

No fractional shares shall be issued or delivered pursuant to the Plan or any Award, and the Administrator shall determine whether cash, other securities, or other property shall be paid or transferred in lieu of any fractional shares or whether such fractional shares or any rights thereto shall be canceled, terminated, or otherwise eliminated.

### 3.19.   Governing Law

The Plan will be construed and administered in accordance with the laws of the State of New York, without giving effect to principles of conflict of laws that would cause the laws of any other jurisdiction to apply.

28

#4821-2212-2011v10

**<u>Exhibit G</u>**

**New Eagle MIP Option Agreements**

Draft

**OPTION AWARD AGREEMENT**
**UNDER THE EAGLE BULK SHIPPING INC.**
**2014 EQUITY INCENTIVE PLAN**

This Option Award Agreement (the "Option Award Agreement") dated as of [___] (the "Date of Grant"), is made by and between Eagle Bulk Shipping Inc., a Republic of the Marshall Islands company (the "Company"), and [___] (the "Participant"). Capitalized terms not defined herein shall have the meaning ascribed to them in the Eagle Bulk Shipping Inc., 2014 Equity Incentive Plan (the "Plan"). Where the context permits, references to the Company shall include any successor to the Company.

1.     Grant of Options. The Company hereby grants to the Participant a non-qualified stock option to purchase [____] shares of Common Stock (the "Option"), subject to all of the terms and conditions of this Option Award Agreement and the Plan.

2.     Vesting. Subject to Section 5, the Option shall vest and become exercisable as follows: [____] shares will vest on [____],[____] shares will vest on [____],[____] shares will vest on [____], and [____] shares will vest on [____].[1]

3.     Exercise Price. The exercise price per share of the option shall be $[__][2] (the "Exercise Price").

4.     Restrictions. Except as otherwise provided in this Option Award Agreement, the Option granted hereunder may not be sold, assigned, transferred, pledged, hypothecated or otherwise disposed of or encumbered, and shall be subject to a risk of forfeiture as described in Section 5, until any additional requirements or restrictions contained in this Option Award Agreement or in the Plan have been otherwise satisfied, terminated or expressly waived by the Company in writing.

5.     Termination of Employment.

(a)     Generally. Except as provided below, if the Participant's employment is terminated for any reason, then (i) exercise of the Option may be made only to the extent that the Participant was entitled to exercise the Option on the date of termination of employment; and (ii) exercise must occur within 90 days after termination of employment but in no event after the original expiration date of the Option; it being understood that the then-outstanding Option shall not be affected by a change of employment or consultancy/service relationship with the Company and its Subsidiaries so long as the Participant continues to be a director, officer or employee of, or a consultant to, the Company or any of its Subsidiaries.

---

[1] To list 25% of the Option shares on each of the first four anniversaries of the Date of Grant.
[2] For [__] awards, to be calculated based on a total implied equity value for the Reorganized Debtor equal to the Plan Enterprise Value minus the Exit Facility Amount and for [__] awards, to be calculated based on a total implied equity value equal to (i) 130.2% times the Plan Enterprise Value minus (ii) the Exit Facility Amount.

1

#4840-3702-4539v9

(b)    For Cause.  If the Participant's employment is terminated by the Company for Cause, all of the Participant's unvested Options not theretofore exercised shall immediately terminate upon such termination of employment.

(c)    On Account of Death or Disability.  If the Participant's employment is terminated on account of death or Disability, then the Option shall immediately become vested and exercisable as though the Participant had remained employed with the Company for an additional year; provided, that, in all cases the Participant shall vest in no less than 50% of the total grant of the Option; and provided further, that, exercise must occur within one year after termination of employment but in no event after the original expiration date of the Option.

(d)    Without Cause or for Good Reason.  If the Participant's employment is terminated by the Company without Cause, or by the Participant for Good Reason (as defined below), then the Option shall immediately become vested and exercisable as though the Participant had remained employed with the Company for an additional year; provided, that, in all cases the Participant shall vest in no less than 50% of the total grant of the Option; and provided further, that, exercise must occur within one year after such termination and prior to the original expiration date of the Option.

For purposes of the foregoing, "Good Reason" shall have the meaning set forth in the Employment Agreement between the Company and the Participant, dated [__].

(e)    Change in Control.  For purposes of Section 1.5(c)(iii)(1) of the Plan, notwithstanding anything therein to the contrary, the Participant will have the right to exercise any vested Award until the earlier of the original expiration date of the Award or 180 days following such termination.

6.    Exercise of the Option:

(a)    Timing and Extent of Exercise.  The Option and stock shall be exercisable as set for in this Option Award Agreement, but, except as provided in clause (b) of Section 3.12 of the Plan, no portion of the Option shall be exercisable subsequent to the seventh anniversary of the Date of Grant.  The Option may be exercised from time to time as to all or part of the shares as to which such Option is then exercisable.

(b)    Notice of Exercise.  The Option may be exercised by the filing of a written notice with the Company or the Company's designated exchange agent (the "Exchange Agent"), on such form and in such manner as the Administrator shall prescribe.

(c)    Payment of Exercise Price.  Any written notice of exercise of the Option shall be accompanied by payment for the shares being purchased.  Such payment may be made, in the Participant's discretion:  (i) by certified or official bank check (or the equivalent thereof acceptable to the Company or its Exchange Agent) for the full option Exercise Price; (ii) by deducting from any shares deliverable upon the exercise of the Option a number of shares having a Fair Market Value equal to all or part of the Option

2

Exercise Price, in the Participant's discretion, and a certified or official bank check (or the equivalent thereof acceptable to the Company or its Exchange Agent) for any remaining portion of the full Option Exercise Price; or (iii) by delivery of shares of Common Stock having a Fair Market Value (determined as of the exercise date) equal to all or part of the Option Exercise Price, in the Participant's discretion, and a certified or official bank check (or the equivalent thereof acceptable to the Company or its Exchange Agent) for any remaining portion of the full option Exercise Price.

(d)      Delivery of Certificates Upon Exercise.  Subject to the Plan, promptly after receiving payment of the Exercise Price, the Company or its Exchange Agent shall (i) deliver to the Participant, or to such other Person as may then have the right to exercise the Option, a certificate or certificates for the shares of Common Stock for which the Option has been exercised.  If the method of payment employed upon exercise of the Option so requires, and if applicable law permits, the Participant may direct the Company or its Exchange Agent, as the case may be, to deliver the stock certificate(s) to the Participant's stockbroker.

7.      No Stockholder Rights.  The Participant shall not have any of the rights of a stockholder of the Company with respect to shares subject to the Option until the issuance of a stock certificate to the Participant, or such other applicable Person, for such shares.

8.      Option Award Agreement Subject to Plan.  This Option Award Agreement is made pursuant to all of the provisions of the Plan, which is incorporated herein by this reference, and is intended, and shall be interpreted in a manner, to comply therewith.  In the event of any conflict between the provisions of this Option Award Agreement and the provisions of the Plan, the provisions of this Option Award Agreement shall govern.

9.      No Rights to Continuation of Employment.  Nothing in the Plan or this Option Award Agreement shall confer upon Participant any right to continue in the employ of the Company or any Subsidiary thereof or shall interfere with or restrict the right of the Company or its shareholders (or of a Subsidiary or its shareholders, as the case may be) to terminate Participant's employment any time for any reason whatsoever, with or without cause.

10.      Transferability.  The Participant may transfer the Option to (i) the Participant's Immediate Family Members, (ii) a trust or trusts for the exclusive benefit of such Immediate Family Members or (iii) any other parties approved by the Administrator.

11.      Tax Withholding.  The Company shall be entitled to withhold the amount of applicable withholding taxes in any manner provided in Section 3.4(a) of the Plan, including, at the election of the Participant, by having the Company deduct from any shares delivered upon the exercise of the Option such shares having a value equal to the amount of minimum tax required to be withheld.  Such shares shall be valued at their Fair Market Value as of the date on which the amount of tax to be withheld is determined.  Fractional share amounts shall be settled in cash.  Such a withholding election may be made by the Participant with respect to all or any portion of the shares to be delivered pursuant to the exercise of the Option.

3

12.     <u>Governing Law</u>.  This Option Award Agreement shall be governed by, interpreted under, and construed and enforced in accordance with the internal laws, and not the laws pertaining to conflicts or choices of laws, of the State of New York applicable to agreements made and to be performed wholly within the State of New York.

13.     <u>Option Award Agreement Binding on Successors</u>.  The terms of this Option Award Agreement shall be binding upon Participant and upon Participant's heirs, executors, administrators, personal representatives, transferees, assignees and successors in interest, and upon the Company and its successors and assignees, subject to the terms of the Plan.

14.     <u>No Assignment</u>.  Notwithstanding anything to the contrary in this Option Award Agreement, neither this Option Award Agreement nor any rights granted herein shall be assignable by Participant.

15.     <u>Necessary Acts</u>.  Participant hereby agrees to perform all acts, and to execute and deliver any documents that may be reasonably necessary to carry out the provisions of this Option Award Agreement, including but not limited to all acts and documents related to compliance with federal and/or state securities and/or tax laws.

16.     <u>Entire Option Award Agreement</u>.  This Option Award Agreement and the Plan contain the entire agreement and understanding among the parties as to the subject matter hereof.

17.     <u>Headings</u>.  Headings are used solely for the convenience of the parties and shall not be deemed to be a limitation upon or descriptive of the contents of any such Section.

18.     <u>Counterparts</u>.  This Option Award Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

19.     <u>Amendment</u>.  No amendment or modification hereof shall be valid unless it shall be in writing and signed by all parties hereto.

4

#4840-3702-4539v9

Draft

IN WITNESS WHEREOF, the parties hereto have executed this Option Award Agreement as of the date set forth above.

**EAGLE BULK SHIPPING, INC.**

By

Print Name:

Title:

The undersigned hereby accepts and agrees to all the terms and provisions of the foregoing Option Award Agreement.

**PARTICIPANT SOPHOCLES N. ZOULLAS**

Signature

Print Name:

Address:

5

**<u>Exhibit I</u>**

**New CEO Employment Agreement**

Draft

## <u>EMPLOYMENT AGREEMENT</u>

THIS EMPLOYMENT AGREEMENT (the "<u>Agreement</u>"), dated as of the [__] day of [____] (the "<u>Effective Date</u>"), is made among Eagle Shipping International (USA) LLC, a Marshall Islands limited liability company (the "<u>Company</u>"), its parent Eagle Bulk Shipping Inc., a Marshall Islands corporation (the "<u>Parent</u>") and Sophocles N. Zoullas (the "<u>Executive</u>").

WHEREAS, the Board of Directors of the Parent (the "<u>Board</u>") has determined that it is in the best interests of the Company and the Parent for the Executive to continue to serve as the Chief Executive Officer of the Company and Chairman of the Board subject to the terms and conditions set forth in this Agreement;

WHEREAS, the Executive desires to accept such continued service, subject to the terms and provisions of this Agreement.

NOW, THEREFORE, in consideration of the premises and mutual covenants contained herein and for other good and valuable consideration, the receipt of which is mutually acknowledged, the Company, the Parent and the Executive agree as follows:

1.      <u>Employment Term</u>.  The Company hereby agrees to employ the Executive, and the Executive hereby agrees to be employed by the Company, subject to the terms and conditions of this Agreement, for a term (the "<u>Employment Term</u>") commencing on the Effective Date and terminating on June 18, 2017 (the "<u>Initial Term</u>") or upon an earlier Date of Termination, as defined in Section 3(f) below; provided, however, that commencing on the expiration of the Initial Term and each anniversary thereafter, the Employment Term shall automatically be extended for one additional year unless, not later than 90 days prior to any such anniversary, either party hereto shall have notified the other party hereto that such extension shall not take effect.

2.      <u>Terms of Employment</u>.

(a)      <u>Position and Duties</u>.

(i)      During the Employment Term, the Executive shall serve as the Chief Executive Officer of the Company, with such duties and responsibilities as are commensurate with such position, and shall report to the Board.  In addition, during the Employment Term, the Executive shall serve as Chairman of the Board.  The Executive's principal location of employment shall be at the Company's offices in New York, New York; provided, however, that the Executive may be required under reasonable business circumstances to engage in business travel in connection with performing his duties under this Agreement.

(ii)      During the Employment Term, the Executive shall devote substantially all of his business time and attention to the business and affairs of the Company and the Parent and use his reasonable best efforts to faithfully perform his duties and responsibilities; but notwithstanding the foregoing, nothing in this Agreement shall preclude the Executive (i) from engaging, consistent with his duties and responsibilities hereunder, in charitable, educational and community affairs, including

**Error! Unknown document property name.**

serving on the board of directors of any charitable, educational or community organization, (ii) from managing his personal passive investments, (iii) upon approval of the Board, which approval shall not be unreasonably withheld, from serving as a director of another company; (iv) from engaging in activities approved by the Board; and (v) from managing his investment in Delphin Shipping LLC, provided that such management does not materially interfere with the Executive's duties with the Company. The Executive agrees not to take personal advantage of any business opportunities relating to general shipping which may arise during the Executive's employment hereunder which could reasonably be expected to be business opportunities that the Company or the Parent might pursue.  The Executive further agrees to disclose all such opportunities, and the material facts attendant thereto, to the Board for consideration by the Company and the Parent. If within 15 business days of the Executive disclosing such business opportunities to the Board, the Board fails to adopt a resolution (and to provide a copy of same to the Executive) that it may pursue such business opportunity, the Company and the Parent will be deemed to have declined to pursue such opportunity, in which event the Executive shall be free to pursue it, provided that the Executive does not have any majority ownership interest or active day-to-day management role in any person or entity which becomes engaged in such business opportunity.

(b)     Compensation and Benefits.

(i)     Base Salary.  During the Employment Term, the Executive shall receive an annualized base salary ("Annual Base Salary") of not less than $850,000 payable pursuant to the Company's normal payroll practices.  During the Employment Term, the current Annual Base Salary shall be reviewed for increase at such time, and in the same manner as the salaries of senior officers of the Company are reviewed generally.

(ii)     Annual Bonus.  For each calendar year of the Company completed during the Employment Term, the Executive shall be eligible to receive a discretionary cash bonus ("Annual Bonus") as determined by the Compensation Committee of the Board (the "Committee").  The performance goals attributable to the Annual Bonus shall be set by the Committee following reasonable consultation with the Executive.  The Annual Bonus shall be paid as soon as practicable following the determination of such bonus by the Committee and in no event later than the 15th day of the third month following the end of the taxable year (of the Company or the Executive, whichever is later) for which the bonus is payable.  During the calendar years of 2014 and 2015, the Executive will have a target Annual Bonus opportunity equal to 50% of Annual Base Salary and a maximum Annual Bonus opportunity equal to 75% of Annual Base Salary.

(iii)     Equity Compensation Plans.  During the Employment Term, the Executive shall be eligible to receive equity-incentive compensation in the Parent to be awarded in the sole discretion of the Committee at levels commensurate with the benefits provided to other senior officers and with adjustments appropriate for his position as the Chief Executive Officer.  All such equity-based awards shall be subject to the terms and conditions set forth in the applicable plan and agreements, and in all cases shall be as determined by the Committee.

- 2 -

**Error! Unknown document property name.**

(iv)     Initial Equity Grants.  Effective as of the Effective Date, the Company shall grant Executive [___] shares of restricted stock, an option to purchase [___] shares of common stock at an exercise price of $[__][1], and an option to purchase [___] shares of common stock at an exercise price of $[__][2] under the Company's 2014 Equity Incentive Plan (the "Equity Incentive Plan"), each vesting ratably over a four year period, 25% on each anniversary of the date of grant, in accordance with and subject to the terms and conditions set forth in the Equity Incentive Plan and the award agreements substantially in the forms attached hereto as Exhibit B.

(v)     Benefits.  During the Employment Term, the Company shall provide the Executive with participation in such benefit plans and fringe benefits as it provides generally to similarly situated senior executives, all in accordance with the eligibility provisions of such plans and benefits.

(vi)     Expense Reimbursement.  During the Employment Term, the Executive shall, upon submission of adequate documentary evidence reasonably satisfactory to the Company, be entitled to reimbursement of reasonable and necessary out-of-pocket expenses incurred in the performance of his duties hereunder on behalf of the Company, subject to, and consistent with, the Company's policies for expense payment and reimbursement, in effect from time to time.  All expenses reimbursable pursuant to this Agreement shall be reimbursed by the end of the calendar year following the year in which the expenses were incurred.

(vii)     Vacation.  During the Employment Term, the Executive shall be eligible for paid vacation in accordance with the policies of the Company as may be in effect from time to time for senior officers generally; provided, however, that during each full calendar year of the Employment Term, Executive shall be entitled to at least four (4) weeks of paid vacation, prorated for each partial calendar year of the Employment Term.

(viii)     Life Insurance.  The Company shall continue to provide the Executive with a life insurance policy during the Employment Term of this Agreement, as determined by mutual agreement of the Company and the Executive.

3.     Termination of Employment.

(a)     Death or Disability.  The Executive's employment shall terminate automatically upon the Executive's death during the Employment Term.  If the Company determines in good faith that the Disability of the Executive has occurred during the Employment Term (pursuant to the definition of Disability set forth below), it may provide the Executive with a Notice of Termination.  In such event, the Executive's employment with the Company shall terminate effective on the 30th day after receipt of such notice by the Executive (the "Disability Effective Date"); provided, that, within

---

[1] To be calculated based on a total implied equity value equal to the Plan Enterprise Value minus the Exit Facility Amount.

[2] To be calculated based on a total implied equity value equal to (i) 130.2% times the Plan Enterprise Value minus (ii) the Exit Facility Amount.

- 3 -

the 30-day period after such receipt, the Executive shall not have returned to full time performance of the Executive's duties.  For purposes of this Agreement, "<u>Disability</u>" shall mean the inability of the Executive to perform his duties with the Company on a full-time basis for 180 consecutive days or for 180 intermittent days in any one-year period as a result of incapacity due to mental or physical illness which is determined to be total and permanent by a licensed physician selected by the Company or its insurers and reasonably acceptable to the Executive or the Executive's legal representative.  If the parties cannot agree on a licensed physician, each party shall select a licensed physician and the two physicians shall select a third who shall be the approved licensed physician for this purpose.

(b)    <u>Cause</u>.  The Company may terminate the Executive's employment during the Employment Term either with or without Cause by providing a Notice of Termination to the Executive, provided that if such termination is with Cause, such Notice of Termination may be provided to the Executive at any time following the adoption of a written resolution by the Board (which shall require an affirmative vote of not less than a majority of the Board (not including the Executive)) that there is "Cause" for such termination.  For purposes of this Agreement, "<u>Cause</u>" shall mean:

(i)    the Executive's continuing refusal to perform his duties or to follow a lawful direction of the Board;

(ii)    the Executive's intentional act or acts of dishonesty which Executive intended to result in his personal, more-than-immaterial enrichment;

(iii)    the Executive's documented willful malfeasance or willful misconduct in connection with his employment or Executive's willful and deliberate insubordination; or

(iv)    the Executive is convicted of a felony or the Executive enters a plea of nolo contendere to a felony.

(c)    The Executive's employment may be terminated by the Executive for Good Reason if (x) an event or circumstance set forth in the clauses of this Section 3(c) occurs and the Executive provides the Company with written notice within 90 days after the Executive has knowledge of the occurrence or existence of the event or circumstance (the notice must specifically identify the event or circumstance that the Executive believes constitutes Good Reason), (y) the Company fails to correct the event or circumstance within 30 days after the receipt of the notice, and (z) the Executive resigns within 60 days after the date of delivery of the notice referred to in clause (x) above (after the expiration of the 30 day cure period in clause(y) above).  "<u>Good Reason</u>" means, in the absence of the Executive's written consent, any of the following:

(i)    a material diminution by the Company in the Executive's Base Salary;

- 4 -

**Error! Unknown document property name.**

(ii)     a material diminution by the Company in the Executive's Annual Bonus;

(iii)     a material diminution in the Executive's authority, duties, or responsibilities; provided, that, the Executive's removal as Chairman of the Board shall not be deemed Good Reason; provided further, however, that the Executive's removal from membership on the Board shall constitute Good Reason (unless such removal is as a result of death, Disability, termination of the Executive's employment for Cause or at the request of the Executive, other than at the request of the Executive for Good Reason);

(iv)     a requirement that the Executive report to a corporate officer or employee instead of reporting directly to the Board;

(v)     a material diminution in the budget over which the Executive retains authority;

(vi)     a material change in the geographic location at which the Executive must perform the services; or

(vii)     any other action or inaction that constitutes a material breach of the terms of the Executive's Agreement.

(d)     <u>Voluntary Termination</u>.  The Executive may voluntarily terminate his employment without Good Reason and such termination shall not be deemed to be a breach of this Agreement.

(e)     <u>Notice of Termination</u>.  Any termination by the Company for Cause, without Cause or for Disability, or by the Executive for Good Reason or without Good Reason, shall be communicated by Notice of Termination to the other party hereto given in accordance with Section 10(b) of this Agreement.  For purposes of this Agreement, a "<u>Notice of Termination</u>" means a written notice which (i) indicates the specific termination provision in this Agreement relied upon, where applicable, (ii) to the extent applicable, sets forth in reasonable detail the facts and circumstances claimed to provide a basis for termination of the Executive's employment under the provision so indicated and (iii) sets forth the applicable Date of Termination as provided below.  The failure by the Executive or the Company to set forth in the Notice of Termination any fact or circumstance which contributes to a showing of Good Reason or Cause shall not waive any right of the Executive or the Company, respectively, hereunder or preclude the Executive or the Company, respectively, from asserting such fact or circumstance in enforcing the Executive's or the Company's rights hereunder.

(f)     <u>Date of Termination</u>.  "<u>Date of Termination</u>" means the date specified in the Notice of Termination.

(g)     <u>Resignation from All Positions</u>.  Notwithstanding any other provision of this Agreement, upon the termination of the Executive's employment for any reason, the Executive shall immediately resign as of the Date of Termination from all positions that he holds or has ever held with the Company and the Parent, including, without limitation,

- 5 -

**Error! Unknown document property name.**

the Board.  The Executive hereby agrees to execute any and all documentation to effectuate such resignations upon request by the Company, but he shall be treated for all purposes as having so resigned upon termination of his employment, regardless of when or whether he executes any such documentation.

(h)      Separation From Service Under Section 409A.  Notwithstanding the foregoing, the Executive will not be entitled to the benefits provided in Section 4 on account of a Date of Termination unless the Executive has incurred a "separation from service" within the meaning of Section 409A of the Internal Revenue Code of 1986, as amended (the "Code").

4.      Obligations of the Company upon Termination.

(a)      Good Reason; Other Than for Cause.  If, during the Employment Term, (1) the Company shall terminate the Executive's employment other than for Cause, death or Disability or (2) the Executive shall terminate employment for Good Reason:

(i)      the Company shall pay to the Executive in a lump sum in cash within 60 days (except as specifically provided in Section 4(a)(i)(A)(3) and 4(a)(iii)) after the Date of Termination, or if later, as provided in Section 6 below, the aggregate of the following amounts:

A.      the sum of (1) the Executive's accrued but unpaid Annual Base Salary and any accrued but unused vacation pay through the Date of Termination, (2) the Executive's business expenses that are reimbursable pursuant to Section 2(b)(vii) but have not been reimbursed by the Company as of the Date of Termination, subject to such deadline for payment set forth in such section, (3) the Executive's Annual Bonus for the calendar year immediately preceding the calendar year in which the Date of Termination occurs if such bonus has been determined or earned but not paid as of the Date of Termination (at the time such Annual Bonus would otherwise have been paid), and (4) an amount equal to the product of the Executive's Additional Bonus multiplied by a fraction, the numerator of which is the number of days in the year in which the Date of Termination occurs through the Date of Termination and the denominator of which is 365 (collectively, the "Accrued Obligations"); and

B.      the amount equal to the product of (x) two and (y) the sum of (I) the Executive's Annual Base Salary and (II) the Additional Bonus (as defined below); and

(ii)      for two years after the Executive's Date of Termination, the Company shall continue medical and life insurance benefits to the Executive (and, if applicable, to any dependents of the Executive who received such benefits under his coverage prior to the Date of Termination) at least equal to those that would have been provided to the Executive (and to any such dependent) in accordance with the plans, programs, practices and policies of the Company if the Executive's employment had not

- 6 -

Error! Unknown document property name.

been terminated; provided, that the Executive continues to make all required contributions; and

(iii)    all equity awards in the Parent held by the Executive ("Equity Awards") shall vest as if the Executive remained employed for an additional year beyond the Date of Termination; provided, that, with respect to the Equity Awards to be granted in accordance with Section 2(b)(iv), the Executive shall vest in the Equity Awards to an extent no less than the Executive would have vested in such Equity Awards had the Executive remained employed for two years immediately following the date of grant under the applicable Equity Award.  With respect to any Equity Awards which are stock options or stock appreciation rights, such Equity Awards shall remain exercisable until the later of one year after the date of termination and the original expiration date of such options or stock appreciation rights.

Except with respect to payments and benefits under Sections 4(a)(i)(A)(l) and 4(a)(i)(A)(2) and 4(a)(iii), all payments and benefits to be provided under this Section 4(a) shall be subject to the Executive's delivering to the Company, and not revoking, a signed release of claims substantially in the form of Exhibit A hereto within fifty-two days following Executive's Date of Termination.

"Additional Bonus" means an amount equal to (i) 62.5% of Base Salary if the Date of Termination occurs within the first two calendar years following the Effective Date and (ii) 100% of Base Salary if the Date of Termination is at any time thereafter.

(b)    Cause; Other than for Good Reason.  If the Executive's employment shall be terminated for Cause or if the Executive terminates his employment without Good Reason during the Employment Term, this Agreement shall terminate without further obligations to the Executive other than the obligation to pay or provide to the Executive an amount equal to the amount set forth in clauses (1), (2), and (except in the event of a termination by the Company for Cause) (3) and (4) of Section 4(a)(i)(A) above.

(c)    Death.  If the Executive's employment is terminated by reason of the Executive's death during the Employment Term, this Agreement shall terminate without further obligations to the Executive's legal representatives under this Agreement, other than:  (i) the obligation to pay or provide to the Executive's beneficiaries the Accrued Obligations, and (ii) the vesting of Equity Awards as provided in subsection (e) below.

(d)    Disability.  If the Executive's employment is terminated by reason of the Executive's Disability during the Employment Term, this Agreement shall terminate without further obligations to the Executive, other than:  (i) the obligation to pay or provide to the Executive the Accrued Obligations, and (ii) the vesting of Equity Awards as provided in subsection (e) below.

(e)    Vesting of Equity on Death or Disability.  With respect to Executive's Equity Awards, if the Executive's employment is terminated by reason of death or Disability, such awards shall vest as provided in the first sentence of Section 4(a)(iii) above, provided that any stock options or stock appreciation rights shall become fully

- 7 -

Error! Unknown document property name.

exercisable and shall remain exercisable for a period of 12 months after such termination (or until the earlier original expiration date of such options or stock appreciation rights).

5.    Section 280G.

(a)    Notwithstanding any other provisions in this Agreement, in the event that any payment or benefit received or to be received by the Executive (including any payment or benefit received in connection with a change in control of the Parent or the Company or the termination of the Executive's employment, whether pursuant to the terms of this Agreement or any other plan, program, arrangement or agreement) (all such payments and benefits, together, the "Total Payments") would be subject (in whole or part), to any excise tax imposed under Section 4999 of the Code, or any successor provision thereto (the "Excise Tax"), then, after taking into account any reduction in the Total Payments provided by reason of Section 280G of the Code in such other plan, program, arrangement or agreement, the Company will reduce the Total Payments to the extent necessary so that no portion of the Total Payments is subject to the Excise Tax (but in no event to less than zero); provided, however, that the Total Payments will only be reduced if (i) the net amount of such Total Payments, as so reduced (and after subtracting the net amount of federal, state, municipal and local income taxes on such reduced Total Payments and after taking into account the phase out of itemized deductions and personal exemptions attributable to such reduced Total Payments), is greater than or equal to (ii) the net amount of such Total Payments without such reduction (but after subtracting the net amount of federal, state, municipal and local income taxes on such Total Payments and the amount of Excise Tax to which the Executive would be subject in respect of such unreduced Total Payments and after taking into account the phase out of itemized deductions and personal exemptions attributable to such unreduced Total Payments).

(b)    In the case of a reduction in the Total Payments, the Total Payments will be reduced in the following order:  (i) payments that are payable in cash that are valued at full value under Treasury Regulation Section 1.280G-1, Q&A 24(a) will be reduced (if necessary, to zero), with amounts that are payable last reduced first; (ii) payments and benefits due in respect of any equity valued at full value under Treasury Regulation Section 1.280G-1, Q&A 24(a), with the highest values reduced first (as such values are determined under Treasury Regulation Section 1.280G-1, Q&A 24) will next be reduced; (iii) payments that are payable in cash that are valued at less than full value under Treasury Regulation Section 1.280G-1, Q&A 24, with amounts that are payable last reduced first, will next be reduced; (iv) payments and benefits due in respect of any equity valued at less than full value under Treasury Regulation Section 1.280G-1, Q&A 24, with the highest values reduced first (as such values are determined under Treasury Regulation Section 1.280G-1, Q&A 24) will next be reduced; and (v) all other non-cash benefits not otherwise described in clauses (ii) or (iv) will be next reduced pro-rata.  Any reductions made pursuant to each of clauses (i)-(v) above will be made in the following manner: first, a pro-rata reduction of cash payment and payments and benefits due in respect of any equity not subject to Section 409A, and second, a pro-rata reduction of cash payments and payments and benefits due in respect of any equity subject to Section 409A as deferred compensation.

- 8 -

(c)    For purposes of determining whether and the extent to which the Total Payments will be subject to the Excise Tax: (i) no portion of the Total Payments the receipt or enjoyment of which the Executive shall have waived at such time and in such manner as not to constitute a "payment" within the meaning of Section 280G(b) of the Code will be taken into account; (ii) no portion of the Total Payments will be taken into account which, in the opinion of tax counsel ("Tax Counsel") reasonably acceptable to the Executive and selected by the accounting firm which was, immediately prior to the change in control, the Company's independent auditor (the "Auditor"), does not constitute a "parachute payment" within the meaning of Section 280G(b)(2) of the Code (including by reason of Section 280G(b)(4)(A) of the Code) and, in calculating the Excise Tax, no portion of such Total Payments will be taken into account which, in the opinion of Tax Counsel, constitutes reasonable compensation for services actually rendered, within the meaning of Section 280G(b)(4)(B) of the Code, in excess of the "base amount" (as set forth in Section 280G(b)(3) of the Code) that is allocable to such reasonable compensation; and (iii) the value of any non-cash benefit or any deferred payment or benefit included in the Total Payments will be determined by the Auditor in accordance with the principles of Sections 280G(d)(3) and (4) of the Code.

(d)    At the time that payments are made under this Agreement, the Company will provide the Executive with a written statement setting forth the manner in which such payments were calculated and the basis for such calculations, including any opinions or other advice the Company received from Tax Counsel, the Auditor, or other advisors or consultants (and any such opinions or advice which are in writing will be attached to the statement).  If the Executive objects to the Company's calculations, the Company will pay to the Executive such portion of the Total Payments (up to 100% thereof) as the Executive determines is necessary to result in the proper application of this Section 5.  All determinations required by this Section 5 (or requested by either the Executive or the Company in connection with this Section 5) will be at the expense of the Company.  The fact that the Executive's right to payments or benefits may be reduced by reason of the limitations contained in this Section 5 will not of itself limit or otherwise affect any other rights of the Executive under this Agreement.

6.    <u>Section 409A – Six Month Delay on Separation From Service if Required</u>. Notwithstanding anything contained herein to the contrary, to the extent required in order to avoid accelerated taxation and/or tax penalties under Section 409A of the Code, amounts that would otherwise be payable under this Agreement during the six-month period immediately following the Executive's termination, shall instead be paid on the first business day after the expiration of such six-month period, plus interest thereon, at a rate equal to the applicable Federal short-term rate (as defined in Section 1274(d) of the Code) for the month in which such Date of Termination occurs from the respective dates on which such amounts would otherwise have been paid until the actual date of payment.

7.    <u>Full Settlement</u>.  In no event shall the Executive be obligated to seek other employment or take any other action by way of mitigation of the amounts payable to the Executive under any of the provisions of this Agreement, and such amounts shall not be reduced as a result of a mitigation duty whether or not the Executive obtains other employment.  To the extent permitted by applicable law, the Company shall pay directly to the Executive all

- 9 -

**Error! Unknown document property name.**

reasonable legal fees and expenses reasonably incurred by the Executive in connection with the negotiation and preparation of this Agreement. All expenses reimbursable pursuant to this Agreement shall be reimbursed as soon as practicable but in no event later than the end of the calendar year following the year in which the expenses were incurred.

8.      Covenants. In order to induce the Company to enter into this Agreement, as a material condition of his employment by the Company, the Executive agrees as follows:

(a)      Nonsolicitation and Noncompetition.

(i)      Nonsolicitation. During the "Restricted Period" (as defined below), the Executive, on his own behalf or on behalf of any other person, partnership, corporation or other entity, will not, directly or indirectly, (i) intentionally solicit or induce or attempt to solicit or induce any employee, agent or consultant to terminate his or her relationship with the Company, or (ii) intentionally take any action to interfere with, disrupt or attempt to disrupt the relationship, contractual or otherwise, between the Company and any customer, supplier, lessor, lessee, broker or employee or any other person or entity which has a business relationship with the Company. For purposes hereof, the "Restricted Period" means the period commencing on the date of this Agreement and terminating twelve (12) months following the termination of the Executive's employment with the Company for any reason or no reason. As used in this Section 8, "Company" shall include the Company, the Parent and their affiliates.

(ii)      Noncompetition. During the Restricted Period, the Executive shall not engage in any Competitive Activity (as defined below). If the Executive engages in Competitive Activity in breach of this Section following the Date of Termination, then the Company shall be entitled, on a non-exclusive basis, and at the Company's sole election, to (i) seek money damages to the extent they can reasonably be determined; and (ii) seek injunctive and equitable relief on both a provisional and permanent basis in accordance with Section 8(f) hereof. The Company shall give the Executive prior written notice of any perceived breach and 10 business days to cure prior to taking any action. As used in this Section, "Competitive Activity" means involvement in the management or operation of or control, direct or indirect, of a company that operates vessels, of which at least 80% (by number of ships) are dry bulk vessels, wherever such business is located in the world if such business is or reasonably could become a competitor of the Company at the time the Executive becomes affiliated with such company.

(b)      Property of the Company.

(i)      Proprietary Information. All right, title and interest in and to "Proprietary Information" (as defined below) will be and shall remain the sole and exclusive property of the Company. The Executive will not remove from the Company's offices or premises any documents, records, notebooks, files, correspondence, reports, memoranda or similar materials of or containing Proprietary Information, or other materials or property of any kind belonging to the Company unless necessary or appropriate in the performance of his duties to the Company. If the Executive removes such materials or property in the performance of his duties, the Executive will return such

- 10 -

**Error! Unknown document property name.**

materials or property to their proper files or places of safekeeping as promptly as possible after the removal has served its specific purpose.  The Executive will not make, retain, remove and/or distribute any copies of any such materials or property, or divulge to any third person the nature of and/or contents of such materials or property or any other oral or written information to which he may have access or become familiar in the course of his employment, except to the extent necessary in the performance of his duties.  Upon termination of the Executive's employment with the Company for whatever reason and whether voluntary or involuntary, or at any time at the request of the Company, he will leave with the Company or promptly return to the Company all originals and copies of such materials or property then in his possession and shall not retain any copies or other reproductions or extracts thereof except for historical financial or corporate information reasonably required to be retained for tax or related purposes.  The foregoing restrictions and obligations under this Section 8(b) shall not apply to:  (A) any Proprietary Information that is or becomes generally available to the public other than as a result of a disclosure by the Executive, (B) any information obtained by the Executive from a third party which the Executive has no reason to believe is violating any obligation of confidentiality to the Company, or (C) any information the Executive is required by law to disclose.  In the event that the Executive is requested in any proceeding to disclose any Proprietary Information, the Executive agrees to give the Company prompt written notice of such request and the documents requested thereby so that the Company may seek an appropriate protective order.  It is further agreed that if, in the absence of a protective order, the Executive is nonetheless, in the written opinion of his counsel, compelled to disclose Proprietary Information to any tribunal or else stand liable for contempt or suffer other censure or penalty, the Executive may disclose such information to such tribunal without liability hereunder; provided, however, that the Executive must give the Company written notice of the information to be disclosed (including copies of the relevant portions of the relevant documents) as far in advance of its disclosure as is practicable, use all reasonable efforts to limit any such disclosure to the precise terms of such requirement and use all reasonable efforts to obtain an order or other reliable assurance that confidential treatment will be accorded to such information.

"Proprietary Information" means any and all information of the Company or of any subsidiary of the Company.  Such Proprietary Information shall include, but shall not be limited to, the following items and information relating to the following items:  (A) all intellectual property and proprietary rights of the Company (including without limitation Intellectual Property) (B) computer codes or instructions (including source and object code listings, program logic algorithms, subroutines, modules or other subparts of computer programs and related documentation, including program notation), computer processing systems and techniques, all computer inputs and outputs (regardless of the media on which stored or located), hardware and software configurations, designs, architecture and interfaces, (C) business research, studies, procedures and costs, (D) financial data, (E) distribution methods, (F) marketing data, methods, plans and efforts, (G) the terms of contracts and agreements with customers, contractors and suppliers, (H) the needs and requirements of, and the Company's course of dealing with, actual or prospective customers, contractors and suppliers, (I) personnel information, (J) customer and vendor credit information, and (K) any information received from third parties subject to obligations of non-disclosure or non-use.  Failure by the Company to

- 11 -

**Error! Unknown document property name.**

mark any of the Proprietary Information as confidential or proprietary shall not affect its status as Proprietary Information under the terms of this Agreement.

(ii)     Intellectual Property.  The Executive agrees that all "Intellectual Property" (as defined below) will be considered "works made for hire" as that term is defined in Section 101 of the Copyright Act (17 U.S.C. § 101) and that all right, title and interest in such Intellectual Property will be the sole and exclusive property of the Company.  To the extent that any of the Intellectual Property may not by law be considered a work made for hire, or to the extent that, notwithstanding the foregoing, the Executive retains any interest in the Intellectual Property, the Executive hereby irrevocably assigns and transfers to the Company any and all right, title or interest that the Executive may now or in the future have in the Intellectual Property under patent, copyright, trade secret, trademark or other law, in perpetuity or for the longest period otherwise permitted by law, without the necessity of further consideration.  The Company will be entitled to obtain and hold in its own name all copyrights, patents, trade secrets, trademarks and other similar registrations with respect to such Intellectual Property.  The Executive further agrees to execute any and all documents and provide any further cooperation or assistance reasonably required by the Company to perfect, maintain or otherwise protect its rights in the Intellectual Property.  If the Company is unable after reasonable efforts to secure the Executive's signature, cooperation or assistance in accordance with the preceding sentence, whether because of the Executive's incapacity or any other reason whatsoever, the Executive hereby designates and appoints the Company or its designee as the Executive's agent and attorney-in-fact, to act on her behalf, to execute and file documents and to do all other lawfully permitted acts necessary or desirable to perfect, maintain or otherwise protect the Company's rights in the Intellectual Property.  The Executive acknowledges and agrees that such appointment is coupled with an interest and is therefore irrevocable.

"Intellectual Property" means (A) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all patents and patent applications claiming such inventions, (B) all trademarks, service marks, trade dress, logos, trade names, fictitious names, brand names, brand marks and corporate names, together with all translations, adaptations, derivations, and combinations thereof and including all goodwill associated therewith, and all applications, registrations, and renewals in connection therewith, (C) all copyrightable works, all copyrights, and all applications, registrations, and renewals in connection therewith, (D) all mask works and all applications, registrations, and renewals in connection therewith, (E) all trade secrets (including research and development, know-how, formulas, compositions, manufacturing and production processes and techniques, methodologies, technical data, designs, drawings and specifications), (F) all computer software (including data, source and object codes and related documentation), (G) all other proprietary rights, and (H) all copies and tangible embodiments thereof (in whatever form or medium), or similar intangible personal property which have been or are developed or created in whole or in part by the Executive (1) at any time and at any place while the Executive is employed by Company and which, in the case of any or all of the foregoing, are related to or used in connection with the business of the Company, or (2) as a result of tasks assigned to the Executive by the Company.

- 12 -

**Error! Unknown document property name.**

(c)     Interpretation; Severability.  The Executive has carefully considered the possible effects on the Executive of the confidentiality provisions and the other obligations contained in this Agreement and the Executive recognizes that the limitations are reasonable and necessary to protect the legitimate business interests, developing new Proprietary Information and Intellectual Property and developing goodwill of the Company.  The parties hereto agree that if any portion of the above restrictive covenants are held to be unreasonable, arbitrary, against public policy, or for any other reason unenforceable, the covenants herein shall be considered diminishable both as to time and geographic area; each month for the specified period shall be deemed a separate period of time, and the restrictive covenants shall remain effective so long as the same is not unreasonable, arbitrary or against public policy, but in no event longer than the Restricted Period.  The parties hereto agree that in the event any court determines the specified time period or the specified geographic area to be unreasonable, arbitrary or against public policy, a lesser period or geographic area which is determined to be reasonable, nonarbitrary and not against public policy having an effect as close as permitted by applicable law to the provision declared unenforceable shall be enforced against the Executive.

(d)     Calculation of Time.  The time period covered by the restrictive covenants contained in this Section 8 shall not include any period(s) of violation of any restrictive covenant.

(e)     Independent Covenants.  The covenants set forth in this Section 8 shall be construed as an agreement independent of any other provision in this Agreement, and the existence of any potential or alleged claim or cause of action of the Executive against the Company or the Company, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by the Company of the covenants contained herein.  An alleged or actual breach of this Agreement by the Company shall not be a defense to enforcement of the provisions of this Section 8.  It is acknowledged and agreed that the provisions of this Section 8 shall survive the termination of this Agreement.

(f)     Injunction; Specific Performance.  The Executive acknowledges that if he were to breach any of the provisions of this Section 8, it would result in an immediate and irreparable injury to the legitimate business interests of the Company for which monetary damages alone might not be an adequate remedy and that the amount of such damages may be difficult to determine.  Therefore, the Executive agrees that if any such breach shall occur, if the Company so elects, and in addition to all other remedies that the Company may have, the Company shall be entitled to seek injunctive relief, specific performance, or any other form of equitable relief to remedy a breach or threatened breach of this Agreement.  The existence of this right shall not preclude or otherwise limit the applicability or exercise of any other rights or remedies which the Company may have at law or in equity.  If any action is brought by the Company pursuant to this Section 8, the prevailing party shall be entitled to recover costs and reasonable attorneys' fees incurred in such action, the amount of such reasonable attorneys' fees to be determined by the court and not a jury.

- 13 -

**Error! Unknown document property name.**

9.      Successors.  This Agreement is binding on and may be enforced by the Company or the Parent and their successors and assigns and is binding on and may be enforced by the Executive and the Executive's heirs and legal representatives.  The Company or the Parent shall cause any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all, substantially all or a substantial portion of its business and/or assets to assume expressly and agree to perform this Agreement immediately upon such succession in the same manner and to the same extent that the Company or the Parent would be required to perform it if no such succession had taken place.  As used in this Agreement, "Company" shall mean the Company as defined above and any successor to its business and/or assets as aforesaid which assumes and agrees to perform this Agreement by operation of law, or otherwise.

10.     Miscellaneous.

(a)      This Agreement will be governed by the laws of the State of New York.  All actions arising out of or relating to this Agreement shall be heard and determined exclusively in any New York state or federal court sitting the Borough of Manhattan in The City of New York.  The parties hereto hereby (i) submit to the exclusive jurisdiction of any state or federal court sitting in the Borough of Manhattan in The City of New York for the purpose of any action arising out of or relating to this Agreement brought by any party hereto, and (ii) irrevocably waive, and agree not to assert by way of motion, defense, or otherwise, in any such action, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the action is brought in an inconvenient forum, that the venue of the action is improper, or that this Agreement or the transactions contemplated hereby may not be enforced in or by any of the above-named courts.

(b)      Notices under this Agreement must be in writing and will be deemed to have been given (i) when personally delivered or (ii) three business days after mailed by U.S. registered or certified mail, return receipt requested and postage prepaid, and will be addressed as follows:

If to the Executive:
Sophocles N. Zoullas
c/o Eagle Shipping International (USA) LLC
477 Madison Ave.
New York, NY 10022

With a copy to:

[Insert Address]

If to the Company:

Eagle Shipping International (USA) LLC
477 Madison Ave.
New York, NY 10022
Attention:  [_____]

- 14 -

**Error! Unknown document property name.**

<u>With a copy to</u>:

[Insert Address]

or to such other address as either party shall have furnished to the other in writing in accordance herewith.  Notice and communications shall be effective when actually received by the addressee.

(c)     The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement.

(d)     The Company may withhold from any amounts payable under this Agreement such federal, state or local income taxes to the extent the same required to be withheld pursuant to any applicable law or regulation.

(e)     Subject to the provisions of Section 3(c), the Executive's or the Company's failure to insist upon strict compliance with any provision of this Agreement or the failure to assert any right the Executive, the Company or the Parent may have hereunder, shall not be deemed to be a waiver of such provision or right or any other provision or right of this Agreement.

(f)     From and after the Effective Date, this Agreement shall supersede any other employment agreement or understanding between the parties with respect to the subject matter hereof except as otherwise specifically set forth in this Agreement.

(g)     Notwithstanding any other provisions in this Agreement to the contrary, any incentive-based compensation, or any other compensation, paid to the Executive pursuant to this Agreement or any other agreement or arrangement with the Company, which is subject to recovery under any law, government regulation or stock exchange listing requirement, will be subject to such deductions and clawback as is required to be made pursuant to such law, government regulation or stock exchange listing requirement.

11.     <u>Director's and Officer's Insurance; Indemnification</u>.

(a)     The Company shall indemnify the Executive, to the fullest extent permitted by applicable law, against all costs, charges and expenses incurred or sustained by the Executive, including the cost and expenses of legal counsel, in connection with any action, suit or proceeding (collectively a "<u>Proceeding</u>") to which the Executive may be made a party by reason of the Executive being or having been an officer, director, or employee of the Company or Parent or any of its subsidiaries or affiliates. Notwithstanding the preceding, the Executive shall not be entitled to indemnification in connection with any gross negligence or willful misconduct of the Executive.

(b)     The Executive shall be covered during the entire term of this Agreement and thereafter for at least six (6) years by officer and director liability insurance in amounts and on terms similar to that afforded to other executives and/or directors of the Company and the Parent or their affiliates, which such insurance shall be paid by the Company or the Parent.

- 15 -

Section 409A.  If it is determined that any amount due the Executive under the terms of this Agreement has been structured in a manner that would result in adverse tax treatment under Section 409A of the Code ("Section 409A"), the parties agree to cooperate in taking all reasonable measures to restructure the arrangement to minimize or avoid such adverse tax treatment without materially impairing Executive's economic rights and without materially increasing the cost to the Company. Each payment made under this Agreement (including each separate installment payment in the case of a series of installment payments) shall be deemed to be a separate payment for purposes of Section 409A.  Amounts payable under this Agreement shall be deemed not to be a "deferral of compensation" subject to Section 409A to the extent provided in the exceptions in Treasury Regulation §§ 1.409A-1(b)(4) ("short-term deferrals") and (b)(9) ("separation pay plans," including the exception under subparagraph (iii)) and other applicable provisions of Section 409A.  For purposes of this Agreement, with respect to payments of any amounts that are considered to be "deferred compensation" subject to Section 409A, references to "termination of employment", "termination", or words and phrases of similar import, shall be deemed to refer to the Executive's "separation from service" as defined in Section 409A, and shall be interpreted and applied in a manner that is consistent with the requirements of Section 409A. Notwithstanding anything to the contrary in this Agreement, any payment or benefit under this Agreement or otherwise that is exempt from Section 409A pursuant to Treasury Regulation § 1.409A-1(b)(9)(v)(A) or (C) (relating to certain reimbursements and in-kind benefits) shall be paid or provided to the Executive only to the extent that the expenses are not incurred, or the benefits are not provided, beyond the last day of the second calendar year following the calendar year in which the Executive's "separation from service" occurs; and provided further that such expenses are reimbursed no later than the last day of the third calendar year following the calendar year in which the Executive's "separation from service" occurs.  To the extent any expense reimbursement, or the provision of any in-kind benefit is determined to be subject to Section 409A (and not exempt pursuant to the prior sentence or otherwise), the amount of any such expenses eligible for reimbursement, or the provision of any in-kind benefit, in one calendar year shall not affect the payment or provision of in-kind benefits or expenses eligible for reimbursement in any other calendar year (except for any life-time or other aggregate limitation applicable to medical expenses), and in no event shall any  expenses be reimbursed after the last day of the calendar year following the calendar year in which the Executive incurred such  expenses, and in no event shall any right  reimbursement or the provision of any in-kind benefit be subject to liquidation or exchange for another benefit.

13.    Survival.  The rights and obligations of the parties under the provisions of this Agreement (including without limitation, Sections 5 through 13) shall survive, and remain binding and enforceable, notwithstanding the expiration of the Employment Term, the termination of this Agreement, the termination of Executive's employment hereunder or any settlement of the financial rights and obligations arising from Executive's employment hereunder, to the extent necessary to preserve the intended benefits and obligations of such provisions.

- 16 -

**Error! Unknown document property name.**

Draft

IN WITNESS WHEREOF, the Executive has hereunto set the Executive's hand and, pursuant to the authorization from the Board, the Company and the Parent have caused these presents to be executed in its name and on its behalf, all as of the day and year first above written.

SOPHOCLES N. ZOULLAS

EAGLE SHIPPING INTERNATIONAL
(USA) LLC

By:

Name:

Title:

EAGLE BULK SHIPPING INC.

By:

Name:

Title:

- 17 -

**Error! Unknown document property name.**

Draft

## Exhibit A

## RELEASE AGREEMENT

THIS RELEASE AGREEMENT (the "Release") is made as of this day of , , among Eagle Shipping International (USA) LLC, a Marshall Islands limited liability company (the "Company"), its parent Eagle Bulk Shipping Inc., a Marshall Islands corporation (the "Parent") and Sophocles N. Zoullas (the "Executive").

1.  Executive hereby voluntarily, knowingly and willingly releases and forever discharges the Company, its Parent and their subsidiaries and affiliates, and each of their respective officers, directors, partners, members, shareholders, employees, attorneys, representatives and agents, and each of their predecessors, successors and assigns (collectively, the "Company Releasees"), from any and all charges, complaints, claims, promises, agreements, controversies, causes of action and demands of any nature whatsoever which against them Executive or Executive's executors, administrators, successors or assigns ever had, now have or hereafter can, shall or may have by reason of any matter, cause or thing whatsoever (a) arising prior to the time Executive signs this Release; (b) arising prior to the time Executive signs this Release out of or relating to Executive's employment with the Company, service as a member of the Board or the termination thereof; or (c) arising prior to the time Executive signs this Release out of or relating to (i) the Employment Agreement between the Company and the Executive, dated [_____], and (ii) any relevant agreement, contract, plan, practice, policy or program of the Company.  This Release includes, but is not limited to, any rights or claims arising under any statute, including the Employee Retirement Income Security Act of 1974, Title VII of the Civil Rights Act of 1991, the Age Discrimination in Employment Act of 1967, as amended by the Older Workers Benefit Protection Act, the Americans with Disabilities Act, the Family and Medical Leave Act, the Fair Labor Standards Act, or any other foreign, federal, state or local law or judicial decision, including, but not limited to, and any rights or claims under any policy, agreement, understanding or promise, written or oral, formal or informal, between Executive and any of the Company Releasees.  The foregoing Release shall not apply to (i) claims that cannot be released under applicable law, including, but not limited to, any claim for unpaid wages, workers' compensation benefits, unemployment benefits; (ii) legally mandated benefits; (iii) vested benefits, if any, under any equity plan, qualified or nonqualified savings and pension plans in which Executive may have participated during his employment with the Company or its affiliates; (iv) any claim related to indemnification for acts performed while an officer or director of the Company or the Parent or their affiliates as permitted under applicable law and the bylaws of the Company or the Parent or their affiliates, as appropriate; or (v) any claim that may be raised by Executive in his capacity as an equity-holder of the Parent or its affiliates .

2.  Executive acknowledges that Executive has not filed any complaint, charge, claim or proceeding, against any of the Company Releasees before any local, state, federal or foreign agency, court or other body (each individually a "Proceeding").  Executive represents that Executive is not aware of any basis on which such a Proceeding could reasonably be instituted.  Executive (i) acknowledges that Executive will not initiate or

1

cause to be initiated on his behalf any Proceeding and will not participate in any Proceeding, in each case, except as required by law; and (ii) waives any right Executive may have to benefit in any manner from any relief (whether monetary or otherwise) arising out of any Proceeding, including any Proceeding conducted by the Equal Employment Opportunity Commission ("EEOC").  Notwithstanding the above, nothing in Section 1 of this Release shall prevent Executive from (i) initiating or causing to be initiated on his behalf any complaint, charge, claim or proceeding against the Company before any local, state or federal agency, court or other body challenging the validity of the waiver of his claims under the ADEA contained in Section 1 of this Release (but no other portion of such waiver); (ii) initiating or participating in an investigation or proceeding conducted by the EEOC; or (iii) enforcing any of the claims preserved by the last sentence of Section 1 of this Release.

3.      Executive acknowledges that Executive has been advised that he has twenty-one (21) days from the date of receipt of this Release to consider all the provisions of this Release and he does hereby knowingly and voluntarily waive said given twenty-one (21) day period.  EXECUTIVE FURTHER ACKNOWLEDGES THAT EXECUTIVE HAS READ THIS RELEASE CAREFULLY, HAS BEEN ADVISED BY THE COMPANY TO, AND HAS IN FACT, CONSULTED AN INDEPENDENT ATTORNEY WHO IS NOT AFFILIATED WITH AND HAS NO DUTY TO, THE COMPANY, AND FULLY UNDERSTANDS THAT BY SIGNING BELOW EXECUTIVE IS GIVING UP CERTAIN RIGHTS WHICH HE MAY HAVE TO SUE OR ASSERT A CLAIM AGAINST ANY OF THE RELEASEES, AS DESCRIBED IN SECTION 1 OF THIS RELEASE AND THE OTHER PROVISIONS HEREOF.  EXECUTIVE ACKNOWLEDGES THAT EXECUTIVE HAS NOT BEEN FORCED OR PRESSURED IN ANY MANNER WHATSOEVER TO SIGN THIS RELEASE, AND EXECUTIVE AGREES TO ALL OF ITS TERMS VOLUNTARILY.

4.      Executive hereby acknowledges and understands that Executive shall have seven (7) days from the date of execution of this Release to revoke this Release (including, without limitation, any and all claims arising under the ADEA) and that neither the Company, the Parent nor any other person is obligated to provide any benefits to Executive pursuant to the Employment Agreement until eight (8) days have passed since Executive's signing of this Release without Executive having revoked this Release, in which event the Company shall arrange and/or pay for any such benefits otherwise attributable to said eight- (8) day period, consistent with the terms of the Employment Agreement.  If Executive revokes this Release, Executive will be deemed not to have accepted the terms of this Release, and no action will be required of the Company or the Parent under any section of this Release.

5.      This Release does not constitute an admission of liability or wrongdoing of any kind by Executive or the Company or the Parent.

6.      This Release shall be governed and construed in accordance with the laws of New York, without reference to the principles of conflicts of law thereof.

2

**Error! Unknown document property name.**

Draft

IN WITNESS WHEREOF, Executive, the Company and the Parent have executed the Release as of the date and year first written above.

SOPHOCLES N. ZOULLAS

EAGLE SHIPPING INTERNATIONAL (USA) LLC

By:

Name:

Title:

EAGLE BULK SHIPPING INC.

By:

Name:

Title:

3

**Error! Unknown document property name.**

**<u>Exhibit J</u>**

**Exit Financing Facility – Debt Arrangement Mandate Letter**

 **ABN·AMRO**

ABN AMRO Capital USA LLC
100 Park Avenue
17th Floor
New York, NY 10017  USA

<u>Strictly Confidential</u>

September 5, 2014

**Eagle Bulk Shipping Inc.** (the "**Company**")
c/o Eagle Shipping International (USA) LLC
477 Madison Avenue, Suite 1405
New York, New York 10022

Up to $275,000,000 Senior Secured Credit Facilities
Debt Arrangement Mandate Letter

Dear Sirs:

This letter is delivered to Eagle Bulk Shipping Inc., a Marshall Islands corporation ("*you*" or "*Eagle Bulk*"), from ABN AMRO Capital USA LLC ("*ABN AMRO*"), Crédit Agricole Corporate & Investment Bank ("**CACIB**") and DVB Bank SE ("**DVB**") regarding the arrangement and documentation of Senior Secured Credit Facilities (together, the "*Facility*") in an aggregate principal amount of up to $275 million, comprised of (i) a revolving credit facility in an aggregate principal amount of up to $50 million and (ii) a term loan facility in an aggregate principal amount of up to $225 million, to be used for general corporate purposes, including retirement of your DIP financing and partial repayment of pre-petition debt facilities, upon and subject to the terms and conditions of the Summary of Terms and Conditions attached as Exhibit A hereto (the "*Term Sheet*"). The transactions contemplated hereby, including the arrangement and funding under the Facility (the "*Loans*") are collectively referred to as the "*Transactions*". Capitalized terms used herein but not otherwise defined shall have the meanings set forth in the Summary of Terms.

Eagle Bulk has requested that ABN AMRO, CACIB and DVB facilitate the arrangement and syndication of the Facility. Subject to the approval of our respective credit committees, ABN AMRO, CACIB and DVB agree to use their commercially reasonable efforts to (i) arrange a syndicate of financial institutions (the "*Lenders*") reasonably satisfactory to Eagle Bulk, and (ii) structure and facilitate the documentation and execution of the Facility, upon and subject to the terms and conditions of this letter and the Term Sheet.

In connection therewith, ABN AMRO, CACIB and DVB will use their commercially reasonable efforts to perform the following functions as may be appropriate, in its judgment of and after consultation with Eagle Bulk:

(i)     assist Eagle Bulk in determining the structure, price and other terms and conditions for the Loans;

(ii)    assist Eagle Bulk in preparing informational materials to be used in connection with the Loans;

(iii)   solicit interest in the Loans from prospective Lenders;

(iv)    facilitate communication between Eagle Bulk and prospective Lenders;

(v)     assist Eagle Bulk in connection with negotiations with Lenders relating to the Loans; and

(vi)    take such related actions on behalf of Eagle Bulk as may be appropriate, in the judgment of ABN AMRO, CACIB and DVB.

In its role as a Mandated Lead Arranger (as defined below), each of ABN AMRO, CACIB and DVB shall have the right to structure, market and sell the Loans on terms deemed appropriate by ABN AMRO, CACIB, DVB and Eagle Bulk.

1.    Engagement.

In connection with the foregoing, ABN AMRO, CACIB and DVB are pleased to advise you of their willingness to act as joint bookrunners (in such capacity, each a *"Bookrunner"*) and mandated lead arranger (in such capacity, each a *"Mandated Lead Arranger"* and collectively, the *"Mandated Lead Arrangers"*) for the Facility and in their capacity as Bookrunners to use their best efforts to form a syndicate of financial institutions reasonably acceptable to you as lenders for the Facility, upon the terms and subject to the conditions set forth or referred to in this Debt Arrangement Mandate letter (including the Term Sheet, this *"Debt Arrangement Mandate Letter"*).  You hereby appoint (a) each of ABN AMRO, CACIB and DVB as a Bookrunner and Mandated Lead Arranger to act, and each of ABN AMRO, CACIB and DVB as a Bookrunner and Mandated Lead Arranger hereby agrees to act, as a bookrunner and mandated lead arranger for the Facility, and (b) ABN AMRO to act, and ABN AMRO hereby agrees to act, as sole administrative agent and sole collateral agent for the Facility, upon the terms and subject to the conditions set forth or referred to in this Debt Arrangement Mandate Letter.  Each of ABN AMRO, CACIB and DVB, in such capacities, will perform the duties and exercise the authority customarily performed and exercised by it and other financial institutions in such roles.  You agree that ABN AMRO, CACIB and DVB will have "top" placement (and ABN AMRO will have "left" placement) in any and all marketing materials or other documentation used in connection with the Facility.  You agree that no other titles will be awarded and no compensation (other than that expressly contemplated by this Debt Arrangement Mandate Letter and the Fee Letter referred to below) will be paid in connection with the Facility unless you and we shall so agree.

2.    Underwriting and Commitment.

The syndication of the Facility will be performed by ABN AMRO, CACIB and DVB (as Eagle Bulk's representatives, it being understood and agreed that the Mandated Lead Arrangers or any of their respective affiliates (each of the foregoing are sometimes referred to as a *"Syndication Entity"* and collectively as the *"Syndication Entities"*) agree to pursue the full underwriting of the Facility under final terms to be agreed.  To facilitate the arrangement efforts of each of ABN AMRO, CACIB and DVB, Eagle Bulk agrees to direct to ABN AMRO, CACIB and DVB all inquiries from prospective Lenders during the period this engagement is in effect.

EAGLE BULK FURTHER AGREES THAT NOTHING HEREIN SHALL CONSTITUTE A COMMITMENT OR OFFER BY ANY SYNDICATION ENTITY TO PROVIDE OR UNDERWRITE ANY PORTION OF THE LOANS, AND THAT ANY SUCH COMMITMENT OR OFFER WOULD BE EVIDENCED BY AN ADDITIONAL AGREEMENT BETWEEN THE APPLICABLE SYNDICATION ENTITY AND EAGLE BULK.

2

3.   Syndication.

The Bookrunners intend to commence syndication of the Facility promptly upon your acceptance of this Debt Arrangement Mandate Letter and the Fee Letter referred to below to a group of banks, financial institutions and other institutional lenders identified by us in consultation with you and reasonably acceptable to you (the "*Lenders*"), and you agree to assist us in completing a satisfactory syndication. Such assistance shall include (a) your using commercially reasonable efforts to ensure that any syndication efforts benefit from your existing lending and banking relationships, (b) upon reasonable advance notice, direct contact, including by participation in due diligence sessions, between senior management, representatives and advisors of you and the proposed Lenders, (c) assistance by you in the preparation of a Confidential Information Memorandum for the Facility and other customary marketing materials to be used in connection with the syndication, (d) your providing or causing to be provided upon request all information reasonably deemed necessary by the Bookrunners to complete syndication, including a detailed business plan and projections for the years 2015 through 2018 and for the fourth quarter of 2014, and (e) upon reasonable advance notice, the hosting, with the Bookrunners, of one or more meetings of prospective Lenders.

The Bookrunners will manage all aspects of any syndication in consultation with you, including decisions as to the selection of institutions to be approached and when they will be approached, when the Lenders' commitments (the "**Commitments**") will be accepted, which institutions will participate, the allocation of the Commitments among the Lenders, any naming rights and the amount and distribution of fees among the Lenders. To assist the Bookrunners in their syndication efforts, you agree promptly to prepare and provide to the Bookrunners all information with respect to Eagle Bulk, its subsidiaries and the transactions contemplated hereby, including all financial information and Projections as the Bookrunners may reasonably request. As used herein, "*Projections*" means financial projections and similar projections of future financial or operating performance.

4.   Information.

You hereby represent and covenant (and it shall be a condition to our agreements to perform the services described herein and to our respective Commitments as an initial lender (in such capacity, each an "*Initial Lender*")) that (a) all written information other than information of a general economic or industry specific nature or the Projections (the "*Information*") that has been or will be made available to any of us by or on behalf of you or any of your representatives in respect of the Company is or will be, taken as a whole, complete and correct in all material respects when furnished and does not or will not, when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made and (b) the Projections that have been or will be made available to any of us by or on behalf of you or any of your representatives have been or will be prepared in good faith based upon assumptions that you believe are reasonable at the time made and at the time the related Projections are furnished to the Bookrunners (it being understood that such Projections are subject to significant uncertainties and contingencies many of which are beyond our control and that no assurance can be given that any particular Projection will be realized). You agree that if, at any time prior to the closing of the Facility, you become aware that any of the representations in the preceding sentence would be incorrect as of the date that the Information or the Projections were furnished to the Bookrunners, then you will promptly supplement the Information and the Projections so that such representations will be correct under

3

those circumstances. In arranging and syndicating the Facility, we will be entitled to use and rely primarily on the Information and the Projections without responsibility for independent verification thereof.

5. Fees.

As consideration for our agreements to perform the services described herein, you agree to pay to the Bookrunners the fees set forth in this Debt Arrangement Mandate Letter and in the Fee Letter dated the date hereof and delivered herewith with respect to the Facility (the "*Fee Letter*"), provided, however, that notwithstanding any other provision of the Debt Arrangement Mandate Letter or the Fee Letter, you shall not be obligated to pay any amounts under this Debt Arrangement Mandate Letter or the Fee Letter other than any indemnification or reimbursements required under Section 7 hereof until such time as the Company's pending chapter 11 plan of reorganization or any amended, supplemented, or subsequent chapter 11 plan of reorganization of the Company (the "**Plan**") (i) is confirmed by the United States Bankrutpcy Court for the Southern District of New York (the "**Bankruptcy Court**") and (ii) becomes effective.

6. Conditions Precedent.

Our agreements to perform the services described herein are subject to (a) our completion of, and our satisfaction in all respects with the results of, our legal, tax, regulatory, title, environmental, and contract due diligence investigation and our confirmatory business and financial due diligence investigation of Eagle Bulk and its subsidiaries and the transactions contemplated hereby, (b) our not having discovered or otherwise become aware of any information not previously disclosed to us that is inconsistent in a material and adverse manner with the information provided to us prior to the date hereof of the business, financial conditions or prospects of Eagle Bulk and its subsidiaries, taken as a whole, (c) our receipt of unaudited consolidated financial statements of Eagle Bulk and its subsidiaries for the fiscal quarter ended June 30, 2014 and our satisfaction that there has not occurred since the date of any such financial statement any change, event, circumstance or development that has or could reasonably be expected to have a material adverse effect on the business, financial condition or results of operations of Eagle Bulk and its subsidiaries, taken as a whole (other than Eagle Bulk's Chapter 11 bankruptcy proceeding in the United States Bankruptcy Court for the Southern District of New York (the "**Chapter 11 Proceeding**")), (d) our satisfaction that (except as contemplated by the Term Sheet), prior to and during the syndication of the Facility, there shall be no competing issues of debt securities or commercial bank or other credit facilities of Eagle Bulk or its subsidiaries being announced, offered, placed or arranged, (e) the negotiation, execution and delivery of definitive documentation with respect to the Facility consistent with the Term Sheet and otherwise reasonably satisfactory to us and our counsel, (f) the accuracy and completeness of all representations of you and your affiliates and your compliance with the terms of this Debt Arrangement Mandate Letter and the Fee Letter, (g) Commitments shall have been received from Lenders for the full amount of the Facility on the terms and conditions referred to herein and in the Term Sheet, (h) receipt of such approvals and/or confirmations required as may be required under applicable law in connection with the Chapter 11 Proceeding, and (i) the other conditions set forth or referred to in the Term Sheet.

7. Indemnification; Expenses.

You agree (a) to indemnify and hold harmless each of us and our officers, directors, employees, agents, advisors, controlling persons, members and successors and assigns (each, an "*Indemnified Person*") from and against any and all losses, claims, damages, liabilities and expenses, joint or several, to

4

which any such Indemnified Person may become subject arising out of or in connection with this Debt Arrangement Mandate Letter, the Fee Letter, the Facility or any related transaction or any claim, litigation, investigation or proceeding relating to any of the foregoing, regardless of whether any such Indemnified Person is a party thereto (and regardless of whether such matter is initiated by a third party or by Eagle Bulk), and to reimburse each such Indemnified Person upon demand for any reasonable legal or other expenses incurred in connection with investigating or defending any of the foregoing, **provided that** the foregoing indemnity will not, as to any Indemnified Person, apply to losses, claims, damages, liabilities or related expenses to the extent they are found in a final, non-appealable judgment of a court of competent jurisdiction to have resulted primarily from the willful misconduct or gross negligence of such Indemnified Person or the breach in bad faith of such Indemnified Person's obligations hereunder, and (b) to reimburse us from time to time, upon presentation of a summary statement, for all reasonable, out-of-pocket expenses (including but not limited to reasonable, out-of-pocket expenses of our due diligence investigation, syndication expenses, and travel expenses as well as reasonable fees, disbursements and other charges of counsel), in each case, incurred in connection with the Facility, due diligence investigation and the preparation, negotiation and enforcement of this Debt Arrangement Mandate Letter, the Fee Letter, the definitive documentation for the Facility and any ancillary documents and security arrangements in connection therewith regardless of whether the closing of the Facility occurs; **provided that** the Facility Agent agrees to keep you informed of the magnitude of legal fees and expenses as they are incurred and shall give prompt notice upon the aggregate amount thereof being equal to or in excess of $100,000 for the Facility Agent. Notwithstanding any other provision of this Debt Arrangement Mandate Letter, neither you nor any Indemnified Person shall be liable for any indirect, special, punitive or consequential damages in connection with its activities related to the Facility.

8.      <u>Sharing Information; Absence of Fiduciary Relationship; Affiliate Activities</u>.

You acknowledge that we and our affiliates may be providing debt financing, equity capital or other services (including financial advisory services) to other companies in respect of which you may have conflicting interests regarding the transactions described herein or otherwise. Neither we nor any of our affiliates will furnish confidential information obtained from you by virtue of the transactions contemplated by this Debt Arrangement Mandate Letter or our other relationships with you to other companies. You also acknowledge that we have no obligation to use in connection with the transactions contemplated by this Debt Arrangement Mandate Letter, or to furnish to you, confidential information obtained by us from other companies.

You further acknowledge and agree that (a) no fiduciary, advisory or agency relationship between you and us or any of our affiliates is intended to be or has been created in respect of any of the transactions contemplated by this Debt Arrangement Mandate Letter, irrespective of whether we or any of our affiliates has advised or is advising you on other matters, (b) we, on the one hand, and you, on the other hand, have an arm's-length business relationship that does not directly or indirectly give rise to, nor do you rely on, any fiduciary duty on the part of any of us, (c) you are capable of evaluating and understanding, and you understand and accept, the terms, risks and conditions of the transactions contemplated by this Debt Arrangement Mandate Letter, (d) you have been advised that we are engaged in a broad range of transactions that may involve interests that differ from your interests and that we do not have any obligation to disclose such interests and transactions to you by virtue of any fiduciary, advisory or agency relationship, and (e) you waive, to the fullest extent permitted by law, any claims you may have against us for breach of fiduciary duty or alleged breach of fiduciary duty and agree that we shall have no liability (whether direct or

5

indirect) to you in respect of such a fiduciary duty claim or to any person asserting a fiduciary duty claim on behalf of or in right of you, including your stockholders, employees or creditors.

You further acknowledge that each of us is a full service securities firm engaged in securities trading and brokerage activities as well as providing investment banking and other financial services. In the ordinary course of business, we may provide investment banking and other financial services to, and/or acquire, hold or sell, for its own accounts and the accounts of customers, equity, debt and other securities and financial instruments (including bank loans and other obligations) of, Eagle Bulk and other companies with which Eagle Bulk may have commercial or other relationships. With respect to any securities and/or financial instruments so held by us or any of our customers, all rights in respect of such securities and financial instruments, including any voting rights, will be exercised by the holder of the rights, in its sole discretion.

9.    Assignments; Amendments; Governing Law, Etc.

This Debt Arrangement Mandate Letter shall not be assignable by you without the prior written consent of the Initial Lenders and the Bookrunners (and any attempted assignment without such consent shall be null and void), is intended to be solely for the benefit of the parties hereto (and Indemnified Persons), and is not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto (and Indemnified Persons). In the course of any syndication contemplated in Section 3 above, and provided that the Debt Arrangement Mandate of all Lenders shall exceed $275,000,000, each of the Initial Lenders may assign a portion of its Commitment hereunder to one or more prospective Lenders; **provided that** no assignment by an Initial Lender of its Commitment on or prior to the Closing Date shall reallocate, reduce or release such Initial Lender's obligation to fund the Indicative Amount in the event any assignee shall fail to fund on the Closing Date and such Initial Lender shall retain exclusive control over all rights and obligations with respect to its Commitment, including all rights with respect to consents, modification, supplements, waivers and amendments until the Closing Date has occurred. Any and all obligations of, and services to be provided by, us hereunder (including, without limitation, the Commitments of the Initial Lender hereunder, if applicable) may be performed and any and all rights of the Initial Lenders and the Bookrunners hereunder may be exercised by or through any of their respective affiliates or branches. This Debt Arrangement Mandate Letter may not be amended or any provision hereof waived or modified except by an instrument in writing signed by each of the Initial Lenders, if applicable, each of the Bookrunners and you. This Debt Arrangement Mandate Letter may be executed in any number of counterparts, each of which shall be an original and all of which, when taken together, shall constitute one agreement. Delivery of an executed counterpart of a signature page of this Debt Arrangement Mandate Letter by facsimile transmission shall be effective as delivery of a manually executed counterpart hereof. Section headings used herein are for convenience of reference only, are not part of this Debt Arrangement Mandate Letter and are not to affect the construction of, or to be taken into consideration in interpreting, this Debt Arrangement Mandate Letter. You acknowledge that information and documents relating to the Facility may be transmitted through SyndTrak, Intralinks, Debtdomain the internet, e-mail, or similar electronic transmission systems, and that none of us shall be liable for any damages arising from the unauthorized use by others of information or documents transmitted in such manner. Notwithstanding anything in Section 12 to the contrary, but subject to your prior approval, which shall not be unreasonably withheld or delayed, we may place advertisements in financial and other newspapers and periodicals or on a home page or similar place for dissemination of information on the Internet or worldwide web as we may choose, and circulate similar promotional materials, after the closing of the Facility in the form of a "tombstone" or otherwise describing the names of Eagle Bulk and its subsidiaries (or any of them), and the

6

amount, type and closing date of the Facility, all at our expense. This Debt Arrangement Mandate Letter and the Fee Letter supersede all prior understandings, whether written or oral, between you and us with respect to the Facility.

**THIS DEBT ARRANGEMENT MANDATE LETTER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

10.    Jurisdiction.

Each of the parties hereto hereby irrevocably and unconditionally (a) submits, for itself and its property, to the exclusive jurisdiction of any New York State court or Federal court of the United States of America sitting in New York County, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Debt Arrangement Mandate Letter, the Fee Letter or the transactions contemplated hereby or thereby, and agrees that all claims in respect of any such action or proceeding may be heard and determined only in such New York State court or, to the extent permitted by law, in such Federal court, (b) waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Debt Arrangement Mandate Letter, the Fee Letter or the transactions contemplated hereby or thereby in any New York State court or in any such Federal court, (c) waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court, and (d) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Service of any process, summons, notice or document by registered mail addressed to you at the address above shall be effective service of process against you for any suit, action or proceeding brought in any such court.

11.    Waiver of Jury Trial.

EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY OR ON BEHALF OF ANY PARTY RELATED TO OR ARISING OUT OF THIS DEBT ARRANGEMENT MANDATE LETTER, THE FEE LETTER OR THE PERFORMANCE OF SERVICES HEREUNDER OR THEREUNDER.

12.    Confidentiality.

This Debt Arrangement Mandate Letter is delivered to you on the understanding that neither this Debt Arrangement Mandate Letter nor the Fee Letter nor any of their terms or substance, nor our activities pursuant hereto, shall be disclosed, directly or indirectly, to any other person except (a) to your officers, directors, and employees, (b) to your attorneys, accountants and advisors on a confidential and need-to-know basis, (c) as required by applicable law or compulsory legal process or as requested by any governmental authority and (d) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Debt Arrangement Mandate Letter, the Fee Letter, the Facility or any transaction contemplated hereby; provided, however, that the Company may file with the Bankruptcy Court copies of the Debt Arrangement Mandate Letter (including the Term Sheet), the Fee Letter and substantially final drafts of any document memorializing the Facility and any ancillary documents in connection with the Company's efforts to obtain confirmation of its Plan.

7

We will treat as confidential all confidential information relating to you or the transactions contemplated by this Debt Arrangement Mandate Letter that has been provided to us by or on behalf of you in connection with such transactions; **provided that** nothing herein shall prevent us from disclosing any such information (a) pursuant to the order of any court or administrative agency or in any pending legal or administrative proceeding, or otherwise as required by applicable law or compulsory legal process, (b) upon the request or demand of any regulatory authority, or self regulatory organization such as the Financial Industry Regulatory Authority, having jurisdiction over us, (c) to the extent that such information becomes publicly available other than by reason of disclosure by us in violation of this Section 12, (d) to our affiliates and to our and their respective employees, legal counsel, independent auditors and other experts or agents in connection with Facility and who are informed of the confidential nature of such information, (e) to assignees or participants or potential assignees or participants who agree to be bound by the terms of this Section 12 or substantially similar confidentiality provisions, (f) to the extent permitted by Section 9, (g) for purposes of establishing a "due diligence" defense or (h) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Debt Arrangement Mandate Letter, the Fee Letter, the Facility or any transaction contemplated hereby.

13.    Surviving Provisions.

The compensation, reimbursement, indemnification, confidentiality, syndication, jurisdiction, governing law and waiver of jury trial provisions contained herein and in the Fee Letter shall remain in full force and effect regardless of whether definitive financing documentation shall be executed and delivered and (other than in the case of the syndication provisions) notwithstanding the termination of this Debt Arrangement Mandate Letter or the Commitment of the Initial Lender, if applicable, and our agreements to perform the services described herein; **provided that** your obligations under this Debt Arrangement Mandate Letter, other than those relating to confidentiality and to the syndication of the Facility (which shall remain in full force and effect), shall, to the extent covered by the definitive documentation relating to the Facility, automatically terminate and be superseded by the applicable provisions contained in such definitive documentation upon the occurrence of the Closing Date.

14.    PATRIOT Act Notification.

We hereby notify you that, pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law October 26, 2001) (the "**PATRIOT Act**"), each of the Initial Lenders and each other Lender is required to obtain, verify and record information that identifies, Eagle Bulk and any entities providing guarantees (the "**Guarantors**"), which information includes the name, address, tax identification number and other information regarding Eagle Bulk and the Guarantors that will allow the Initial Lender or such other Lender to identify Eagle Bulk and the Guarantors in accordance with the PATRIOT Act. This notice is given in accordance with the requirements of the PATRIOT Act and is effective as to each Initial Lender and each other Lender. You agree that we can share any information provided by you pursuant to this Section 14 with each Initial Lender and each other Lender.

15.    Acceptance and Termination.

If the foregoing correctly sets forth our agreement with you, please indicate your acceptance of the terms of this Debt Arrangement Mandate Letter and of the Fee Letter by returning to us executed counterparts hereof and of the Fee Letter not later than 6:00 p.m., New York City time, on September 5, 2014. Our agreements to perform the services described herein, will expire automatically and without

8

further action or notice and without further obligation to you at such time in the event that we have not received such executed counterparts in accordance with the immediately preceding sentence. In the event that the Closing Date does not occur on or before 5:00 p.m., New York City time, on or before November 5, 2014, then this Debt Arrangement Mandate Letter and our agreements to perform the services described herein, and, if applicable, the Initial Lender's Commitment, shall automatically terminate without further action or notice and without further obligation to you unless we shall, in our discretion, agree to an extension.

*[Remainder of this page intentionally left blank]*

We are pleased to have been given the opportunity to assist you in connection with this financing.

Very truly yours,

ABN AMRO CAPITAL USA LLC

By:
Name: J.D. Kalverkamp
Title: Country Executive

By:
Name:
Title: VP.   Rajn̄r Talwar

CRÉDIT AGRICOLE CORPORATE &
INVESTMENT BANK

By:
Name:
Title:

By:
Name:
Title:

DVB BANK SE

By:
Name:
Title:

10

We are pleased to have been given the opportunity to assist you in connection with this financing.

Very truly yours,

ABN AMRO CAPITAL USA LLC


By:_____
    Name:
    Title:


By:_____
    Name:
    Title:


CRÉDIT AGRICOLE CORPORATE &
INVESTMENT BANK

By:_____
    Name: Jerome Ouval
    Title: Managing Director

By:_____
    Name: Michael Choina
    Title: Director


DVB BANK SE


By:_____
    Name:
    Title:

We are pleased to have been given the opportunity to assist you in connection with this financing.

Very truly yours,

ABN AMRO CAPITAL USA LLC

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

CRÉDIT AGRICOLE CORPORATE &
INVESTMENT BANK

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

DVB BANK SE

By:_____
    Name:  **Gill Driscoll**      JUHO RANTA·AHO
    Title:  **Senior Vice President**    VICE PRESIDENT

10

*Accepted and agreed to as of the date first above written:*

EAGLE BULK SHIPPING INC.

By: _____

Name:  Adir Katzav

Title:   CFO

4

Exhibit A
Summary of Terms and Conditions

ABN/CACIB/DVB 9/9/14

## INDICATIVE TERM SHEET FOR USD 275,000,000 SENIOR SECURED CREDIT FACILITIES FOR EAGLE BULK SHIPPING, INC.

### TERM SHEET

*Please note that the terms set out in this term sheet are indicative only and do not constitute an offer to arrange or finance the Facility. The provision of the Facility is subject to amongst others due diligence, credit committee approvals, the terms and conditions of the Mandate Letter, outcome of corporate restructuring that is satisfactory to the Lenders and their counsel and due execution of documentation and all conditions precedent being met, all to be in form and substance satisfactory to the Lenders.*

### Total Facility of maximum USD 275,000,000
### (United States Dollars Two Hundred Seventy Five Million)

### PART I
### PARTIES TO THE FACILITY

| | |
|---|---|
| **Borrower:** | Eagle Bulk Shipping Inc. (the "**Borrower**"), a Marshall Islands corporation. |
| **Guarantor (s):** | Companies owning the Collateral Vessels that are each registered in Marshall Islands, and 100% owned and controlled by the Borrower. |
| **Collateral Vessel:** | Vessels as set out in Appendix-1. |
| **Obligors:** | The Borrower and the Guarantors. |
| **Joint Bookrunners / Mandated Lead Arrangers (MLA):** | ABN AMRO Capital USA LLC or any entity within the ABN AMRO Bank N.V. group ("**ABN**"), Crédit Agricole Corporate and Investment Bank ("**CACIB**") and DVB Bank SE ("**DVB**") |
| **Structuring Banks** | ABN and CACIB |
| **Facility Agent:** | ABN |
| **Security Agent:** | ABN |
| **Lenders:** | ABN, CACIB, DVB and any other banks committing to the Facility (the "**Lenders**") to make up the Senior Credit Facility.  ABN, CACIB and DVB will each aim to commit 1/3 of the Facility or USD 91,666,667. |
| Account Bank: | [An MLA] |
| **Required Lenders:** | The Lenders having outstanding principal amounts and available commitments equal to or greater than 66-2/3% of the Facility. |
| **Swap Providers:** | Any Lender (each a "**Swap Bank**" and together "**Swap Banks**"). |

---

FOR DISCUSSION PURPOSES ONLY                                            Page 1

ABN/CACIB/DVB 9/9/14

**Arrangers' Legal Counsel:**          Watson, Farley & Williams LLP

## PART II

## THE FACILITY

**Facility Type:**

Senior Secured Credit Facility (the "**Senior Credit Facility**") in an aggregate principal amount of USD 275,000,000; provided that the aggregate principal amount does not exceed 35% of the fair market value ("**FMV**") of the Collateral Vessels tested at the time of the initial drawdown, following which for any subsequent drawdown compliance with the VMC covenant, amongst other covenants, is to be adhered to. Such Senior Secured Facility to consist of:

1.  A revolving credit facility (the "**Revolving Credit Facility**"): in an aggregate principal amount of USD 50 million; and

2.  A term loan facility (the "**Term Loan Facility**"): in an aggregate principal amount of USD 225 million.

"**FMV**" shall be determined as the arithmetic average of the valuations of two Approved Brokers nominated by the Borrower. "**Approved Brokers**" shall be [Braemar, Compass Maritime, Clarksons, ICAP, Lorentzen & Stemoco and Maritime Strategies International.]

**Facility Purpose:**

The Senior Credit Facility will be used for general corporate purposes, including retiring the DIP finance and the partial repayment of pre-petition debt facilities.

**Closing Date:**          [●] 2014

**Availability:**

Senior Secured Facility will be available for drawing as follows:

1.  The Revolving Credit Facility will be available on a revolving basis from and after the Closing Date until [30] business days from the Maturity Date, with the minimum amount of each drawdown to be not less than USD [1] million. However, the Revolving Credit Facility can only be drawn on a maximum of 3 occasions between any two consecutive Term Loan Facility repayment dates.

2.  The Term Loan Facility will be available only in a single draw of the full amount of the Term Loan Facility on the Closing Date.

No amounts repaid under the Term Loan Facility may be re-borrowed.

**Final Maturity Date:**

The earlier of 5 years from Closing Date ("**Maturity Date**") and December 15, 2019

ABN/CACIB/DVB 9/9/14

| | |
|---|---|
| **Repayment:** | The Term Loan Facility to be repaid in 20 quarterly instalments of USD 3,906,250 million.  On the Final Maturity Date, the Borrower shall pay a balloon covering any amounts remaining unpaid under the Term Loan Facility and the Revolving Credit Facility (the "**Senior Credit Facility Net Balloon**") of max USD 180 million plus restricted cash pledged to the Lenders of USD 16.875 million (a total balloon of USD 196,875,000 million). |
| **Voluntary Prepayment:** | Loans under the Senior Secured Facility may be voluntarily prepaid by the Borrower at any time, and unused commitments under the Revolving Credit Facility may be voluntarily reduced at any time, in whole or in part, at the option of the Borrower, upon notice and in minimum principal amounts of USD [5] million for the Term Loan Facility and USD [1] million for the Revolving Credit Facility.  Any prepayment of the Term Loan Facility to be applied in inverse order of maturity.  Any voluntary prepayment will be made with accrued interest on the amount prepaid and, if made on a day other than the last day of the relevant Interest Period, subject to reimbursement of the Lenders' breakage costs. |
| | In case the Borrower decides to refinance the Senior Credit Facility at any time between the Closing Date and the date which is 18 months following the Closing Date, a 1% prepayment fee shall be payable together with the prepayment, unless the refinance is done with the existing Lenders. |
| **Mandatory Prepayment:** | Upon total loss or disposal of a Collateral Vessel, an amount that is higher of (a) the FMV ratio percentage attributable to that Collateral Vessel at the time of its sale or total loss, (b) the amount ensuring that ratio of aggregate FMV of the Collateral Vessels divided by the aggregate amount under the Senior Credit Facility (including all outstanding amounts and amounts committed but undrawn) remains the same at and after sale or total loss of such vessel and (c) USD 4.0 million, **provided that** if the proceeds are less than USD 4.0 million, then the entire amount of such proceeds shall be used to prepay the Senior Credit Facility.  A Mandatory Prepayment shall be made on (i) in the case of a disposal, on the date on which such disposal is completed, or (ii) in the case of a total loss, the earlier of (x) the date the disposal/insurance proceeds have been received, and (y) 120 days after such event of total loss has occurred.  Disposals are permitted only to the extent that after such disposals the ratio of aggregate FMV of remaining Collateral Vessels which were of age less than 10 years on the Closing Date to the aggregate FMV of all remaining Collateral Vessels shall be greater than 60%. |
| **Security:** | Security documentation to secure on a cross-collateralized basis the obligations of the Obligors under the Senior Secured Facility, the joint and several guarantee of the Guarantors and to be customary for financing of this nature and acceptable to the Lenders, including but not limited to: |

1.  First priority mortgage on all the Collateral Vessels;

2.  First priority pledge over all equity interests of the Guarantors;

3.  First priority assignment of insurances on the Collateral Vessels;

4.  First priority pledge of the earnings account(s) held with the Account Bank, into which the all earnings of the Collateral Vessels are to be paid;

5.  First priority assignment of any charter contracts of 18 months or longer duration (if any) (with consent and acknowledgement from each charterer to be obtained on a commercially reasonable efforts basis).

6.  First priority assignment of the Hedging Agreements (if any) entered into with the Swap Bank(s).

7.  First priority assignment of all earnings of the Collateral Vessels in respect of any charter contracts of less than 18 months duration.

8.  First priority assignment of ship management agreements in respect of the Collateral Vessels and a manager's confirmation reasonably acceptable to the Lenders.

9.  If the Collateral Vessels are on charters with affiliates of the Borrower, a first priority assignment of these charters (regardless of duration) to the Lenders.

## PART III

## PRICING

**Facility Fee:**    As per the mandate and fee letter.

**Agency Fee:**    As per the mandate and fee letter.

**Commitment Fee:**    40% of the applicable margin, payable quarterly in arrears from the closing date and on the final drawdown date on the undrawn and un-cancelled portion of the Revolving Credit Facility. Commitment fee on any cancelled portion of the Senior Secured Facility shall be paid on the date the cancellation is effective.

**Interest Periods:**    Each interest period shall be for a period of 1, 3 or 6 months duration, or such other period as the Facility Agent may, with the consent of all Lenders, agree with the Borrower.

**Interest:**    The aggregate of:

1.  The Margin

2.  The applicable LIBOR rate, if LIBOR is below zero then it will be deemed to be zero for the relevant Interest Period; and

3.  Mandatory cost, if any.

Interest will be calculated on the basis of the actual number of days elapsed in a year of 360 days, and shall be payable at the end of each interest period starting from the Closing Date.

Interest on any prepayment shall be made on the date the prepayment is due.

ABN/CACIB/DVB 9/9/14

**Margin:**      If the aggregate FMV of the Collateral Vessels divided by aggregate facility amount (including amounts drawn and committed but undrawn) is:

(a) greater than 250% then applicable Margin shall be 3.50% per annum;

(b) greater than or equal to 225% and less than or equal to 250% then applicable Margin shall be 3.75% per annum;

(c) less than 225% then applicable Margin shall be 4.00% per annum.

Notwithstanding the above the applicable Margin for the first 12 months from Closing Date, to be 3.875% per annum

However, in case of an Event of Default, the default rate shall be the applicable Margin plus 2% per annum.

**Interest Rate Swap:**    The Swap Banks may at their discretion provide an interest rate swap facility to the Borrower in support of an interest rate hedge and any liabilities of the Borrower under any and all hedging transactions made pursuant to the ISDA Master Agreement (the "**Hedging Agreements**"), and any collateral security therefor, shall be subordinated to the Senior Secured Credit Facility, and subject to documentation reasonably acceptable to the Lenders.

# PART IV

## OTHER TERMS

**Financial Covenants:**    The following financial covenants will apply to the Borrower:

**Net Debt to Total Capital Ratio** – net interest bearing total debt divided by the sum of shareholders' equity and interest bearing total debt to be $\leq 0.65$ (measured quarterly)

**Minimum Liquidity** – Minimum liquidity shall at all times be at least the higher of (a) USD 20,000,000 and (b) USD 500,000 of Cash per Collateral Vessel (the "**Minimum Liquidity**"). At least 75% of the Minimum Liquidity to be in the form of Cash and the remaining can be in the form of either undrawn credit lines with remaining maturity of at least 1 year or other form of Cash Equivalents acceptable to the Lenders. The Cash component of Minimum Liquidity to be held in an account with the Security Agent and to be pledged to the Lenders.

**Interest Cover ratio** – EBITDA to cover at least 2.50 times the Interest expenses at all times (measured quarterly on a historically rolling 12 month basis). To be tested for the first time at the end of the financial quarter following the 12 month anniversary from the Closing Date. Breach of this covenant can be cured by placing into a pledged account additional cash via further equity injection to cover any shortfall in EBITDA, such cash injection to be deemed and included in as EBITDA for these purposes, but only if the VMC at such time is greater than or equal to 180% and remains so during such a cure period.

ABN/CACIB/DVB 9/9/14

**Value Maintenance Clause:**

The aggregate FMV of the Collateral Vessels divided by the aggregate amount under the Senior Credit Facility (including all outstanding amounts and amounts committed but undrawn) should at all times be, for years 1 and 2 after the Closing Date not less than 150%, for year 3 after the Closing date not less than 157.5% and thereafter till Final Maturity Date not less than 165% ("**VMC**"). Valuations shall be obtained at the expense of the Borrower at least twice per year or, upon the occurrence of (i) an Event of Default (and thereafter at such frequency the Facility Agent requests) or (ii) a Mandatory Prepayment event (disposal or total loss). In other events, the Facility Agent is at all times entitled to obtain additional valuations at its own cost. All valuations in respect of a Collateral Vessel shall be in the form of a written appraisal and in form and substance satisfactory to the Facility Agent and on a charter free basis.

Non-compliance with the VMC will result in an immediate reduction in the availability under the Revolving Credit Facility for the amount needed to cure the breach. If a reduction in the availability of the Revolving Credit Facility is not sufficient to cure the breach, a decrease of the Facility will be required or additional security in form and substance satisfactory to the Lenders will have to be provided within 30 days of notice from Facility Agent.

**Documentation:**

The Senior Secured Facility will be made available under a facility agreement (the "**Facility Agreement**") and related documents (together with the Facility Agreement, the "**Finance Documents**"), all in form and substance satisfactory to the Lenders.

**Events of Default:**

Standard for transactions of this nature subject to customary cure periods, carve-outs and thresholds (if applicable), including (but not limited to):

1. failure to pay any amounts due when required under the Senior Credit Facility Agreement unless failure to pay is caused by an administrative or technical error or any disruption event in the payment/communication system which is beyond the control of the Obligors, in which case the Obligors will rectify such an error within 3 business days;

2. breach of any of the financial covenants and VMC;

3. untimely submission of compliance certificates;

4. non-payment insurance premium or failure to maintain required insurance coverage or insurers/clubs disclaiming liability for non-disclosure, misrepresentation or breach of insurance terms or cancelling insurances;

5. failure to comply with any other provision of the Finance Documents unless such failure is capable of remedy and is remedied within 10 Business Days of the earlier of (i) Facility Agent giving notice and (ii) the relevant Obligor becoming aware;

6. misrepresentation;

7. cross default (including but not limited to swap liabilities);

8. insolvency, insolvency proceedings or a creditor attaches or takes possession of, or a distress, execution, sequestration or process is levied or enforced upon or sued out against, a material part of the undertakings, assets, rights or revenues of any Obligor in relation to a claim by such creditor;

ABN/CACIB/DVB 9/9/14

9. unlawfulness and invalidity;

10. cessation of business;

11. [audit qualification];

12. expropriation;

13. repudiation and rescission of agreements;

14. failure of an Obligor to comply with or pay any sum in an amount exceeding USD 2.0 million due from it under any final judgment or any final order made or given by any court of competent jurisdiction;

15. security over Collateral Vessel or other assets securing the Senior Secured Facility becomes un-enforceable;

16. registration of Collateral Vessel in flag state is terminated or, where applicable, not renewed;

17. arrest of Collateral Vessel, if vessel is not released within 14 days;

18. material adverse change or event or circumstance which has or may have a material adverse effect; and

19. political instability in a Collateral Vessel's flag state or in a jurisdiction relevant to an Obligor that in the reasonable opinion of the Lenders has or could have a material adverse effect and the relevant Obligor does not transfer registration to a flag state reasonably acceptable to the Majority Lenders within 60 days.

**Other Covenants:** Usual and customary including customary (carve-outs to be agreed), including but not be limited to, the following:

1. No Change of Control.

   *Borrower*: No entity to have more than [35]% equity interest in the Borrower except for any entity whose equity interest in the Borrower at the date of its exit from Chapter 11 was greater than [35]% but less than or equal to [45]%. In addition, a Change of Control of the Borrower shall be deemed to have occurred if:

   (i) any person (other than an existing shareholder on the Closing Date) obtains the power (whether or not exercised) to elect a majority of the Board of Directors, or

   (ii) any "Person" or "Group" (within the meaning of the United States Securities Exchange Act of 1934, as amended) (other than an existing shareholder that holds [35]% or more on a fully diluted basis of the voting interest on the Closing Date) becomes a "beneficial owner" of [35]% or more on a fully diluted basis of the voting interest.

   *Guarantors*: the Guarantors to remain 100% owned by the Borrower.

2. No material change of business of the Obligors without the prior written consent of the Required Lenders.

FOR DISCUSSION PURPOSES ONLY

Page 7

3. The Guarantors will not incur additional indebtedness or investments except for (a) any guarantee of the Borrower's Interest Rate Swap exposure with the Swap Banks, (b) unsecured shareholder loans that are fully subordinated to the Senior Credit Facility, and (c) trade debt incurred in the ordinary course of business (which is not outstanding for more than 60 days).

4. The Collateral Vessels will be free of all liens and debts (including other mortgages) other than maritime liens/debts incurred in the ordinary course of business in connection with the operation of the Collateral Vessels in an amount of up to USD 250,000 per Collateral Vessel (this amount not to remain outstanding for more than 60 days).

5. All earnings of each Collateral Vessel shall be paid into the relevant Earnings Account for such vessel.

6. The Borrower may declare or pay dividends in the first year after the Closing Date provided that it reduces the Senior Credit Facility Net Balloon on a dollar-for-dollar basis. The Borrower may not declare or pay dividends if the aggregate of (i) Cash & Cash equivalents and (ii) undrawn but available amounts under the Revolving Credit Facility falls below USD 30 million.

7. The Obligors will not declare or pay dividends if a potential Event Of Default or an Event of Default has occurred and is continuing or will occur from the payment of such dividend.

8. Collateral Vessels shall maintain the highest class available in their category by classification society member of IACS, free of any overdue recommendation, and to be acceptable to the Lenders (acting reasonably). No change on class certification without the Required Lenders' prior written consent.

9. The Collateral Vessels shall be registered in and fly the flag of [TBD], or such other ship registry or flag acceptable to the Required Lenders. No change of registry or flag without the Required Lenders prior written consent.

10. Upon a reasonable request from the Facility Agent, the Obligors shall provide details regarding the current employment status of the Collateral Vessels.

11. No encumbrances over existing and future assets of any of the Guarantors save for encumbrances created under this Senior Credit Facility or permitted thereby and encumbrances created in the ordinary course of business.

12. From the delivery of the Collateral Vessels, the Guarantors shall comply with the ISM Code and with the ISPS Code. The Guarantors shall provide copies of documents of compliance and safety management certificates to the Facility Agent.

13. Each Obligor shall comply with applicable laws, rules, regulations (including but not limited to environmental and safety laws and requirements), the failure to comply with which could reasonably be expected to result in a material adverse effect on such Obligor's business.

14. The Facility Agent has the right to access to class records and inspection reports of the Collateral Vessels throughout the life of the Senior Credit

Facility.

15. The Facility Agent shall have the right on a reasonable basis to inspect the Collateral Vessels at any time, provided that a 15 business days advance notice is given to the relevant Guarantor(s), (and without undue interference with vessel operations), but not more than once per year at the cost of the relevant Guarantor(s).

16. No Material Adverse Change ("**MAC**") (defined as a change in the financial condition of the Borrower on a consolidated basis which, in the reasonable opinion of the Lenders acting in good faith, would materially prejudice the successful and timely performance of the material payment obligations under the Facility).

17. The Borrower will inform the Facility Agent upon becoming aware of the occurrence of any insolvency event, any material default under any finance document, any material environmental claim, any liquidation, arbitration or administrative proceedings, any material adverse change in its financial position, any material default under a contract relative to the Collateral Vessels.

18. The Obligors shall notify the Facility Agent of any Event of Default, which occurs (and steps taken, if any, to remedy it) promptly upon its occurrence.

19. Each Obligor shall duly and punctually pay and discharge all taxes imposed on it or its assets within the time period allowed without incurring penalties unless contested in good faith and for which adequate reserves are being maintained.

20. Any transaction with affiliates to be made on market terms and otherwise on arms-length basis.

21. The Obligors shall not, without the prior written consent of the Required Lenders, merge or consolidate with any other company, de-merge or undertake any corporate restructuring.

22. Restriction on disposals.  The Borrower shall not and shall ensure that no other subsidiary will either in a single transaction or in a series of transactions, whether related or not and whether voluntarily or involuntarily, without the prior written consent of the Required Lenders, sell, transfer, grant or lease out or otherwise dispose of the whole or a substantial part of its assets, or sell, transfer, grant or lease out or otherwise dispose of any of its assets other than at market value and on arms-length terms, except that a Guarantor may sell a Collateral Vessel if it complies with the terms of sale provided for herein.

23. All information required by National or Supra-national Financial Institutions to comply with the Client Acceptance Procedures ("**Know Your Customer**", "**KYC**") of the Lenders, including but not limited to: (i) Evidence of due incorporation, including Certificates of Good Standing, (ii) Officer's certificate, setting out the names of Directors/Officers, (iii) Copy of the passports and address proof of the Directors and (iv) Articles of Incorporation/By Laws.

24. The Collateral Vessels shall be operated in compliance with all applicable sanction regimes.

ABN/CACIB/DVB 9/9/14

25. In consultation with the Facility Agent the Obligors to put in place a "green" scrapping policy.

26. The Borrower to use its best efforts to remain listed on the NASDAQ or another exchange acceptable to the Lenders.

**Insurance:**

The Guarantors shall ensure and the Borrower will procure that Collateral Vessels are fully insured against such risks, including but not limited to Hull & Machinery, Hull Interest and/or Freight Interest, War Risks (including acts of terrorism and piracy), Protection & Indemnity (including maximum cover for pollution liability) in such amounts, on such terms consistent with the prevailing market practice and placed with such brokers/insurers/clubs as the Facility Agent from time to time may approve, such approval not to be unreasonably withheld.

In addition, the Guarantors / Borrower shall reimburse expenses related to MII / MAP which the Administrative Agent will take out on the Collateral Vessels upon such terms and amounts as the Administrative Agent deems appropriate.

The aggregate agreed insurable value of the Collateral Vessels shall be at least equal to the higher of (i) the FMV of the Collateral Vessels and (ii) one hundred and twenty per cent (120%) of the facility amount.

The loss payable clause to be in excess of USD 1.0 million and standard letters of undertaking to be executed.

**Representations and Warranties:**

The Borrower or the Guarantors (as the case maybe) will represent and warrant as of the Closing Date with respect to customary matters including but not limited to, due organization, corporate authority, due execution and delivery of the transaction documents, no contravention of laws, regulations or material contractual obligations, receipt of necessary consents, no material litigation except as disclosed, financial statements and other information, payment of taxes, no deductions, *pari passu* ranking, use of proceeds, ERISA compliance, no place of business or office in the U.S. except in the state of New York, no material adverse effect, disclosure (no material misstatement of facts or material omissions), maintenance of properties and insurance, no money laundering, PATRIOT Act, OFAC, and anti-terrorism law compliance, FCPA and anti-bribery law compliance, environmental compliance, use of proceeds, creation, perfection and priority of security interests, ownership structure, subject to any qualifications or reservations as to matters of law. Each Obligor will also represent that it is not in breach of any applicable sanction regimes, on the date of the agreement, on the date of each drawdown notice and on the first day of each Interest Period.

**Information Undertakings:**

The Obligors shall supply, as the case maybe, each of the following:

1. as soon as they become available, but in any event within 120 days after the end of its financial year the audited consolidated financial statements of the Borrower;

2. as soon as they become available, but in any event within 90 days after the end of each financial quarter the consolidated financial statements of the Borrower;

3. as soon as they become available, but in any event within 90 days of the

ABN/CACIB/DVB 9/9/14

quarter end quarterly management accounts of the Guarantors;

4. as soon as they become available, but in any event prior to the start of each financial year, cash flow projections for the Borrower;

5. with each set of financial statements, a certificate demonstrating compliance with the Financial Covenants (quarterly), along with supporting schedules and VMC (as defined above) (half yearly) signed by the CFO or another authorized signatory of the Borrower/Guarantor as the case maybe;

6. details of any material litigation, arbitration or administrative proceedings relative to the Obligors; and

7. such other information regarding the financial condition, business and operations of the Obligors as the Agent may reasonably request.

**Conditions Precedent:**

Standard conditions precedent for transactions of this nature, which are acceptable to the Facility Agent, including but not limited to execution of the Senior Secured Facility, the Guarantees (if not imbedded in the Senior Secured Facility) and legal opinions satisfactory to the Facility Agent, terms of the documentation to be acceptable to the Lenders, necessary approvals, satisfactory KYC checks, information requirement, registrations, corporate documents provided, no litigation, signing of all relevant contracts, all costs, fees and expenses relating to the Senior Credit Facility paid, no Event of Default, no MAC, valuations from approved shipbrokers provided no earlier than 14 business days before respective drawdown and inspection reports of vessels by an independent surveyor for Collateral Vessels older than 15 years of age at drawdown, confirmation that the Minimum Liquidity amount has been funded in an account pledged to the Security Agent and that the Revolving Credit Facility is not drawn to make such funding, creation and perfection of security interests, and a favorable opinion from the Facility Agent's insurance consultants (acting on behalf of the Lenders) at the expense of the Borrower/Guarantors confirming that the required insurances have been placed on terms and with underwriters acceptable to the Facility Agent.In addition for subsequent drawings under the Revolving Credit Facility, customary condition precedents including but not limited to the following will apply: no MAC, no Event of Default continuing or no Event of Default as a result of the borrowing.

Finally, receipt of such approvals and/or confirmations required as may be required under applicable law in connection with Eagle Bulk's Chapter 11 bankruptcy proceeding in the United States Bankruptcy Court for the Southern District of New York.

**Market Disruption:**

If a Market Disruption Event occurs in relation to the Senior Secured Facility for any Interest Period, then the rate of interest on each Lender's share of the Senior Credit Facility for the Interest Period shall be the rate per annum which is the sum of (x) the Margin and (y) the rate notified to the Facility Agent by that Lender, which expresses the cost to that Lender of funding its participation in the Credit Facility from whatever source it may reasonably select. A "Market Disruption Event" shall mean that (i) LIBOR is not available, or (ii) the Facility Agent receives notifications, from a Lender or Lenders whose participations in the Senior Credit Facility exceed 50%, that the cost to it of funding its participation in the Credit Facility from the London Interbank Market or if cheaper from whatever source it may reasonably select would be in excess of

ABN/CACIB/DVB 9/9/14

LIBOR.

**Disclosure:** The Obligors agree and irrevocably authorize the Lenders to give, divulge and reveal from time to time information and details relating to the Obligors' accounts, loan documentation, and the Senior Credit Facility to any government authorities (only if they are legally required to do so), the Lenders' head offices, branches and affiliates, regarding any funding, operational arrangement or enforcement, in relation thereto.

**Assignment and Transfers by Lenders:** A Lender may assign any of its rights or transfer by novation any of its rights and obligations to another bank or financial institution (other than the following parties (the "**Restricted Parties**")) without the consent of the Borrowers (provided that an assignment or transfer to a Restricted Party or Restricted Parties shall be permitted where an Event of Default occurs and is continuing and the Agent has given the Borrowers 15 Business Day's written notice of the Restricted Party or Restricted Parties to whom such assignment or transfer is to be made and the relevant Event of Default is continuing at the expiry of such period of notice). [Borrower to suggest list of Restricted Parties, if any]

**Taxes:** Any payments under the Senior Facility agreement are to be made free and clear of all present and future taxes, levies, duties or deductions of any nature whatsoever, levied either now or at any future time.

**Illegality:** The finance documents will contain provisions for prepayment and cancellation of the Facility in the event of supervening illegality without premium or penalty.

**Miscellaneous:** The finance documents will contain provisions customary in syndicated loans including, without limitation, Lenders' rights of set-off, pro rata sharing between Lenders and agency provisions. Further provisions relating to breakage costs, tax gross up, indemnities (including, without limitation, in relation to withholding tax), increased costs, illegality, FATCA, disclosure of information, cost and expenses including (value added tax).

**Expenses:** All costs incurred in connection with the establishment and maintenance of the Senior Credit Facility, the Senior Credit Facility Agreement and other finance documents, including reasonable and documented legal fees and reasonable and documented out of pocket expenses will be for the account of the Borrowers.

**Documentation:** Usual and customary for a transaction for this type.

**Governing Law:** New York State

ABN/CACIB/DVB 9/9/14

**[Appendix-1: Collateral Vessels**

*[To be adjusted based closer to Closing Date]*

| [# | Collateral Vessel | Built | Age (yrs) |
|---|---|---|---|
| 1 | Sandpiper | 2011 | 2.8 |
| 2 | Roadrunner | 2011 | 2.8 |
| 3 | Puffin | 2011 | 2.9 |
| 4 | Petrel | 2011 | 3.6 |
| 5 | Owl | 2011 | 3.6 |
| 6 | Oriole | 2011 | 3.6 |
| 7 | Nighthawk | 2011 | 3.6 |
| 8 | Thrush | 2011 | 3.6 |
| 9 | Avocet | 2010 | 4.6 |
| 10 | Crane | 2010 | 4.6 |
| 11 | Egret Bulker | 2010 | 4.6 |
| 12 | Gannet Bulker | 2010 | 4.6 |
| 13 | Golden Eagle | 2010 | 4.6 |
| 14 | Grebe Bulker | 2010 | 4.6 |
| 15 | Ibis Bulker | 2010 | 4.6 |
| 16 | Imperial Eagle | 2010 | 4.6 |
| 17 | Jay | 2010 | 4.6 |
| 18 | Kingfisher | 2010 | 4.6 |
| 19 | Martin | 2010 | 4.6 |
| 20 | Thrasher | 2010 | 4.6 |
| 21 | Bittern | 2009 | 5.6 |
| 22 | Canary | 2009 | 5.6 |
| 23 | Crested Eagle | 2009 | 5.6 |

ABN/CACIB/DVB 9/9/14

| [# | Collateral Vessel | Built | Age (yrs) |
|---|---|---|---|
| 24 | Stellar Eagle | 2009 | 5.6 |
| 25 | Crowned Eagle | 2008 | 6.6 |
| 26 | Woodstar | 2008 | 6.6 |
| 27 | Wren | 2008 | 6.6 |
| 28 | Redwing | 2007 | 7.6 |
| 29 | Cardinal | 2004 | 10.6 |
| 30 | Jaeger | 2004 | 10.6 |
| 31 | Kestrel I | 2004 | 10.6 |
| 32 | Shrike | 2003 | 11.6 |
| 33 | Skua | 2003 | 11.6 |
| 34 | Tern | 2003 | 11.6 |
| 35 | Goldeneye | 2002 | 12.6 |
| 36 | Kittiwake | 2002 | 12.6 |
| 37 | Osprey I | 2002 | 12.6 |
| 38 | Condor | 2001 | 13.6 |
| 39 | Falcon | 2001 | 13.6 |
| 40 | Harrier | 2001 | 13.6 |
| 41 | Hawk I | 2001 | 13.6 |
| 42 | Merlin | 2001 | 13.6 |
| 43 | Peregrine | 2001 | 13.6 |
| 44 | Sparrow | 2000 | 14.6 |
| 45 | Kite | 1997 | 17.6 |

FOR DISCUSSION PURPOSES ONLY

**<u>Exhibit K</u>**

**Amended and Restated Delphin Management Agreement**

## AMENDED AND RESTATED MANAGEMENT AGREEMENT

This AMENDED AND RESTATED MANAGEMENT AGREEMENT, hereby amends and restates the Management Agreement (the "Agreement") dated as of August 5, 2009 (the "Original Date"), entered into by and between Delphin Shipping LLC, a Marshall Islands limited liability company (the "Company") and Eagle Bulk Shipping Inc., a Marshall Islands corporation (the "Manager").  This Amended and Restated Management Agreement shall not become effective unless and until (i) an order approving the assumption of the Agreement (which order may be the plan confirmation order) is entered by the United States Bankruptcy Court, Southern District of New York, presiding over the chapter 11 case of the Manager (Case No. 14-_____) (the "Chapter 11 Case") and (ii) the Manager's prepackaged plan of reorganization filed in the Chapter 11 Case has become effective and the transactions contemplated under the Plan have been consummated (the date that on which such conditions in clause (i) and (ii) have both been satisfied, the "Effective Date"), and from the Effective Date all references to this Agreement shall be to the Agreement as so amended and restated.

### W I T N E S S E T H

WHEREAS, the Company was formed for the purpose of acquiring dry bulk vessels and engaging in other activities in the shipping sector;

WHEREAS, after the Original Date, as the Company, directly or indirectly through wholly-owned vessel owning subsidiaries, acquires a dry bulk vessel, the wholly-owned vessel owning subsidiary shall be set forth on Schedule I hereto (each an "Owner" and collectively the "Owners") and the dry bulk vessel owned by such Owner shall be set forth next to the name of such Owner on Schedule I hereto (each a "Vessel" and collectively the "Vessels");

WHEREAS, the Company desires to continue to engage the Manager to provide the management services more particularly described herein with respect to the Vessels;

WHEREAS, the Manager is in the business of furnishing commercial vessel management services and technical vessel management supervision services for the fleet of dry bulk vessels that are majority owned, chartered-in pursuant to a bareboat charter or leased-in pursuant to a sale/leaseback or similar financing arrangement by the Manager or its wholly-owned vessel owning subsidiaries (collectively, the "Manager Vessels") and continues to desire to provide such services with respect to the Vessels in accordance with the terms and conditions set forth herein;

WHEREAS, on the Original Date, the Company, the Manager and the other parties named therein entered into a waiver and release agreement (the "Manager Waiver") as set forth on Exhibit A hereto relating to certain matters regarding this Agreement;

WHEREAS, on the Original Date, the Company, Kelso Investment Associates VIII, L.P., KEP VI, LLC and Sophocles Zoullas ("Zoullas") entered into a limited liability company agreement governing the affairs of the Company (the "Company LLC Agreement"); and

SK 25083 0001 6064347 v6

WHEREAS, the parties have determined to amend and restate this Agreement in its entirety, and all references to this Agreement shall be to this Agreement as so amended and restated.

NOW, THEREFORE, in consideration of the mutual covenants hereinafter set forth and for other valuable consideration, the parties hereto hereby agree as follows:

1.      Engagement of Manager.  The Company hereby engages the Manager to provide the commercial management and technical management supervisory services described more fully herein, and the Manager hereby accepts such engagement, effective as of the date that the first Vessel is delivered to an Owner and the Company will pay to the Manager during the term of this Agreement the management fees set forth in Section 3 hereof with respect to each Vessel.

2.      Manager's Responsibilities.

(a)      Management Services.  Subject to the terms and conditions set forth herein, the Manager shall provide or, through a wholly owned subsidiary of the Manager or other third party expressly approved in advance by the Company, cause to be provided to the Company or the applicable Owner with respect to each Vessel all customary commercial management services "Commercial Management Services" and all technical management supervisory services ("Technical Management Services") as are necessary in connection with the operation of each Vessel, including without limitation, the following services in accordance with sound ship management practices and with the care, diligence and skill and in a substantially similar manner and scope as the Manager currently provides, directly or indirectly, for the Manager Vessels (collectively the "Management Services").

(b)      Commercial Management Services.  The Commercial Management Services shall consist of the following:

(i)      The Manager's reasonable best efforts to seek employment for each of the Vessels and to negotiate, arrange, complete, market, promote and supervise the chartering or other employment of the Vessels and to monitor the employment and location of each Vessel on a regular basis, *provided, however,* that prior to making any offer relating to a charter contract or other employment arrangement of a Vessel that, if accepted, would result in a binding obligation of the Company or an Owner, the Manager shall communicate with and describe to the Company, or one or more directors of the Company or agent thereof generally designated by the Company to communicate with the Manager in respect of such matters (each, a "Company Designee") the material terms of the proposed offer, charter contract or other employment, and no such charter contract or other such employment arrangement will be entered into, in each case, with respect to any Vessel without the express approval of the Company;

2

(ii) Arrange for and monitor the proper payment to the Company, Owners or their nominees of all charter hire, freight and other revenues or other moneys of whatsoever nature arising out of the employment of the Vessels or otherwise in connection with the Vessels to which the Company or the Owners may be entitled to;

(iii) Communicate and maintain relations with the charterers of the Vessels and ensure that, to the extent commercially practicable, the requirements of each charterer of a Vessel are met on a continual basis, generally administer the charters of each Vessel and maintain and manage relationships between the Company and shipbuilders, insurers, and other shipping industry participants;

(iv) Act for and on behalf of the Company and each Owner in the negotiation and documentation of appropriate third party technical management agreements (each a "Technical Management Agreement") between each Owner and one or more third party technical ship managers (each a "Technical Manager") in which such Technical Managers would provide the technical management services to the Vessels that the Manager, directly or through one or more subsidiaries, does not provide to the Manager Vessels as of the date of this Agreement, *provided, however,* that each Technical Management Agreement shall be subject to the prior written approval of the Company, and, *further provided*, that each Technical Management Agreement shall constitute a direct agreement between the Company or the relevant Owner and the Technical Manager, and any amounts payable under the Technical Management Agreements shall be for the account of, and paid to the Technical Manager by, the Company or the relevant Owner;

(v) Arrange surveys associated with the commercial operation of the Vessels; and

(vi) Arrange hull and machinery, war, loss of hire and P&I risks insurances for each Vessel in accordance with sound ship management practices or as otherwise directed by the Company, and handle all claims arising in connection with the insurance of the Vessels including the preparation, documentation and submission of claims to insurers and/or P&I clubs and the making of settlements of claims against insurers and/or P&I clubs, in each case in accordance with the instructions of the Company, and following up on such claims or settlements, and instituting, defending, intervening in or settling any legal proceedings by or against the Vessel or any Owner in any way that concerns a Vessel, its freight, earnings and disbursements (each, a "Proceeding") (it being understood that the handling of all such claims and legal matters shall always be consistent with the

3

instructions and requirements of the Vessels' P&I club or other insurers or underwriters) *provided* that any out of pocket expenses incurred by the Manager in connection with instituting, defending, intervening or settling such Proceeding on behalf of the Company or an Owner shall be a Company Expense (as such term is used in Section 3(d) of this Agreement), and *provided, further,* that if the Manager is advised that the Proceeding will not be covered by the Vessel's P&I club or other insurance, then the Manager will only take such action with respect to (x) any individual Proceeding, or group of related Proceedings, that involve monetary claims below $50,000 with the prior consent of Zoullas and (y) any individual Proceeding, or group of related Proceedings, that involve monetary claims in excess of $50,000 with the prior consent of a Company Designee.

(c) <u>Technical Management Services</u>. The Technical Management Services shall consist of the following:

(i) Supervise the provision of customary technical management services provided by the relevant Technical Manager, including voyage operations, superintendence, surveys, maintenance, crewing, drydocking, repairs, alterations, maintenance and renewals to hull, machinery, boilers, auxiliaries, equipment and accommodations, the arrangement of necessary stores and spare, and lubricating oils;

(ii) Visit each Vessel at such times as deemed necessary and appropriate by the Manager to evaluate the technical management services and operation of the Vessel by the relevant Technical Manager pursuant to a Technical Management Agreement;

(iii) Promptly upon the Company's request, reporting to the Company the Vessel's movement, position at sea, arrival and departure dates, and provide voyage estimates and accounts and calculate and invoice of hire, freights, demurrage and dispatch moneys due from or due to the charterers of the Vessels;

(iv) Promptly report to the Company any major casualties and damages received or caused by the Vessel;

(v) Perform class records review and physical inspection and make reports to the Company as to a vessel's classification, physical condition and the compliance of the vessel and the vessel owner with applicable rules and regulations and if requested by the Company, assist the Company in negotiating and carrying out the purchase of dry bulk vessels and perform all functions necessary to allow the Company to take physical delivery of the Vessel;

4

(vi)     Implementing (at the direction of the Company) potential divestitures or dispositions of any of the Vessels; and

(vii)    Upon the prior agreement of the Company and the Manager, with respect to any contract entered into by the Company or an Owner relating to a newbuild dry bulk vessel, the Manager shall (1) oversee and supervise, in all material respects, the construction of such newbuild, (2) assist the Company upon request in the negotiation of the shipbuilding contract and specifications and related documentation, (3) attend to plan approval for the design of the newbuild, (4) arrange for and supervise alternations and changes to the newbuild, (5) liaise with the ship builder, supervising the ship builder's progress and overseeing construction to ensure the ship builder is constructing the newbuild in accordance with the relevant shipbuilding contract, design and specifications, (6) attending to the purchasing and other activities relating to the pre-delivery purchases and (7) arranging for registration of the Vessel under the relevant flag in accordance with applicable law and registration of the Vessel with the relevant classification society and other authorities as may be requiring for obtaining trading, canal and other marine certificates for the Vessel.

(d)     Ancillary Agreements.  Subject to the limitations and requirements contained elsewhere in this Agreement, the Manager may enter into, make and perform all contracts, agreements and other undertakings as may be, in the opinion of the Manager, necessary, advisable or incidental to the performance of the Management Services contemplated by this Agreement; provided, however, the Manager may only enter into any such contract that would involve payments from the Company (whether through a direct payment to the counterparty or indirectly through a reimbursement to the Manager in accordance with this Agreement) in one payment or series of contemplated payments in an amount in excess of $50,000 with the prior consent of a Company Designee.

(e)     General Obligations; Employment of Personnel.  In the exercise of its duties hereunder, the Manager shall act fully in accordance with the reasonable policies, guidelines and instructions from time to time communicated to it by the Company or Company Designees and serve the Company faithfully and diligently in the performance of this Agreement, according to sound ship management practices and shipping industry standards.  In the performance of this Agreement, the Manager shall protect the interests of the Company and the Owner in all matters directly or indirectly relating to the provision of Management Services to the Vessel in its reasonable control.  All discounts, commissions and other benefits received by the Manager and/or its employees from third parties as a consequence of the provision of the Management Service shall be disclosed to the Company and, unless otherwise agreed, placed at the Company's or, as the case may be, the relevant Owner's disposal.  The Company shall, at all times, be allowed full access to the accounts and records of the Manager which are relevant to the performance of the Management Services hereunder. The Manager shall at all times

5

maintain, at its own expense, staffing levels deemed necessary in its reasonable judgment to provide the Management Services set forth herein for the Vessels.

(f)     Engagement of Consultants.   As deemed necessary or advisable by the Manager, the Manager shall recommend third-party consultants and advisors, including technical managers, vessel brokers, insurance consultants, engineers, environmental specialists, chartering agents, appraisers, attorneys, accountants and other professionals and consultants to be engaged by the Company or an Owner, each upon such terms as shall be approved by the Company.   The costs of all such consultants or advisors which are authorized hereunder or are approved by the Company shall be for the account of, and shall be paid directly by, the Company or the relevant Owner, as the case may be.

3.     Fees, Expenses and Reimbursements.

(a)     Management Fees. In consideration for the Manager's provision of the Management Services pursuant to this Agreement, with respect to each Vessel, the Company shall pay the Manager a commercial management fee the "Commercial Management Fee" and a technical management supervisory fee (the "Technical Management Fee") monthly in advance, commencing on the first business day of each calendar month (each a "Payment Date") occurring on or following the date on which the Company, directly or through one or more Owners, takes delivery of a Vessel (the "Acquisition Date") in accordance with and subject to the terms and conditions of this Section 3.   The amount of the Technical Management Fee shall be $700 per vessel per day.   The amount of the Commercial Management Fee shall be 1.25% of charter hire; provided, however, that no Commercial Management Fee shall be payable with respect to charter hire that is earned while a vessel is a member of a pool and with respect to which a fee is paid to the pool manager.

(b)     Technical Management Fee Adjustments.   As described below and on Exhibit A to this Agreement (the "Illustrative Example"), the amount of the Technical Management Fee payable on a Payment Date during the term of this Agreement shall be adjusted in the event that (i) a Vessel is not immediately fixed under a charter contract on the Acquisition Date of such Vessel or (ii) a Vessel is laid-up during the term of the Management Agreement, and such lay-up lasts for more than two (2) months, in each case in the manner set forth below. Any inconsistencies between the Illustrative Example and the provisions below shall be resolved in favor of the Illustrative Example.

(i)     *Vessel Fixed upon Acquisition Date.*

(A)     *Acquisition Date is Payment Date*:   If a Vessel is immediately fixed under a charter contract as of the Acquisition Date of such Vessel and such Acquisition Date occurs on a Payment Date, then with respect to such Vessel, the Company shall pay the Manager on such Acquisition Date that is a Payment Date an amount equal to two (2) times the monthly Technical Management Fee relating to such Vessel, it being understood and agreed that such amount reflects the payment of one month's Technical Management Fee payable in advance and one month's Technical Management Fee

6

as compensation to the Manager for advance work of the Manager in connection with the initial employment of the Vessel on the Acquisition Date (as described in the Illustrative Example).

(B)   *Acquisition Date is Not Payment Date.*  If a Vessel is immediately fixed under a charter contract as of the Acquisition Date of such Vessel but such Acquisition Date does not occur on a Payment Date, then with respect to such Vessel the Company shall pay the Manager on the next Payment Date immediately following such Acquisition Date the aggregate of (i) an amount equal to two (2) times the monthly Technical Management Fee relating to such Vessel (it being understood and agreed that such amount reflects the payment of one month's Technical Management Fee payable in advance and one month's Technical Management Fee as compensation to the Manager for advance work of the Manager in connection with the initial employment of the Vessel on the Acquisition Date (as described in the Illustrative Example)) and (ii) a pro-rata portion of the monthly Technical Management Fee for such Vessel based on the number of days elapsed in the month from and after the Acquisition Date for such Vessel occurred as compared to a 30-day calendar month.

Thereafter, for each Payment Date after the initial Payment Date described in the preceding paragraphs for such Vessel, the Company shall pay the Manager the monthly Technical Management Fee for such Vessel, *provided, however*, that if such Vessel is thereafter laid-up during the term of this Agreement, and such lay-up lasts for more than two (2) months, the monthly Technical Management Fee for such Vessel will be reduced to an amount equal to 30% of the monthly Technical Management Fee (such reduced fee the "<u>Reduced Technical Management Fee</u>") for the period exceeding two-months until one month before such Vessel is again fixed under a charter contract.  If, as described in the Illustrative Example, the mechanics described above result in a true up, credit or payment required to be made from the Manager to the Company, such credit or true up shall be credited against the other payments required to be made by the Company to the Manager on the next Payment Date following the realization of such credit. Commencing on the first Payment Date after the date that the Vessel is again fixed on a charter contract, the Technical Management Fee shall be paid in accordance with the payment terms applicable to a Full Fee Management Payment Date, as set forth in Section 3(b)(ii), below.

(ii)   *Vessel not fixed upon Acquisition date.*  If a Vessel is not immediately fixed under a charter contract as of the Acquisition Date of such Vessel and the Acquisition Date of such Vessel

7

occurs on a Payment Date, then with respect to such Vessel, the Company shall pay the Manager on such Acquisition Date the Reduced Technical Management Fee relating to such Vessel.

If a Vessel is not immediately fixed under a charter contract as of the Acquisition Date of such Vessel and such Acquisition Date does not occur on a Payment Date, then with respect to such Vessel, the Company shall pay the Manager on the next Payment Date immediately following such Acquisition Date (assuming that on such Payment Date such Vessel continues to be laid-up) the aggregate of (i) the Reduced Technical Management Fee relating to such Vessel and (ii) a pro-rata portion of the Reduced Technical Management Fee relating to such Vessel based on the number of days elapsed in the month from and after the Acquisition Date for such Vessel occurred as compared to a 30-day calendar month.

Thereafter, for each Payment Date after the initial Payment Date described above for such Vessel, the Company shall pay the Manager the Reduced Technical Management Fee for such Vessel until the first Payment Date on which the Vessel is fixed under a charter contract (the "Full Technical Management Fee Payment Date").  On the first Full Technical Management Fee Payment Date in respect of such Vessel, the Company shall pay the Manager the aggregate of (i) the monthly Technical Management Fee relating to such Vessel, (ii) an amount equal to (x) a pro-rata portion of the monthly Technical Management Fee relating to such Vessel based on the number of days elapsed in the month immediately prior to such Payment Date during which such Vessel was fixed under a charter contract as compared to a 30-day calendar month *minus* (y) a pro-rata portion of the Reduced Technical Management Fee relating to such Vessel that was paid on such immediately prior Payment Date based on the number of days elapsed in the such month during which such Vessel was not being utilized under a charter contract as compared to a 30-day calendar month, and (c) an amount equal to 70% of the Technical Management Fee relating to such Vessel.

(c)    Adjustment to Payment Date. Notwithstanding any other provision of this Section 3, with respect to each Vessel that is fixed under a charter contract, the Company and the Manager agree that the monthly amounts payable to the Manager on any Payment Date relevant to such Vessel shall be deemed to be due and shall be paid by the Company not more than five (5) days following the receipt of the monthly revenue relating to the charter contract for such Vessel by the Company or an Owner, although such day may not be on the first business day of a calendar month, *provided, however,* that such provision shall not be applicable with respect to any Vessel not then fixed on a charter contract.

8

(d)     Manager Expenses. The Manager shall bear the cost of all Management Expenses.  As used herein, the term "Management Expenses" means the day-to-day operating expenses of the Manager, including, without limitation, salaries and employee benefit expenses of employees of the Manager, office rent, supplies, secretarial services, telephone, investment and research publications and other overhead expenses and any other expenses incurred by the Manager in the performance of the Management Services hereunder to the extent not expressly contemplated by this Agreement to be reimbursed by the Company to the Manager.

(e)     Company Expenses. The Company shall promptly reimburse the Manager for any third-party brokerage commissions advanced by the Manager for the account of the Company or any Owner with respect to the purchase, sale or charter of a Vessel, and such other reasonable and out-of-pocket expenses incurred by the Manager; *provided, however,* that other than with respect to (i) third-party brokerage commissions, (ii) pre-purchase inspection fees and expenses, and (iii) travel, lodging and other travel related expenses incurred in connection with visiting a Vessel, the Manager shall not incur any expenses in excess of $50,000 (fifty thousand dollars) on behalf of the Company for which any reimbursement will be sought hereunder unless and until such expenses have been discussed with and approved by the Company or Company Designee.

4.     Manager's Vessels, Other Activities; Devotion of Time.

(a)     The parties hereto acknowledge and agree that, during the term of this Agreement, depending on  a number of facts and circumstances that may exist at any given time when a Vessel and a Manager Vessel are both available for charter, the Manager may have a conflict of interest in pursuing charter opportunities for itself (with respect to the Manager Vessels) and also complying with its obligations under this Agreement (with respect to identifying and pursuing chartering opportunities with respect to the Vessels), including, without limitation, providing the Management Services described in Sections 2(a) and 2(b) hereof. Except as set forth in Section 4(b) hereof, the Manager shall have the right to give priority to the Manager Vessels (but not, for the avoidance of doubt, any other vessel for which the Manager may now or hereafter be engaged to provide management services with respect to) over the Vessels with respect to all potential charter opportunities for which the Manager believes in good faith that a Manager Vessel could be expected to compete with the Vessels in accordance with factors relevant to such decision (including, without limitation, the availability, suitability and positioning of the Manager Vessels as compared to the Vessels with respect to the intended voyage).  The Manager agrees that, except with respect to the expiration of a Manager Vessel charter as described in Section 4(b)(ii), if the Manager decides to pursue a potential charter opportunity with a Manager Vessel instead of a Vessel, then the Manager will deliver notice to the Company informing the Company of such decision with respect to such potential charter opportunity.

(b)     The parties further agree that, notwithstanding Section 4(a) above, upon the expiration of an existing charter contract of a Vessel or a Manager Vessel, as the case may be, the Manager shall act in accordance with the following:

(i)     *Expiration of Vessel Charter.*  Upon or in anticipation of the expiration of any charter contract relating to a Vessel, the Company shall

9

have the right to exclusively negotiate, with the assistance of the Manager acting in accordance with Sections 2(a) and 2(b), a renewal of such contract with a Vessel, *provided*, *however*, that if the Company is not successful in obtaining a renewal of an expired charter contract and a Manager Vessel that meets the customer's requirements relating to, among other factors, suitability, specification, positioning, size and cost is available for charter at such time, the Company shall notify the Manager of such opportunity and the Manager shall be entitled to pursue such employment with a Manager Vessel.

(ii) *Expiration of Manager Vessel Charter.* Upon or in anticipation of the expiration of any charter contract relating to a Manager Vessel, the Manager shall have the right to exclusively negotiate a renewal of such contract with a Manager Vessel, *provided, however,* that if the Manager is not successful in obtaining a renewal of an expired charter and a Vessel that meets the customer's requirements relating to, among other factors, suitability, specifications, positioning, size, and cost is available for charter at such time, the Manager shall notify the Company of such opportunity and, at the request of the Company, prepare a summary of the material terms of a proposed charter contract or other employment that could be explored by the Company with a Vessel in respect of such expired charter contract in accordance with Sections 2(a) and 2(b).

(c) The Manager shall at all times devote a sufficient amount of its time, resources and personnel to provide the Management Services. Nothing in this Management Agreement shall in any way restrict the amount of time, resources or personnel devoted to the Manager Vessels or to engage independently or with others, for its or their own accounts and for the accounts of others, in other business ventures and activities of every nature and description, whether such ventures are competitive with the business of the Company, any Owner, or otherwise; provided, however, during the term of this Agreement, the Manager shall not, directly or indirectly, agree to provide management services to other companies or entities in such a manner that would conflict with its obligations to the Company under this Agreement, including without limitation, performing the Management Services to the Company and giving priority to the Vessels in seeking employment and charter over any and all other vessels (other than the Manager Vessels in the manner contemplated by Section 4 hereof) that may come under the management control of the Manager or for which the Manager or any of its subsidiaries or affiliates may provide management services with respect to. Neither the Company nor any Owner shall have any rights or obligations by virtue of this Management Agreement or otherwise in or to such independent ventures and activities or the income or profits derived therefrom.

5. <u>Termination</u>.

(a) <u>Initial Term, Renewal Term</u>. This Agreement shall have an initial term of one (1) year from the Effective Date (the "<u>Initial Term</u>") and shall thereafter be renewable for successive one year terms (each a "<u>Renewal Term</u>") upon the election of and at the option of the Company by delivering notice to the Manager not less than 90 days prior to the expiration of the Initial Term or each successive Renewal Term thereafter, as the case may be, subject to the

10

Manager's right not to renew, which notice must be provided to the Company not less than 90 days prior to the commencement of any Renewal Term.

(b)     Termination by Company.  The Company may terminate this Agreement at any time after the Effective Date (i) upon not less than three (3) months prior written notice to the Manager, (ii) upon the consummation of a Manager Change of Control (as defined below) or (iii) upon the consummation of a sale of the Company whether in an initial public offering, a private sale of the Company by way of a merger, sale of equity securities, sale of assets or otherwise or any other debt or equity capital raising transaction.  It is agreed that the Manager shall have no right under this Agreement or otherwise, to participate in or object to any such sale of, or transaction relating to, the Company.  A Manager Change of Control shall be deemed to occur upon the occurrence of any of the following (1) the sale, lease, transfer or other disposition (other than pursuant to sale/leaseback or similar financing arrangement), in one or a series of related transactions, of all or substantially all of the Manager's assets, (2) the consummation of any transaction the result of which is that any person or group becomes the beneficial owner, directly or indirectly, of more than a majority of the Manager's outstanding voting securities, or (3) a change in directors after which a majority of the members of the board of directors of the Manager are not Continuing Directors. "Continuing Directors" shall mean, as of any date of determination, any member of the board of directors of the Manager who (i) was a member of such board of directors as of the date hereof, or (ii) was nominated for election or elected to such board of directors with, or whose election to such board of directors was approved by, the affirmative vote of the Continuing Directors who were members of such board of directors at the time of such nomination or election.

(c)     Termination by Manager.  The Manager may terminate this Agreement at any time after the Effective Date upon not less than three (3) months prior written notice to the Company.

(d)     Termination for Cause.  The Company and the Manager shall each have the right to terminate this Agreement at any time (i) if the other party becomes insolvent, admits in writing its inability to pay its debts as they become due, is adjudged bankrupt or declares bankruptcy or makes an assignment for the benefit of creditors, a proposal or similar action under the bankruptcy, insolvency or other similar laws of any applicable jurisdiction, or commences or consents to proceedings relating to it under any reorganization, arrangement, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction, or (ii) by written notice delivered to the other party if such other party shall have committed a material breach of any provision of this Agreement and, if such breach is reasonably subject to cure, such breach is continuing and has not been cured in full within ten (10) days of the receipt of such notice of termination.

(e)     Termination Adjustments.  Upon any termination of this Agreement in accordance with its terms, the Manager shall remit to the Company the pro-rata portion of any Management Fees held by the Manager attributable to any period following the effective date of termination of this Agreement.  The Manager shall be entitled to reimbursement of any expenses advanced in accordance with Section 3(e) hereof prior to the effective date of termination of this Agreement that have not been reimbursed by the Company prior to such termination.

11

(f)     Effect of Termination.  In the event of termination of this Agreement by either Manager or the Company as provided in this Section 5, the Agreement shall forthwith become void and there shall be no liability or obligation on the part of the Company, any Owner or the Manager, except (i) Sections 5, 9, 10, 11 and 12 shall survive in accordance with their terms, (ii) the Manager Waiver shall survive in accordance with its terms, and (iii) no such termination shall relieve any party hereto from any liabilities or damages for any breach of this Agreement occurring prior to such termination.

6.     "Himalaya".  No employee or agent of the Manager shall be liable to the Company or an Owner for any loss, damage or delay of any nature arising directly or indirectly from any act, neglect or default relating to the performance of the Management Services by the such employee or agent of the Manager or other persons or independent contractors employed by the Manager in connection with the Management Services; provided, however, the foregoing shall in no way limit the liability, if any, of the Manager for the fraud, gross negligence, willful misconduct or willful breach of this Agreement by the Manager or its directors, officers, employees, agents or sub-contractors employed by them in connection with the Vessel or the performance of the Management Services hereunder, in each case to the extent provided in Section 7 hereof.

7.     Indemnification.  Except to the extent set forth in second sentence of this Section 7 or in the Manager Waiver, the Company and the Owners hereby undertake to keep the Manager and its directors, officers, employees, agents and sub-contractors indemnified and to hold them harmless against all actions, proceedings, claims, demands or liabilities whatsoever or howsoever arising which may be brought against them or incurred or suffered by them arising out of or in connection with the performance of this Agreement, and against and in respect of all costs, losses, damages and expenses (including legal costs and expenses on a full indemnity basis) which the Manager may suffer or incur (either directly or indirectly) in the course of the performance of this Agreement, unless and to the extent such costs, losses, damages or expenses results from the fraud, gross negligence, recklessness, willful misconduct or willful breach of this Agreement by the Manager or its directors, officers, employees, agents or sub-contractors.  The Manager shall be under no liability whatsoever to the Company or the Owner for any loss, damage, delay or expense of whatsoever nature, whether direct or indirect, (including but not limited to loss of profit arising out of or in connection with detention of or delay to the Vessel) and howsoever arising from the performance of the Management Services unless and to the extent the same results from the fraud, gross negligence, willful misconduct or willful breach of this Agreement by the Manager or its directors, officers, employees, agents or sub-contractors employed by them in connection with the Vessel or the performance of the Management Services hereunder, in which case (except where loss, damage, delay or expense has resulted from the Manager's or such directors, officers, employees, agents or sub-contractors personal act or omission committed with the intent to cause the same or recklessly and with knowledge that such loss, damage, delay or expense would probably result), the Manager's liability for each incident or series of incidents giving rise to a claim or claims shall never exceed a total of ten times the annual management fee payable hereunder with respect to such Vessel or Vessels with respect to which such loss, damage, delay or expenses arose.

8.     Force Majeure.  Neither the Company, the Owner nor the Manager shall be under any liability for any failure to perform any of their obligations under this Agreement by

12

SK 25083 0001 6064347 v6

reason of any cause whatsoever of any nature or kind beyond their reasonable control due to civil war, insurrections, strikes, riots, fires, floods, explosions, earthquakes, serious accidents, or any acts of God, or failure of transportation, epidemics, quarantine restrictions, or labor trouble causing cessation, slow down or interruption of work.

9.      Non-Solicitation.  During the term of this Agreement and for a period of twelve months thereafter, the Company agrees that it shall not for any reason, without the prior written consent of the Manager, solicit any person then currently employed by the Manager to join the Company as an employee, member or partner; provided, however (i) for so long as Zoullas is an employee of the Manager, the foregoing restriction shall not prohibit Zoullas' participation in the Company as contemplated by and in accordance with the terms of this Agreement and the LLC Agreement and (ii) from and after the time Zoullas ceases to be an employee of the Manager for any reason, the foregoing restriction shall not apply with respect to Zoullas.

10.      Notices.  Any notices required to be delivered hereunder shall be in writing and must be delivered either by hand in person, by facsimile transmission or by electronic mail or by nationally recognized overnight delivery service (receipt request) and shall be deemed given when so delivered by hand (with written confirmation of receipt), sent by facsimile transmission (with confirmation of receipt of transmission from sender's equipment), sent by electronic mail, or if delivered by overnight delivery service when received by the addressee, in each case at the appropriate addresses set forth below (or to such other addresses as a party may designate for that purpose upon fifteen (15) days written notice to the other party).

If to the Company or any Owner at:

Delphin Shipping LLC
477 Madison Avenue
14th Floor
New York, NY  10022
Attention:  Costa Tsoutsoplides
Telephone:  1-646-833-2528
E-Mail:  ctsoutsoplides@delphinship.com

Kelso & Company
320 Park Avenue, 24th Floor
New York, New York 10022
Attention:  James J. Connors II, Esq.
Facsimile:  (212) 223-2379
E-Mail: jconnors@kelso.com

13

SK 25083 0001 6064347 v6

with a copy to (which shall not constitute notice) to:

Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036
Attention: Lou R. Kling
Facsimile: (917) 777-2770
E-Mail: lou.kling@skadden.com

If to the Manager, at:

Eagle Bulk Shipping Inc.
477 Madison Avenue
Suite 1400
New York, New York 10022
Attention: Alexis Zoullas
Facsimile : 212-785-3311
E-Mail: azoullas@eagleships.com

with a copy to (which shall not constitute notice) to:

Seward & Kissel LLP
One Battery Park Plaza
New York, New York 10004
Attention: Gary J. Wolfe
Facsimile: 212 480 8421
E-Mail: wolfe@sewkis.com

11.     Assignments; Successors.  Neither this Agreement nor any of Manager's rights or obligations hereunder shall be directly or indirectly assigned, pledged, hypothecated, or otherwise transferred or disposed of by the Manager without the prior consent of the Company; provided, however, any of the Management Services hereunder may be subcontracted to a wholly-owned subsidiary of the Manager without the consent of the Company; provided, that notwithstanding any such subcontracting, the Manager shall remain fully liable for the due performance of its obligations under the Agreement.  This Agreement shall not be assigned by the Company without the prior consent of the Manager.  Subject to such limitations on the right of assignment, this Agreement shall be binding upon and shall inure to the benefit of the respective permitted successors and assigns of the parties.

14

SK 25083 0001 6064347 v6

12.     Miscellaneous Provisions.

(a)     Authority of the Parties.  Each party hereto represents to the other that it is duly authorized with full power and authority to execute, deliver and perform its obligations under this Agreement.  The Manager represents that its engagement hereunder has been duly authorized by the Manager and is in accordance with all governing documents of the Manager and does not conflict with any material contract, employment agreement, credit agreement or indenture to which the Manager is a party to as of the date hereof.

(b)     Confidentiality.  Except as (i) the parties may otherwise agreement, or (ii) may be required in the disclosing party's reasonable opinion after consultation with outside legal counsel by applicable law (including without limitation U.S. federal securities law) or compliance with the requirements of regulatory authority or stock exchange on which the shares of the Company or the Manager are listed, any non-public information or confidential information relating to this Agreement or the business or affairs of any party hereto or their affiliates shall be kept strictly confidential by the other party hereto; provided, however, in the case of clause (ii) hereof, prior to any public disclosure by a party hereto contemplated to be made in order to comply with applicable law or requirements of regulatory authorities or stock exchange requirements, the disclosing party shall provide a draft of such public disclosure or other communication to the non-disclosing party in advance and consult with the non-disclosing party regarding the contents of such disclosure and, to the extent reasonably practicable in the circumstances, take into consideration any comments on such disclosure as may be provided by the non-disclosing party.

(c)     Entire Agreement.  This Agreement and the Manager Waiver constitutes the entire agreement among the parties with respect to the subject matter hereof and supersedes any prior agreement or undertaking among them with respect to such subject matter.

(d)     Headings.  The Section headings in this Agreement are for convenience of reference only, and shall not be deemed to alter or affect the meaning or interpretation of any provisions hereof.

(e)     Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

(f)     Modification.  No change or modification of this Agreement shall be of any force unless such change or modification is in writing and has been signed by all of the parties.

(g)     Waivers.  No waiver of any breach of any of the terms of this Agreement shall be effective unless such waiver is in writing and signed by the party against whom such waiver is claimed.  No waiver of any breach shall be deemed to be a waiver of any other or subsequent breach.

(h)     Severability.  If any provision of this Agreement shall be held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

15

SK 25083 0001 6064347 v6

(i)      Independent Contractor.  The parties agree that the Manager is and shall act as an independent contractor in the performance of its duties hereunder.  The Manager is not, and in the performance of its duties hereunder will not hold itself out as, an employee, agent or partner of the Company, but shall advise person with whom it deals on behalf of the Company that it is conducting such business as an independent contractor for the Company or relevant Owner.

(j)      Attorneys' Fees.  In any action brought by any party to enforce any of such party's rights or remedies under this Agreement, the prevailing party shall be entitled to all reasonable attorneys' fees and all costs, expenses and disbursements in connection with any such action.

(k)      Governing Law.  This Agreement shall be governed by and construed in accordance with the internal laws (as opposed to the conflict of laws provisions) of the State of New York.

(l)      Third Parties.  This Agreement is not intended to, nor shall it create, any rights, claims or benefits enforceable by any person not a party to it.

[*Remainder of Page Intentionally Left Blank*]

16

SK 25083 0001 6064347 v6

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

**THE MANAGER:**

EAGLE BULK SHIPPING INC.

By:  
      Name:  
      Title:

**THE OWNER:**

DELPHIN SHIPPING LLC

By:  
      Name:  
      Title:

17

## SCHEDULE I

## LIST OF VESSELS/OWNERS

**Vessel**                                    **Owner**

18

SK 25083 0001 6064347 v6